UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                          Chapter 11 Cases

HEARUSA, INC.,[1]                               Case No. _____

    Debtors.
_____/

## DECLARATION OF JOSEPH J. LUZINSKI IN SUPPORT OF CHAPTER 11 PETITION AND REQUEST FOR FIRST DAY RELIEF

## I.    INTRODUCTION

1.    My name is Joseph J. Luzinski.  I am over the age of eighteen and am competent to testify.  I am a Senior Vice President of Development Specialists, Inc. ("DSI").  I have been retained as Chief Restructuring Officer ("CRO") of HearUSA, Inc. ("HearUSA" or the "Debtor"), and DSI has been retained as the Debtor's restructuring advisor.

2.    DSI and its professionals and employees are highly qualified and experienced in providing restructuring management servicers. For more than three decades, DSI has been providing well-respected restructuring management services. DSI has specific and extensive experience in the retail sector and its core competencies include providing management services and advising debtors in chapter 11.

3.    I have more than 20 years of experience in the chapter 11 process and in providing restructuring management services. My recent restructuring and bankruptcy experience includes serving as: (i) the chapter 11 trustee to a regional shopping center; (ii) the chapter 7 trustee to a large, complex personal bankruptcy estate; (iii) advisor to the chapter 11 trustee to a large law firm; (iv) CRO to a marketer and distributor of branded products in the

---

[1] The address of the Debtor is 1250 Northpoint Parkway, West Palm Beach, FL  33407, Attn: Gino Chouinard, Interim CEO; and the last four digits of the taxpayer identification number of the Debtor are (8248).

automotive aftermarket; (v) the chapter 11 trustee for 2 separate operating automobile dealership debtors; (vi) the CRO to a watch manufacturer and jewelry distributer and related entities in operating chapter 11 proceedings; (vii) the CRO to debtor group of competitive local exchange carriers; (vii) the CRO of a bank holding company where the underlying bank was taken over by the FDIC; (viii) the chapter 11 and then chapter 7 trustee for a wholesaler of rare and foreign coins; and (ix) CEO of a commercial airline under its chapter 11 plan.

4.      In my capacity as CRO of HearUSA, I have reviewed HearUSA's books and records and have conferred with members of HearUSA's senior management. The facts set forth herein are derived from my review of those records and information conveyed to me by other members of senior management of HearUSA and other of my colleagues at DSI.

## II.      FACTUAL BACKGROUND

5.      On the date hereof (the "Petition Date"), HearUSA filed a voluntary petition under chapter 11, title 11, United States Code (the "Bankruptcy Code") in this Court.

6.      The Debtor continues to operate its business and manage its assets as debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

7.      No trustee, examiner or official committee of unsecured creditors has been appointed or established in the Debtor's bankruptcy case.

## A.      Background and Corporate Structure of HearUSA

8.      HearUSA is a publicly traded company, and there are a total of seven entities that are owned, in whole or in part, by the Debtor. A list of the subsidiaries of the Debtor is attached hereto as **Exhibit "A."**

9.      HearUSA is a Delaware corporation that was incorporated on April 11, 1986, under the name HEARx Ltd. HearUSA formed HEARx West LLC ("Hearx West"), a fifty-

2

percent joint venture with The Permanente Federation, LLC ("Kaiser"), in 1998.  In July 2002, HearUSA acquired Helix Hearing Care of America Corp. and changed its name from HEARx Ltd. to HearUSA, Inc.  The shares of HearUSA are publicly traded on the New York Stock Exchange Amex under the symbol EAR.  As of April 10, 2011, there are 45,206,218 shares of stock issued and outstanding.

10.     HearUSA's corporate offices, network management office and national call center are located at 1250 Northpoint Parkway, West Palm Beach, FL  33407 (the "Corporate Office").

**B.     The Officers and Board of Directors of HearUSA, and a Description of its Business**

11.     The Debtor's Board of Directors is currently comprised of:

| Name and Age | Director Since | Position with the Company |
|---|---|---|
| Thomas W. Archibald (72) | 1993 | Director |
| Bruce N. Bagni (66) | 2005 | Director |
| Paul A. Brown (73) | 1986 | Director |
| Joseph L. Gitterman III (75) | 1997 | Director |
| Michel Labadie (57) | 2002 | Director |
| David J. McLachlan (72) | 1986 | Lead Independent Director |
| Stephen W. Webster (50) | 2008 | Director |

12.     The officers of HearUSA consist of the following:

- *Gino Chouinard* joined HearUSA in 2002 and serves as its Interim Chief Executive Officer, President and Chief Operations Officer.  Mr. Chouinard is a Chartered Accountant who previously worked for Ernst & Young, LLP, an international accounting firm, as Manager from 1996 to 1999 and as Senior Accountant from 1994 to 1996.

- *Francisco V. Puñal*, joined HearUSA in early 2008 and serves as its Senior Vice President and Chief Financial Officer.  Mr. Puñal has 25 years of private and public company experience.  Prior to joining HearUSA, Mr. Puñal was chief financial officer for International Bedding Group, Inc., a national bedding manufacturer with

3

revenues of $160 million. Mr. Puñal also previously served as vice president and controller of Jacuzzi Brands, Inc., a New York Stock Exchange Company with worldwide revenues of $1.2 billion. Earlier in his career, Mr. Puñal was a senior audit manager for Ernst & Young, managing audit engagements for companies in a wide range of industries.

- *Cindy Beyer* joined HearUSA in 1987 and serves as its Senior Vice President Professional Services. Ms. Beyer is responsible for overseeing quality improvement department, contracting and strategic relationships, accreditation, and network operations. Prior to joining HearUSA, Ms. Beyer was a Director of a hospital-based Audiology Clinic, dispensing audiologist, contracting manager and quality improvement director.

- *Paige Brough* joined HearUSA in 1991 and serves as its Senior Vice President Corporate Communications. Ms. Brough is responsible for marketing, advertising public relations, new center branding and the call center. Prior to joining HearUSA, Ms. Brough was with various advertising agencies as the media director for healthcare, retail, hospitality and restaurant chain companies, including McDonald's.

- *Donna Gelnett* joined HearUSA in 1998 and serves as its Senior Vice President Center Sales and Operations. Ms. Gelnett is responsible for the revenue generation and profitability of the company owned centers and the leadership development of center management. Prior to joining HearUSA, Ms. Gelnett was with The House Ear Institute in Los Angeles as a research audiologist and with the VA Hospital, Long Beach, as a manager of the hearing aid program.

- *Eugene Fell* joined HearUSA in 2006 and serves as its Senior Vice President Business Development. Mr. Fell is responsible for HearUSA's acquisitions program, managing the center leases, drafting and negotiating Network-related contracts, and other business development. Prior to joining HearUSA, Mr. Fell was the owner of hearing centers and has over 41 years in the hearing aid business.

- *Kevin Beninati* joined HearUSA in 1997 and serves as its Senior Vice President of Information Technology and Administration. Mr. Beninati is responsible for the design, implementation and maintenance of HearUSA's information technology strategy which includes technical support, network design, programming and reporting expertise and the vendor relations process for company owned centers. Prior to joining HearUSA, Mr. Beninati was the Director of Technology with the Palm Beach School Board.

13.    HearUSA is the recognized leader in hearing care for the nation's top managed care organizations. HearUSA is the nation's only hearing care network accredited by Utilization Review Accreditation Commission ("URAC"), an independent, nonprofit health care accrediting

4

organization dedicated to promoting health care quality through accreditation, certification and commendation.

14.      HearUSA is also the administrator of the AARP Hearing Care Program, designed to help millions of Americans aged 50+ who have untreated hearing loss.  This is the only hearing program endorsed by the American Association of Retired Persons ("AARP").  Under this program, HearUSA has agreed to provide the members of AARP in the fifty states, the District of Columbia, and the five U.S. Territories, discounts on hearing aids and related services through its company-owned centers and independent network of participating hearing care providers.  Hearing aids sold under the program include a three year limited warranty and a three year supply of batteries included in the price of the hearing aid.

15.      HearUSA's centers provide a complete range of quality hearing aids, with emphasis on the latest digital technology along with assessment and evaluation of hearing. While the centers may order a hearing aid from nearly any manufacturer, the majority of hearing aids sold by the centers are manufactured by Siemens Hearing Instruments, Inc. and its subsidiary, Rexton (collectively, "Siemens").  HearUSA has a supply agreement with Siemens for HearUSA centers.  HearUSA has agreed to fill 90% of the centers' hearing aid requirements with Siemens' products.  The centers also sell hearing aids manufactured by other manufacturers including Phonak, Oticon, Starkey, Sonic Innovations and Unitron.  HearUSA centers also offer a large selection of assistive listening devices and other products related to hearing care.

16.      Since 1991, HearUSA has entered into arrangements with institutional buyers relating to the provision of hearing care products and services.  These institutional buyers include managed care companies, employer groups, health insurers, benefit sponsors, senior citizen groups and unions.

3628389-7

17.    HearUSA enters into provider agreements with benefit sponsors for the provision of hearing care using three different arrangements: (a) a discount arrangement on products and services which is payable by the member; (b) a fee for service arrangement which is partially or fully subsidized by the sponsor and the member pays the balance, if any; or (c) a *per capita* basis, which is a fixed payment per member per month from the benefit sponsor to HearUSA determined by the amount of coverage offered to the patient and the number of patients, and the balance, if any, paid by the individual member.    When the agreement involves network providers, HearUSA pays the network provider an encounter fee, net of administration fees.    All contracts are for one calendar year, and are usually cancelable with ninety days or less notice by either party.

18.    HearUSA and its joint venture subsidiary, HEARx West, currently receive a per-member-per-month fee for more than 2 million managed care members.    In total, HearUSA services over 200 benefit programs for hearing care with various health maintenance organizations, preferred provider organizations, insurers, benefit administrators and healthcare plans.

19.    Each HearUSA center is staffed by a licensed and credentialed audiologist or hearing instrument specialist and at least one office manager or patient care coordinator. Experienced audiologists supervise the clinical operations.    The majority of HearUSA's centers are conveniently located in shopping or medical centers.

20.    HearUSA offers all of its customers a full 30-day return period or the return period applicable to state guidelines.    For patients who participate in the family hearing counseling program, the return period is extended to 90 days, and, as referenced above, for AARP members the return period is 90 days.    In addition HearUSA provides its patients with

6

3628389-7

warranties on hearing aids varying from one to three years. The first year of warranty is always covered by the manufacturer's warranty. The warranties provided for the second and third year usually require a co-payment from the patients.

21.     For the fiscal years 2010 and 2009, HearUSA net revenues were approximately $83.5 million and $88.9 million, respectively. During these years, HearUSA did not have revenues from a single customer which totaled 10% or more of total net revenues.

22.     As of the Petition Date, HearUSA owned 134 centers throughout 10 states: Florida, New York, New Jersey, Massachusetts, Ohio, Michigan, Missouri, North Carolina, Pennsylvania, South Carolina and 38 centers in California (through HEARx West). These centers offer patients a complete range of hearing care services and products, including diagnostic audiologic testing, the latest technology in hearing aids and assistive listening devises to improve their quality of life. As of the Petition Date, HearUSA had 360 employees: 263 full-time and 97 part-time.

23.     The 38 full service centers (25 full-time and 13 part-time) owned through HEARxWest are located in California. HearUSA is responsible for the daily operation of the centers. All clinical and quality issues are the responsibility of a joint committee comprised of HearUSA and Kaiser-Permanente clinicians. HEARx West centers concentrate on providing hearing aids and audiology testing to Kaiser-Permanente members and self-pay patients in the state of California.

24.     HearUSA sponsors a network of credentialed audiology providers that supports hearing benefit programs with employer groups, health insurers and benefit sponsors in 48 states. Each of the approximately 1,800 network providers operates independently from HearUSA. To ensure compliance with its hearing benefit programs, HearUSA performs annual credential

7

verification for each of the network providers. Unlike the company-owned centers, the network is comprised of hearing care practices owned by independent practitioners. Through the network, HearUSA can pursue national hearing care contracts and offer managed hearing benefits in areas outside of the company-owned center markets. Revenues from the network are mainly derived from administrative fees paid by employer groups, health insurers and benefit sponsors to administer their benefits. In addition, the network provides purchasing programs (known as "Provider Advantage") whereby affiliated providers purchase products through HearUSA volume discounts and HearUSA receives royalties or rebates.

25. Integral to the success of HearUSA's strategy is increased awareness of the impact of hearing loss and the medical necessity of treatment, in addition to the enhancement of consumer confidence and the differentiation of HearUSA from other hearing care providers. To this end, HearUSA has taken the following unique steps: (1) HearUSA has a three-year accreditation by the URAC, an independent nonprofit organization which is a recognized leader in promoting health care quality. URAC provides a symbol of excellence of organizations to validate their commitment to quality and accountability and ensures that all stakeholders are represented in establishing meaningful quality measures for the entire health care industry, and (2) HearUSA has developed a proprietary center management and data system called the Center Management System ("CMS"). CMS has two primary functions: to manage patient information and to process point-of-sale customer transactions. The CMS system is hosted over a secured internet portal that links all locations with the Corporate Office. HearUSA's corporate system is fully integrated with CMS to provide additional benefits and functionality that can be better supported centrally. Data redundancy is built into the system architecture as data are stored in a collocation environment utilizing a datacenter in Miami. The consolidated data repository is

3628389-7

constructed to support future expected revenues and business units. One of the outputs of CMS is computerized reporting system that provides referring physicians the test results and recommended action for every patient examined by HearUSA staff in a company-owned center. Consistent with HearUSA's mission of increasing awareness of hearing conditions in the medical community, this reporting system makes hearing a part of the individual's health profile.

## C.    **Industry Conditions**

26.     The U.S. hearing care industry is highly fragmented with approximately 12,000 independent practitioners providing hearing care products and services. HearUSA competes on the basis of price and service, and tries to distinguish itself as a leading provider of hearing care to health care providers and patients. HearUSA competes for the managed care customer on the basis of access, quality and cost.

27.     It is difficult to determine the precise number of HearUSA's competitors in every market where it has operations, or the percentage of market share enjoyed by HearUSA. Some competitors are large distributors, including the Italian company Amplifon, which owns a network of franchised centers (Miracle Ear and Amplifon Hearing Aid Centers) and company-owned stores (Sonus) in the United States and Canada, and Beltone Electronics Corp., a hearing aid manufacturer owned by GN Store Nord that distributes its products primarily through a national network of "authorized" distributors in the United States and Canada. Large discount retailers, such as Costco, also sell hearing aids and present a competitive threat in selected HearUSA markets.

28.     HearUSA's network business also will face competition by companies offering similar networks services. These companies attempt to aggregate demand for hearing products and sell marketing and other services to network participants. In addition, some of these

9

networks are able to offer discounts to managed care payors, insurers and membership organizations. Many independent hearing care providers belong to more than one network. In addition, contract terms for membership are typically short and may be terminated by either party at will.

**D.** **Historical Financial Performance**

29.     HearUSA has historically incurred net losses since its organization. Quarterly and annual operating results fluctuate depending primarily on timing of product sales, level of consumer demand for its products, timing and amounts of payments by health insurance and managed care organizations, and timing and success of new centers and acquired centers.

30.     For the fiscal year ended December 27, 2008, the Debtor generated on a consolidated basis[2] net revenues of approximately $95.297 million, and a net loss from operations of $ 3.34 million. For the fiscal year ended December 26, 2009, the Debtor generated net revenues of approximately $88.934 million, and a net gain from operations of $1.514 million, which included a gain on foreign exchange as a result of the Canadian sale in April 2009, and a gain from insurance proceeds and final payment resulting from property damage and business interruption claims sustained by a California hearing center in 2009, and hurricane damages and business interruption claims sustained by Florida hearing care centers in 2005. For the fiscal year ended December 30, 2010, the Debtor generated net revenue of approximately $83.502 million and net loss from operations of $7.737 million.

31.     For the fiscal quarter ended April 2, 2011, the Debtor generated revenue of $14.79 million and a loss from operations of $2.247 million. Projected revenue for the year 2011 is $61 million. As of March 31, 2010, the Debtor reported approximately $65.56 million in assets, and

---

[2] This includes net revenues and expenses attributable to HEARx West.

10

approximately $64.71 million in liabilities. Restricted cash and cash equivalents at December 25, 2010 consist of certificates of deposit with contractual maturities of one year or less of approximately $2.3 million. Cash and cash equivalents of $2.0 million are pledged as collateral for a standby letter of credit provided to AARP in 2009. The commitment to maintain a standby letter of credit will decline by $1 million in January 2012 and by another $1 million in August 2012.

E.    **Events Leading to Chapter 11 Filing**

    (i)    **Agreements with Siemens**

32.    HearUSA has entered into credit, supply, investor rights and security agreements with Siemens. The terms of the current agreements extend to February 2015. Pursuant to these agreements, Siemens has extended to HearUSA a $50 million credit facility and HearUSA has agreed to purchase at least 90% of its hearing aid purchases from Siemens and its affiliates. If the 90% minimum purchase requirement is met, HearUSA earns rebates which are then used to liquidate principal and interest payments due under the credit agreements.

    a.    **Credit Agreement.**

33.    The credit agreement includes a revolving credit facility of $50 million that bears interest at 9.5%, matures in February 2015 and is secured by substantially all of HearUSA's assets. As of December 25, 2010, there was approximately $32.2 million outstanding under the credit agreement. Amounts available to be borrowed under the credit facility are to be used solely for acquisitions unless otherwise approved by Siemens. HearUSA may not borrow further under its line for acquisitions until such time as it is generating cash from operations. Borrowings under the credit facility are accessed through Tranche B and Tranche C. Borrowing for acquisitions under Tranche B is generally based upon a formula equal to 1/3 of 70% of the

11

acquisition target's trailing 12 months revenues, and any amount greater than that may be borrowed under Tranche C with Siemen's approval. Principal borrowed under Tranche B was repaid quarterly at a rate of $65 per Siemens unit purchased by the acquired businesses through September 2009. In October 2009, the parties agreed to reduce the rebate to a rate of $50 per Siemens unit purchased by the acquired businesses in exchange for more favorable pricing. Principal borrowed under Tranche C is repaid at $500,000 per quarter.

34.     The required quarterly principal and interest payments on Tranches B and C are forgiven by Siemens through rebate credits of similar amounts as long as 90% of hearing aid units purchased by HearUSA are from Siemens. Amounts not forgiven through rebate credits are payable in cash each quarter. HearUSA has met the minimum purchase requirements of the arrangement since inception of the arrangement with Siemens.

35.     The credit agreement requires HearUSA to reduce the principal balance by making annual payments in an amount equal to 20% of Excess Cash Flow (as defined in the credit agreement), and by paying Siemens 50% of the proceeds of any net sales and 25% of proceeds from any equity offer HearUSA may complete. HearUSA did not have any Excess Cash Flow in 2010 or 2009.

36.     In 2009 HearUSA paid Siemens approximately $8.1 million of the proceeds received from the sale of HearUSA's Canadian operations in 2009.

37.     HearUSA is in dispute with Siemens concerning the amount of the cash prepayment due to Siemens on the credit facility from the net cash proceeds of the sale of the Canadian operations in 2009.

38.     On March 17, 2011, Siemens issued to HearUSA a notice of default. The notice stated that as a result of HearUSA's failure to pay a disputed $2.3 million purportedly due as a

result of the sale of HearUSA's Canadian operations, Siemens declared HearUSA in default under the credit agreement. Siemens also claims in the notice that it is entitled to accelerate all of the remaining payments under the credit agreement and demands the immediate payment of $32.7 million. The notice stated that Siemens intended to pursue its rights and remedies to recover the total amount, including enforcing its security interests in HearUSA's assets.

39. On February 4, 2011, the Debtor filed a complaint against Siemens in the Supreme Court of the State of New York, seeking a declaratory judgment concerning a claim by Siemens for an additional loan prepayment under the Credit Agreement of $2.3 million arising from the Debtor's sale of its Canadian assets in 2009. The Debtor believes it has satisfied the loan prepayment requirement related to the 2009 Canadian sale and that no additional amounts should be due.

40. On March 17, 2011, before the matter had come before the court, Siemens issued a notice of default. The notice stated that, as a result of the Debtor's failure to pay the $2.3 million related to the Canadian asset sale, Siemens was declaring the Debtor to be in default under the Credit Agreement. Siemens also claimed in the notice that it was entitled to accelerate all of the remaining payments under the Credit Agreement, and demanded the immediate payment of $32.7 million. The notice further stated that Siemens intends to pursue its rights and remedies to recover the total amount, including enforcing its security interests in the Debtor's assets.

41. On March 17, 2011, the Debtor filed a motion for a temporary restraining order against Siemens to prevent Siemens from declaring the default, accelerating the full amount under the Credit Agreement, and from employing self-help measures to enforce its rights under the Credit Agreement. The trial court denied the motion and HearUSA appealed.

3628389-7

42.    On March 29, 2011, the Appellate Division of the New York State Supreme Court granted a motion by HearUSA for a temporary restraining order against Siemens. At a hearing held on May 2, 2011, the New York state court deferred ruling on the permanent injunction, and as of the Petition Date, the injunction remains in place.

43.    As of the Petition Date, the Debtor was indebted to Siemens in the approximate amount of $31,300,000, subject in all respects to defenses HearUSA has in respect of the amounts Siemens claims are due to it from HearUSA and affirmative claims HearUSA has against Siemens .

b.    **Supply Agreement**

44.    The supply agreement requires HearUSA to purchase at least 90% of its hearing aid purchases from Siemens and its affiliates. The 90% requirement is computed on a cumulative four consecutive quarters. Approximately $47.3 million has been rebated since HearUSA entered into this arrangement in December 2001. Additional quarterly volume rebates of $156,250, $312,500 or $468,750 can be earned by meeting certain quarterly volume tests. These rebates reduce the principal due on the credit facility. Additional volume rebates of $788,000 and $821,250 were recorded in 2010 and 2009, respectively.

45.    The supply agreement may be terminated by either party upon a material breach of the agreement by the other party. Siemens may claim that HearUSA's failure to make payments allegedly due under the supply agreement would constitute a material breach, giving Siemens the right, but not the obligation to terminate the supply agreement. Termination of the supply agreement or a material breach of the supply agreement by HearUSA may be deemed to be a breach of the credit agreement and Siemens might then have the right to declare all amounts outstanding under the credit facility immediately due and payable.

14

c.     **Investor Rights Agreement**

46.     Pursuant to the terms of the Investor Rights Agreement with Siemens, HearUSA granted Siemens resale registration rights covering the 6.4 million shares of common stock acquired by Siemens on December 23, 2008 under the Siemens Purchase Agreement (HearUSA completed the registration of these shares for resale in the second quarter of 2009); is obligated to provide Siemens with a right of first refusal in the event HearUSA proposes a transaction that would constitute a change of control with, or primarily involving, a person in the hearing aid industry, and rights to have a representative of Siemens' attend meetings of the Board of Directors as a nonvoting observer.  A breach of HearUSA's resale registration obligations under the investor rights agreement may be deemed to be a breach of the credit agreement.  The term of the agreement extends to February of 2015.

## III.     NECESSITY FOR EMERGENCY HEARINGS ON "FIRST DAY" MOTIONS

47.     Contemporaneously herewith, the Debtor has filed the following "first day" motions (the "First Day Motions"):

a.     Debtor's Application for Approval, on an Interim and Final Basis, of Employment of Paul Steven Singerman and Berger Singerman, P.A., as Counsel for Debtor in Possession, *Nunc Pro Tunc* to the Petition Date;

b.     Debtor's Application for Approval, on an Interim and Final Basis, of Employment of Sonenshine Partners, as Investment Banker to the Debtor *Nunc Pro Tunc* to the Petition Date;

c.     Debtor's Application for Approval, on an Interim and Final Basis, of Employment of Joseph J. Luzinski as Chief Restructuring Officer and Development Specialists, Inc, as Restructuring Advisor for Debtor in Possession, *Nunc Pro Tunc* to the Petition Date;

d.     Debtor's Application for Approval of Employment of Trustee Services, Inc., as Claims, Noticing, Balloting and Solicitation Agent of the Bankruptcy Court Under 28 U.S.C. § 156(c), *Nunc Pro Tunc* to the Petition Date;

15

e.    Debtor's Application for Approval of Employment of AlixPartners, LLP for Communication Consultant for the Debtor, *Nunc Pro Tunc* to the Petition Date;

f.    Debtor's Motion to Establish Certain Notice, Case Management and Administrative Procedures;

g.    Debtor's Emergency Motion for Approval of (i) Form and Manner of Notice of Commencement of Cases and (ii) Form for Filing Proofs of Claim;

h.    Debtor's Motion for Order Establishing Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Professionals;[3]

i.    Debtor's Emergency Motion for (A) Authority to (I) Maintain Bank Accounts and Continue to Use Existing Business Form and Checks, and (II) Continue to Use Existing Cash Management System; (B) Waiver of Certain Investment and Deposit Guidelines; and (C) Authority to Accept Customer Returns and Make Refund Payments in the Ordinary Course of Business;

j.    Debtor's Emergency Motion For Authority To (I) Pay Prepetition Wages And Other Employment-Related Costs And Expenses, And To Honor Vacation And Sick Leave Rights; And (II) Honor Major Accounts Agreement With ADP, Inc.;

k.    Debtor's Emergency Motion for Authorization to Pay Prepetition Sales, Use, Franchise, Trust Fund and Other Taxes and Similar Obligations;

l.    Debtor's Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies and Related Agreements; (II) Continue Certain Related Premium Financing Agreements; and (III) Honoring Certain Obligations in Respect Thereof;

m.    Debtor's Motion For Interim And Final Orders Under 11 U.S.C. §§ 361, 362, 363, And 364, Fed. R. Bankr. P. 4001(b) And (c), And Local Bankruptcy Rules 4001-2 And 4001-3, (A) Authorizing Debtor To Incur Postpetition Indebtedness, (B) Granting Security Interests And Superpriority Expense Claims, (C) Authorizing Use Of Cash Collateral, And (D) Granting Other Relief;

n.    Debtor's Emergency Motion for Authorization to (I) Pay Managed Care Providers and Perform Managed Care Contracts in the Ordinary Course of Business, and (II) Maintain Network Relationship and Current Payment Arrangements with Hearing Care Solutions;

---

[3] This is being filed on the first day but emergency relief is not being sought.

16

3628389-7

o.  Debtor's Emergency Motion to Honor License Agreement and Service Agreement with AARP in the Ordinary Course of Business;

p.  Debtor's Emergency Motion For Authorization To Continue to Honor Agreements with HEARx West, LLC;

q.  Debtor's Emergency Motion Seeking Approval to Retain and Employ Professionals Utilized in the Ordinary Course of Business;

r.  Debtor's Motion for Determination That The Appointment Of A Patient Care Ombudsman Is Unnecessary;[4]

s.  Debtor's Motion Requesting Appointment of Consumer Ombudsman;[5]

t.  Debtor's Emergency Motion for an Order Authorizing Payment of Pre-Petition Claims of Critical Vendors; and

u.  Debtor's Motion for Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Form of Asset Purchase Agreement; (D) Scheduling Dates to Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (F) Granting Related Relief.[6]

## IV.    SERVICE OF FIRST DAY MOTIONS

48.    The Debtor has directed Trustee Services, Inc. ("TSI") to provide notice of all motions presented to the Court for consideration as First Day Motions by overnight mail, hand delivery, facsimile or electronic mail on all parties identified on the Master Service List on May 16, 2011.  The Debtor has also instructed TSI to file an affidavit of service certifying that it effectuated service in the manner set forth above.

---

[4] This motion is being filed on the first day but emergency relief is not being sought.
[5] This motion is being filed on the first day but emergency relief is not being sought.
[6] This motion is being filed on the first day but emergency relief is not being sought.

3628389-7

A.   **Debtor's Application for Approval, on an Interim and Final Basis, of Employment of Paul Steven Singerman and Berger Singerman, P.A. as Counsel for Debtor in Possession,** *Nunc Pro Tunc* **to the Petition Date**

49.     The Debtor seeks authority to retain, on an interim and final basis, Paul Steven Singerman and the law firm of Berger Singerman, P.A. ("BSPA") as general bankruptcy counsel *nunc pro tunc* to the Petition Date.  The Debtor understands that Paul Steven Singerman and BSPA have extensive experience representing Chapter 11 debtors in this District (and others across the country) and that they are well-qualified to serve as general bankruptcy counsel to the Debtor.

50.     To the best of the Debtor's knowledge, except as disclosed in the *Declaration of Paul Steven Singerman, on Behalf of Berger Singerman, P.A. as Proposed* Counsel *for Debtor-In-Possession,* affirmed by Mr. Singerman and filed by BSPA which accompanies the Application to retain it, neither Mr. Singerman nor BSPA has any connection with the Debtor's creditors or other parties in interest or their respective attorneys.

51.     Counsel has informed me that corporations may not appear in a Florida or federal court *pro se*, and that only a licensed attorney may appear on their behalf.  Because there is a myriad of relief that must be sought from the Court immediately, the Debtor will suffer immediate and irreparable harm if it is unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened. For example, the Debtor requires the Court's approval of an agreement to provide debtor-in-possession financing.  Without such funds, the Debtor will be unable to operate its business and maximize the value of its assets for the benefit of its estates.   It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided.  In that regard, counsel advises that this relief has been granted in other Chapter 11

18

cases in this District. *See, e.g.*, *In re HNI Holdco, Inc. (f/k/a Medical Staffing Network Holdings, Inc., et al.),* Chapter 11 Case No. 10-29101-BKC-EPK (Bankr. S.D. Fla. July 2, 2010); *In re Gemini Cargo Logistics, Inc., et al.,* Chapter 11 Case No. 08-18173-BKC-PGH (Bankr. S.D. Fla. June 20, 2008); *In re First NLC Financial Services, LLC, et al.,* Chapter 11 Case No. 08-10632-BKC-PGH (Bankr. S.D. Fla. Feb. 13, 2008); *In re Tousa, Inc., et al.,* Chapter 11 Case No. 08-10928-BKC-JKO (Bankr. S.D. Fla. Jan. 31, 2008). Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to retain Berger Singerman under the terms of its engagement letter.

**B.      Debtor's Application for Approval, on an Interim and Final Basis, of Employment of Sonenshine Partners, as Investment Banker to the Debtor *Nunc Pro Tunc* to the Petition Date**

52.     The Debtor seeks authority to retain, on an interim and final basis, the investment banking firm of Sonenshine Partners ("Sonenshine"), *nunc pro tunc* to the Petition Date. The Debtor understands that Jennifer Doré Russo and Sonenshine have significant and extensive experience providing investment banking services, including services previously provided to the Debtor pre-petition, and has an excellent reputation for providing such services throughout the United States in restructuring matters, and that they are well-qualified to provide investment banking services to the Debtor in this case. The Debtor believes it is in its best interest, and those of its creditors, that Sonenshine be retained to serve as investment banker to the Debtor in its Chapter 11 case.

53.     To the best of the Debtor's knowledge, except as disclosed in the *Declaration of Jennifer Doré Russo on Behalf of Sonenshine Partners as Proposed Investment Banker to the Debtor,* affirmed by Ms. Russo, which accompanies the Application to retain Sonenshine, neither

Ms. Russo nor Sonenshine has any connection with the Debtor's creditors or other parties in interest or its attorneys.

54.    Due to Sonenshine's extensive experience acting as investment banker to companies in restructuring matters, and in light of the pre-petition work done for the Debtor by Sonenshine, including successfully locating a stalking horse bidder, the Debtor will suffer immediate and irreparable harm if it is unable to obtain the services of an investment banker before a final hearing on the application for approval of Sonenshine's employment can be convened.    It is, therefore, my belief that only with the granting of interim approval of Sonenshine's employment will such immediate and irreparable injury be avoided.

**C.    Debtor's Application for an Order Authorizing Employment and Retention of Joseph J. Luzinski as Chief Restructuring Officer and Development Specialists, Inc. as Restructuring Advisors and to the Debtor, *Nunc Pro Tunc* to Petition Date**

55.    The Debtor seeks authority to retain, on an interim and final basis, me and Development Specialists, Inc. ("DSI") as Chief Restructuring Officer and restructuring advisor to the Debtor, *nunc pro tunc* to the Petition Date.  DSI and I have significant and extensive experience providing restructuring and financial advisory services, including services previously provided to the Debtor pre-petition.  DSI and I have an excellent reputation for providing such services throughout the United States in restructuring matters, and that we are well-qualified to provide financial advisory services to the Debtor in this case.   The Debtor believes it is in its best interest, and the best interest of its creditors and interest holders, that I be retained as CRO and DSI be retained to serve as restructuring advisor to the Debtor in its Chapter 11 case.

56.    To the best of the Debtor's knowledge, except as disclosed in my *Declaration on Behalf of Development Specialists, Inc. as Proposed Restructuring Advisor to the Debtor,* neither

20

I nor DSI have any connection with the Debtor's creditors or other parties in interest or its attorneys.

57.     Due to my and DSI's extensive experience acting as CRO and advisor to companies in restructuring matters, and in light of the pre-petition work done for the Debtor by DSI, the Debtor will suffer immediate and irreparable harm if it is unable to obtain the services of a chief restructuring officer and financial advisor before a final hearing on the application for approval of my and DSI's employment can be convened.   It is, therefore, my belief that only with the granting of interim approval of my and DSI's employment will such immediate and irreparable injury be avoided.

**D.     Debtor's Application for Approval of Employment of Trustee Services, Inc. as Claims, Noticing, Balloting and Solicitation Agent of the Bankruptcy Court Under 28 U.S.C. § 156(c), *Nunc Pro Tunc* to the Petition Date**

58.     The Debtor seeks approval of its agreement with Trustee Services, Inc. ("TSI") and have TSI appointed as claims, noticing, balloting and solicitation agent of the Court. I am informed that TSI has significant experience in noticing, claims administration, balloting, solicitation, and facilitating other administrative aspects of Chapter 11 cases.  I am further informed that TSI has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and balloting agent in many large bankruptcy cases pending in various districts. The approval of the Debtor's agreement with TSI and TSI's appointment as claims, noticing, balloting and solicitation agent of the Court will facilitate the orderly and efficient management of this Chapter 11 case.  Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to retain TSI under the terms of its engagement letter.

3628389-7

E.     **Debtor's Application for Approval of Employment of AlixPartners, LLP as Communications Consultant *Nunc Pro Tunc* to the Petition Date**

59.     The Debtor seeks approval of its agreement with AlixPartners, LLP ("AP") and have AP appointed as Communications Consultant. I am informed that AP is one of the country's leading Chapter 11 administrators, with experience in strategic consulting services for Chapter 11 cases. I am further informed that AP has substantial experience in cases of this size and complexity, and has provided strategic communications consulting services in many large bankruptcy cases pending in various districts nationwide. The approval of the Debtor's agreement with AP and AP's appointment to provide strategic communications consulting services will facilitate the orderly and efficient communications in this Chapter 11 case with the Debtor's employees, independent providers, customers and vendors.   Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to retain AP under the terms of its engagement letter.

F.     **Debtor's Motion for Order Establishing Certain Notice, Case Management and Administrative Procedures**

60.     The Debtor seeks to establish notice, case management and administrative procedures for the conduct of these Chapter 11 cases, including, but not limited to, scheduling omnibus hearings in advance, providing service via e-mail, maintenance of a website and 800 number for access by creditors and parties in interest, setting up a core list of persons and entities on whom and which service must be made, etc. (the "Notice Procedures").   The Notice Procedures, among other things, (a) define the parties who are to receive notice of each document that is filed with the Court, (b) describe what information must be included in notices of requests for relief from the Court, (c) set forth the deadlines for objections to be filed to

22

requests for relief and the date of the hearing at which such requests for relief will be heard, and (d) explain the procedures for service of documents filed with the Court.

61.     The Debtor has over 25,000 creditors and parties-in-interest, including vendors, stockholders, lessors, and customers with warranty claims.  Therefore, I anticipate that hundreds of creditors and other parties in interest will file requests for service in this Chapter 11 case.  I also expect that numerous motions and applications will be filed in this Chapter 11 cases in pursuit of various forms of relief.  By scheduling regular omnibus hearings in advance, parties in interest, and certainly the Debtor, will be better able to plan for and schedule attendance at hearings, thus reducing the need for emergency hearings and/or expedited relief and fostering consensual resolution of important matters.  Moreover, by establishing certain notice and service procedures, all parties in interest will be assured of receiving appropriate notice of matters affecting their interests and ample opportunity to prepare for and respond to and be heard on such matters.  Based on the foregoing, I submit that the proposed notice, case management and administrative procedures are in the best interests of the Debtor, its creditors and parties in interest.

**G.     Debtor's Emergency Motion to for Approval of (i) Form and Manner of Notice of Commencement of Cases and (ii) Form for Filing Proofs of Claim**

62.     The Debtor seeks approval of the form and notice of commencement of this Chapter 11 case.  I believe that given the size and complexity of this Chapter 11 case, the proposed form and notice, including the manner of publication of that form and notice, will help ensure that as many creditors and parties in interest as possible receive notice of the filing of this Chapter 11 case and the bar dates by which they must assert claims against the Debtor.  Pursuant to the proposed procedures, Proofs of Claims will be submitted to TSI, the Debtor's proposed Claims and Notice Agent.  The Debtor proposes to publish notice of the commencement of this

23

Chapter 11 case and the respective bar dates within ten (10) days of the entry of an Order granting this motion, and at least thirty (30) days prior to the general bar date for filing Proofs of Claims, so as to afford creditors, equity holders and parties in interests more than ample time to assert Proofs of Claims.    The Debtor believes that adoption of the procedures, and the publication of those procedures, is in the best interests of its creditors and parties in interest and will allow the Debtor's constituents the ability to participate in the Chapter 11 case to the extent they are so inclined. The Debtor's prospective counsel has provided the form or the proposed Notice of Commencement to the Office of the United States Trustee in advance of the filing of this case for its review and approval.

**H.    Debtor's    Motion    for    Order    Establishing    Procedures    for    Monthly and    Interim    Compensation    and    Reimbursement    of    Expenses    for Professionals (the "Interim Compensation Procedures Motion")**

63.    The Debtor seeks approval of interim compensation procedures for professionals retained by the Debtor in the case, which has been filed on the first day, but which has not been requested to be set for emergency relief. The proposed procedures will provide an orderly mechanism to compensate professionals and provide reimbursement of out-of-pocket expenses on a monthly basis, comparable to those established in many other large Chapter 11 cases in this and other districts as explained to me by counsel.  In this way, the Court and parties in interest can more effectively monitor the fees incurred, and the Debtor will be able to spread out its payments of professional fees, rather than suffer larger depletions to their cash on an irregular basis.

64.    In summary, the requested monthly compensation procedure would require all professionals retained with Court approval to present to the Debtor, counsel for the Debtor, counsel for the DIP Lender (as hereinafter defined), counsel for the Official Committee of

24

Unsecured Creditors, if one is established, any other appointed committee, and the Office of the United States Trustee a detailed statement of services rendered and expenses incurred for the prior month. If no timely objection is filed, the Debtor would be directed to promptly pay from the Professional Expense Escrow (as defined in the DIP Credit Agreement) 80% of the amount of fees incurred for the month, with a 20% holdback, and 100% of out-of-pocket expenses for the month. These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process (approximately every 120 days). These procedures will help ensure the continued services of professionals rendering critical services to the Debtor and help facilitate an orderly wind-down or disposition of the Debtor's' assets or enterprise. The Debtor seeks to pay TSI, AP and Sonenshine monthly without holdback due to the nature of their engagements.

I.   **Debtor's Emergency Motion for (A) Authority to (I) Maintain Bank Accounts and Continue to Use Existing Business Form and Checks, and (II) Continue to Use Existing Cash Management System; (B) Waiver of Certain Investment and Deposit Guidelines; and (C) Authority to Accept Customer Returns and Make Refund Payments in the Ordinary Course of Business**

65.    I understand that the Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. These guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account. The Debtor seeks a waiver of these requirements.

3628389-7

66.    The Debtor seeks a waiver of the requirement that they open a new set of books and records as of the Petition Date because the Debtor respectfully submits that opening a new set of books and records would create unnecessary administrative burdens and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it will be easy to differentiate between pre and post-petition transactions by date. In the ordinary course of its business, the Debtor uses many checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtor is engaged, and the numerous other parties with whom the Debtor deals, the Debtor needs to be permitted to use its existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, I believe it is in the best interests of the Debtor and its creditors to continue to use existing business forms and maintain existing business records.

67.    In addition, the Debtor requests authority to maintain its existing bank accounts (each a "Bank Account" or and collectively, the "Bank Accounts") and cash management system (the "Cash Management System") in accordance with their usual and customary practices to ensure a smooth transition into Chapter 11 with minimal disruption to operations and payments to employees. The Debtor also requests authority to close any of the Bank Accounts if, in the exercise of its business judgment, the Debtor determines that such action is in the best interest of its estate.

68.    Only if the Bank Accounts are continued with the same account numbers can the transition into Chapter 11 be smooth and orderly, with minimal interference with continuing operations and payment of the Debtor's employees. In order to conduct its post-petition

26

3628389-7

business, the Debtor needs to be able to issue checks to vendors, service providers, employees, and others. Due to the large number of the Debtor's employees paid on a bi-weekly basis, opening new accounts and obtaining checks for those accounts would cause severe delay and disruption to the Debtor's business and have a serious and potentially devastating impact on the Debtor's ability to reorganize. Moreover, a change in the Bank Accounts to which customers wire and route payments could delay the Debtor's receipt of funds needed for operations. By preserving business continuity and avoiding the operational and administrative paralysis that would result from closing the existing Bank Accounts and opening new ones, all parties-in-interest, including employees, vendors, and customers, will be best served, and the benefit to the Debtor's estate will be considerable. Additionally, the confusion that would otherwise result could only work to the detriment of the Chapter 11 case. (Of course, no checks issued prior to the Petition Date are to be honored, except as otherwise provided by separate order of this Court.)

69.     Prior to the commencement of this Chapter 11 case, in the ordinary course of its business, the Debtor utilized a network of local and national banks to efficiently collect, transfer and disburse funds generated on a daily basis from its operations (collectively, the "Bank Accounts"). A list of the Debtor's Bank Accounts and the amount on deposit in each such Bank Account as of May 13, 2011 is set forth on **Exhibit "A"** to the Motion. The Bank Accounts are part of a carefully constructed and highly automated cash management system that ensures the Debtor's ability to efficiently monitor and control its cash position, as is more fully described below.

70.     HearUSA's cash management system is comprised of nine cash accounts maintained throughout the United States. The primary components of the Debtor's existing cash

27

management system are (i) two primary depository accounts maintained with Bank of America[7] and three secondary depository accounts at other institutions (collectively, the "Depository Accounts")[8]; (ii) a disbursement account maintained at Bank of America that is automatically funded from the Depository Account at Bank of America and used for the payment of funds to vendors and others (the "Disbursement Account"); (iii) a payroll account maintained at Bank of America that is automatically funded from the Depository Account at Bank of America and used for the payment of funds to employees (the "Payroll Account"); and (iv) two accounts maintained with Bank of America and Citibank to handled restricted cash balances, i.e., CD's and Letters of Credit.

71.     HearUSA operates approximately 134 company-owned locations in ten states. Approximately 111 of these locations make deposits throughout each week in local branches of Bank of America, which subsequently are collected in one master Depository Account (the "Master Depository Account") maintained at Bank of America. These deposits are identified by location within the Master Depository Account. Additionally, HearUSA utilizes lockbox services for deposits from third party managed care companies for the remittance of amounts owing to HearUSA. These funds are deposited in the Master Depository Account.

72.     The remaining locations make local deposits with Citibank (in New York), M&T Bank (in Northern NY) and PNC Bank (in Ohio, Michigan and New Jersey). The funds deposited into these accounts are swept into the Master Depository Account on a weekly basis.

---

[7] One of these accounts is a newly established capitation account that is used for the deposit of monthly capitation payments from members of the Debtor's managed care network.

[8] The Depository Accounts exist for the collection of credit card proceeds and other methods used by customers and third party managed care organizations for the remittance of amounts owing to HearUSA. The Depository Accounts are maintained at the following institutions: Bank of America, Citibank, M&T Bank and PNC Bank. Funds are transferred automatically from the Depository Accounts on a regular basis to the Disbursement and Payroll Accounts (as hereinafter defined).

73.     In addition, the Debtor has entered into an agreement with Allegro Acceptance, a division of Sherman Clay & Co. ("Allegro"), in order to facilitate the Debtor's financing of its consumer loan programs and other promotional credit plans such as "same as cash," that enable consumers to finance the purchase of hearing instruments and accessories and related products.

74.     Upon Allegro's receipt of properly executed and credit approved consumer contracts, Allegro sends the Debtor the proceeds due under the consumer contract at an agreed upon rate, and Allegro then administers and collects the payments due directly from the consumers.

75.     The Cash Management System used by the Debtors constitutes ordinary, usual, and essential business practice.  This system allows the Debtor to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, (c) ensure prompt and efficient payment of employees, and (d) reduce administrative expenses.

76.     The Debtor's operations require that the Cash Management System continue during the pendency of the Chapter 11 case.  If the Debtor was required to adopt a new cash management system, its operations and payments to its employees and subcontractors would be severely disrupted, which would have a serious and potentially devastating impact on the Debtor's ability to reorganize.  Further, the establishment of new cash accounts and a new collection and disbursement system would result in substantial additional costs to the Debtor's bankruptcy estate.  Accordingly, maintenance of the existing Cash Management System is essential and in the best interests of all creditors and other parties in interest.

77.     I believe that the Debtor's current cash and investments are safe because all of Debtor's financial institutions are, upon information and belief, financially stable banking institutions, are FDIC insured and are authorized depositories that satisfy section 345(b) of the

29

3628389-7

Bankruptcy Code.   Further, in accordance with the United States Trustee Guidelines, as of April 13, 2011, Bank of America, Citibank and PNC Bank are authorized depositories for Region 21. Due to the significant amounts of money that may be in the Bank Accounts from time to time, it would take some time for the Debtor to locate and determine, where necessary, appropriate alternative accounts that satisfy section 345(b).   Therefore, it is in the best interests of the Debtor, its estate and its creditors to obtain a waiver of the requirements of section 345(b).

78.    I am advised by counsel that courts, including courts from this District, have often granted relief from these requirements and replaced them with alternative procedures.

79.    With respect to refunds in the ordinary course of business, the Debtor provides its customers with the benefit of a very liberal return policy.  Any customer may return a hearing aid for any reason within thirty (30) days of purchase.  Those customers who opt to enroll in the family hearing counseling program offered by the Debtor to provide training in the proper use and care of hearing aids receive a sixty (60) day period within which to return a purchased hearing aid.  Finally, those customers who purchase their hearing aids through the Debtor's programs sponsored and endorsed by AARP receive a ninety (90) day return period.  The Debtor believes that these liberal return policies are attractive to potential and existing customers, and thus constitute a valuable aspect of the Debtor's overall marketing strategy.[9]

80.    Thus, to maintain the good will of its customers and in order to foster positive public relations during the Chapter 11 process, the Debtor seeks authority to continue to accept product returns and to make refund payments to customers in the ordinary course of business postpetition.

---

[9] The Debtor generally sells approximately 50,000 hearing aid units annually at an average retail price of $1,520. Approximately 3,700 units are returned annually.  The cost of a returned hearing aid is reimbursed to the Debtor by the manufacturer.

81.    The success and viability of the Debtor's business is dependent upon the loyalty and confidence of its customers. The continued support of this constituency is absolutely essential to the survival of the Debtor's business, the preservation of the value of its estate, and the Debtor's ability to reorganize successfully.   Any delay in honoring or paying various customer refunds will severely impair the Debtor's customer relations at a time when the loyalty and support of its customers are extremely critical.   By contrast, honoring these prepetition obligations will require minimal expenditure of estate resources, and will assist the Debtor in preserving its key customer relationships to the benefit of all stakeholders.

## J.    Debtor's Emergency Motion For Authority To (I) Pay Prepetition Wages And Other Employment-Related Costs And Expenses, And To Honor Vacation And Sick Leave Rights; And (II) Honor Major Accounts Agreement With ADP, Inc.

82.    As of the April 20, 2011, the Debtor employed approximately 360 employees (collectively, the "Employees"), who provide various services to the Debtor throughout the country.  Approximately 263 of the Employees are full-time (the "Full-Time Employees"), while 97 of the Employees are part-time (the "Part-Time Employees").[10]   In addition, the Debtor utilizes the services of a variety of independent contractors from time to time, all of whom are paid as vendors through the Debtor's normal accounts payable system and not through the normal payroll systems, as are discussed herein.   Approximately 63% of all Employees are hourly wage earners (the "Hourly Employees"), while the remaining 37% are salaried personnel (the "Salaried Employees").

83.    The annual payroll for all of the Debtor's Employees is approximately $19.80 million.

---

[10] "Part-Time Employees" are defined as those Employees who are normally scheduled to work less than 40 hours per week for an indefinite period.

3628389-7

84.    The Salaried Employees consist of the Debtor's executive, management, supervisors, and certain highly specialized skilled employees.  The Salaried Employees are generally paid bi-weekly on varying dates of each month, and are up to five days in arrears depending on their work schedules.

85.    The Salaried Employees collectively are paid approximately $880,000 per month, and the Debtor's portion of the payroll taxes for these Salaried Employees is approximately $96,000 per month.  The Debtor estimates that, as of Petition Date, accrued but unpaid payroll for the Salaried Employees will be approximately $411,000, and accrued but unpaid payroll taxes will be approximately $45,000.

86.    The Hourly Employees are generally paid bi-weekly, and are 5 days in arrears.  The Hourly Employees, collectively, are paid approximately $770,000 each month, and the Debtor's portion of payroll taxes for these Hourly Employees is approximately $84,000 per month.  The Debtor estimates that, as of the Petition Date, accrued but unpaid payroll for the Hourly Employees will be approximately $360,000, and accrued but unpaid payroll taxes will be approximately $40,000.

87.    The Debtor believes that none of the Debtor's Employees is owed in excess of $11,750 per individual for pre-petition wages or salaries.[11]  Thus, each  of the Debtor's

---

[11] These calculations do not include accrued but unpaid Sick Leave or Vacation Time (both as defined hereafter).  Information regarding Sick Leave is not centrally collected by the Debtor, and therefore the Debtor is not easily able to calculate the amounts owed to individual Employees as of any given time.  In addition, the Debtor has excluded Sick Leave from the calculations, because Employees are not normally entitled to compensation for accrued Sick Leave upon resignation or termination of employment.  Therefore, the Debtor expects Sick Leave to be used by Employees solely in the ordinary course of business.  Finally, the Debtor has excluded Vacation Time from the calculation, because the Debtor does not normally expect such amounts to be paid out except as Employees use their Vacation Time in the ordinary course of business or if they leave the company.  Therefore, the Debtor believes that including such amounts would overstate the pre-petition obligations that it will actually be required to pay to Employees upon entry of an order approving this Motion.

32

Employees has a priority claim with respect to all of her or his accrued but unpaid pre-petition wages or salaries pursuant to Section 507(a)(4) of the Bankruptcy Code.

88.     The Debtor offers its Employees other forms of compensation, including vacation time, paid holidays, paid sick leave, and other earned time off, and reimbursement of certain business expenses.  These forms of compensation are usual, customary, and necessary if the Debtor is to retain qualified employees to operate its business.

89.     The Debtor offers a 401(k) plan (the "401(k) Plan") for all Employees. Employees are eligible to participate in the plan after completing three months of service. The Debtor does not currently contribute to the 401(k) Plan for employees.

90.     The Debtor provides workers' compensation insurance coverage for the benefit of all Employees.  These benefits are covered primarily under the Debtor's workers' compensation insurance programs, insured primarily by the Traveler's Insurance Company.  Failure to maintain this insurance in the various states in which the Debtor conducts business could result in the institution of administrative or legal proceedings against the Debtor.  The monthly premium for the workers' compensation insurance is approximately $7,300.

91.     In addition to the benefits and other items described above (collectively, the Prepetition Employment Obligations"), the Debtor offers certain other benefit programs to Employees, including, without limitation, substance abuse and other counseling services ("Employee Assistance Program").  The Debtor believes that these programs are important to maintaining Employee morale and assisting in the retention of the Debtor's workforce.  The cost of such programs for the Debtor each month is negligible.  The Debtor believes that failing to honor such programs would have an adverse effect on the Debtor's Employees.

33

92.     The Debtor routinely withholds from Employee paychecks amounts that the Debtor is required to transmit to third parties.  Examples of such withholding are garnishments, health care payments, 401k withholdings and employee loans.  The Debtor believes that such withheld funds, to the extent that they remain in the Debtor's possession, constitute monies held in trust and, therefore, are not property of the Debtor's bankruptcy estate.

93.     The Debtor has determined that, in order to ensure that the Employees remain with the Debtor during its Chapter 11 case, and in order to maintain Employee morale and productivity and continuous service to customers, it is necessary to pay, in the ordinary course of the Debtor's business, the Prepetition Employment Obligations that are owed to or payable for the benefit of the Debtor's current Employees.   Payment of these amounts will encourage the Employees to continue to work for the Debtor, thereby avoiding potential disruption in the Debtor's businesses and its service to customers, promoting the prospects for a successful reorganization, and, ultimately, enhancing potential recoveries for the Debtor's creditors. The Debtor proposes to pay the Prepetition Employment Obligations that accrued prior to the Petition Date.

94.     Moreover, the Debtor is a party to a Major Accounts Agreement (the "Payroll Processing Agreement") with ADP, Inc. ("ADP") for the procurement of payroll, tax filing, benefits administration, and other data processing services.  To provide uninterrupted payroll services and direct deposit service to the Debtor's Employees, it is imperative that the Payroll Processing Agreement be honored and maintained, and that all costs incident to the Payroll Processing Agreement be paid, in the ordinary course of the Debtor's business.

95.     Accordingly, the Debtor seeks an order authorizing it to continue honoring its payment obligations under the Payroll Processing Agreement, and directing ADP to perform

34

uninterrupted its services (including all payroll services and direct deposit service to the Debtor's Employees) thereunder in the same manner as before the filing of the Debtor's Chapter 11 case.

**K.    Debtor's    Emergency    Motion    for    Authorization    to    Pay    Prepetition Sales, Use, Franchise, Trust Fund and Other Taxes and Similar Obligations**

96.    The Debtor requests the Court enter an order authorizing, but not directing, the Debtor to pay prepetition sales, use, trust fund, and other taxes and similar obligations, as detailed herein, in the ordinary course of the Debtor's business.  In addition, the Debtor requests that (i) to the extent Debtor has paid certain taxes which should not have been paid, the Court authorize the Debtor to seek a refund of such taxes, and (ii) to the extent that the Debtor disputes any such pre-petition tax, the Court authorize the Debtor to set aside, in a segregated account, funds to pay the subject tax until a final determination is made as to whether the Debtor is obligated to pay the subject tax.

97.    In connection with the operation of its business, the Debtor (a) incurs certain taxes by various taxing authorities (collectively the "Taxes"); (b) is responsible for the collection of certain Taxes; and (c) is charged fees, licenses, and other similar charges and assessments by various licensing authorities (collectively the "Fees"). The Taxes and Fees are paid to various taxing and licensing authorities (the "Authorities") on a periodic basis (whether monthly, quarterly, or yearly) that is established for each particular Tax or Fee.

98.    As of the Petition Date, the Debtor estimates that it has incurred prepetition payroll and employment-related Taxes in the ordinary course of business and that such Taxes are owed (but have not yet been paid) to the Authorities.  Those payroll and employment-related taxes will be paid in conjunction with the Debtor's upcoming payroll, which payroll is subject of a separate first day motion.

3628389-7

99.    Separate from the payroll and employment-related taxes, the Debtor estimates that it owes the various Authorities approximately $22,000 in Taxes and Fees, including sales, use, trust fund and property Taxes.  The Debtor seeks only the authorization to pay the Authorities the amounts described herein.

100.    If the Taxes and Fees are not paid immediately, I am informed that some, if not all, of the Authorities may, pursuant to Bankruptcy Code § 362(b)(9), cause the Debtor to be audited and subjected to various administrative proceedings.  Such audits and administrative proceedings and the accompanying disruption in business activities would materially and adversely affect the Debtor's reorganization prospects and unnecessarily divert the Debtor's attention away from the case.  Moreover, while reserving the right to argue to the contrary in particular cases, the Debtor believes that the Debtor generally does not have any legal or equitable interest under Bankruptcy Code § 541(a)(1) in funds held by it and due in respect of the Taxes and Fees.

101.    Accordingly, the Debtor requests that the Debtor be authorized, but not directed, to pay the Taxes and Fees to the relevant Authorities in the ordinary course of business.  Nothing herein, however, shall preclude the Debtor from contesting, in its sole discretion, the validity and amount of any Taxes and Fees under bankruptcy or non-bankruptcy law.

102.    The Debtor further requests that all depositories on which checks were drawn in payment of pre-petition amounts to the Authorities be directed to clear such checks as and when presented for payment, if appropriate.

103.    The timely payment of Taxes and Fees is therefore necessary and in the best interest of the Debtor's estate.

3628389-7

**L.** **Debtor's Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies and Related Agreements; (II) Continue Certain Related Premium Financing Agreements; and (III) Honoring Certain Obligations in Respect Thereof (the "Insurance Motion")**

104.    The Debtor maintains several insurance policies and is seeking authority to (i) continue to administer the insurance policies described below (collectively, the "Insurance Policies"); (ii) continue to pay certain claims, deductibles and/or premiums to the extent they may become due and payable according to the terms of the Insurance Policies; and (iii) continue to pay Premium Assignment Corporation to finance the (a) Coastal Property Insurance; (b) Crime Insurance; (c) Cyber Insurance; (d) Executive Risk Insurance; and (e) Directors & Officers Insurance.  The Debtor further requests authority to pay certain amounts as they come due under the Insurance Policies in the ordinary course of its business.  Except as otherwise noted, the insurance premiums are due on an annual basis and are paid via deposit and eleven monthly installment payments.  The Insurance Policies include:

a.    Workers' Compensation and Employers Liability policies with The Phoenix Insurance Company and Travelers Indemnity Company, member companies of the Travelers Companies, Inc.  All premiums and installment payments for current policy term due under the Workers' Compensation and Employers Liability policies are paid through May 29, 2011.

b.    Business automobile liability policies with General Insurance Company, member company of the Liberty Mutual Companies in Florida and New York.  These policies cover owned and leased vehicles and hired and non-owned automobile liability insurance in all states.  The down payment was made on March 18, 2011, making the policy current through June 1, 2011.  The business auto physical damage insurance for owned and leased vehicles is subject to a deductible of $500 per accident in Florida and $500 per accident in New York.

37

3628389-7

      c.      Commercial package liability policies with American Economy Insurance Company and American States Insurance Company (for the state of New Jersey), for general liability, professional liability, employee benefits liability and commercial property insurance for properties not specifically insured separately. The down payment was made on March 18, 2011, making the policy current through June 1, 2011.

      d.      Coastal property policies, primary and excess with Ironshore Specialty Insurance Company and Arch Specialty Insurance Group. Premiums are paid through insurance premium financing agreements. The down payment and first of the nine installment payments are paid through the next payment due date of May 29, 2011. This policy has a $10,000 deductible per occurrence and a 5% named windstorm deductible.

      e.      Directors and officers liability policies (collectively, the "D&O Liability Insurance") with XL Specialty, Liberty Mutual and Illinois Union. Premiums are paid through insurance premium financing agreements. The down payment and first of the nine installment payments are paid through the next payment due date of May 29, 2011.

      f.      Executive risk policy with Federal Insurance Company. Premiums are paid through insurance premium financing agreements. The down payment and first of the nine installment payments are paid through the next payment due date of May 29, 2011. The Employment Practices Liability Insurance portion of this policy is subject to a Retention of $35,000 1st Party/$75,000 2nd Party per claim.

      g.      Cyber insurance policy with Illinois Union. Premiums are paid through insurance premium financing agreements. The down payment and first of the nine installment payments are paid through the next payment due date of May 29, 2011. The privacy liability,

internet media liability and network security liability portion of this policy are subject to a retention of $25,000 per claim.

        h.      Crime insurance policy with Travelers Insurance Company. Premiums are paid through insurance premium financing agreements. The down payment and first of the nine installment payments are paid through the next payment due date of May 29, 2011.

        i.      Umbrella liability policy with Federal Insurance Company with American States Insurance Company. The down payment was made on March 18, 2011, amking the policy current through June 1, 2011. The policy is subject to a retention of $10,000 per claim.

        j.      Boiler and machinery policy with Travelers Property Casualty Company of America. All premiums under the Boiler & Machinery Insurance policy are paid through April 1, 2012.

        k.      Flood insurance policy for contents only, with Fidelity National Indemnity Insurance Company. This insures the Debtor's corporate headquarters premises located at 1250 Northpoint Parkway, West Palm Beach, FL. All premiums under the Flood Insurance policies are paid through August 24, 2011.

        l.      ERISA fidelity bond insurance policy with Travelers Casualty and Surety Company of America. The ERISA fidelity bond insurance policy provides for the payment of premiums every three years. All premiums under are paid through October 1, 2013.

      105.    The Debtor uses Premium Assignment Corporation to finance the (i) Coastal Property Insurance; (ii) Crime Insurance; (iii) Cyber Insurance; (iv) Executive Risk Insurance; and (v) Directors & Officers Insurance policies. The Debtor has entered into an insurance premium financing agreement (the "Agreement") with Premium Assignment Corporation with respect to these policies. Pursuant to the Agreement the Debtor makes nine (9) monthly

3628389-7

payments to Premium Assignment Corporation of $43,268.82, which amount includes principal and interest, with interest fixed at 4.41%.

106.     It is essential for the Debtor to maintain the Insurance Policies (as well as the Agreement with Premium Assignment Corporation), which provide a comprehensive range of coverage for the Debtor.  If the Insurance Policies are allowed to lapse, the Debtor will be exposed to substantial liability for any damages resulting to persons or property of the Debtor and others, and the Debtor would have to bear the costs and expenses of defense litigation. Moreover, maintenance of the Insurance Policies is mandatory under the United States Trustee guidelines and various state and federal laws.

**M.    Debtor's Motion For Interim And Final Orders Under 11 U.S.C. §§ 361, 362, 363, And 364, Fed. R. Bankr. P. 4001(b) And (c), And Local Bankruptcy Rules 4001-2 And 4001-3, (A) Authorizing Debtor To Incur Postpetition Indebtedness, (B) Granting Security Interests And Superpriority Expense Claims, (C) Authorizing <u>Use Of Cash Collateral, And (D) Granting Other Relief</u>**

107.     The Debtor has received an offer from William Demant Holdings A/S ("WD" or the "Proposed Purchaser") to acquire substantially all of the Debtor's assets in connection with an auction and sale process to be conducted in this Chapter 11 case pursuant to section 363 of the Bankruptcy Code and subject to the approval of this Court whereby WD would act as the "stalking horse" bidder.  Pursuant to the Asset Purchase Agreement, the Proposed Purchaser proposes to acquire the Purchased Assets (as defined in the Asset Purchase Agreement) for $70 million in cash plus other non-cash consideration (including the assumption of substantially all of the Debtor's operating and trade liabilities (excluding liabilities in favor of employees and Siemens) as set forth in the Asset Purchase Agreement.

108.     The Debtor intends to continue to market its business for sale as a going concern as set forth in the Debtor's *Emergency Motion For An Order (A) Approving Asset Purchase*

*Agreement, (B) Approving The Bidding Procedures, (C) Approving The Form And Manner Of Notice Of The Auction And Sale, And (D) Authorizing The Sale Of The Debtors' Assets* (the "Bid Procedures Motion").   As discussed in the Bid Procedures Motion, the Asset Purchase Agreement is subject to higher and better offers.   The Debtor intends to proceed with a sale process pursuant to section 363 of the Bankruptcy Code, subject to the approval of this Court. In order to preserve the value of its operations during the period between the Petition Date and a going concern sale, the Debtor seeks to continue to operate its businesses in the ordinary course. To achieve that goal and preserve its estate, the Debtor needs continued access to postpetition financing.

109.   The Proposed Purchaser (also referred to hereinafter as the "DIP Lender") has agreed to provide liquidity through the DIP Loan Facility (as defined below).   The DIP Loan Facility will give the Debtor access to sufficient credit to take it through the 363 sale process. Absent immediate and continued availability of credit, the Debtor's operations undoubtedly will be disrupted, and its going concern value eroded. The DIP Loan Facility will assist the Debtor in continuing its operations pending a sale.   The availability of postpetition financing will also provide a sense of confidence in the suppliers, customers and employees of the Debtor.

110.   Under the DIP Loan Facility, the Debtor will obtain from the DIP Lender cash advances and other extensions of credit in an aggregate principal amount of $10,000,000 (the "DIP Loan Facility"), subject to the entry of a final order (the "Final DIP Order") approving the DIP Loan Facility.   Specifically, the Debtor is seeking authorization to incur post-petition indebtedness (the "DIP Financing"), pursuant to the debtor-in-possession credit facility under that certain "Credit and Security Agreement" dated May 16, 2011 by and among the Debtor, as the Borrower, and WD, as lender (as it may be modified, supplemented or amended from time to

41

3628389-7

time, the "DIP Credit Agreement", and together with the other Loan Documents, as defined in the DIP Credit Agreement, the "DIP Loan Documents"), and to grant non-priming liens and security interests and superpriority claims to the DIP Lender. The Debtor is also requesting authorization to use prepetition collateral under its prepetition debt facilities, including cash collateral in which Siemens may claim an interest, and to provide adequate protection in respect of the interests of the lenders, including Siemens, asserting interests in such collateral.

111. The DIP Loan Facility will enable the Debtor to pay operating expenses, compensate their employees and purchase inventory and otherwise maximize the value of its business. The Debtor negotiated the terms of the DIP Loan Facility with the DIP Lender at arms' length and in good faith (as defined in Section 364(e) of the Bankruptcy Code), with all parties represented by counsel. The Debtor believes that the negotiated terms are fair and reasonable under the circumstances.

112. The Debtor further seeks authorization to use the cash collateral of Siemens. Specifically, the consideration to be paid by the Proposed Purchaser for the Purchased Assets exceeds by over $50 million the principal amount of the prepetition secured obligations Siemens may claim are due to it from the Debtor. Therefore, the replacement liens proposed by the Debtor in favor of Siemens as well as the fact that the liens securing the DIP Loan are subordinate to the liens Siemens may claim more than adequately protects Siemens. And if the Debtor's assets are sold to the Proposed Purchaser (or to a competing bidder who is determined to make a higher and better bid than the Proposed Purchaser's bid), the Debtor expects that there will be sufficient funds to pay any ultimately allowed claims Siemens has against the Debtor. Moreover, as stated above, Siemens will retain its existing prepetition liens, and any security

42

interests granted the DIP Lender shall be junior to all validly existing prepetition liens and security interests in the Collateral.

113.    Additionally, the Debtor seeks authorization to use Siemens' cash collateral derived from all prepetition receivables. The Debtor will provide, as adequate protection with respect thereto, a replacement lien on all post-petition receivables on dollar-for-dollar basis of the prepetition cash utilized prior to the closing of the sale of the Purchased Assets.

114.    The Debtor is unable to procure the credit required to fund its postpetition business operations in the form of unsecured credit or unsecured credit with an administrative expense priority under Bankruptcy Code section 503(b)(1). The Debtor, therefore, has no choice but to obtain credit on a secured basis.

115.    On February 3, 2011, the Debtor retained Tejas Securities ("Tejas") as its placement agent to assist the Debtor in evaluating its financial options with respect to raising debt or equity capital. In this regard, Tejas began a process more than 3 months before the bankruptcy filings, to identify potential sources of new capital for the Debtor's business. Tejas did not procure a lender which offered to provide subordinate lien financing on the terms equal to or better than the financing proposed by the DIP Loan.

116.    The financing contemplated by the DIP Loan Facility benefits the Debtor's bankruptcy estate and its creditors. It is critical to the preservation of the Debtor's business and going concern value. With the credit provided under the DIP Loan Facility, the Debtor will be able to sustain its operations, including paying its employees, maintaining adequate cash balances, and operating its businesses in order to preserve the ongoing value of its assets and enterprise for the benefit of all creditors. The availability of credit under the DIP Loan Facility will provide Debtor's vendors and suppliers the necessary confidence to resume ongoing

43

relationships with the Debtor, including the extension of credit terms for the payment of goods or services.

117.    Moreover, the implementation of the DIP Loan Facility will be viewed favorably by the Debtor's employees and customers. Without the financing furnished by the DIP Loan Facility, the Debtor will not be able to meet its payroll and other direct operating expenses, will suffer irreparable harm, and the value of its enterprise will be severely eroded.

118.    I believe the terms and conditions of the DIP Loan Facility and related DIP Loan Documents are fair and reasonable, and were negotiated by the parties in good faith and at arm's length. The DIP Lender should therefore be accorded the benefits granted under Bankruptcy Code section 364(e).

119.    Pending entry of the Final DIP Order, the Debtor will only borrow such monies from the DIP Lender as are necessary to maintain its operations and to avoid immediate and irreparable harm to the estates. The Debtor estimates that the interim emergency financing will be approximately $3,086,400.

**N.    Debtor's Emergency Motion for Authorization to (I) Pay Managed Care Providers and Perform Managed Care Contracts in the Ordinary Course of Business, and (II) Maintain Network Relationship and Current Payment Arrangements with Hearing Care Solutions**

120.    HearUSA has many important provider agreements with benefit sponsors for the provision of hearing care using three different arrangements: (a) a discount arrangement on products and services which is payable by the member; (b) a fee for service arrangement which is partially or fully subsidized by the sponsor and the member pays the balance, if any; or (c) a *per capita* basis, which is a fixed payment per member per month from the benefit sponsor to HearUSA determined by the amount of coverage offered to the patient and the number of patients, and the balance, if any, paid by the individual member. When the agreement involves

44

network providers, HearUSA pays the network provider an encounter fee, net of administration fees. All contracts are for one calendar year and are usually cancelable with ninety days or less notice by either party. HearUSA and its joint venture subsidiary, HEARx West, currently receive a per-member-per-month fee for more than 2 million managed care members. Annual revenue related to these contracts on a consolidated basis totaled approximately $27,007,000 in 2009, approximately $16,906,000 in 2010, and are projected to reach approximately $23,900,000 for fiscal year 2011. In total, HearUSA services over 200 benefit programs for hearing care with various health maintenance organizations, preferred provider organizations, insurers, benefit administrators and healthcare plans.

121.    Over half of HearUSA revenues are associated with third-party agreements that include health plans, benefit sponsors and employer groups. HearUSA operates a network of over 1,800 independent provider locations (the "Hearing Care Network"). The Hearing Care Network obtains 100% of its revenues from third-party agreements. Annual revenue related to these agreements on a consolidated basis totaled approximately $3,028,000 in 2009, approximately $2,836,000 in 2010, and are projected to reach approximately $3,020,000 for fiscal year 2011. Some of the agreements utilize a third-party to administer certain network functions, including patient receivables and wholesale purchase of hearing aids. Hearing Care Solutions acts on behalf of the HearUSA Hearing Care Network to schedule appointments, collect patient balances, and purchase hearing aids. In the course of conducting these business functions, Hearing Care Solutions accesses a HearUSA bank account, whereby the funds are allocated to cover provider fees, the cost of goods, and profit distribution.

122.    In addition, HearUSA is pre-funded on a monthly basis (approximately $450,000) to cover claims on behalf of company owned and network providers. In those cases where the

45

services are provided by network providers, the provider submits a claim form to HearUSA when services are rendered. By contract with the health plan, HearUSA must pay said claims within 30 days of receipt. Failure to pay claims within the 30 day time-frame can result in interest payments, fines by the contracted health plan, and termination for non-performance under the terms of the applicable agreements.

123.    In order to ensure that the capitation payments are available to pay the network providers, HearUSA has established a segregated bank account where the capitation payments will be placed and the funds used to pay the providers. By establishing a separate account, the network providers, and the contracted health plans, are assured that the funds will be available to pay the network providers during the pendency of the bankruptcy case.

124.    HearUSA bills health plans electronically or by paper claim to obtain reimbursement for services provided in its company-owned and network locations. The health plans reimburse HearUSA within 5 - 30 days and HearUSA then reimburses the provider. Turnaround time is 30 days, except in the state of Georgia where the claims are required to be paid within 10 days, subject to interest and non-performance clauses. HearUSA needs the contracted health plans to continue reimbursing the fee for service payments and to ensure access to the funds to meet the Debtor's payment and timeliness requirements. Untimely payments could also result in provider resignations from the network, which will cause disruption to the business model and render the company unable to meets its network access requirements.

125.    By providing the relief requested in this Motion, the Court will ensure that the Debtor's delivery of patient services and patient care is not interrupted and/or negatively impacted.

**O.    Debtor's Emergency Motion For Authorization To Honor License and Services Agreements with AARP in the Ordinary Course of Business**

126.    HearUSA is the administrator of the AARP Hearing Care Program (the "Hearing Care Program"), designed to help millions of Americans aged 50+ who have hearing loss. HearUSA is the only hearing care program endorsed by the American Association of Retired Persons ("AARP").

127.    AARP has licensed HearUSA to make hearing aids and related services available to AARP members.  Co-branded advertising and AARP member communications promote the benefits of purchasing hearing aids through the Hearing Care Program, and members are provided a consistent program with uniform discounted pricing, along with extended guarantees and warranties.

128.    Under the AARP License Agreement AARP granted HearUSA a license to use the AARP Intellectual Property and establishes royalty payments due from HearUSA to AARP for hearing aids sold through the Hearing Care Program.  Such royalties are payable in arrears and quarterly.[12]    The balance owing on fourth quarter 2010 and first quarter 2011 are approximately $400,000 per quarter.

129.    To secure the performance of HearUSA's obligations under the AARP License Agreement, the Debtor has provided an irrevocable standby letter of credit (the "Letter of Credit") to AARP.  Funds securing the Letter of Credit will be released as follows: (a) $1 million on January 1, 2012 and (b) $1,000,000 in August 2012.

130.    Under the Hearing Care Program Services Agreement, AARP and AARP Services ("ASI") contracts with HearUSA to provide services relating to the design,

---

[12] In three states, there is a fixed fee schedule amount, which approximates the variable unit amount in the states where HearUSA is currently operating.

development and management of AARP branded products and services. This agreement includes the Economic Assistance Program which requires HearUSA to donate 1000 hearing aids to disadvantaged individuals.[13]   HearUSA is obligated in 2011 to make quarterly payments equaling a total annual contribution of $250,000 to AARP's Education and Awareness Fund.  In addition, HearUSA is required to commit $4.4 million to the annual marketing budget of the Hearing Care Program, with 9.25% of such amount to go to the AARP General Program administered by ASI.[14]

131.    The Debtor seeks authority to continue to perform under the AARP License Agreement and the AARP Services Agreement (collectively, the "Agreements"), make certain payments due under the Agreements, and continue postpetition, in the ordinary course of business, to honor the Agreements and any obligations thereunder.

132.    The Debtor has made significant investments into the Hearing Care Program.  Its license to use the AARP Intellectual Property is a marketing advantage. There have been over 12,000 hearing aids sold under this program since inception, and over 50,000 calls and inquiries by AARP members.

133.    There will be no prejudice to unsecured creditors resulting from the relief sought in the motion.  Rather, the disruption in the operation and management of the Hearing Care Program will result in irreparable harm to the Debtor's business.   Failure to meet these obligations could result in allegations of the Debtor's breach of its obligations under the Hearing Care Program and the loss of $2 million held in Letters of Credit.  Further, if the Hearing Care

---

[13] The Economic Assistance Program is in pilot mode in the State of Florida.  To date, no hearing aids have been donated to this program, but it is anticipated that a small number will be donated this year (<100).
[14] Although the AARP Services Agreement, as amended, requires HearUSA to commit $4.4 million to the annual marketing budget of the Hearing Care Program, budgets submitted to AARP for less than that amount historically have been approved. The Debtor's 2011 budget for this marketing item is currently pending approval and is anticipated to total approximately $2 million.

48

Program is terminated, HearUSA's brand will suffer in the market, and the Debtor will lose future sales that otherwise would have resulted from the current marketing investments. HearUSA will also lose the confidence of AARP purchasers, as well as its provider network, which receives business from HearUSA and AARP co-branded member communications.

134.    By providing the relief requested in the motion, the court will enable the Debtor to continue to perform under the Agreements so that it may gain rewards from the resources invested, and continue to honor its obligations to the AARP.

**P.    Debtor's Emergency Motion For Authorization to Honor Agreements with HEARx West, LLC**

135.    HEARx West is a joint venture between the Debtor and The Permanente Foundation, LLC ("Kaiser"), which owns 38 full service centers in California, concentrating on providing hearing aids and audiology testing to Kaiser's members and self-pay patients.

136.    The obligations of the Debtor in connection with HEARx West are set forth in the Limited Liability Company Agreement and the Management Services Agreement (collectively the "HEARx Agreements").

137.    The Debtor seeks authority to continue to perform under the HEARx Agreements.

138.    In accordance with the terms of the HEARx Agreements, the Debtor is the Governing Manager and is responsible for the day-to-day operations of HEARx West, and is engaged to provide all management and administrative services reasonably required for the proper operation of the HEARx West centers.  The responsibilities include, business planning, records maintenance, accounting, financial reporting, information technology, budgeting and financial planning, tax preparation, accounts payable, customer records, billing and collection, employee records and payroll processing, employee benefits administration and providing management personnel.

49

3628389-7

139.    On account of these services, the Debtor was paid management fees in 2010 totaling approximately $3,079,664.  Through April 30, 2011, the Debtor was paid management fees totaling approximately $1,205,000.  In addition, as a result of the joint venture with Kaiser, the Debtor has the ability to market to Kaiser members and promote the business within Kaiser medical centers, including the referral of potential customers by Kaiser.

140.    It is important that the relationship with HEARx West be allowed to continue in its current capacity, so that HearUSA may continue to fulfill its contractual obligations to serve HEARx West customers, and to maintain and preserve this important source of revenue and market.

141.    By providing the relief requested in this Motion, the Court will ensure that the Debtor's delivery of patient services and patient care for the HEARx West network is not interrupted and/or negatively impacted, as well as continue an important revenue and marketing source for the Debtor.

142.    There will be no prejudice to unsecured creditors resulting from the relief sought herein.  Rather, disruption in the operation and maintenance of the HEARx West centers will result in irreparable harm to the Debtor's business through loss of management fees and marketing opportunities.

## Q.    Debtor's Emergency Motion Seeking Approval to Retain and Employ Professionals Utilized in the Ordinary Course of Business

143.    The Debtor seeks entry of an order approving the retention, employment, compensation and reimbursement of expenses for all professionals utilized by the Debtors in the ordinary course of business ("Ordinary Course Professionals"), subject to a monthly cap of $25,000 per professional.

50

144.    The Debtor regularly employs the Ordinary Course Professionals to render prepetition services relating to, among other things: (i) Medicaid matters; (ii) immigration; (iii) preparation of tax returns; and (iv) landlord disputes. The Debtor will continue to require the services of certain Ordinary Course Professionals while operating as debtor-in-possession and completing its reorganization efforts.

145.    The Ordinary Course Professionals are distinct from those professionals who are tasked specifically with assisting the Debtor with its Chapter 11 restructuring (for whom the Debtor is seeking to employ through separate applications to this Court). The uninterrupted service of the Ordinary Course Professionals is critical to the Debtor's ability to continue operations and successfully reorganize.

146.    The Ordinary Course Professionals will primarily assist with the Debtor's ongoing business operations and will generally not be involved with the administration of the Chapter 11 case. Thus, I am informed that many, if not all, of the Ordinary Course Professionals do not constitute "professional persons" within the meaning of § 327 of the Bankruptcy Code. The Debtor proposes that it be permitted to pay, without formal application to the Court by any Ordinary Course Professional, 100% of fees and costs to each of the Ordinary Course Professionals upon the submission to the Debtor of an appropriate invoice setting forth in reasonable detail the nature of the services rendered after the Petition Date.

147.    The Debtor is also requesting that it be authorized and empowered to employ and retain additional Ordinary Course Professionals needed by the Debtor in the ordinary course of their business by filing a supplement to the **Exhibit "A"** attached to the order granting the motion, without the need for any further hearing or notice to any other party.

51

148.    The employment of the Ordinary Course Professionals is in the best interests of the Debtor's estate.    While the Ordinary Course Professionals with whom the Debtor has previously dealt generally wish to provide services to the Debtor on an ongoing basis, many might be unwilling to do so if they are unable to be paid on a regular basis and only through a cumbersome, formal application process.    Moreover, if the expertise and background knowledge of certain of these Ordinary Course Professionals with respect to the particular areas and matters for which they were responsible prior to the Petition Date are lost, the estates undoubtedly will incur additional and unnecessary expenses because the Debtor will be forced to retain other professionals without such background and expertise.    It is therefore in the best interest of the Debtor's estate to avoid any disruption in the professional services required in the day-to-day operation of the Debtor's business.

**R.    Debtor's Motion for Determination that the Appointment of a Patient Care Ombudsman is Unnecessary**

149.    The Debtor seeks entry of an Order finding that there is no need for the appointment of an ombudsman as contemplated by section 333 of the Bankruptcy Code under the facts of this case.

150.    The Debtor's primary business is the provision of hearing aids, and it is not the provision of surgical care, drug treatment, psychiatric care, or obstetric care.    As such, I am informed and believe that the Debtor is not a "health care business" and accordingly, there is no basis for the appointment of an ombudsman.

**S.    Debtor's Motion to Appoint a Consumer Ombudsman**

151.    I have been advised that the Debtor may not sell or lease personally identifiable information to any person unless either (A) such sale or such lease is consistent with such policy; or (B) after appointment of a consumer privacy ombudsman in accordance with section 332.

52

152.   As will be discussed in greater detail, below, the Debtor filed its *Motion For Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Form of Asset Purchase Agreement; (D) Scheduling Dates To Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Authorizing Sale of Substantially All The Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (F) Granting Related Relief* (the "Bidding Procedures Motion"). As set for the in the Bidding Procedures Motion, the Debtor intends to sell substantially all of its assets at a 363 sale. Among the assets to be sold is information that may constitute   personally identifiable consumer information.

153.   The Debtor's privacy policy, which is attached to the Motion as **Exhibit "A"**, provides that "[p]atient and employee information is confidential and is used for internal purposes to conduct the business of the organization only, and only by those in a 'need to know' capacity." The privacy policy further provides that "[c]onfidential patient and employee records are defined as any documents that contain individually identifiable information including, but not limited to, patient or employee names, Social Security numbers, address and phone numbers, passwords and PIN numbers, account numbers, past or present medical information, other protected health information as designated under HIPAA, and any information marked as 'confidential' by HearUSA."

154.   I believe that it is appropriate under these circumstances to have a consumer privacy ombudsman appointed.

3628389-7

**T.    Debtor's Emergency Motion for an Order Authorizing Payment of Prepetition Claims of Critical Vendors**

155.    The Debtor seeks the entry of an order authorizing it to pay the prepetition claims of certain vendors that are critical to the operation of the Debtor's business (the "Critical Vendors Motion").

156.    Set forth in the Critical Vendors Motion is a list of those vendors (collectively, the "Critical Vendors") that the Debtor deems to be critical to its business operations. Each Critical Vendor provides important goods or services to the Debtor that are critical to the Debtor's ongoing business. The Critical Vendors are essential to the Debtor's business operations for the following reasons:

- Oaktree Products, Inc. ("Oaktree") –    Oaktree is a supplier of medical consumables, including ear wax flush, stethoscopes, assisted hearing devices and other medical items needed by the Debtor's audiologists to work with their patients. Oaktree supplies each of the Debtor's over 130 locations directly. To switch to a new supplier and obtain the rates and services currently being provided by Oaktree would be difficult and time-consuming, resulting in a disruption or loss of patient revenue at a critical time to the Debtor's efficient entry into Chapter 11.

- Phonak – Phonak is the Debtor's second-largest supplier of hearing aids. Should any disruption arise in the current contractual relationship with the Debtor's primary supplier of hearing aids (Siemens Hearing Instruments, Inc.), the Debtor would turn to Phonak to be the company's major hearing aid supplier.

- Precision Mold Laboratories ("Precision Mold") – Precision Mold provides the Debtor with the ear molds necessary to fit the Debtor's patients for their hearing aids, essential for proper sales. Precision Mold is one of a very few suppliers of such product. It would be difficult for the Debtor to establish a relationship with a new supplier after bankruptcy.

157.    If payment of the claims of the Critical Vendors, the amounts of which are set forth in the Critical Vendors Motion (collectively, the "Critical Vendor Claims"), are not paid, the Critical Vendors may terminate the services they provide to the Debtor and operations of the Debtor's business will be jeopardized to the detriment of all creditors. Much of the Debtor's

54

business operations are dependent upon the Critical Vendors.   Accordingly, interrupting the business relationship of the Debtor, on the one hand, and the Critical Vendors, on the other hand, if not fatal to the Debtor's efforts to reorganization, will severely impair that effort to the detriment of the Debtor's estate and the creditors thereof.   I believe that payment of the Critical Vendor Claims is fair and reasonable for the services provided. The amounts of the respective Critical Vendor Claims are as follows:

     i.  Oaktree:  $61,021.44

    ii.  Phonak:  $228,840.65

   iii.  Precision Mold:  $46,337.85

158.   In the exercise of my business judgment, I believe the relief requested in the Critical Vendors Motion is in the best interests of the Debtor and its estate, and I have been advised by counsel that similar relief has been granted in other large Chapter 11 cases in this and other districts, as set forth in more detail in the motion.   In return for payment, the Critical Vendors must agree to continue providing services to the Debtor under the same terms and conditions as existed pre-petition.

U.    **Debtor's Motion for Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Form of Asset Purchase Agreement; (D) Scheduling Dates to Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (F) Granting Related Relief**

159.   The Debtor intends to sell substantially all of the Purchased Assets as promptly as possible, consistent with (i) the due process requirements of sections 363 and 365 of the Bankruptcy Code, and (ii) the sale process under the Bidding Procedures.   The Debtor seeks approval and implementation of a three-step sales process, as follows (and of course, all dates

referred to below and in the Stalking Horse's Proposed Bid are subject to the approval and calendar of this Court):

(a)      a "Bid Procedures Hearing" at which the Debtor will seek approval of the Bidding Procedures, as described below. The Terms of the Stalking Horse's Proposed Bid require entry of the order approving the Bidding Procedures by June 6, 2011;

(b)      an "Auction" to be conducted in accordance with the Bidding Procedures, following a confirmatory due diligence period for other interested parties, assuming one or more "Qualified Bids" are timely received as provided in the Bidding Procedures. The Debtor proposes to conduct the Auction not later than July 18, 2011 ; and

(c)      a "Sale Hearing" proposed to be held on July 19, 2011, subject to the Court's availability, at which time an order approving the sale (the "Sale Order") would be entered.

160.    The Debtor expects to be able to meet its burden at the Bid Procedures Hearing and the Sale Hearing of demonstrating that the sale efforts to date have been appropriately conducted, with the Debtor already having exposed the Purchased Assets to a comprehensive and competitive sale process.  As such, the proposed time frame will appropriately balance the Debtor's objective need to quickly conclude the sale with the need to thoroughly market the Purchased Assets and properly negotiate a transaction.

161.    In order to ensure that the Debtor's estate is able to derive maximum value from the Purchased Assets, the Debtor negotiated in the Asset Purchase Agreement the right to continue to solicit offers for the Purchased Assets, as provided in the Bidding Procedures.  The Debtor seeks to adopt procedures that will foster continued competitive bidding among potential

buyers without eliminating or discouraging any qualified bids, including the present "stalking horse" bid by the Proposed Purchaser embodied in the Asset Purchase Agreement.

162.    The Debtor, in consultation with its proposed investment banker, Sonenshine, have developed a list of parties who the Debtor believes may potentially be interested in and who the Debtor reasonably believes would have the financial resources to consummate a competing transaction to that of the Proposed Purchaser (a "Competing Transaction"), which list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party", and collectively, the "Contact Parties").   The Debtor and Sonenshine have previously contacted the Contact Parties to explore their interest in pursuing a Competing Transaction.   The Contact Parties may include parties whom the Debtor or its advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction.   The Debtor will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate, as well as advertise the sale of the Proposed Assets.

163.    The Debtor believes that the proposed Bidding Procedures constitute the best method of maximizing the value of the Purchased Assets through the continuation of a competitive sale process.   Accordingly, the Debtor requests that the Court enter the Bidding Procedures Order authorizing the Debtor to implement the Bidding Procedures.

164.    The Proposed Purchaser and the Debtor have negotiated the Asset Purchase Agreement and the transactions contemplated thereby in good faith.   The Debtor requests that the Sale Order find that the Proposed Purchaser is a good-faith purchaser entitled to the protections of 11 U.S.C. § 363(m).   Given Debtor's and the Proposed Purchaser's interest in proceeding

expeditiously, the Debtor requests that the Court also waive the ten-day stay of the effectiveness of the Sale Order consistent with Rule 6004(g) of the Federal Rules of Bankruptcy Procedure.

165.    This concludes my declaration.

I DECLARE UNDER PENALTY OF PERJURY THAT FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

3628389-7

Signed this 16th day of May, 2011.

_____
Joseph J. Luzinski
Chief Restructuring Officer

3628389-7

## EXHIBIT "A"

(Non-debtor) Subsidiaries of HearUSA, Inc.
Owns 100% interest unless otherwise noted

1.  HEARx/PHC, LLC
2.  HEARx Canada, Inc.
3.  HEARx Acquisition, LLC
4.  3838358 Canada, Inc.
5.  Helix Hearing Care of America (USA) Corp.
6.  Auxiliary Health Benefits Corporation D/B/A National Ear Care Plan
7.  HEARx West, LLC (owns 50% interest)