# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION
www. flsb.uscourts.gov

In re:

HearUSA, Inc., [1]

Chapter 11

Case No. 11-_____ (___)

Debtor.

_____/

### DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 361, 362, 363, AND 364, FED. R. BANKR. P. 4001(b) AND (c), AND LOCAL BANKRUPTCY RULES 4001-2 AND 4001-3, (A) AUTHORIZING DEBTOR TO INCUR POSTPETITION INDEBTEDNESS, (B) GRANTING SECURITY INTERESTS AND SUPERPRIORITY EXPENSE CLAIMS, (C) AUTHORIZING USE OF CASH COLLATERAL, AND (D) GRANTING OTHER RELIEF

### (EMERGENCY HEARING REQUESTED)

### Basis for Emergency Relief

**The Debtor submits that a hearing on this Motion is necessary on a "first day" basis. The Debtor faces an acute liquidity problem that necessitated the commencement of this Chapter 11 case. At the present time, the Debtor has no available cash to operate its business and pay its employees. It is therefore critical that, pending a final hearing on this Motion, the Debtor obtains immediate approval to obtain the post-petition financing requested herein on an interim basis. Without approval of the post-petition financing, the Debtor's operations will come to a halt, the value of the Debtor's assets will decline, and creditors and parties in interest will be severely prejudiced. In contrast, approval of the post-petition financing on an interim basis will preserve the value of the Debtor's assets and enable the Debtor to continue its operations and allow for an orderly sale thereof.**

HearUSA, Inc. (the "Company" or the "Debtor"), by undersigned counsel, hereby submits this motion (the "Motion") for entry of interim and final orders, pursuant to sections 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Federal Rule of Bankruptcy Procedure 4001(b) and (c), and Local Bankruptcy Rules 4001-2 and 4001-3, authorizing the Debtor

---

[1] The address of the Debtor is 1250 Northpoint Parkway, West Palm Beach, Florida 33407; and the last four digits of the taxpayer identification number of the Debtor are (8248).

to incur postpetition indebtedness, grant security interests and superpriority expense claims, use cash collateral, provide adequate protection, and granting related relief.  In support of this Motion, the Debtor relies upon the *Declaration In Support of First Day Pleadings* (the "First Day Declaration") which was filed with the Court concurrently herewith, and respectfully represents as follows:

## I.    <u>Jurisdiction</u>

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    <u>Background</u>

2.    On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

3.    The Debtor is operating its businesses and managing its affairs as debtor in possession.  11 U.S.C. §§ 1107(a) and 1108.

4.    As of the filing of this Motion, no trustee, or examiner or committee has been appointed in the Debtor's Chapter 11 case.

5.    For a detailed description of the Debtor and its operations, the Debtor respectfully refers the Court and parties in interest to the First Day Declaration.

## III.

## <u>SUMMARY OF TERMS OF DIP FINANCING</u>

Pursuant to Federal Rule of Bankruptcy Procedure 4001(b)(1)(B) and (c)(1)(B), the Debtor submits the following list and summary of the material terms of the DIP Credit Agreement (as

hereinafter defined) and proposed Interim DIP Order, setting forth the location within the relevant

documents of such material terms.[2]

| Material Provision | Summary Description and/or Location of Provisions in Relevant Documents |
|---|---|
| DIP Lender | William Demant Holdings A/S.  **DIP Credit Agreement, p.1** |
| Borrower | HearUSA, Inc. **DIP Credit Agreement, p. 1.** |
| The purposes for the use of the DIP Facility | All proceeds provided by DIP Lender to Borrower pursuant to any Interim DIP Order or Final DIP Order, the DIP Credit Agreement or otherwise, shall be used by Borrower to make payments in accordance with the Budget prior to the closing of the Section 363 sale, including, without limitation, to fund prior to the Auction, both the Wind Down Amount and the Reserve. Borrower shall pay for administrative expenses from the proceeds of Advances which are (i) directly attributable to the operation of the business of Borrower or (ii) as otherwise authorized by the Bankruptcy Court in any proceeding to which DIP Lender received notice and a reasonable opportunity to object, but in no event may the proceeds of any Advance be used for in excess of the amount permitted under the Budget as approved by the then applicable Interim DIP Order.  **DIP Credit Agreement, p. 16.** |
| Interest Rate | Except where specified to the contrary in the Loan Documents, the aggregate outstanding balances of the Obligations shall accrue interest at the per annum rate of four percentage points (4%) above the Prime Rate.  The Obligations shall bear interest from and after written notice by DIP Lender to Borrower of the occurrence of an Event of Default, and without constituting a waiver of any such Event of Default, at the per annum rate of two percentage points (2%) above the highest interest rate before an Event of Default.  All interest payable under the DIP Loan shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.  Interest as provided for herein shall continue to accrue until the Obligations are paid in full. **DIP Credit Agreement p. 10.** |
| Scheduled Termination Date | The DIP Credit Agreement shall become effective upon execution by DIP Lender and continue in full force through the Term.  This DIP Credit Agreement may be extended by mutual written agreement of the parties on mutually agreeable terms.  In addition, DIP Lender shall have the right to terminate the Term of this DIP Credit Agreement |

---

[2] The following summary contains truncated descriptions of material terms and is qualified in its entirety by the actual terms of the proposed Interim DIP Order and the DIP Credit Agreement themselves.  Capitalized but undefined terms used in this summary shall have the meanings given to such terms in the DIP Loan Documents, the Interim DIP Order, and/or this Motion, as applicable.

3627756-10

| Material Provision | Summary Description and/or Location of Provisions in Relevant Documents |
|---|---|
|  | immediately at any time upon the occurrence of an Event of Default by sending written notice of termination to Borrower.  No such termination shall relieve or discharge Borrower of its duties, Obligations and covenants hereunder until all Obligations have been paid and performed in full, and DIP Lender's continuing security interest in the Collateral shall remain in effect until the Obligations have been fully and irrevocably paid and satisfied in cash or cash equivalent.  Following the termination of the Term of this DIP Credit Agreement, the Obligations shall be immediately due and payable in full.  In the event DIP Lender or its affiliate closes the acquisition contemplated by the APA, then, following the disbursement by the DIP Lender to Borrower prior to the Auction of the Wind Down Amount and, to Borrower's counsel, the Reserve which disbursement is described in the last sentence of **Section 2.1**, all Obligations under the DIP Credit Agreement shall be automatically paid in full at the closing under such APA and the DIP Lender shall release all liens and security interests granted in connection with the DIP Loan.  **DIP Credit Agreement p. 12.** |
| Events of Default Under DIP Credit Agreement and Termination Events | The DIP Credit Agreement includes such events of default (each, an "Event of Default") as are usual and customary for debtor-in-possession financings of this kind.  **DIP Credit Agreement, Section 8, pp. 21 – 23.   Interim DIP Order, ¶ 16, pp. 10-11.** |
| Liens | The First Lien Lender shall be granted first priority, perfected replacement lien covering the Accounts to secure the indebtedness owing under the First Lien Loan Documents, and the DIP Lender shall be granted a junior perfected lien on such Accounts to secure the DIP Loan, subject only to the first lien granted to the First Lien Lender. **DIP Credit Agreement, p 12.** |
| Loan Amount | The Debtors are hereby authorized, pending approval of the Motion on a final basis, to immediately borrow, pursuant to the DIP Credit Agreement, an aggregate amount not to exceed the sum of (i) $10,000,000 (the "DIP Loan Amount"), provided that disbursements of such amounts shall not exceed the amounts permitted under the DIP Budget attached to the Motion as Exhibit C, for the period to and including the date set by the Court for the hearing on the entry of the Final Order (the "Interim Period").  **Interim DIP Order p. 5, Para 2.** |
| Adequate Protection | **See Interim DIP Order, pp. 8-9, ¶ 11-14.** |
| Findings and Determination as to | The liens granted to the DIP Lender shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non- |

4

| Material Provision | Summary Description and/or Location of Provisions in Relevant Documents |
|---|---|
| validity, enforceability, priority, or amount of Prepetition Secured Facilities | avoidable and effective by operation of law as of the Petition Date without any further action by the Debtor or any other party and without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including without limitation the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions.  The granting of the liens on the Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Facility and this Order and except in respect of validly existing duly perfected liens as of the Petition Date.  If the DIP Lender requests that the Debtor execute and deliver to the DIP Lender financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Lender, in accordance with the terms of the DIP Facility, to be reasonably necessary or desirable to further evidence the perfection of the liens granted hereunder, the Debtor is authorized and directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Lender is authorized to file or record such documents, without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order. **Interim Order at ¶ 28, p. 15**. |
| Waiver or modification of Code provisions or applicable rules relating to the automatic stay | With respect to any default under paragraph 16 above of the Interim DIP Order, without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary exercise its rights and remedies under the Interim DIP Order, the DIP Facility, the DIP Credit Agreement and the Loan Documents including, without limitation, automatically terminating the  Debtor's authorization to use any borrowings under the DIP Financing and the Debtor shall have no right to use any borrowings under the DIP Financing other than towards the satisfaction of the DIP Obligations or claims of the Debtor's employees for unpaid wages and commissions accrued in the ordinary course of the Debtor's business prior to the default (to the extent provided in the DIP Budget). <br><br>In the event of a default under any other provision of the Interim DIP Order, the DIP Credit Agreement, or the DIP Loan Documents, and upon five calendar  days' notice by the DIP Lender to the Debtor, the Committee (or the top 20 unsecured creditors if no Committee has been appointed) and the United States Trustee ("Default Notice"), the automatic stay provisions of section 362 of the Bankruptcy Code are |

3627756-10

| Material Provision | Summary Description and/or Location of Provisions in Relevant Documents |
|---|---|
| | vacated and modified to the extent necessary to exercise the DIP Lender's rights and remedies under this Interim Order, the DIP Facility, the DIP Credit Agreement and the Loan Documents and, on the expiration of that five calendar days' notice hereby, automatically terminating the Debtor's authorization to use borrowings under the DIP Financing and the Debtor shall have no right to use borrowings under the DIP Financing other than toward the satisfaction of the DIP Obligations or claims of the Debtor's employees for unpaid wages and commissions accrued in the ordinary course of the Debtor's business prior to the default (to the extent provided in the DIP Budget). Such termination is without prejudice to the right of the Debtor to seek an order contesting the Event of Default, and the DIP Lender consents to a hearing for such purpose on such expedited notice as the Court orders. **Interim DIP Order p. 11-12 at ¶ 17-18.** |
| Limitation of Rights of Parties under § 506(c) | Nothing contained in the Interim DIP Order shall be construed as an agreement or consent by (a) the DIP Lender to be surcharged for any of the Debtor's post-petition expenses pursuant to the Potential Surcharge Sections, except as provided in the Interim Order, (b) the DIP Lender to surcharge by a bankruptcy trustee in a successor case with respect to any period after the termination of the use of borrowings under the DIP Financing pursuant to this Interim Order, and (c) the Debtor irrevocably waives and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment), for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender or its Collateral. In no event shall the DIP Lender be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral. Nothing herein shall waive any right of the Debtor to surcharge other parties in interest. **Interim Order at ¶ 23, p. 13-14.** |
| Professional Fees | Immediately prior to the Auction (as defined in the APA), the DIP Lender shall fund, and the Borrower shall borrow, the sum of (i) the amount designated in the Budget as the amount needed to fund the wind down of the Chapter 11 Case (the "Wind Down Amount") and (ii) for the exclusive benefit of the Professional Persons and the U.S. Trustee to be held by Borrower's counsel in escrow, the Reserve. The Reserve and the Wind Down Amount (a) shall be retained by |

6

| Material Provision | Summary Description and/or Location of Provisions in Relevant Documents |
|---|---|
| | Borrower (or Borrower's counsel in escrow with respect to the Reserve), (b) shall be free and clear of all liens, claims and encumbrances in favor of the First Lien Lender or the DIP Lender and (c) shall not be sold and transferred to the Purchaser under the APA. **DIP Credit Agreement Section 2.1, p. 9.** |
| Application of Collateral Proceeds | Notwithstanding anything to the contrary set forth in the DIP Credit Agreement, Borrower shall have the right to use 100% of the proceeds of any and all Accounts (regardless of whether such proceeds are received by DIP Lender, its designee or Borrower) to fund the working capital needs of Borrower as described in the Budget, in addition to the amounts funded by DIP Lender to Borrower under the DIP Loan. The DIP Order shall provide that (i) the First Lien Lender shall be granted first priority, perfected replacement lien covering the Accounts to secure the indebtedness owing under the First Lien Loan Documents and (ii) the DIP Lender shall be granted a junior perfected lien on such Accounts to secure the DIP Loan, subject only to the first lien granted to the First Lien Lender. **DIP Credit Agreement at Section 2.9, p. 12.** |

## IV.    Pre-Petition Loans and Other Secured Obligations

6.    The Debtor is the obligor under that certain Second Amended and Restated Credit Agreement, dated as of December 30, 2006, among the Debtor, as borrower, and Siemens Hearing Instruments, Inc., as lender (the "Pre-Petition Lender"), as the same heretofore has been amended, amended and restated or otherwise modified ("Pre-Petition Credit Agreement"), as well as the "Loan Documents" as defined in the Pre-Petition Credit Agreement (as each of such agreements and other instruments shall have heretofore been amended, amended and restated or otherwise modified), which include all of the agreements granting security interests and liens in property and assets of the Debtor to the Pre-Petition Lender (collectively, the "Pre-Petition Loan Documents"). The Pre-Petition Credit Agreement and Pre-Petition Loan Documents are collectively referred to herein as the "Existing Agreements."

7

7.      The Existing Agreements provide that (i) the Debtor is obligated under the Pre-Petition Credit Agreement and Pre-Petition Loan Documents for principal, accrued and unpaid interest (including default interest), fees, costs, expenses, indemnities, and other amounts arising under the Pre-Petition Credit Agreement (the "Pre-Petition Obligations"); and (ii) all of the Pre-Petition Obligations purport  to be secured by an asserted first priority security interest in all collateral identified in the Pre-Petition Credit Agreement and all other security for the Pre-Petition Obligations as provided in the Existing Agreements immediately prior to the Petition Date ("Pre-Petition Collateral"), which collateral includes cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral"). Nothing in this motion or the orders the Debtor seeks hereby constitutes any admission by the Debtor regarding the validity, priority or extent of any lien that Siemens may claim in and to any property of the Debtor or the allowability of any claim Siemens may assert against the Debtor's estate.

8.      As of the Petition Date, the Debtor was indebted to the Pre-Petition Lender in the amount of $31.3 million.

9.      The Debtor is party to various other prepetition loans, purchase money secured financing, and capital leases.

## V.      Debtor's Need For Postpetition Financing

10.      In January of 2011, with the assistance of Sonenshine Partners ("Sonenshine") and Tejas Securities ("Tejas"), the Debtor commenced the process of marketing its assets to prospective purchasers and parties that would consider refinancing the Pre-Petition Obligations. Sonenshine and Tejas contacted approximately thirty-five (35) parties, including thirty (30)  financing sources with respect to a refinance of the Pre-Petition Obligations.

11.      The Debtor has received an offer from William Demant Holdings A/S or its permitted assigns (collectively, "WD" or the "Proposed Purchaser") to acquire substantially all of

8

the Debtor's assets itself or through an affiliate, subsidiary or other designee established for such purpose in connection with an auction process to be conducted in this Chapter 11 case pursuant to section 363 of the Bankruptcy Code whereby WD would act as the "stalking horse" bidder. Pursuant to the Asset Purchase Agreement, the Proposed Purchaser proposes to acquire the Purchased Assets (as defined in the Asset Purchase Agreement) for approximately $70 million in cash plus other cash and non-cash consideration set forth in the Asset Purchase Agreement (including, the assumption of liabilities, the payment of cure costs and the payment in full of the DIP Loan).

12.     The Debtor intends to continue to market its business for sale as a going concern as set forth in the Debtor's *Emergency Motion For An Order (A) Approving Asset Purchase Agreement, (B) Approving The Bidding Procedures, (C) Approving The Form And Manner Of Notice Of The Auction And Sale, And (D) Authorizing The Sale Of The Debtor's Assets* (the "Bid Procedures Motion").  As discussed in the Bid Procedures Motion, the Asset Purchase Agreement is subject to higher and better offers.   The Debtor intends to proceed with a sale process pursuant to section 363 of the Bankruptcy Code.    In order to preserve the value of its operations during the period between the Petition Date and a going concern sale, the Debtor seeks to continue to operate its businesses in the ordinary course. To achieve that goal and preserve its estate, the Debtor needs continued access to post petition financing.

13.     WD (also referred to hereinafter as the "DIP Lender") has agreed to provide liquidity through the DIP Loan Facility (as defined below).  The DIP Loan Facility will give the Debtor access to sufficient credit to take it through the 363 sale process. Absent immediate and continued availability of credit, the Debtor's operations undoubtedly will be disrupted, and its going concern value eroded. The DIP Facility will assist the Debtor in continuing its operations pending a sale.

The availability of postpetition financing will also provide a sense of confidence in the suppliers, customers and employees of the Debtor.

## VI.    Terms of the Proposed DIP Facility

14.    Under the DIP Facility, the Debtor will obtain from the DIP Lender cash advances and other extensions of credit in an aggregate principal amount of $10,000,000 (the "DIP Loan Facility"), subject to the entry of a final order (the "Final DIP Order") approving the DIP Loan Facility.  Specifically, by this Motion, the Debtor is seeking authorization to incur post-petition indebtedness (the "DIP Financing"), pursuant to the debtor-in-possession credit facility under that certain "Credit and Security Agreement" dated May 16, 2011 by and among the Debtor, as the Borrower, and WD, as lender, attached to the Motion as Exhibit A (as it may be modified, supplemented or amended from time to time, the "DIP Credit Agreement", and together with the other Loan Documents, as defined in the DIP Credit Agreement, the "DIP Loan Documents"),[3] and to grant liens, security interests and superpriority claims to the DIP Lender.  The Debtor is also requesting authorization to use prepetition collateral under its prepetition debt facilities, including cash collateral, and provide adequate protection in respect of the interests of the lenders asserting interests in such collateral.

15.    The DIP Credit Agreement is subject to the terms and conditions of a proposed order approving the relief requested herein (the "Interim DIP Financing Order," a copy of which, is attached hereto as Exhibit B).

16.    Certain of the material terms of the DIP Credit Loan Agreement are summarized below:[4]

---

[3] Capitalized terms used in this Motion and not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement.

[4] The summary of the DIP Credit Agreement is intended only to assist the Court and parties in interest in understanding the key aspects of the agreement.  In the event of any conflict between this Motion and the terms of the DIP Credit Agreement, the DIP Credit Agreement shall control.

10

| | |
|---|---|
| **APA** | Prior to the funding of the DIP Loan Facility, WD or its affiliate, subsidiary or other designee established for such purpose (the "Proposed Purchaser") will enter into an asset purchase agreement (the "APA") with the Debtor under which the Proposed Purchaser will agree to purchase substantially all of the assets of the Debtor (the "Sale"). Proposed Purchaser's rights under the APA will be non-exclusive, and the APA will be subject to termination if the Debtor receives a superior offer. The outstanding balance of the DIP Loan Facility will be treated as a portion of the Proposed Purchaser's purchase price (*i.e.*, as a "credit bid") and be deemed satisfied at closing of such bid, or shall be satisfied in full out of the closing proceeds of any higher and better bid approved by the Bankruptcy Court. DIP Lender shall have the right to credit bid all of the Obligations in connection with a sale of the Debtor's assets under section 363 of the Bankruptcy Code or under a plan of reorganization or otherwise. |
| **Funding** | Initial draw available on the entry of an interim order (the "Interim DIP Order") approving the DIP Loan Facility on an interim basis and up to the full principal amount permitted solely in accordance with Final DIP Order and the budget agreed to by the Debtor and WD (the "Budget"). |
| **Maturity** | WD will be entitled to immediate repayment of all outstanding obligations under the DIP Loan Facility on the earliest of: (a) the closing of the Sale contemplated by the APA; (b) the closing of any higher and better bid approved by the Bankruptcy Court; and (c) to and including 120 days following the entry of the Interim DIP Order. |
| **Priority** | The security interests securing the DIP Loan Facility shall be junior to all valid, enforceable, nonavoidable, perfected security interests in existence as of the filing date of the Company's chapter 11 case. |
| **Security** | The collateral for the DIP Loan Facility, subject to the priority provided for above, shall include a fully perfected security interest in substantially all of the existing and after-acquired real property and personal, tangible and intangible, assets of the Company including, without limitation, all cash, cash equivalents, bank deposit and securities accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, general intangibles, avoidance actions to the extent provided in the Final DIP Order, investment property, supporting obligations, tax refunds, securities, franchise rights, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, patents, tradenames, trademarks, copyrights, |

11

intellectual property and all substitutions, accessions and proceeds of such intellectual property, wherever located, including insurance or other proceeds (collectively, the "Collateral"). Notwithstanding the foregoing, the Company will not be required to grant leasehold mortgages on their leased property, but the Interim DIP Order and Final DIP Order will grant a security interest in any proceeds of leases and other real property.

**Interest Rate**    Borrowings will bear interest at a rate per annum equal to the Prime Rate plus four (4%) percent, calculated on the basis of actual days lapsed over a 360 day year and will be payable on the earlier of the closing of the Sale or the expiration of the Term of the DIP Loan Facility.

**Default Rates**    After an event of default under the DIP Loan Facility, the applicable rates of interest shall be increased by 2% per annum above the highest pre-default rates. Such increased rates shall also apply to any obligations owing that remain unpaid after the termination of the DIP Loan Facility.

**Closing Fee**    The Debtor shall pay to WD the amount equal to two (2%) percent of $10,000,000 as a closing fee, which fee is fully earned as of and payable at the time of the initial draw.

**Use of Proceeds**    The DIP Loan Facility will be available to the Debtor to fund the Company's budgeted administrative expenses through the closing of the Sale or any alternative sale transaction substantially in accordance with the budget, attached to the Motion as Exhibit C (the "Budget"). The budget shall be agreed to by the Debtor and WD and shall include, without limitation, budgeted professionals fees and post closing chapter 11 wind down expenses. Notwithstanding anything herein to the contrary, the proceeds of the DIP Loan Facility shall not be used for any purpose other than to maintain the value and security of the assets that are the subject of the APA, including day-to-day operational and overhead expenses (including professional fees), until such time as the Bankruptcy Court has entered the Final DIP Order approving the DIP Loan Facility.

**Documentation**    The DIP Loan Facility will be documented with a promissory note, security or credit agreement and interim and final orders of the Bankruptcy Court. The documentation of the DIP Loan Facility and the interim and final order shall be reasonably satisfactory to the Debtor and WD.

**Amendments**    The Debtor shall not enter into any amendment to the APA or the documentation of the DIP Loan Facility, nor shall it exercise any discretionary rights thereunder, without the express prior consent of

12

WD.

17.     Moreover, immediately prior to the Auction (as defined in the APA), the DIP Lender shall fund, and the Debtor shall borrow, the sum of  the amount designated in the Budget as the amount needed to fund the wind down of the Debtor's Chapter 11 case (the "Wind Down Amount") and the Reserve.  The Reserve constitutes funds placed in escrow with Debtor's counsel consistent with the amounts permitted by the Budget for the exclusive benefit of the payment of Professional Persons with the approval of the Court as well as the fees due to the Office of the U.S. Trustee.   The Wind Down Amount and the Reserve (a) shall be retained by the Debtor (or Debtor's counsel, with respect to the Reserve), (b) shall be free and clear of all liens, claims and encumbrances in favor of any secured creditor, including the Pre-Petition Lender or the DIP Lender, and (c) shall not be sold and transferred to the Purchaser under the APA.

18.     The DIP Loan Facility will enable the Debtor to pay operating expenses, compensate their employees and purchase inventory and otherwise maximize the value of its business.  The Debtor negotiated the terms of the DIP Loan Facility with the DIP Lender at arms' length and in good faith (as defined in Section 364(e) of the Bankruptcy Code), with all parties represented by counsel.  The Debtor believes that the negotiated terms are fair and reasonable under the circumstances.

## VII.   <u>Relief Requested</u>

19.     By this Motion, the Debtor requests, pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (c), that the Court enter interim and final orders authorizing, *inter alia,* the Debtor to enter into the DIP Facility with the DIP Lender pursuant to the DIP Loan Documents and granting other relief related thereto.  The Debtor further seeks authorization to use the Cash Collateral of the Pre-Petition Lender on the terms provided herein.  Specifically, the cash consideration to be paid by the Proposed Purchaser

for the Purchased Assets exceeds by almost $40 million the principal amount of the Pre-Petition

Obligations.  Therefore, the Pre-Petition Lender is adequately protected, as the Pre-Petition

Obligations will be paid off in full upon the closing of the sale of the Purchased Assets to the

Proposed Purchaser or other successful bidder.  Moreover, the Pre-Petition Lender will retain its

existing prepetition liens, and any security interests granted the DIP Lender shall be junior to all

validly existing prepetition liens and security interests in the Collateral.

20.     Additionally, the Debtor seeks authorization to use the Pre-Petition Lender's cash

collateral derived from all prepetition receivables.  The Debtor will provide, as adequate protection

with respect thereto, a replacement lien on all post-petition receivables on dollar-for-dollar basis of

the prepetition cash utilized prior to the closing of the sale of the Purchased Assets, to the extent of

Siemens's claims are secured by validly existing duly perfected and nonavoidable liens.  The Pre-

Petition Lender is being provided further adequate protection in that the full amount of its allowed

secured claim will be paid or escrowed at closing until allowed.

## VIII.   Authority For Relief

**A.     The DIP Credit Facility Satisfies the Standards of Bankruptcy Code Section 364(c)**

21.     The Debtor is unable to procure the credit required to fund its postpetition business

operations in the form of unsecured credit or unsecured credit with an administrative expense

priority under Bankruptcy Code section 503(b)(1).

22.     The Debtor, therefore, has no choice but to obtain credit on a secured basis.  The

obtaining of postpetition credit by a debtor-in-possession is governed by Bankruptcy Code Section

364.  That statute provides:

(c)  If the [debtor-in-possession] is unable to obtain unsecured credit allowable
under section 503(b)(1) of this title as an administrative expense, the court, after
notice and a hearing, may authorize the obtaining of credit or incurring of debt --

14

(1)   with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)  secured by a junior lien on property of the estate that is subject to a lien.

23.     A debtor seeking financing under Bankruptcy Code sections 364(c) must make a reasonable effort to seek other sources of unsecured credit available but "is not required to seek credit from every possible source." *In re Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085 (4th Cir. 1986); *In re Ames Department Store, Inc.*, 115 B.R. 34 (S.D.N.Y. 1990).  The Debtor, through its advisors, approached approximately thirty (30) financing sources regarding a refinance of the Pre-Petition Obligations.  None expressed a willingness to provide the Debtor with the liquidity it requires to operate its businesses.  The DIP Lender will provide the Debtor with enough credit availability under its financing proposal.  The most favorable terms - indeed the only terms - for such financing were offered by the DIP Lender. Because the Debtor has a need for financing to meet its ongoing working capital needs and the DIP Lender is willing to provide such financing on the best terms offered, the Debtor has satisfied its burden of showing the unavailability of alternative unsecured financing.

24.     Having determined that postpetition financing is available only under Bankruptcy Code section 364(c), the Debtor negotiated the DIP Loan Facility at arm's length and in accordance with its sound business judgment.  In negotiating debtor-in-possession financing arrangements, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties." *Id.* at 38.  Courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the necessity for obtaining financing so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. *See, e.g., In re Snow Shoe*,

789 F.2d 1085 (4th Cir. 1986) (approving postpetition financing necessary to sustain seasonable

business); *Ames*, 115 B.R. at 40 ("Cases consistently reflect that the court's discretion under section

364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as

the financing agreement does not contain terms that leverage the bankruptcy process and powers or

its purpose is not so much to benefit the estate as it is to benefit parties in interest.")  Courts

generally will not override the debtor's prudent and responsible exercise of its business judgment

consistent with its fiduciary duties to the bankruptcy estate and its creditors in negotiating an

appropriate financing package.  *See In re Simasko Prod Co.*, 47 B.R. 444 (Bankr.  D. Colo. 1985)

(noting that business judgment should be left to the boardroom and not to the bankruptcy courts).

25.    The financing contemplated by the DIP Loan Facility benefits the Debtor's

bankruptcy estate and its creditors.  It is critical to the preservation of the Debtor's business and

going concern value.  With the credit provided under the DIP Loan Facility, the Debtor will be able

to sustain its operations, including paying its employees, maintaining adequate cash balances, and

operating its businesses in order to preserve the ongoing value of its assets and enterprise for the

benefit of all creditors.   The availability of credit under the DIP Loan Facility will provide

Debtor's vendors and suppliers the necessary confidence to resume ongoing relationships with the

Debtor, including the extension of credit terms for the payment of goods or services.

26.    Moreover, the implementation of the DIP Loan Facility will be viewed favorably by

the Debtor's employees and customers.  Without the financing furnished by the DIP Loan Facility,

the Debtor will not be able to meet its payroll and other direct operating expenses, will suffer

irreparable harm, and the value of its enterprise will be severely eroded.  This Court should

authorize the Debtor to obtain postpetition financing to the extent and pursuant to the terms

contained in the DIP Loan Documents and the proposed final financing orders.

27.    The terms and conditions of the DIP Loan Facility and related DIP Loan Documents are fair and reasonable and were negotiated by the parties in good faith and at arm's length.  The DIP Lender should therefore be accorded the benefits granted under Bankruptcy Code section 364(e).

**B.    Use of Pre-Petition Lender's Cash Collateral and Adequate Protection under Bankruptcy Code Sections 363 and 364**

28.    By this Motion, the Debtor further seeks authority to use the Cash Collateral of the Pre-Petition Lender.  The cash portion of the purchase price to be paid by the Proposed Purchaser for the Purchased Assets exceeds by almost $40 million the principal amount of the Pre-Petition Obligations.  Therefore, the Pre-Petition Lender is adequately protected, as the Pre-Petition Obligations will be paid off in full upon the closing of the sale of the Purchased Assets to the Proposed Purchaser or other successful bidder.

29.    The purpose of adequate protection is to ensure that the secured creditor receives the value for which he bargained prebankruptcy.  *In re Swedeland Development Group, Inc.*, 16 F.3d 552 (3rd Cir. 1994); *In re Dunes Casino Hotel*, 69 B.R. 784, 793 (Bankr.  D.N.J. 1986), citing *In re Coors of the Cumberland*, 19 B.R. 313 (Bankr. M.D. Tenn. 1982).  It is designed to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization.  *In re 495 Central Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992).  Because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis.  *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393 (10th Cir. 1987).

30.    The adequate protection to be granted to the Pre-Petition Lender pursuant to the financing orders is fair and reasonable under the circumstances of this case.  Any diminution in the

17

Pre-Petition Lender's interest in the Cash Collateral ultimately will be remedied as the result of the complete satisfaction and pay off of the Pre-Petition Obligations.

31.     Pending a final hearing on this Motion, as required by Bankruptcy Rule 4001(c), the Debtor will only borrow such monies from the DIP Lender as are necessary to maintain its operations and to avoid immediate and irreparable harm to the estates.  The Debtor estimates that the interim emergency financing will be approximately $3,086,400.

## IX.    Notice

32.     Notice of this Motion will be provided by hand delivery, or facsimile, or electronic mail to: (1) the Office of the United States Trustee; (2) counsel to the Pre-Petition Lender; counsel to WD; (3) the 20 largest unsecured creditors for the Debtor as identified in the Debtor's Chapter 11 petition; and (4) all parties who have timely filed requests for Notice under Bankruptcy Rule 2002.

WHEREFORE, the Debtor respectfully requests entry of an order in the form that accompanies this Motion, as well as granting any other and further relief the Court deems just and proper.

Dated: May 16, 2011                    Respectfully submitted,

                                       BERGER SINGERMAN, P.A.
                                       *Proposed Counsel for Debtor-in-Possession*
                                       350 East Las Olas Boulevard, Suite 1000
                                       Fort Lauderdale, FL 33301
                                       Telephone: (954) 525-9900
                                       Facsimile:  (954) 523-2782

                                       and

                                       200 S. Biscayne Boulevard, Suite 1000
                                       Miami, FL 33131
                                       Telephone:  (305) 755-9500
                                       Facsimile:   (305) 714-4340

                                       By:   */s/  Paul Steven Singerman*
                                             Paul Steven Singerman
                                             Florida Bar No. 378860
                                             singerman@bergersingerman.com
                                             Brian K. Gart
                                             Florida Bar No. 381152
                                             bgart@bergersingerman.com

**EXHIBIT A**

3627756-10

## CREDIT AND SECURITY AGREEMENT

This CREDIT AND SECURITY AGREEMENT is entered into as of May 16, 2011 (the "Execution Date"), by and among, HearUSA, Inc., a Delaware corporation ("HUSA" or "Borrower") and William Demant Holdings A/S ("DIP Lender"):

WHEREAS, HUSA intends to be a debtor and debtor in possession in a bankruptcy case to be pending under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the "Bankruptcy Code"), to be filed within two business days after the Execution Date (the date in which such bankruptcy case shall be commenced, the "Filing Date") in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "Bankruptcy Court")(the "Chapter 11 Case") and Borrower shall retain possession of its assets and shall be authorized under sections 1107 and 1108 of the Bankruptcy Code to continue the management and operation of its business as a debtor in possession;

WHEREAS, Borrower requested that DIP Lender provide, and the DIP Lender agrees to provide, subject to the terms and conditions hereof, a new debtor-in-possession financing facility to Borrower to provide working capital to the Borrower in an aggregate principal amount up to and including $10,000,000.00;

WHEREAS, DIP Lender or its affiliate has also executed an APA (hereinafter defined) with the Borrower to serve as the "stalking horse" purchaser in connection with a section 363 sale of substantially all of the assets of the Borrower in the Chapter 11 Case and DIP Lender is providing the DIP Loan to accommodate and support such sale process and such "stalking horse" bid;

NOW, THEREFORE, in consideration of these premises and the covenants and agreements contained herein, the parties hereto agree to as follows:

1. DEFINITIONS, CONSTRUCTION AND RATIFICATION

1.1 **Terms**. As used in this DIP Credit Agreement, the following terms have the following meanings:

(a) "Account" means (i) any and all post petition accounts receivable, trade accounts and other amounts receivable (including overdue accounts receivable) owed to the Borrower relating to, or arising in connection with the operation and conduct of, the Business from and after the Filing Date and any other rights of the Borrower to payment from third parties arising from and after the Filing Date, including, but not limited to, those reflected in the books and records of HUSA, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of services rendered, in each case owing to the Borrower from and after the Filing Date; (ii) all other accounts or notes receivable of the Borrower arising from and after the Filing Date and the full benefit of all security for such accounts or notes receivable arising in the conduct of the Business; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon, in each case existing on the Execution Date or arising in the ordinary course of business after the Execution Date and in each case that have not been satisfied or discharged prior to the close of business on the day

immediately preceding the Filing Date or have not been written off or sent to collection prior to the close of business on the day immediately preceding the Filing Date (it being understood that the receipt of a check prior to the close of business on the day immediately preceding the Filing Date shall constitute satisfaction or discharge of the applicable account or note receivable to the extent of the payment represented thereby). No PrePetition Collateral shall be included in this definition of the term "Account."

(b)     "Advances" means all loans, advances and other financial accommodations by DIP Lender to or on account of Borrower under **Section 2.1** hereof.

(c)     "APA" means the Asset Purchase Agreement entered into contemporaneously or prior to the execution of this DIP Credit Agreement by the DIP Lender or its affiliate, subsidiary or designee established for such purpose, William Demant Holdings A/S, as guarantor, the Borrower and Auxiliary Health Corporation ("Auxiliary Health") for the purchase of substantially all of the Borrower's assets and Auxiliary Health's assets and to serve as the stalking horse bidder under the section 363 sale proposed by the Borrower in the Chapter 11 Case.

(d)     "Authorized Officer" means any officer or other representative of Borrower authorized in a writing delivered to DIP Lender to transact business with DIP Lender.

(e)     "Avoidance Actions" means recoveries from, or settlements of, actions commenced by Borrower's bankruptcy estate under chapter 5 of the Bankruptcy Code.

(f)     "Bankruptcy Code" means chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*

(g)     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division, or such other court having jurisdiction over the Chapter 11 Case.

(h)     "Borrower's Books" means all of Borrower's books and records including all of the following: ledgers; records indicating, summarizing, or evidencing Borrower's assets or liabilities, or the Collateral; all information relating to Borrower's business operations or financial condition; and all computer programs, disk or tape files, printouts, runs, or other computer prepared information, and the facilities containing such information, but specifically excluding Borrower's corporate minute books, stock ledgers and the like.

(i)     "Borrower Professional Expense Reserve" means on any date, an amount (in each case excluding security retainers provided by Borrower to Professionals prior to the date hereof) set forth for Professional Expenses in the Budget, but in no event shall such amount exceed the aggregate amount set forth in the Budget.

(j)     "Business Day" means any day, excluding Saturday, Sunday and any other day on which commercial banks in New York are authorized or required by law to close.

-2-

(k)     "Budget" means the budget agreed to by the Borrower and the DIP Lender (and as amended, from time to time, with the consent of Borrower and the DIP Lender), a copy of which is attached as **Schedule 2.1**.

(l)     "Chapter 11 Case" means, collectively, Borrower's cases under chapter 11 of the Bankruptcy Code, to be commenced in the Bankruptcy Court within two business days after the Execution Date.

(m)     "Chattel Paper" shall have the same meaning ascribed to such term in the Code.

(n)     "Code" means the Florida Uniform Commercial Code, as amended or revised from time to time.

(o)     "Collateral" means and shall include, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, a fully perfected security interest in substantially all of the existing and after-acquired real property and personal, tangible and intangible, assets of the Company including, without limitation, all cash, cash equivalents, bank deposit and securities accounts, Accounts, other receivables, Chattel Paper, contract rights, Inventory, instruments, documents, securities (whether or not marketable), Equipment, fixtures, real property interests, franchise rights, general intangibles, Avoidance Actions (to the extent permitted in the Final DIP Order), investment property, supporting obligations, tax refunds, securities, franchise rights, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, patents, tradenames, trademarks, copyrights, intellectual property and all substitutions, accessions and proceeds of such intellectual property, wherever located, including insurance or other proceeds; but expressly excluding Avoidance Actions and any proceeds with respect to such Avoidance Actions (unless expressly permitted in the Final DIP Order).  Notwithstanding the foregoing, the Borrower will not be required to grant leasehold mortgages on their leased property, but the Interim DIP Order and Final DIP Order will grant a security interest in any proceeds of leases and other real property.

(p)     "Committee Professional Expense Reserve" means on any date, the applicable amount per week set forth in the Budget  (effective as of Monday or first business day of each week), multiplied by the number of Mondays that have elapsed from the date of this Agreement through the date of determination, minus the amount of allowed Professional Expenses paid during such period to Professional Persons retained by the Committee, but in no event shall such amount exceed the aggregate amount provided therefor in the Budget.

(q)     "Deposit Account" shall have the meaning ascribed to such term in the Code.

(r)     "DIP Credit Agreement" means this Credit and Security Agreement, by and among HUSA and the DIP Lender and any extensions, supplements, amendments, addenda or modifications to or in connection with this  DIP Credit Agreement.

(s)     "DIP Lender" means William Demant Holdings A/S, its successors and assigns.

-3-

(t)    "DIP Lender Expenses" means all of the following:  costs and expenses (whether taxes, assessments, insurance premiums or otherwise) required to be paid by Borrower under any of the Loan Documents which are paid or advanced by DIP Lender; filing, recording, publication, appraisal and search fees paid or incurred by DIP Lender in connection with DIP Lender's transactions with Borrower; costs and expenses incurred by DIP Lender in the disbursement or collection of funds to or from Borrower; charges resulting from the dishonor of checks; costs and expenses incurred by DIP Lender to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated; and costs and expenses incurred by DIP Lender in enforcing or defending the Loan Documents, including, but not limited to, costs and expenses incurred in connection with any proceeding, suit, enforcement of judgment, or appeal; and DIP Lender's reasonable attorneys' fees and expenses (which will include reasonable outside counsel fees and expenses) incurred in amending, terminating, enforcing, defending, or otherwise representing DIP Lender post petition concerning the Loan Documents or the Obligations; but expressly excluding the "Expense Reimbursement" under the APA and any costs and expenses (including, without limitation, any legal, accounting or other fees and expenses) incurred by the DIP Lender or its affiliate(s) in connection with the negotiation of, due diligence with respect to, and the consummation of, the transaction contemplated by the APA.

(u)    "DIP Loan" means the loan, in the aggregate amount up to $10,000,000.00 including but not limited to borrowings, interest due on the DIP Loan and the DIP Lender Expenses, which is made by the DIP Lender to the Borrower, as evidenced by this DIP Credit Agreement and the other Loan Documents.

(v)    "DIP Order" means any Interim DIP Order or Final DIP Order, as applicable, in form and substance satisfactory to the DIP Lender approving the DIP Credit Agreement and authorizing the Borrower's incurrence of post petition secured and super priority debtor in possession financing, subject to the liens and security interests of the First Lien Lender.

(w)    "Documents" means all of Borrower's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case, whether or not in electronic form.

(x)    "Encumbrance" means any lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

3635404-9

(y)     "Equipment" means all equipment, machinery, vehicles, furniture, fixtures, supplies and other tangible personal property of every kind and description used, or held for use, in connection with the operation of the Borrower's business and owned by Borrower, wherever located, and including all warranties of the vendor applicable thereto, to the extent such warranties are transferable, but excluding software and any other intangibles associated therewith except to the extent embedded in such Equipment and required to operate it.

(z)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

(aa)     "ERISA Affiliate" means any entity which is, or at any relevant time was, a member of (A) a controlled group of corporations (as defined in section 414(b) of the Code), (B) a group of trades or businesses under common control (as defined in section 414(c) of the Code), (C) an affiliated service group (as defined under section 414(m) of the Code) or (D) any group specified in regulations under section 414(o) of the Code, any of which includes or included Borrower.

(bb)     "Event of Default" means the events specified in **Section 8**, below.

(cc)     "Financial Assets" shall have the meaning ascribed to such term in the Code.

(dd)     "Final DIP Order" means the order, in a form consented to by the DIP Lender in its sole discretion, authorizing, inter alia, the granting of credit by DIP Lender to Borrower on a permanent basis authorizing to the Borrower as post petition secured and super priority debtor in possession financing .

(ee)     "Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in Borrower's Chapter 11 Case or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari,* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

(ff)     "First Lien Credit Agreement" means that certain Second Amended and Restated Credit Agreement, dated as of December 30, 2006, among HUSA, as borrower, and the First Lien Lender, as lender, as such agreement has been amended, modified and supplemented from time to time.

-5-

(gg) "First Lien Lender" means Siemens Hearing Instruments, Inc. and its successors and assigns.

(hh) "First Lien Loan Documents" means the "Loan Documents" as defined in the First Lien Credit Agreement, as such Loan Documents are amended, modified, supplemented or restated from time to time.

(ii) "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(jj) "General Intangibles" means in addition to the definition of general intangibles in the Code all of Borrower's present and future general intangibles and other personal property (including choses or things in action, goodwill, patents, trade names; trademarks, service marks, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds (other than "trust funds"), route lists, infringement claims, computer programs, computer discs, computer tapes, Borrower's Books, literature, reports, catalogs, deposit accounts, insurance premium rebates, tax refunds, and tax refund claims) other than goods and Accounts. However, the term "General Intangibles" shall not include Avoidance Actions.

(kk) "Insolvency Proceeding" means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code, as amended, or under any other state or federal insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with its creditors.

(ll) "Instruments" shall have the meaning ascribed to such term in the Code.

(mm) Interim DIP Order" means the order, that is consented to by the DIP Lender in its sole discretion, authorizing, inter alia, the granting of credit by DIP Lender to Borrower on a permanent basis authorizing to the Borrower as post petition secured and super priority debtor in possession financing; but without any use by the Borrower of any cash collateral of the First Lien Lender.

(nn) "Interim Period" means the period commencing on the date that the Interim DIP Order is entered by the Court and ending on the date that the Final DIP Order is entered by the Court.

(oo) "Inventory" means in addition to the definition of inventory in the Code all present and future inventory in which Borrower has any interest, including goods held for sale or lease or to be furnished under a contract of service, Borrower's present and future raw materials, work in process, finished goods, tangible property, stock in trade, wares, and materials used in or consumed in Borrower's business, goods which have been returned to, repossessed by, or stopped in transit by Borrower, packing and shipping materials, wherever located, any documents of title representing any of the above, and Borrower's Books relating to any of the foregoing.

(pp) "Investment Property" shall have the meaning ascribed to such term in the Code.

(qq)    "IRC" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

(rr)    "Letter of Credit Rights" shall have the meaning ascribed to such term in the Code.

(ss)    "Loan Documents" means, collectively, this DIP Credit Agreement, any Note, Interim DIP Order, Final DIP Order, security agreement, pledge agreement, mortgage, deed of trust or any other encumbrance or agreement which secure the Obligations, and any other agreement entered into between Borrower and DIP Lender or by Borrower for the benefit of DIP Lender relating to or in connection with this DIP Credit Agreement or the Obligations, as each of same may be amended, modified, extended or substituted from time to time.

(tt)    "Multiemployer Plan" means a multiemployer plan as defined in ERISA sections 3(37) or 4001(a)(3) or IRC section 414(f).

(uu)    "Negotiable Collateral" means all of Borrower's present and future letters of credit, notes, drafts, instruments, documents, leases, and Chattel Paper.

(vv)    "Note" means any promissory note made by Borrower to the order of DIP Lender concurrently herewith or at any time hereafter.

(ww)    "Obligations" means all loans, advances, debts, liabilities (including all interest and amounts charged to the Obligations pursuant to any agreement authorizing DIP Lender to charge the Obligations), obligations, lease payments, guaranties, covenants, and duties owing by Borrower to DIP Lender of any kind and description (whether Prepetition Obligations or incurred thereafter and whether pursuant to or evidenced by the Loan Documents or by any other agreement between DIP Lender and Borrower, and irrespective of whether for the payment of money), whether made or incurred prior to, on, or after the Termination Date, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including any debt, liability or obligation owing from Borrower to others which DIP Lender may obtain by assignment or otherwise, all interest thereon and all DIP Lender Expenses.

(xx)    "Plan" means any plan described in ERISA section 3(2) maintained for employees of Borrower or any ERISA Affiliate, other than a Multiemployer Plan.

(yy)    "PrePetition Collateral" means any collateral encumbered by the liens evidenced by the First Lien Loan Documents arising prior to the Filing Date.

(zz)    "Prime Rate" means that rate designated in the "Money Section" of the Wall Street Journal on the business day prior to the date in question or any successor thereof, from time to time as its prime rate, which shall not necessarily constitute its lowest available rate.

(aaa)    "Professional Expenses" means the fees and reimbursable expenses of a Professional Person.

(bbb)    "Professional Expense Reserve" means the collective reference to (i) the Borrower's Professional Expense Reserve, (ii) the Committee's Professional Expense Reserve

-7-

and (iii) the other reserves for the payment of Professional Persons, in each case, as set forth in the Budget.

(ccc)    "Professional Person" means a Person who is an attorney, accountant, investment banker, appraiser, auctioneer or other professional person and who is retained, with Court approval, by (i) Borrower pursuant to Section 327 of the Bankruptcy Code or (ii) a Committee pursuant to Section 1103(a) of the Bankruptcy Code.

(ddd)    "Reserve" means an amount, for the exclusive benefit of the Professional Persons and the U.S. Trustee, equal to the sum of (a) the Professional Expense Reserve and (b) an amount equal to all claims for the fees and expenses of the Clerk of the Court and fees of the United States Trustee if not paid within five days of the due date.

(eee)    "Super-Priority Administrative Expense" means a claim against Borrower or its estate in its Case which is an administrative expense claim having priority over (i) any and all allowed administrative expenses and (ii) unsecured claims now existing or hereafter arising, including, without limitation, administrative expenses of the kind specified in section 503(b), 506(c) or 507(b) of the Bankruptcy Code.

(fff)    "Supporting Obligation" shall have the meaning ascribed to such term in the Code.

(ggg)    "Term" means the period from the date of the execution and delivery by DIP Lender of this DIP Credit Agreement through and including the earlier of (a) the closing of the sale contemplated by the APA and (b) the closing of any higher and better bid approved by the Bankruptcy Court and (c) to and including 120 days following the entry of the first Interim DIP Order. Once the DIP Loan is repaid it is terminated and unavailable.

(hhh)    "Wind Down Amount" shall have meaning set forth in **Section 2.1**.

1.2    **Construction.** Unless the context of this DIP Credit Agreement clearly requires otherwise, references to the plural include the singular and to the singular include the plural. The words *hereof, herein, hereby, hereunder,* and similar terms in this DIP Credit Agreement refer to this DIP Credit Agreement as a whole and not to any particular provision of this DIP Credit Agreement, section, subsection, clause and exhibit references are to this DIP Credit Agreement unless otherwise specified. Words importing a particular gender mean and include every other gender.

1.3    **Accounting Terms.** All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles (GAAP) as in effect from time to time. When used herein, the term financial statements shall include the notes and schedules thereto.

1.4    **Exhibits.** All of the exhibits, addenda or riders attached to this DIP Credit Agreement shall be deemed incorporated herein by reference.

1.5    **Code.** Any terms used in this DIP Credit Agreement which are defined in the Code shall be construed and defined as set forth in the Code, unless otherwise defined herein.

-8-

## 2.    ADVANCES AND TERMS OF PAYMENT

2.1    **Advances.**  Upon the request of Borrower, Advances under the DIP Loan  will be used, in accordance with the terms of the Budget attached as **Schedule 2.1**,  (i) to pay expenses described  in the Budget during the Interim Period and, after the Interim Period, to pay any expenses described in the Final DIP Order; (ii) to pay adequate protection claims, but only to the extent authorized by the Bankruptcy Court and consented to by DIP Lender; (iii) to pay, on a weekly basis, fees required to be paid to the office of the U.S. Trustee; (iv) to pay, on a weekly basis, Professional Expenses of Professional Persons subject to any limitations in the Interim DIP Order, the Final DIP Order, allowance by the Court and Borrower's receipt of an itemized billing and expense statement from such Professional Person; (v) to pay property taxes with respect to any Collateral to the extent nonpayment thereof is secured by a Lien senior to DIP Lender's Liens thereon; (vi) to fund the Reserve, on a weekly basis, as provided in the Interim DIP Order and the Final DIP Order; and (vii) to pay other expenses authorized by the Bankruptcy Court in orders entered in the Chapter 11 Case that are acceptable to DIP Lender; including to pay transaction costs, fees and expenses under the DIP Loan, on the entry of an Interim DIP Order approving this DIP Credit Agreement on an interim basis solely  up to the interim amount agreed to by the DIP Lender under the Budget for ordinary operating expenses and other expenses described above during the period authorized under the Interim DIP Order and, further, under a Final DIP Order, the lesser of the amount permitted under the Budget and up to and including Ten Million Dollars ($10,000,000.00).  DIP Lender shall fund the Reserve on a weekly basis in accordance with the Budget. Notwithstanding the foregoing, immediately prior to the Auction (as defined in the APA), the DIP Lender shall fund, and the Borrower shall borrow, the sum of (i) the amount designated in the Budget as the amount needed to fund the wind down of the Chapter 11 Case (the "Wind Down Amount") and (ii) for the exclusive benefit of the Professional Persons and the U.S. Trustee to be held by Borrower's counsel in escrow, the Reserve.  The Reserve and the Wind Down Amount (a) shall be retained by Borrower (or Borrower's counsel in escrow with respect to the Reserve), (b) shall be free and clear of all liens, claims and encumbrances in favor of the First Lien Lender or the DIP Lender and (c) shall not be sold and transferred to the Purchaser under the APA.

2.2    **Authorization to Make Advances.**  DIP Lender is hereby authorized, on entry of an Interim DIP Order or Final DIP Order to make the Advances based upon telephonic or other instructions received from anyone purporting to be an Authorized Officer. All requests for Advances shall specify the date on which such Advance is to be made (which day shall be a Business Day) and the amount of such Advance. Requests received after 12:00 p.m. Eastern time on any day shall be deemed to have been made as of the opening of business on the immediately following Business Day. All Advances made under this DIP Credit Agreement shall be conclusively presumed to have been made to, at the request of, and for the benefit of Borrower when deposited to the credit of Borrower or otherwise disbursed in accordance with the instructions of Borrower or in accordance with the terms and conditions of this DIP Credit Agreement. Unless otherwise requested by Borrower, all Advances shall be made by a wire transfer to the deposit account of Borrower designated on **Schedule 2.2** annexed hereto, or such other account as Borrower shall notify DIP Lender in writing.  Borrower shall pay to DIP Lender a funds transfer fee of $25.00 for each Advance.  Said fees shall be payable on the first day of each month of the Term for all Advances made during the preceding month.

2.3    **Interest**.

(a)    Except where specified to the contrary in the Loan Documents, the aggregate outstanding balances of the Obligations shall accrue interest at the per annum rate of four percentage points (4%) above the Prime Rate. The Obligations shall bear interest from and after written notice by DIP Lender to Borrower of the occurrence of an Event of Default, and without constituting a waiver of any such Event of Default, at the per annum rate of two percentage points (2%) above the highest interest rate before an Event of Default. All interest payable under the DIP Loan shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed. Interest as provided for herein shall continue to accrue until the Obligations are paid in full.

(b)    The interest rate payable by Borrower under the terms of this DIP Credit Agreement shall be adjusted in accordance with any change in the Prime Rate from time to time on the date of any such change. No payments of interest or principal shall be due and payable prior to the expiration of the Term of the DIP Loan and DIP Lender shall add such accrued interest and all DIP Lender Expenses to the Obligations, and such amount shall thereafter accrue interest at the rate then applicable under this DIP Credit Agreement.

(c)    In no event shall interest on the Obligations exceed the highest lawful rate in effect from time to time. It is not the intention of the parties hereto to make an agreement which violates any applicable state or federal usury laws. In no event shall Borrower pay or DIP Lender accept or charge any interest which, together with any other charges upon the principal or any portion thereof, exceeds the maximum lawful rate of interest allowable under any applicable state or federal usury laws. Should any provision of this DIP Credit Agreement or any existing or future Notes or Loan Documents between the parties be construed to require the payment of interest or any other fees or charges which could be construed as interest which, together with any other charges upon the principal or any portion thereof and any other fees or charges which could be construed as interest, exceeds the maximum lawful rate of interest, then any such excess shall be applied to the remaining principal balance of the Obligations, if any, and the remainder refunded to Borrower.

(d)    Notwithstanding the foregoing, for purposes of this DIP Credit Agreement, it is the intention of Borrower and DIP Lender that "interest" shall mean, and be limited to, any payment to DIP Lender which compensates it for extending credit to Borrower, for making available to Borrower a line of credit during the term of this DIP Credit Agreement and for any default or breach by Borrower of a condition upon which credit was extended. Borrower and DIP Lender agree that, for the sole purpose of calculating the "interest" paid by Borrower to DIP Lender, it is the intention of Borrower and DIP Lender that interest shall mean and include, and be expressly limited to, any interest accrued on the aggregate outstanding balance of the Obligations during the term hereof. Borrower and DIP Lender further agree that it is their intention that the following fees shall not constitute "interest": any attorney fees incurred by DIP Lender, any premiums or commissions attributable to insurance guaranteeing repayment, finders' fees, credit report fees, appraisal fees or fees for document preparation or notarization. To the extent, however, that governing law excludes from the calculation of "interest" any fees defined herein as interest, or includes as interest any fees or other sums which are intended not to

-10-

constitute interest governing law shall supersede and prevail and all such interest shall be subject to **Section 2.3(c)** above.

2.4     **Collection of Accounts.** DIP Lender or a DIP Lender designee may, at any time during the existence of an Event of Default (but subject to the terms of any Interim DIP Order and Final DIP Order), with or without notice to Borrower, notify customers or Account debtors that the Accounts have been assigned to DIP Lender, and that DIP Lender has a security interest in them and collect the Accounts directly, and add the collection costs and expenses to the Obligations. During the existence of an Event of Default, at the request of DIP Lender, Borrower shall notify all Account debtors to remit payments on Accounts to a lockbox to be designated by DIP Lender. All such payments remitted to the lockbox shall be credited to a deposit account of DIP Lender and into which account remittances from account debtors of other clients of DIP Lender may be credited. If during the existence of an Event of Default, notwithstanding said notice Borrower obtains payment on any Account, Borrower shall receive all payments on Accounts and other proceeds, including cash, of Collateral in trust for DIP Lender and immediately deliver said payments to DIP Lender in their original form as received from the Account debtor, together with any necessary endorsements. Notwithstanding the receipt by DIP Lender or a DIP Lender designee of any proceeds of any Accounts during an Event of Default or otherwise or such lockbox arrangement for the payment of proceeds of the Accounts for the benefit of the DIP Lender during the existence of an Event of Default, in either case, in the event the DIP Lender has not properly terminated the Term of the DIP Loan, then, the DIP Lender shall disburse to Borrower, at the request of Borrower, to fund the working capital needs of the Borrower in accordance with the Budget, any and all proceeds of any Account received by DIP Lender.

2.5     **Use by Borrower of Receipts.** The receipt of any item of payment by DIP Lender from any Person other than Borrower shall be provided to Borrower for use in the funding of Borrower's working capital expenses as described in the Budget. Any prepayment by Borrower of the DIP Loan shall be applied to the outstanding balance of the DIP Loan without penalty. Notwithstanding anything to the contrary contained herein, payments received by DIP Lender after 12:00 p.m. Eastern time shall be deemed to have been received by DIP Lender as of the opening of business on the immediately following Business Day.

2.6     **Closing Fee.** In consideration of DIP Lender entering into this DIP Credit Agreement, Borrower shall pay DIP Lender a closing fee of two percent (2%) of the DIP Loan, which shall be paid simultaneous with the first Advance made following the entry of the Interim DIP Order.

2.7     **Monthly Statements.** DIP Lender shall render monthly statements to Borrower of all Obligations, including statements of all principal, interest and DIP Lender Expenses, and Borrower shall have fully and irrevocably waived all objections to such statements and the contents thereof unless, within thirty (30) days after receipt, Borrower shall deliver to DIP Lender, by email (to the email address provided by DIP Lender to Borrower), registered, certified or overnight mail as set forth in **Section 12** hereof, written objection to such statement specifying the error or errors, if any, contained therein.

-11-

2.8    **No Right To Reborrow**. The DIP Loan is not a revolving credit facility. The aggregate amount of all Advances made by the DIP Lender under this DIP Credit Agreement shall not at anytime exceed the lesser of the maximum amount provided for in the Budget from time to time and $10,000,000; provided however that DIP Lender shall provide to Borrower and Borrower shall be entitled to use, 100% of the funds received by DIP Lender (or its designee) or Borrower from any Account or otherwise and the release of such funds by DIP Lender to Borrower (or the use of such funds by Borrower) shall not be included in the calculation of the $10,000,000 DIP Loan amount. Any amounts repaid hereunder may not be reborrowed at any time.

2.9    **Use of Cash Collateral; Adequate Protection Liens and Relative Priorities.** Notwithstanding anything to the contrary set forth in this Agreement, Borrower shall have the right to use 100% of the proceeds of any and all Accounts (regardless of whether such proceeds are received by DIP Lender, its designee or Borrower) to fund the working capital needs of Borrower as described in the Budget, in addition to the amounts funded by DIP Lender to Borrower under the DIP Loan. The DIP Order shall provide that (i) the First Lien Lender shall be granted first priority, perfected replacement lien covering the Accounts to secure the indebtedness owing under the First Lien Loan Documents and (ii) the DIP Lender shall be granted a junior perfected lien on such Accounts to secure the DIP Loan, subject only to the first lien granted to the First Lien Lender described in clause (i) above.

3.    TERM

3.1    **Term.** This DIP Credit Agreement shall become effective upon execution by DIP Lender and continue in full force through the Term. This DIP Credit Agreement may be extended by mutual written agreement of the parties on mutually agreeable terms. In addition, DIP Lender shall have the right to terminate the Term of this DIP Credit Agreement immediately at any time upon the occurrence of an Event of Default by sending written notice of termination to Borrower. No such termination shall relieve or discharge Borrower of its duties, Obligations and covenants hereunder until all Obligations have been paid and performed in full, and DIP Lender's continuing security interest in the Collateral shall remain in effect until the Obligations have been fully and irrevocably paid and satisfied in cash or cash equivalent. Following the termination of the Term of this DIP Credit Agreement, the Obligations shall be immediately due and payable in full. In the event DIP Lender or its affiliate closes the acquisition contemplated by the APA, then, following the disbursement by the DIP Lender to Borrower prior to the Auction of the Wind Down Amount and, to Borrower's counsel, the Reserve which disbursement is described in the last sentence of **Section 2.1**, all Obligations under this DIP Credit Agreement shall be automatically paid in full at the closing under such APA and the DIP Lender shall release all liens and security interests granted in connection with the DIP Loan.

3.2    **Interim DIP Order**. Prior to making Advances, the Bankruptcy Court shall have entered an Interim DIP Order or a Final DIP Order, as appropriate, and the applicable order shall be in full force and effect and shall not have been amended, modified, stayed or reversed.

4.    CREATION OF CONTINUING SECURITY INTEREST

4.1    **Grant of Security Interest.** Borrower (as debtor and as debtor in possession) hereby grants to DIP Lender a security interest in all presently existing and hereafter acquired or

-12-

arising Collateral, which is subject and junior to any and all validly existing prepetition liens and security interests in the Collateral, including without limitation, the liens and security interests of the First Lien Lender, in order to secure prompt repayment of the Obligations and in order to secure prompt performance by Borrower of each and all of its covenants and Obligations under the Loan Documents and otherwise.

4.2    **Negotiable Collateral.** In the event that any Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, Borrower shall notify DIP Lender and upon the request of DIP Lender, immediately endorse and assign such Negotiable Collateral to DIP Lender and deliver physical possession of such Negotiable Collateral to DIP Lender.

4.3    **Delivery of Additional Documentation Required.** Borrower shall execute and deliver to DIP Lender concurrently with Borrower's execution and delivery of this DIP Credit Agreement and at any time thereafter at the request of DIP Lender, all financing statements, continuation financing statements, fixture filings, security agreements, chattel mortgages, pledges, assignments, endorsements of certificates of title, applications for title, affidavits, reports, notices, schedules of accounts, letters of authority, and all other documents that DIP Lender may request, in form satisfactory to DIP Lender, to perfect and maintain perfected DIP Lender's continuing security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents and Borrower hereby authorizes DIP Lender to file and/or record such financing statements and other documents as DIP Lender deems necessary to perfect and maintain DIP Lender's continuing security interest in the Collateral, and agrees any such financing statement may contain an "all asset" or "all property" description of the Collateral, and Borrower hereby ratifies any such financing statement or other document heretofore filed by DIP Lender. The documentation of the DIP Loan and any Interim DIP Order and Final DIP Order shall be reasonably satisfactory to the DIP Lender.

4.4    **Power of Attorney.** Borrower hereby irrevocably makes, constitutes and appoints DIP Lender (and any person designated by DIP Lender) as Borrower's true and lawful attorney-in-fact with power to sign the name of Borrower on any of the above described documents or on any other similar documents to be executed, recorded or filed in order to perfect or continue perfected DIP Lender's continuing security interest in the Collateral, subject however to the rights of the First Lien Lender in and to the PrePetition Collateral. In addition, subject to the rights of the First Lien Lender in the PrePetition Collateral, Borrower hereby appoints DIP Lender (and any person designated by DIP Lender) as Borrower's attorney-in-fact with power to: (a) sign Borrower's name on verifications of Accounts, on other Collateral and, subject to **Section 2.5** hereof, on notices to Account debtors; (b) send requests for verification of Accounts and other Collateral; (c) endorse Borrower's name on any checks, notes, acceptances, money orders, drafts or other forms of payment or security that may come into DIP Lender's possession; (d) upon the occurrence of an Event of Default notify the post office authorities to change the address for delivery of Borrower's mail to an address designated by DIP Lender, to receive and open all mail addressed to Borrower, and to retain all mail relating to the Collateral and forward all other mail to Borrower; (e) upon the occurrence of an Event of Default make, settle and adjust all claims under Borrower's policies of insurance (other than any director's and officer's insurance of the Borrower), endorse the name of Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and make all determinations and decisions with respect to such policies of insurance. The appointment of DIP Lender as

-13-

Borrower's attorney-in-fact and each and every one of DIP Lender's rights and powers, being coupled with an interest, is irrevocable so long as any Accounts in which DIP Lender has a continuing security interest remain unpaid and until all of the Obligations have been fully repaid and performed.

4.5  **Right To Inspect.**  DIP Lender shall have the right at any time or times hereafter during Borrower's usual business hours, or during the usual business hours of any third party having control over Borrower's Books to inspect Borrower's Books in order to verify the amount or condition of, or any other matter relating to, the Collateral or Borrower's financial condition. DIP Lender also shall have the right at any time or times hereafter during Borrower's usual business hours to inspect and examine the Inventory, the Equipment and the other Collateral and to check and test the same as to quality, quantity, value and condition.

5.  REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to DIP Lender the following and acknowledges (it being agreed that references to the "knowledge of Borrower" in this DIP Credit Agreement shall be limited to the actual (not constructive) knowledge of  Steve Hansbrough, Frank Punal and Gino Chouinard):

5.1  **Prior Encumbrances; Security Interests**. Borrower has good and marketable title to the Collateral, including without limitation the Collateral, free and clear of liens, claims, security interests or encumbrances, except for the security interests granted to DIP Lender by Borrower and those arising under the First Lien Documents in favor of the First Lien Lender and those disclosed on **Schedule 5.1** annexed hereto.  Other than those expressly disclosed, Borrower will not create or permit to be created any security interest, lien, pledge, mortgage or encumbrance on any Collateral or any of its other assets other than purchase money security interests on and capital leases of hereafter acquired items of Equipment.

5.2  **Location of Inventory and Equipment.**  The Inventory and Equipment is not now and shall not at any time or times hereafter be stored with a bailee, warehouseman, processor, or similar party.

5.3  **Inventory Records.**  Borrower now keeps and hereafter at all times shall keep correct and accurate records itemizing and describing the kind, type, quality and quantity of the Inventory and Borrower's cost of said items.

5.4  **Relocation of Chief Executive Office.**  The chief executive office of Borrower is at the address indicated on the first page of this DIP Credit Agreement and Borrower will not, without thirty (30) days' prior written notice to DIP Lender, relocate such office.

5.5  **Due Incorporation and Qualification.**  Borrower is and shall at all times hereafter be a corporation duly organized and existing under the laws of the state of its incorporation as set forth on the first page hereof and is qualified and licensed to do business and is in good standing in any state in which the conduct of its business or its ownership of assets requires that it be so qualified.

-14-

5.6     **Fictitious Name.** Borrower is conducting its business under the following trade or fictitious name(s) and no others:  **[none]**.  Borrower has complied with the fictitious name laws of all jurisdictions in which compliance is required in connection with its use of such name(s).

5.7     **Permits and Licenses.** Borrower holds all licenses, permits, franchises, approvals and consents required for the conduct of its business and the ownership and operation of its assets.

5.8     **Due Authorization.** Borrower has the right and power and is duly authorized to enter into the Loan Documents to which it is a party.

5.9     **Compliance with Articles; Bylaws.** The execution by Borrower of the Loan Documents to which it is a party does not constitute a breach of any provision contained in Borrower's Certificate or Articles of Incorporation or its Bylaws, nor does it constitute an event of default under any material agreement to which Borrower is now or may hereafter become a party.

5.10     **Accuracy of Information and Financial Statements.** All information furnished by Borrower to DIP Lender and all statements made by Borrower to DIP Lender including, without limitation, information set forth in any loan application, is true, accurate and complete in all material respects and, to the knowledge of Borrower, does not contain any misstatement of fact or omit to state any facts necessary to make the statements or information contained therein not misleading.  All financial statements relating to Borrower which have been or may hereafter be delivered to DIP Lender (i) have been prepared in accordance with GAAP; (ii) fairly present Borrower's financial condition as of the date thereof and Borrower's results of operations for the period then ended; and (iii) disclose all contingent obligations of Borrower which are required to be disclosed in accordance with GAAP; provided however the Budget was not prepared in accordance with GAAP or any reporting requirements by the Securities and Exchange Commission, the AICPA or any state societies of CPAs.

5.11     **ERISA.** Neither Borrower or any ERISA Affiliate, nor any Plan is or has been in violation of any of the provisions of ERISA, any of the qualification requirements of IRC section 401(a), or any of the published interpretations thereof.  No lien upon the assets of Borrower has arisen with respect to any Plan.  No *prohibited transaction* within the meaning of ERISA section 406 or IRC section 4975(c) has occurred with respect to any Plan.  Neither Borrower nor any ERISA Affiliate has incurred any withdrawal liability with respect to any Multiemployer Plan. Borrower and each ERISA Affiliate have made all contributions required to be made by them to any Plan or Multiemployer Plan when due.  There is no accumulated funding deficiency in any Plan, whether or not waived.

5.12     **Environmental Laws and Hazardous Materials.** (A) Subject to **subsection (B)** below: to the knowledge of Borrower, Borrower has complied, and at all times through the Term will comply, with all Environmental Laws.  Borrower has not and will not cause or permit any Hazardous Materials to be located, incorporated, generated, stored, manufactured, transported to or from, released, disposed of, or used at, upon, under, or within any premises at which Borrower conducts its business, or in connection with Borrower's business.  To the Borrower's knowledge,

-15-

no prior owner or operator of any premises at which Borrower conducts its business has caused or permitted any of the above to occur at, upon, under, or within any of the premises. Borrower will not permit any lien to be filed against the Collateral or any part thereof under any Environmental Law, and will promptly notify DIP Lender of any proceeding, inquiry or claim relating to any alleged violation of any Environmental Law, or any alleged loss, damage or injury resulting from any Hazardous Material. DIP Lender shall have the right to join and participate in, as a party if it so elects, any legal or administrative proceeding initiated with respect to any Hazardous Material or in connection with any Environmental Law. "Hazardous Material" includes without limitation any substance, material, emission, or waste which is or hereafter becomes regulated or classified as a hazardous substance, hazardous material, toxic substance or solid waste under any Environmental Law, asbestos, petroleum products, urea formaldehyde, polychlorinated biphenyls (PCBs), radon, and any other hazardous or toxic substance, material, emission or waste. The term "Environmental Law" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act of 1976, the Hazardous Materials Transportation Act, the Toxic Substances Control Act, the regulations pertaining to such statutes, and any other safety, health or environmental statutes, laws, regulations or ordinances of the United States or of any state, county or municipality in which Borrower conducts its business or the Collateral is located.

(B)    To the knowledge of Borrower, all present business operations of Borrower's businesses including those involving Hazardous Materials are in material compliance with all applicable Environmental Laws.

5.13    **Tax Compliance.**  Borrower has filed all tax returns required to be filed by it and has paid all taxes due and payable on said returns and on any assessment made against it or its assets, except for returns which have not been filed but are the subject of appropriate extensions.

5.14    **Use of Proceeds.**  All proceeds provided by DIP Lender to Borrower pursuant to any Interim DIP Order or Final DIP Order, this DIP Credit Agreement or otherwise, shall be used by Borrower to make payments in accordance with the Budget prior to the closing of the Section 363 sale, including, without limitation, to fund prior to the Auction, both the Wind Down Amount and the Reserve. Borrower shall pay for administrative expenses from the proceeds of Advances which are (i) directly attributable to the operation of the business of Borrower or (ii) as otherwise authorized by the Bankruptcy Court in any proceeding to which DIP Lender received notice and a reasonable opportunity to object, but in no event may the proceeds of any Advance be used for in excess of the amount permitted under the Budget as approved by the then applicable Interim DIP Order or Final DIP Order.

5.15    **DIP Order.**  Any applicable Interim DIP Order or Final DIP Order has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by DIP Lender) and is not subject to any pending appeal or stay.

5.16    **Super-Priority Administrative Expenses.**  Upon the entry of an Interim DIP Order of a Final DIP Order, as appropriate, the Obligations: (a) shall at all times constitute a Super-Priority Administrative Expense having priority, pursuant to sections 364(c)(1) of the Bankruptcy Code, over any other claims of any entity, including, without limitation, any claims

-16-

under sections 503, 507, 1113, and 1114 of the Bankruptcy Code, and (b) pursuant to sections 364(c)(2) and (3) and 364(d) of the Bankruptcy Code, shall at all times be secured by a second priority perfected lien in all of the assets (expressly excluding any proceeds of Avoidance Actions until the issuance of the Final DIP Order), whether now owned or hereafter acquired of Borrower and their estates, pursuant to the terms of the Loan Documents, subject to the first priority liens and security interests of the First Lien Lender in the PrePetition Collateral.

5.17 **Reliance by DIP Lender; Cumulative.** Each warranty, representation and agreement contained in this DIP Credit Agreement shall be automatically deemed repeated by Borrower with each request for an Advance and shall be conclusively presumed to have been relied on by DIP Lender regardless of any investigation made or information possessed by DIP Lender; provided however that the information in any schedule with respect to such representation or warranty shall be limited to the time period in which such schedule was delivered to the DIP Lender. The warranties, representations and agreements set forth herein shall be cumulative and in addition to any and all other warranties, representations and agreements which Borrower shall now or hereafter give, or cause to be given, to DIP Lender.

5.18 **Credit Bidding.** Subject to the terms and provisions of the APA, DIP Lender shall have the right to credit bid all of the Obligations in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization or otherwise.

6. AFFIRMATIVE COVENANTS

Borrower covenants and acknowledges that during the Term Borrower shall comply with all of the following:

6.1 **Budget Variance and Other Reports.** On the fifth (5th) Business Day of the week, the Borrower shall issue a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Borrower for the prior week and setting forth all the variances in excess of ten percent, on a line-item basis, from the amount set forth for such week as compared to the Budget on a weekly and cumulative basis; each such Variance Report shall include explanations for all material variances in excess of ten percent per line item and shall be certified by the Chief Financial Officer. Borrower shall deliver to DIP Lender, as DIP Lender may from time to time require, collection reports, sales journals, invoices, original delivery receipts, customers' purchase orders, shipping instructions, bills of lading and other documentation respecting shipment arrangements. Absent such a request by DIP Lender, copies of all such documentation shall be held by Borrower as custodian for DIP Lender. In addition, Borrower shall provide to DIP Lender within three (3) business days of Borrower's filing with the Bankruptcy Court all Monthly Operating Reports required by the Office of the United Sates Trustee and all schedules and statements required by section 521 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007.

6.2 **Financial Statements, Reports, Certificates.** Borrower shall deliver to DIP Lender: (a) as soon as available, but in any event within forty-five (45) days after the end of each month during the Term, a balance sheet and profit and loss statement prepared by Borrower covering Borrower's operations during such period; and (b) as soon as available, but in any event within one hundred fifty (150) days after the end of each of Borrower's fiscal years, financial statements of Borrower for each such fiscal period, reviewed by independent certified public

-17-

accountants acceptable to DIP Lender. Such financial statements shall include a balance sheet and profit and loss statement, and the accountants' management letter, if any, and shall be prepared in accordance with GAAP. Together with the above, Borrower shall also deliver Borrower's Form 10-Qs, 10-Ks or 8-Ks, if any, as soon as the same become available, and any other report reasonably requested by DIP Lender relating to the Collateral and the financial condition of Borrower and a certificate signed by its chief financial officer to the effect that all reports, statements or computer prepared information of any kind or nature delivered or caused to be delivered to DIP Lender under this **Section 6.2** fairly present its financial condition and that there exists on the date of delivery of such certificate to DIP Lender no condition or event which constitutes an Event of Default.

6.3 **Tax Returns, Receipts.** Borrower shall deliver to DIP Lender copies of each of its future federal income tax returns, and any amendments thereto, within thirty (30) days of the filing thereof. Borrower further shall promptly deliver to DIP Lender, upon request, satisfactory evidence of Borrower's payment of all withholding and other taxes required to be paid by it.

6.4 **Title to Equipment.** Upon DIP Lender's request, Borrower shall deliver to DIP Lender, properly endorsed, any and all evidences of ownership of, certificates of title, or applications for title to any items of Equipment.

6.5 **Maintenance of Equipment**. Borrower shall keep and maintain the Equipment in good operating condition and repair (ordinary wear and tear excepted), and shall make all necessary replacements thereto so that its value and operating efficiency shall at all times be maintained and preserved. Borrower shall not permit any item of Equipment to become a fixture to real estate or an accession to other property, and the Equipment is now and shall at all times remain leased by Borrower or be Borrower's personal property.

6.6 **Taxes**. To the extent Borrower has sufficient funds to pay such amounts when they become due, all Federal, state and local assessments and taxes, whether real, personal or otherwise, due or payable by, or imposed, levied or assessed against Borrower or any of its assets or in connection with Borrower's business shall hereafter be paid in full, before they become delinquent or before the expiration of any extension period except for those taxes, assessments and the like being contested by Borrower in good faith and by appropriate proceedings and as to which Borrower has established appropriate reserves, provided that no lien is placed on any assets of Borrower during any such contest as a consequence of the failure to pay such tax, assessment or the like. To the extent Borrower has sufficient funds to pay such amounts when they become due, Borrower shall make due and timely payment or deposit of all federal, state and local taxes, assessments or contributions required of it by law, and will execute and deliver to DIP Lender, on demand, appropriate certificates attesting to the payment or deposit thereof.

6.7 **Insurance.** Borrower, at its expense, shall keep and maintain the Collateral insured against all risk of loss or damage from fire, theft, vandalism, malicious mischief, explosion, sprinklers, and all other hazards and risks of physical damage included within the meaning of the term "extended coverage" in such amounts as are ordinarily insured against by similar businesses. Borrower shall also keep and maintain comprehensive general public liability insurance and property damage insurance, and insurance against loss from business interruption, insuring against all risks relating to or arising from Borrower's ownership and use of the

-18-

Collateral and its other assets and the operation of its business. All such policies shall be in such form, with such companies and in such amounts as are currently maintained by Borrower. Borrower shall deliver to DIP Lender certificates of insurance for such policies and evidence of the payments of all premiums therefor. All such policies (except those of public liability and liability property damage) shall contain a DIP Lender's Loss Payable endorsement in a form satisfactory to DIP Lender, naming DIP Lender as sole loss payee thereof, and containing a waiver of warranties. Subject to the rights of the First Lien Lender in such insurance with respect to any PrePetition Collateral, all proceeds payable under such policies shall be payable to DIP Lender. In the event of partial or total destruction of the collateral by fire or other casualty, then, subject to the rights of the First Lien Lender with respect to any PrePetition Collateral, the insurance proceeds shall, if an Event of Default exists, at the option of DIP Lender, be paid to DIP Lender to reduce the Obligations, or, alternatively, be held in a trust fund with DIP Lender to be disbursed solely for repairs and reconstruction of such collateral or if no Event of Default exists such insurance proceeds shall at the option of Borrower, be applied to reduce the balance owing on the Obligations or be held in a trust fund with DIP Lender to be disbursed solely for repairs and reconstruction of the collateral. Any such trust fund shall be additional security for the Obligations. Borrower shall notify DIP Lender of its exercise of its option as to the use of such insurance proceeds within thirty (30) days of the subject casualty occurrence.

      6.8    **DIP Lender Expenses.** Borrower shall immediately and without demand reimburse DIP Lender for all DIP Lender Expenses and Borrower hereby authorizes the payment of such DIP Lender Expenses without the need for further approval of the Bankruptcy Court or any other court having jurisdiction over the Chapter 11 Case and/or the Borrower.

      6.9    **Compliance With Law.** Borrower shall comply, in all material respects, with the requirements of all applicable laws, rules, regulations and orders of governmental authorities relating to Borrower and the conduct of its business.

      6.10    **Accounting System.** Borrower at all times hereafter shall maintain a standard and modern system of accounting in accordance with GAAP with ledger and account cards or computer tapes, disks, printouts and records pertaining to the Collateral containing such information as may from time to time be requested by DIP Lender.

      6.11    **Compliance with Bankruptcy Court**. Borrower shall comply in full with the notice and other requirements of the Bankruptcy Code and all other applicable rules with respect to any relevant DIP Order in a manner acceptable to DIP Lender and its counsel.

7.    NEGATIVE COVENANTS

      Borrower covenants and acknowledges that during the Term Borrower shall not undertake any of the following without the prior written consent of DIP Lender:

      7.1    **Extraordinary Transactions and Disposal of Assets.** Except as expressly authorized by the Bankruptcy Court under section 363 of the Bankruptcy Code, enter into any transaction not in the ordinary and usual course of its business as conducted on the date hereof, including but not limited to the sale, lease, disposal, movement, relocation or transfer, whether by sale or otherwise, of any its assets other than sales of Inventory in the ordinary and usual course of its business as presently conducted; incur any indebtedness for borrowed money or other

indebtedness outside the ordinary and usual course of its business as conducted on the date hereof except for renewals or extensions of existing debts permitted by DIP Lender; make any advance or loan to any third party; or grant a lien on any of its assets except (a) in favor of DIP Lender or (b) the continuing security interests, if any, set forth on **Schedule 5.1**.

7.2    **Change Name.**  Change its name, business structure or identity or add any new fictitious name.

7.3    **Merge, Acquire**.  Merge, acquire, or consolidate with or into any other business organization.

7.4    **Guaranty.**  Guaranty or otherwise become in any way liable with respect to the obligations of any third party, except by endorsement of instruments or items of payment for deposit to the account of Borrower for negotiation and delivery to DIP Lender.

7.5    **Restructure.**  Make any change in its financial structure or business operations.

7.6    **Prepayments.**  Prepay any existing indebtedness owing to any third party other than trade payables and provided no Event of Default exists, upon notice to DIP Lender, prepayments of permitted equipment financing indebtedness.

7.7    **Change of Ownership.**  Cause, permit or suffer any change, direct or indirect, in the ownership of the capital stock of Borrower or enter into any agreement with any person or entity that provides for a payment to such person or entity based upon the income of Borrower.

7.8    **Loans and Advances.**  Make any loans, advances or extensions of credit to any officer, director, executive employee or shareholder of Borrower (or any relative of any of the foregoing), or to any entity which is a subsidiary of, related to, affiliated with or has common shareholders, officers or directors with Borrower.

7.9    **Consignments of Inventory**.  Consign any Inventory except to persons or entities as to which Borrower has furnished to DIP Lender prior written notice and provided Borrower has filed such UCC-1 financing statements or taken such other action as required by applicable law to perfect Borrower's interest in such consigned Inventory.

7.10    **Distributions**.  Make any distribution or declare or pay any dividends (in cash or in stock) on, or purchase, acquire, redeem or retire any of its capital stock, of any class, whether now or hereafter outstanding except that provided no Event of Default exists so long as Borrower is a subchapter S corporation under federal or state income tax laws Borrower may pay and declare cash dividends to its stockholders up to the amount of the federal or state income tax payable by said shareholders solely as a consequence of the income of Borrower being attributed to said shareholders based upon the highest income tax rates applicable to any shareholder of Borrower.

7.11    **Accounting Methods.**  Modify or change its method of accounting or enter into, modify or terminate any agreement presently existing or at any time hereafter entered into with any third party for the preparation or storage of Borrower's records of Accounts and financial

-20-

condition without said party agreeing to provide DIP Lender with information regarding the Collateral or Borrower's financial condition.

    7.12    **Business Suspension**.  Suspend or go out of business.

    7.13    **Chapter 11 Case.**  Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to any DIP Order, unless (A) DIP Lender has failed to perform its obligations hereunder in any respect material to the business or operations of Borrower and the effect of such modification, stay, vacation or amendment is solely to remedy such failure or to obtain for Borrower substitute performance or (B) DIP Lender has consented to such modification, stay, vacation or amendment in writing, (ii) a priority claim for any administrative expense or unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense of the kind specified in section 503(b), 506(c) or 507(b) of the Bankruptcy Code) equal or superior to the priority claim of DIP Lender in respect of the Obligations, or (iii) any lien on any Collateral, having a priority equal or superior to the liens in favor of DIP Lender in respect of the Obligations (other than the existing prepetition liens and security interests, including,without limitation the liens and security interests of the First Lien Lender).

    7.14    **Prepetition Indebtedness**.  Borrower shall not pay or discharge, or cause to be paid or discharged, any obligations of Borrower incurred before the Filing Date other than those agreed to by the DIP Lender in the Budget and permitted by Final Order.

8.    EVENTS OF DEFAULT

    The occurrence of any one or more of the following events shall constitute an Event of Default by Borrower hereunder:

    8.1    **Failure to Pay.**  Borrower's failure to pay when due and payable, or when declared due and payable, any portion of the Obligations (whether prepetition or post petition, and whether principal, interest, taxes, or otherwise) and such failure continues for a period of three days after written notice from DIP Lender to Borrower;

    8.2    **Failure to Perform**.  Borrower's failure to perform, keep or observe any term, provision, condition, representation, warranty, covenant or agreement contained in this DIP Credit Agreement, in any of the Loan Documents, in any DIP Order, or in any other present or future agreement between Borrower, and/or a DIP Lender and such failure to perform, keep or observe continues for a period of twenty days after written notice by the DIP Lender to Borrower;

    8.3    **Misrepresentation.**  Any material misstatement or material misrepresentation now or hereafter exists in any warranty, representation in this DIP Credit Agreement

    8.4    **Injunction Against Borrower.**  Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business;

    8.5    **Government Lien.**  A notice of lien, levy or assessment is filed of record with respect to any of Borrower's assets by the United States Government, or any department, agency or instrumentality thereof, or by any state, county, municipal or other governmental agency, or

-21-

any taxes or debts owing at any time hereafter to any one or more of such entities becomes a lien, whether choate or otherwise, upon any of Borrower's assets and the same is not paid on the payment date thereof;

8.6    **Subordinated Debt Payments.**  Borrower makes any payment on account of indebtedness which has now or hereafter been subordinated to the Obligations, except to the extent such payment is allowed under any subordination agreement entered into with DIP Lender;

8.7    **ERISA Violation.**  A *prohibited transaction* within the meaning of ERISA section 406 or IRC section 1975(c) shall occur with respect to a Plan which could have a material adverse effect on the financial condition of Borrower; any lien upon the assets of Borrower in connection with any Plan shall arise; Borrower or any ERISA Affiliate shall completely or partially withdraw from a Multiemployer Plan and such withdrawal could, in the good faith opinion of DIP Lender, have a material adverse effect on the financial condition of Borrower. Borrower or any of its ERISA Affiliates shall fail to make full payment when due of all amounts which Borrower or any of its ERISA Affiliates may be required to pay to any Plan or any Multiemployer Plan as one or more contributions thereto; Borrower or any of its ERISA Affiliates creates or permits the creation of any accumulated funding deficiency, whether or not waived; the voluntary or involuntary termination of any Plan or Borrower shall fail to notify DIP Lender promptly and in any event within ten (l0) days of the occurrence of an event which constitutes an Event of Default under this clause or would constitute an Event of Default upon the exercise of DIP Lender's judgment.

8.8    **Bankruptcy Court.**  The Bankruptcy Court enters any order (i) amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying any DIP Order or any other order with respect to the Chapter 11 Case affecting in any material respect this DIP Credit Agreement  (ii) appointing a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code in the Chapter 11 Case, (iii) dismissing the Chapter 11 Case or converting the Chapter 11 case to a chapter 7 case or (iv) granting relief from the automatic stay to any creditor holding or asserting a lien or reclamation claim (in excess of $100,000 when aggregated with all other reclamation claims), except if the relief granted to the creditor is limited to an administrative expense or except with respect to the First Lien Lender.

8.9    **Judgments or Execution Action**.  There remains undischarged for more than ten (10) days any final post-petition judgment or execution action against Borrower, or relief from the automatic stay of section 362(a) of the Bankruptcy Code shall be granted to any creditor or creditors of Borrower with respect to assets having an aggregate value in excess of $100,000 or where the deprivation of Borrower of such assets would reasonably be expected to have a material adverse effect on Borrower, considered as a whole.

8.10    **Motions.**  Borrower files a motion in any of the Chapter 11 Case (i) except as provided in any DIP Order, to use cash collateral of DIP Lender under section 363(c) of the Bankruptcy Code without the DIP Lender's consent, (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section

506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to DIP Lender or its rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating DIP Lender's interest in any of the Collateral;

8.11    **Actions.** A suit or action against DIP Lender is commenced by Borrower, any federal, state environmental protection or health and safety agency or any official committee in any Case, which suit or action asserts any claim or legal or equitable remedy contemplating subordination of any claim or lien of DIP Lender, and shall remain undismissed or unstayed for thirty (30) days after its commencement without any preliminary relief of the nature sought having been granted;

8.12    **Reorganization Plan.** Borrower files a plan of reorganization in any Case which does not provide for payment in full of the Obligations on the effective date thereof or to which DIP Lender does not consent in writing.

9.      DIP LENDER'S RIGHTS AND REMEDIES

9.1    **Rights and Remedies.** Upon the occurrence of an Event of Default and subject to the rights and remedies of the First Lien Lender with respect to the Borrower and the PrePetition Collateral, DIP Lender may, notwithstanding the provisions of section 362 of the Bankruptcy Code, at its election, without notice of such election and without demand, do any one or more of the following:

(a)     Declare all Obligations, whether evidenced by the Loan Documents or otherwise, immediately due and payable in full;

(b)     Cease advancing money or extending credit to or for the benefit of Borrower under the Loan Documents or under any other agreement between Borrower and DIP Lender;

(c)     Terminate this DIP Credit Agreement as to any future liability or obligation of DIP Lender, but without affecting DIP Lender's rights and security interest in the Collateral and without affecting the Obligations;

(d)     Settle or adjust disputes and claims directly with Account debtors for amounts and upon terms which DIP Lender considers advisable and, in such cases, DIP Lender will credit the Obligations with the net amounts received by DIP Lender in payment of such disputed Accounts, after deducting all DIP Lender Expenses;

(e)     Cause Borrower to hold all returned Inventory in trust for DIP Lender, segregate all returned Inventory from all other property of Borrower or in Borrower's possession and conspicuously label said returned Inventory as the property of DIP Lender;

(f)     Without notice to or demand upon Borrower, make such payments and do such acts as DIP Lender considers necessary or reasonable to protect its security interest in the Collateral. Borrower shall assemble the Collateral if DIP Lender so requires and deliver or make the Collateral available to DIP Lender at a place designated by DIP Lender. Borrower authorizes DIP Lender to enter any premises where the Collateral is located, to take and maintain possession

of the Collateral, or any part of it, and to pay, purchase, contest or compromise any encumbrance, charge or lien which in DIP Lender's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith;

(g)     Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, lease, license or other disposition, advertise for sale, lease, license or other disposition, and sell, lease, license or otherwise dispose (in the manner provided for herein or in the Code) the Collateral. DIP Lender is hereby granted a license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any asset of a similar nature, pertaining to the Collateral, in completing the production of, advertising for sale, lease, license or other disposition, and sale, lease license or other disposition of the Collateral. Borrower's rights under all licenses and all franchise agreements shall inure to DIP Lender's benefit;

(h)     Sell, lease, license or otherwise dispose of the Collateral at either a public or private proceeding, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as is commercially reasonable. It is not necessary that the Collateral be present at any such sale;

(i)     DIP Lender shall give notice of the disposition of the Collateral as follows:

(1)     To Borrower and each holder of a security interest in the Collateral who has filed with DIP Lender a written request for notice, a notice in writing of the time and place of public sale or other disposition or, if the sale or other disposition is a private sale or some other disposition other than a public sale is to be made, then the time on or after which the private sale or other disposition is to be made;

(2)     The notice hereunder shall be personally delivered or mailed, postage prepaid, to Borrower as provided in **Section 12** hereof, at least ten (10) calendar days before the date fixed for the sale or other disposition, or at least five (5) calendar days before the date on or after which the private sale or other disposition is to be made, unless the Collateral is perishable or threatens to decline speedily in value. Notice to persons other than Borrower claiming an interest in the Collateral shall be sent to such addresses as they have furnished to DIP Lender;

(j)     DIP Lender may credit bid and purchase at any public sale:

(k)     Any deficiency that exists after disposition of the Collateral as provided herein shall be immediately paid by Borrower. Any excess will be remitted without interest by DIP Lender to the party or parties legally entitled to such excess;

(l)     In addition to the foregoing, DIP Lender shall have all rights and remedies provided by law (including those set forth in the Code) and any rights and remedies contained in any Loan Documents and all such rights and remedies shall be cumulative; and

(m)     In addition to the foregoing, DIP Lender shall, as provided for in the Interim DIP Order and the Final DIP Order, at any time at the request of Borrower (whether or not an Event of Default exists or has occurred) fund, prior to the Auction: (i) into an escrow

-24-

account with Borrower's counsel for the sole and exclusive benefit of the Professional Persons and the U.S. Trustee in an amount equal to the Reserve, and (ii) to the Borrower, the Wind Down Amount; and such funds advanced by the DIP Lender shall be entitled to all of the benefits and security of such Orders.

9.2    **No Waiver.**  No delay on the part of DIP Lender in exercising any right, power or privilege under any Loan Document shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege under such Loan Documents or otherwise, preclude other or further exercise of any such right, power or privilege.

10.    TAXES AND EXPENSES REGARDING THE COLLATERAL

If Borrower fails to pay any monies (whether taxes, assessments, insurance premiums or otherwise) due to third persons or entities, or fails to make any deposits or furnish any required proof of payment or deposit, or fails to perform any of Borrower's other covenants under any of the Loan Documents, then in its discretion and upon prior notice to Borrower, DIP Lender may do any or all of the following: (a) make any payment which Borrower has failed to pay or any part thereof; (b) set up such reserves in Borrower's loan account as DIP Lender deems necessary to protect DIP Lender from the exposure created by such failure; (c) obtain and maintain insurance policies of the type described in **Section 6.10** hereof and take any action with respect to such policies as DIP Lender deems prudent; or (d) take any other action deemed necessary to preserve and protect its interests and rights under the Loan Documents.  Any payments made by DIP Lender shall not constitute:  (a) an agreement by DIP Lender to make similar payments in the future or (b) a waiver by DIP Lender of any Event of Default.  DIP Lender need not inquire as to, or contest the validity of, any such expense, tax, security interest, encumbrance or lien and the receipt of notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

11.    WAIVERS

11.1    **Demand, Protest.**  Except as provided in the Interim DIP Order and the Final DIP Order, Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, and notice of nonpayment at maturity and acknowledges that DIP Lender may compromise, settle or release, without notice to Borrower, any Collateral and/or guaranties at any time held by DIP Lender.  Borrower hereby consents to any extensions of time of payment or partial payment at, before or after the Termination Date.

11.2    **No Marshaling.**  Borrower, on its own behalf and on behalf of its successors and assigns hereby expressly waives all rights, if any, to require a marshaling of assets by DIP Lender or to require that DIP Lender first resort to some portion(s) of the Collateral before foreclosing upon, selling or otherwise realizing on any other portion thereof.

11.3    **DIP Lender's Non-Liability for Inventory or Equipment or for Protection of Rights.**  So long as DIP Lender complies with its obligations, if any, under section 9-207 of the Code, DIP Lender shall not in any way or manner be liable or responsible for:  (a) the safekeeping of the Inventory or Equipment; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency or other person whomsoever.

-25-

All risk of loss, damage or destruction of the Inventory or Equipment shall be borne by Borrower. DIP Lender shall have no obligation to protect any rights of Borrower against any person obligated on any Collateral.

12.    NOTICES

Unless otherwise provided herein, all consents, waivers, notices or demands by any party relating to the Loan Documents shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be telecopied (followed up by a mailing), personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by receipted overnight delivery service to Borrower or to DIP Lender, as the case may be, at their addresses set forth below

If to Borrower, to:

HearUSA, Inc.
1250 Northpoint Parkway
West Palm Beach, FL 33407
Attn: Stephen Hansbrough, CEO
Facsimile No.: (561) 478-9603

With a copy (which shall not constitute effective notice) to:

Berger Singerman
200 South Biscayne Boulevard
Miami, FL 33131
Attn: Paul Steven Singerman, Esq.
and Brian Gart, Esq.
Facsimile No.: (305) 755-4340

And to:

Bryan Cave LLP
1155 F Street, N.W.
Washington, D.C. 20004
Attn: LaDawn Naegle, Esq.
Facsimile No.: (202) 508-6046

If to the DIP Lender, to:

> William Demant Holding A/S
> Kongebakken 9
> 2765 Smørum
> Denmark
> Attn: Legal Department

With a copy (which shall not constitute effective notice) to:

> Lowenstein Sandler PC
> 65 Livingston Avenue
> Roseland, New Jersey 07068
> Attn: Peter H. Ehrenberg, Esq.
> Telephone No.: 973-597-2350
> Facsimile No.: 973-597-2351

or to such other Persons or addresses as may be designated in writing by the party to receive such notice. Any party may change the address at it is to receive notices hereunder by notice in writing in the foregoing manner given to the other. All notices or demands sent in accordance with this **Section 12** shall be deemed received on the earlier of the date of actual receipt or five (5) calendar days after the deposit thereof in the mail or on the date telecommunicated if telecopied. The failure to provide a copy of any notice, consent, waiver, demand or other document or communication to Borrower's or DIP Lender's counsel as indicated above shall not affect its validity.

13.   DESTRUCTION OF BORROWER'S DOCUMENTS

All documents, schedules, invoices, agings or other papers delivered to DIP Lender may be destroyed or otherwise disposed of by DIP Lender four (4) months after they are delivered to or received by DIP Lender, unless Borrower requests, in writing, the return of the said documents, schedules, invoices or other papers and makes arrangements, at Borrower's expense, for their return.

14.   GENERAL PROVISIONS

14.1   **Effectiveness.** This DIP Credit Agreement shall be binding and deemed effective when executed by Borrower and executed and delivered by DIP Lender.

14.2   **Successors and Assigns.** This DIP Credit Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; **provided, however,** that Borrower may not assign this DIP Credit Agreement or any rights hereunder and any prohibited assignment shall be absolutely void. No consent to an assignment by DIP Lender shall release Borrower from its Obligations. Without notice to or the consent of Borrower, DIP Lender may assign this DIP Credit Agreement and its rights and duties hereunder and DIP Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in DIP Lender's rights and benefits hereunder. In connection therewith, DIP Lender may disclose

-27-

all documents and information which DIP Lender now or hereafter may have relating to Borrower or Borrower's business. Borrower and DIP Lender do not intend any of the benefits of the Loan Documents to inure to any third party, and no third party shall be a third party beneficiary hereof or thereof.

14.3    **Section Headings.** Headings and numbers have been set forth herein for convenience only.

14.4    **Interpretation.** Neither this DIP Credit Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against DIP Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this DIP Credit Agreement has been reviewed by each party and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto.

14.5    **Severability of Provisions.** Each provision of this DIP Credit Agreement shall be severable from every other provision of this DIP Credit Agreement for the purpose of determining the legal enforceability of such provision.

14.6    **Amendments in Writing.** Neither this DIP Credit Agreement nor the APA can be changed or terminated orally. This DIP Credit Agreement is the entire agreement between the parties with respect to the matters contained herein. This DIP Credit Agreement supersedes all prior agreements, understandings and negotiations, if any, all of which are merged into this DIP Credit Agreement.

14.7    **Counterparts.** This DIP Credit Agreement may be executed in any number of counterparts each of which, when executed and delivered, shall be deemed to be an original and all of which, when taken together, shall constitute but one and the same DIP Credit Agreement.

14.8    **Indemnification.** Borrower hereby indemnifies, protects, defends and saves harmless DIP Lender and any member, officer, director, official, agent, employee and attorney of DIP Lender, and their respective heirs, successors and assigns (collectively, the "Indemnified Parties"), from and against any and all losses, damages, expenses or liabilities of any kind or nature and from any suits, claims or demands, including reasonable counsel fees incurred in investigating or defending such claim, suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with the Loan Documents and the transactions contemplated therein or the Collateral (whether prepetition or post-petition) (unless caused by the gross negligence or willful misconduct of the Indemnified Parties) including, without limitation: (a) losses, damages, expenses or liabilities sustained by DIP Lender in connection with any environmental cleanup or other remedy required or mandated by any Environmental Law; (b) any untrue statement of a material fact contained in information submitted to DIP Lender by Borrower or the omission of any material fact necessary to be stated therein in order to make such statement not misleading or incomplete; (c) the failure of Borrower to perform any obligations required to be performed by Borrower under the Loan Documents; and (d) the ownership, construction, occupancy, operations, use and maintenance of any of Borrower's assets. The provisions of this **Section 14.8** shall survive termination of this DIP Credit Agreement and the other Loan Documents.

14.9    **Joint and Several Obligations**.  If more than one person or entity is named as a Borrower hereunder, all Obligations, representations, warranties, covenants and indemnities set forth in the Loan Documents to which such person or entity is a party shall be joint and several. The foregoing is a material inducement to the agreement of DIP Lender to enter into this DIP Credit Agreement and to consummate the transactions contemplated hereby.  The Borrower represents they are operated as part of one consolidated business entity and are directly dependent upon each other for an in connection with their respective business activities financial resources. Each Borrower will receive a direct economic and financial benefit from the Obligations incurred under this DIP Credit Agreement and the incurrence of such Obligations is in the best interests of Borrower.

15.    CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER

THE VALIDITY OF THE LOAN DOCUMENTS, THEIR CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF FLORIDA , WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.  THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THE LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT.  **BORROWER AND DIP LENDER EACH WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY** IN ANY PROCEEDING UNDER THE LOAN DOCUMENTS OR RELATING TO THE DEALINGS OF BORROWER AND DIP LENDER AND ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF "*FORUM NON CONVENIENS*" OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS **SECTION 15**.

Borrower and DIP Lender have executed this DIP Credit Agreement as of the date first above written.

**DIP LENDER:**

**WILLIAM DEMANT HOLDING A/S**

By:_____
      Name: Niels Jacobsen
      Title:   President & CEO

**BORROWER:**

**HEARUSA, INC.,**
a Delaware corporation

By:_____
      Name:
      Title:

-30-

Borrower and DIP Lender have executed this DIP Credit Agreement as of the date first above written.

DIP LENDER:

WILLIAM DEMANT HOLDING A/S

By:_____

      Name:

      Title:

BORROWER:

HEARUSA, INC.,
a Delaware corporation

By:_____

      Name: Gino Chouinard

      Title: Interim CEO, President & COO

-30-

Schedule 2.1

BUDGET

# HearUSA

## Disclaimer

Enclosed is the financial projection ("Projection") for HearUSA (the "Company") for the period beginning May 16, 2011 through August 12, 2011, inclusive. This Projection has been prepared with information provided by management of the Company ("Management"). Development Specialists, Inc. ("DSI") did not audit or review the historical information provided by management. DSI does not provide any opinion or assurance that the historical information presented is accurate.

The Projection was not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants or any other US or international governing body regarding projections or forecasts for Generally Accepted Accounting Principles ("GAAP") or local laws or regulations.. There can be no assurance that the Projection will be realized and actual results may be materially different. The Projection should not be regarded as a representation of DSI or Management that the projected results will be achieved. DSI and Management assume no responsibility for the accuracy of such information.

The Projection is intended solely for the use by the Company and William Demant Holdings A/S and should not be used by any person without knowledge of the Company's business or any other user except for William Demant Holdings A/S.

The Projection reflects the Company's anticipated financial results and are forward-looking statements subject to risks and uncertainties such as the breadth of the global economic downturn, the ability to successfully rationalize inventory, retail demand and other competitive pressures. Forward-looking statements included herein are made as of the date hereof, and the Company and DSI undertake no obligation to update such statements to reflect subsequent events or circumstances. Actual results could differ materially from anticipated results.

## HearUSA
### Debtor-in-Possession Budget
#### Summary Statement of Cash Sources and Uses

$000s

| | Total | 5/16/2011 | 5/23/2011 | 5/30/2011 | 6/6/2011 | 6/13/2011 | 6/20/2011 | 6/27/2011 | 7/4/2011 | 7/11/2011 | 7/18/2011 | 7/25/2011 | 8/1/2011 | 8/8/2011 | Wind Down & Reserve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOURCES OF CASH** | | | | | | | | | | | | | | | |
| Patient Revenue and A/R | 14,774.0 | 1,136.5 | 1,136.5 | 932.0 | 1,136.5 | 1,136.5 | 1,136.5 | 1,340.9 | 972.9 | 972.9 | 1,136.5 | 1,463.5 | 972.9 | 972.9 | 0.0 |
| Cap Payments | 1,170.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 0.0 |
| HealthPayments | 440.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 220.0 | 0.0 | 0.0 | 0.0 | 220.0 | 0.0 | 0.0 | 0.0 |
| Credit Card Fees | (67.5) | (4.4) | (6.2) | (3.3) | (4.4) | (4.4) | (4.4) | (5.5) | (3.5) | (3.5) | (4.4) | (6.2) | (3.5) | (3.5) | 0.0 |
| **Total Cash Inflows** | **16,326.5** | **1,222.0** | **1,547.3** | **1,018.7** | **1,222.0** | **1,222.0** | **1,222.0** | **1,645.3** | **1,059.4** | **1,059.4** | **1,222.0** | **1,767.3** | **1,059.4** | **1,059.4** | **0.0** |
| **USES OF CASH** | | | | | | | | | | | | | | | |
| **Cost of Sales** | | | | | | | | | | | | | | | |
| Cost of Sales | 5,403.0 | 41.9 | 41.9 | 231.0 | 41.9 | 41.9 | 41.9 | 231.0 | 264.5 | 33.5 | 41.9 | 1,678.1 | 264.5 | 33.5 | 33.5 |
| Branches Commissions | 693.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net Cost of Sales | 6,096.0 | 41.9 | 41.9 | 231.0 | 41.9 | 41.9 | 41.9 | 231.0 | 264.5 | 33.5 | 41.9 | 1,678.1 | 264.5 | 33.5 | 33.5 |
| **Gross Profit (Cash Basis)** | **10,230.5** | **1,180.1** | **1,678.1** | **766.3** | **1,180.1** | **1,180.1** | **1,180.1** | **1,671.8** | **794.9** | **1,025.9** | **1,180.1** | **89.2** | **794.9** | **1,025.9** | **0.0** |
| **Operating Expenses** | | | | | | | | | | | | | | | |
| Salaries and Benefits | 7,311.5 | 1,056.1 | 851.1 | 854.7 | 251.6 | 856.1 | 854.7 | 854.7 | 251.6 | 856.1 | 854.7 | 854.7 | 51.6 | 1,059.8 | 340.2 |
| Advertising and Marketing | 1,222.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 |
| Occupancy | 2,594.7 | 36.2 | 382.2 | 35.2 | 559.2 | 35.2 | 109.6 | 35.2 | 559.2 | 35.2 | 109.6 | 35.2 | 300.0 | 28.2 | 28.2 |
| Supplies and Postage | 176.0 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 |
| Insurance | 468.0 | 0.0 | 0.0 | 0.0 | 39.0 | 0.0 | 0.0 | 39.0 | 39.0 | 0.0 | 39.0 | 0.0 | 39.0 | 39.0 | 300.0 |
| Travel & Entertainment | 99.0 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 |
| Prof. Fees (Legal/Tax/Other) | 1,297.5 | 98.1 | 98.1 | 123.1 | 73.1 | 123.1 | 73.1 | 63.1 | 63.1 | 63.1 | 83.1 | 83.1 | 73.1 | 73.1 | 232.5 |
| Buena World Expense | 20.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Bank Fixed Rate Fees | 36.0 | 36.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Miscellaneous Expenses | 321.4 | 17.9 | 17.9 | 20.9 | 17.9 | 17.9 | 17.9 | 17.9 | 17.9 | 17.9 | 17.9 | 20.9 | 17.9 | 17.9 | 80.0 |
| TI Center/Region Exp. (subtotal) | 13,664.1 | 1,288.4 | 1,149.0 | 1,149.0 | 1,107.9 | 1,148.4 | 346.8 | 1,089.0 | 1,097.9 | 1,088.4 | 356.8 | 1,109.0 | 917.9 | 1,594.1 | 745.7 |
| **Other Expenses** | | | | | | | | | | | | | | | |
| AARP Expenses | 450.0 | 0.0 | 150.0 | 0.0 | 0.0 | 0.0 | 150.0 | 0.0 | 0.0 | 0.0 | 150.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Network Payments | 2,577.7 | 425.0 | 227.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 0.0 |
| Royalty Payments | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Interest (DIP) | 91.4 | 0.0 | 0.0 | 0.0 | 18.6 | 0.0 | 0.0 | 0.0 | 30.1 | 0.0 | 0.0 | 0.0 | 42.6 | 0.0 | 0.0 |
| **Total Other Expenses** | **3,318.4** | **425.0** | **377.0** | **175.0** | **193.6** | **225.0** | **475.0** | **175.0** | **205.1** | **175.0** | **325.0** | **175.0** | **217.6** | **175.0** | **0.0** |
| **Total Operating Expenses** | **16,982.4** | **1,713.4** | **1,001.4** | **1,324.0** | **1,301.6** | **1,373.4** | **821.8** | **1,264.0** | **1,303.1** | **1,263.4** | **681.8** | **1,284.0** | **1,335.6** | **1,769.1** | **745.7** |
| **Net Operating Cash Flow** | **(6,751.9)** | **(533.3)** | **(1,132.2)** | **(567.7)** | **(121.5)** | **(193.3)** | **568.4** | **(1,290.5)** | **(508.2)** | **(237.6)** | **498.4** | **(1,194.8)** | **(340.7)** | **(743.2)** | **(745.7)** |
| **Bankruptcy Expenses** | | | | | | | | | | | | | | | |
| Utility Deposits | 94.7 | 0.0 | 0.0 | 0.0 | 94.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Claims/Noticing Agent | 201.0 | 17.0 | 7.0 | 38.0 | 7.0 | 7.5 | 7.5 | 0.0 | 66.5 | 9.5 | 9.5 | 9.5 | 9.5 | 10.5 | 10.5 |
| Critical Vendors | 336.2 | 0.0 | 336.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Bankruptcy Professionals | 1,772.5 | 0.0 | 130.0 | 125.0 | 140.0 | 125.0 | 86.7 | 86.7 | 126.7 | 83.0 | 96.0 | 97.5 | 87.0 | 117.0 | 460.0 |
| Investment Banker Fees[1] | 1,750.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,500.0 |
| Other Professional Exp. | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 200.0 |
| DIP Closing Fee | 200.0 | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| US Trustee Fees | 63.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 13.0 | 0.0 | 0.0 | 0.0 | 0.0 | 50.0 |
| **Total Bankruptcy Exp.** | **4,707.4** | **317.0** | **473.2** | **163.0** | **331.7** | **132.5** | **273.2** | **96.2** | **273.2** | **105.5** | **140.0** | **107.0** | **106.5** | **207.5** | **2,260.0** |
| **Net Cash Flow** | **(11,459.3)** | **(750.3)** | **(1,605.4)** | **(730.7)** | **(453.1)** | **(325.8)** | **284.2** | **(1,386.7)** | **(781.4)** | **(343.1)** | **358.4** | **(1,301.8)** | **(447.2)** | **(950.7)** | **(3,005.7)** |
| Beginning Cash Balance | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| +Cash Generated from Ops | (11,459.3) | (750.3) | (1,605.4) | (730.7) | (453.1) | (325.8) | 284.2 | (1,386.7) | (781.4) | (343.1) | 358.4 | (1,301.8) | (447.2) | (950.7) | (3,005.7) |
| +Loan Needed | 11,459.3 | 750.3 | 1,605.4 | 730.7 | 453.1 | 325.8 | (284.2) | 1,386.7 | 781.4 | 343.1 | (358.4) | 1,301.8 | 447.2 | 950.7 | 3,005.7 |
| **Ending Cash Balance** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |

[1] HUSA reserves the right to change the amount owed for the transaction, fee owed to the investment banker dependent on final purchase price in accordance with the terms of the investment banker engagement letter.

Schedule 2.2

DEPOSIT ACCOUNT OF BORROWER FOR ADVANCES

Schedule 5.1

EXISTING LIENS WHICH ARE TO CONTINUE

1.    Each of the liens and security interests listed on the UCC financing statements attached hereto.

Date: Apr. 26,2011

## CT Corporation
### UCC Search Report (CT Database)

The following represents a list of the information you requested using the content and search logic available on the website of the relevant state authority, and/or records maintained from the relevant states and licensed from that state, or from an independent third party and made available through our offices. Variations of the Name and Address of the search key may appear on this report as a result of the search findings and your individual request for that information. CT Corporation cannot independently verify the accuracy or timeliness of the public information maintained by the responsible government agency or the other sources of this data. CT, therefore, makes no guarantees, representations, or warranties as to the accuracy or completeness of the information contained in this report. For the fees charged, the user understands that CT Corporation cannot and does not accept any liability to the user or third party for errors or omissions CT Corporation's terms and conditions also apply to this report.

The report reflects records effective at the time of the last update of the relevant information source.

Search results performed on the below Search Key:

Information source:   UCC Database for the State of Delaware

Name = HearUSA

| Debtor(s) | Debtor Address | Service | Jurisdiction | Currency/Date | Findings | Secured Party of Record | Secured Party Address | File Type | Filed, Cased, Book/Page | File Date | Original Filed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CISCO SYSTEMS CAPITAL CORPORATION | | Original | 31453698 | 06/09/2003 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | SIEMENS HEARING INSTRUMENTS, INC. | 10 CONSTITUTION AVENUE PISCATAWAY NJ 08855 | Original | 60565465 | 02/15/2006 | - |
| HEAR USA INC | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | US BANCORP | 1450 CHANNEL PARKWAY MARSHALL MN 56258 | Original | 22262772 | 09/03/2002 | - |
| HEARUSA, INC | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | DVI STRATEGIC PARTNER GROUP, A DIVISION OF DVI FINANCIAL SERVICES INC. | 1751 LAKE COOK ROAD SUITE 600 DEERFIELD IL 60015 | Original | 30247651 | 01/10/2003 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CISCO SYSTEMS CAPITAL CORPORATION | 170 WEST TASMAN DRIVE, MAILSTOP SJ 13-3 SAN JOSE CA 951341706 | Original | 32238437 | 08/26/2003 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CISCO SYSTEMS CAPITAL CORPORATION | 170 WEST TASMAN DRIVE, MAILSTOP SJ 13-3 SAN JOSE CA 951341706 | Original | 20082722369 | 09/09/2008 | - |
| HEARUSA, INC | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | WESTCHESTER PREMIUM ACCEPTANCE CORP | PO BOX 17600 DENVER CO 80217 | Original | 41384795 | 05/17/2004 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | WESTCHESTER PREMIUM ACCEPTANCE CORP | PO BOX 17600 DENVER CO 80217 | Original | 50536998 | 02/17/2005 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CALIFORNIA FIRST LEASING CORPORATION | 18201 VON KARMAN AVENUE, SITE 800 IRVINE CA 92612 | Original | 52549195 | 08/18/2005 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CALIFORNIA FIRST LEASING CORPORATION | 18201 VON KARMAN AVENUE, SITE 800 IRVINE CA 92612 | Original | 53123524 | 10/10/2005 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | SIEMENS HEARING INSTRUMENTS, INC. | 10 CONSTITUTION AVENUE PISCATAWAY NJ 08855 | Original | 60565848 | 02/15/2006 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CALIFORNIA FIRST LEASING CORPORATION | 18201 VON KARMAN AVENUE, SUITE 800 IRVINE CA 92612 | Original | 62719821 | 08/07/2006 | - |
| HEARUSA, INC. | 1250 NORTH POINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CALIFORNIA FIRST LEASING CORPORATION | 18201 VON KARMAN AVENUE, SUITE 800 IRVINE CA 92612 | Original | 2007034040 | 01/04/2007 | - |

| Debtor(s) | Debtor Address | Service | Jurisdiction | Currency Date | Findings | Secured Party of Record | Secured Party Address | File Type | File#, Case#, Book/Page | File Date | Original File# |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | KINGSBRIDGE HOLDINGS | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 63165503 | 08/25/2006 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | GENERAL ELECTRIC CAPITAL CORPORATION | 10 RIVERVIEW DRIVE DANBURY CT 06810 | Original | 63860061 | 10/18/2006 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 64156659 | 11/13/2006 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 20071870343 | 05/17/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | REPUBLIC BANK OF CHICAGO | 2221 CAMDEN COURT FLOOR 1 OAK BROOK IL | Original | 2007132553 | 03/27/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | CALIFORNIA FIRST LEASING CORPORATION | 18201 VON KARMAN AVENUE, SUITE 800 IRVINE CA 92612 | Original | 20071474369 | 04/19/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 20072195466 | 05/31/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | REPUBLIC BANK OF CHICAGO | 2221 CAMDEN COURT FLOOR 1 OAK BROOK IL 60523 | Original | 2007362943 | 09/07/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 NORTH FIELD DRIVE, SUITE 193 LAKE FOREST IL 60045 | Original | 2007386440 | 09/10/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | HEWLETT-PACKARD FINANCIAL SERVICE COMPANY | 420 MOUNTAIN AVE NEW PROVIDENCE NJ 07974 | Original | 2008408452 | 02/01/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 20081360912 | 04/21/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 20083223563 | 08/27/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 20084101224 | 12/10/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 20084101133 | 12/10/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | TOSHIBA FINANCIAL SERVICES | 1961 HIRST DR MORBELY MO 65270 | Original | 2008162244 | 06/24/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PKWY WEST PALM BCH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | MB FINANCIAL BANK, N.A. | 6111 NORTH RIVER ROAD ROSEMONT IL 60018 | Original | 20091263489 | 04/21/2009 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PKWY WEST PALM BCH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01,2011 | | MB FINANCIAL BANK, N.A. | 6111 NORTH RIVER ROAD ROSEMONT IL 60018 | | 2008521548 | 11/03/2009 | - |

| Debtor(s) | Debtor Address | Service | Jurisdiction | Currency Date | Findings | Secured Party of Record | Secured Party Address | File Type | File#, Case#, Book/Page | File Date | Original File# |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | 2186935 ONTARIO INC. | | Original | 2009/390268 | 04/27/2009 | -- |
| HEARUSA, INC. | 1250 NORTHPOINT PRKWY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 2009282439 | 09/12/2009 | -- |
| HEARUSA, INC. | 1250 NORTHPOINT PRKWY WEST PALM BCH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 2009582579 | 11/03/2009 | -- |
| HEARUSA, INC. | 1250 NORTHPOINT PKWY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | DELL FINANCIAL SERVICES L.L.C. | MB FINANCIAL BANK, N.A. 6111 NORTH RIVER ROAD ROSEMONT, IL 60018 ONE DELL WAY ROUND ROCK, TX 78682 | Original | 20120913501 | 08/19/2010 | -- |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | STEELCASE FINANCIAL SERVICES INC. | 901 44TH STREET S.E. GRAND RAPIDS MI 49508 | Original | 20120986440 | 08/26/2010 | -- |

[End of Report]

# ELECTRONIC JUDGMENT LIEN CERTIFICATE

FOR PURPOSES OF FILING A JUDGMENT LIEN, THE FOLLOWING INFORMATION IS SUBMITTED IN ACCORDANCE WITH s. 55.203, F.S..

'UDGMENT DEBTOR (DEFENDANT) NAME(S) AS SHOWN ON JUDGMENT LIEN:

HEARUSA, INC
1250 NORTH POINT PARKWAY
WEST PALM BEACH, FL. 33407
FEI#: 22-2748248    DOS DOCUMENT#: P14251

HEARX LTD., INC.
1250 NORTH POINT PARKWAY
WEST PALM BEACH, FL. 33407
FEI#: N/-A    DOS DOCUMENT#: N/A

**J07000176050**
**FILED**

**Jun 07, 2007 08:00 A.M.**
**Secretary of State**
KBEYER

JUDGMENT CREDITOR (PLAINTIFF) NAME AS SHOWN ON JUDGMENT LIEN OR CURRENT OWNER
OF JUDGMENT IF ASSIGNED:

DHL EXPRESS (USA) INC.
515 W GREENS ROAD
HOUSTON, TX
DOS DOCUMENT#: N/A

NAME AND ADDRESS TO WHOM ACKNOWLEDGMENT/CERTIFICATION IS TO BE MAILED:

STEVEN B SPRECHMAN ESQ
ROBERTA.BENDELL@SPRECHMANLAW.COM

AMOUNT DUE ON MONEY JUDGMENT: 62,168.74
APPLICABLE INTEREST RATE: 11.00%
NAME OF COURT: PALM BEACH COUNTY CIRCUIT COUR
CASE NUMBER: CA-5912-MBAF
DATE OF ENTRY: 05/24/07
WAS A WRIT OF EXECUTION DOCKETED ON THIS JUDGMENT LIEN WITH ANY SHERIFF PRIOR TO OCTOBER 1, 2001?
    ( ) YES  (IF YES, A "CREDITOR AFFIDAVIT CERTIFICATION" FORM MUST BE ATTACHED TO THIS CERTIFICATE.)
    (X) NO

UNDER PENALTY OF PERJURY, I hereby certify that: (1) The judgment above described has become final and there is no stay of the
judgment or its enforcement in effect; (2) All of the information set forth above is true, correct, current and complete; (3) I have not
previously filed a Judgment Lien Certificate regarding the above judgment with the Department of State; and, (4) I have complied with
all applicable laws in submitting this Electronic Judgment Lien Certificate for filing.

Electronic Signature of Creditor or Authorized Representative: STEVEN B SPRECHMAN

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

Diligenz, Inc.    1-800-858-5294

B. SEND ACKNOWLEDGEMENT TO:

| | |
|---|---|
| Name | 22399981 |
| Address | Prepared by: |
| Address | Diligenz, Inc.<br>8500 Harbour Heights Pkwy, Suite 400 |
| City/State/Zip | Mukilteo, WA 98275 |

FLORIDA SECURED TRANSACTION REGISTRY

# FILED

2006 Oct 25 AM 12:00

****** 200603984442 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

---

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

| 1a. ORGANIZATION'S NAME HEARUSA, INC. | | | | | | |
|---|---|---|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS<br>1250 NORTHPOINT PARKWAY | | CITY<br>WEST PALM BCH | | STATE<br>FL | POSTAL CODE<br>33407 | COUNTRY<br>USA |
| 1d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION<br>Inc. | 1f. JURISDICTION OF ORGANIZATION<br>FL | | 1g. ORGANIZATIONAL ID#<br>P14251 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

| 2a. ORGANIZATION'S NAME | | | | | | |
|---|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | | 2g. ORGANIZATIONAL ID#<br> | ☐ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME General Electric Capital Corporation | | | | | | |
|---|---|---|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS<br>10 Riverview Drive | | CITY<br>Danbury | | STATE<br>CT | POSTAL CODE<br>06810 | COUNTRY<br>USA |

**4. This FINANCING STATEMENT covers the following collateral:**

QTY (6) HP Smart Buy Proliant DL360 and any and all additions, attachments, accessories and accessions and any and all substitutions, replacements or exchanges therefor, and any all insurance and/or other proceeds thereof, securing Debtor's obligations under that certain Lease Agreement between General Electric Capital Corporation and HEARUSA, INC.

---

| 5. ALTERNATE DESIGNATION (if applicable) | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR |
|---|---|---|---|
| | AG. LIEN | NON-UCC FILING | SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**

[X] All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA** 39h7 - 4451627-001

STANDARD FORM - FORM UCC-1  (REV.12/2001)          Filing Office Copy          Approved by the Secretary of State, State of Florida

Case 11:23341-EPK    Doc 18    Filed 05/16/11    Page 62 of 104

**Exhibit A**

Lease Agreement No. 4451627001
Between
**GENERAL ELECTRIC CAPITAL CORPORATION**, as Lessor
And **HEARUSA, INC.**, as Lessee

| Qty | Description |
|---|---|
| 6 | HP Smart Buy ProLiant DL380 G4 2U Rack Xeon 3.0GHz(X1) / 2MB L2 / 2GB / Open Bay U320 HS / CD-ROM / GigNIC / RPS<br>HP SERVERS |
| 6 | Processor, Xeon 3.0GHz, 800MHz FSB, 2MB L2 Cache, for ProLiant DL380 G4, ML370 G4<br>HP SERVER ACCESSORIES |
| 12 | 72.8GB 10K U320 Hot-Swap Hard Drive<br>HP SERVER ACCESSORIES |
| 6 | HP Hot Plug AC Redundant Power Supply Module for DL380 (IEC cord)<br>HP SERVER ACCESSORIES |
| 24 | 146GB 10K U320 Pluggable Hard Drive<br>HP SERVER ACCESSORIES |
| 6 | 2GB PC2-3200 400MHz 240-pin Registered ECC DDR2 SDRAM DIMM Kit for Select Dell, HP and IBM Models<br>EDGE TECH CORP |
| 1 | 1TB Snap Server 520<br>ADAPTEC |
| 6 | Corp. MOB Windows Server 2003 Standard Edition R2 License Only<br>MICROSOFT LICENSING |
| 1 | Corp. MLF-EDI Windows Server 2003 Standard Edition R2 x32/x64 Media<br>MICROSOFT LICENSING |
| 49 | HP Smart Buy dc5100 Microtower P4 630 3.0GHz w / HyperThrdng / 2MB L2 / 800MHz / 512MB / 80GB / CD-RW / GigNIC / XPP<br>HEWLETT PACKARD COMMERCIAL PC'S |
| 49 | Config. Desktop / Notebook Hardware Install and / or SW Install<br>PC CONNECTION CONFIGURATION SERVICES |
| 1 | Config. Customized Customer Image Load Setup (1X)<br>PC CONNECTION CONFIGURATION SERVICES |

THIS IS SCHEDULE 4451627001

THIS SCHEDULE IS HEREBY VERIFIED AS CORRECT BY THE UNDERSIGNED CUSTOMER, WHO
ACKNOWLEDGES RECEIPT THEREOF.

CUSTOMER: HEARUSA, INC.

BY: X _____

TITLE: X _EVP & CFO_

DATE: X _9\25\2006_

**EXHIBIT B**

3627756-10

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                              Chapter 11 Case

HEARUSA, INC.,[1]                                   Case No. _____

     Debtor.
_____/

**ORDER (A) APPROVING COMPETITIVE BIDDING AND
SALE PROCEDURES; (B) APPROVING FORM AND MANNER OF NOTICES;
(C) APPROVING ASSET PURCHASE AGREEMENT; (D) SCHEDULING DATES TO
CONDUCT AUCTION AND HEARING TO CONSIDER FINAL APPROVAL OF SALE,
INCLUDING TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; (E) AUTHORIZING SALE OF SUBSTANTIALLY ALL THE DEBTOR'S
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
INTERESTS; AND (F) GRANTING RELATED RELIEF**

     **THIS CAUSE** came before the Court on _____, 2011 at ____ __.m. in

West Palm Beach, Florida upon the *Motion For Entry of Order (A) Approving Competitive*

*Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Asset*

---

[1] The address of the Debtor is 1250 Northpoint Parkway, West Palm Beach, FL 33407, Attn: Gino Chouinard, Interim CEO, President and COO; and the last four digits of the taxpayer identification number of the Debtor are (8248).

*Purchase Agreement; (D) Scheduling Dates To Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Authorizing Sale of Substantially All The Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests;  and (F) Granting Related Relief* (the "Bid Procedures Motion" or the "Motion")[2] [D.E. ___] filed by HEARUSA, INC. ("HUI") the above-captioned debtor and debtor in possession (the "Debtor" or the "Company").   Having reviewed the Bid Procedures Motion and the record in these cases, including the *Declaration of Joseph J. Luzinski In Support of Chapter 11 Petitions and First Day Relief* [D.E. ____] (the "Declaration") and having considered the statements of counsel for the Debtor and an affiliate of William Demant Holdings A/S, the proposed purchaser (the "Proposed Purchaser"), and the evidence adduced by the Debtor (including proffers of evidence admitted into evidence without objection),  the Court finds that establishing procedures for a sale of the Purchased Assets (as defined below) in accordance with this Bidding Procedures Order, is in the best interests of the Debtor's estate. Accordingly,

---

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion, the bidding procedures attached hereto as Exhibit 1 (the "Bidding Procedures") or that certain Asset Purchase Agreement dated as of May 16, 2011 among William Demant Holdings A/S or its permitted assigns, as purchaser (the "Proposed Purchaser"),  William Demant Holdings A/S,  guarantor and HearUSA, Inc. and Auxiliary Health Benefits Corporation d/b/a/ National Ear Care Plan (as subsidiary of the Debtor), as seller (as amended, modified or supplemented, the "Asset Purchase Agreement"), as applicable.

IT IS HEREBY FOUND AND DETERMINED THAT:

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014;

B.      The Court has jurisdiction over the Motion and the transaction contemplated by the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409;

C.      The statutory bases for the relief requested in the Motion are (i) sections 105, 363, 364 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and (ii) Bankruptcy Rules 2002(a)(2), 6004, 6006 and 9014 and (iii) Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules");

D.      Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein with respect to the Sale Hearing.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to creditors, equity holders and other parties in interest;

E.      The Debtor's proposed notice of the Bidding Procedures is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the sale of substantially all of the Debtor's assets (the "Purchased Assets"), and the Bidding Procedures to be employed in connection therewith;

F.      The Debtor articulated good and sufficient reasons for the Court to:  (i) approve the Bidding Procedures; (ii) schedule the Sale Hearing, approve the manner of notice of the

3

Motion and the Sale Hearing, and set the Sale Objection Deadline (as defined below); and (iii) approve the procedures for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assumed Executory Contracts"), including notice of proposed cure amounts;

G.      The entry of this Bidding Procedures Order is in the best interests of the Debtor, its estate, its creditors, equity holders and other parties in interest; and

H.      The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Purchased Assets.

IT IS THEREFORE ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      All objections to the Motion or the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, hereby are overruled and denied on the merits.

3.      The Bidding Procedures, attached hereto as Exhibit 1, are hereby incorporated herein and approved in their entirety.  The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

4.      As further described in the Bidding Procedures, the deadline for submitting bids for the Purchased Assets (the "Bid Deadline") is **July 11, 2011 at 4:00 p.m. (prevailing Eastern Time)**.  No Bid shall be deemed to be a Qualified Bid or otherwise considered for any purposes unless such Bid meets the requirements set forth in the Bidding Procedures. For the avoidance of doubt, the Asset Purchase Agreement provided by the Proposed Purchaser constitutes a Qualified Bid.

4

5.      The Debtor may sell the Purchased Assets, and enter into the transactions contemplated by the Asset Purchase Agreement by conducting an Auction in accordance with the Bidding Procedures.

6.      If Qualified Bids, other than the Qualified Bid of the Proposed Purchaser, are timely received by the Debtor in accordance with the Bidding Procedures, the Auction shall take place on **July 18, 2011 at 10:00 a.m**. **(prevailing Eastern Time)** at the offices of Berger Singerman, P.A., 350 East Las Olas Blvd., Suite 1000, Fort Lauderdale, 33301, or such other place and time as the Debtor shall notify all Qualified Bidders, including the Proposed Purchaser, any official committee of unsecured creditors appointed in these chapter 11 cases (the "Committee"), counsel for the Proposed Purchaser and other invitees.  The Auction shall be conducted in accordance with the Bidding Procedures.  If, however, no Qualified Bid, other than the Qualified Bid submitted by the Proposed Purchaser, is received by the Bid Deadline, then the Auction will not be held and the Debtor shall seek Bankruptcy Court approval of the Asset Purchase Agreement with the Proposed Purchaser at the Sale Hearing.

7.      The Proposed Purchaser shall be entitled to credit bid each round at the Auction using the current outstanding balance of the DIP Loan (which amount shall be announced at the Auction by the Proposed Purchaser and Debtor to inform all of the participants in the Auction of such amount), the Expense Reimbursement (which amount shall be announced by the Proposed Purchaser and the Debtor to inform all of the participants of the Auction of such amount) and the Break-up Fee, defined below as a portion of any subsequent bid by the Proposed Purchaser.

8.      The Sale Hearing shall be held before the Court on **July 19, 2011 at _____ __.m. (prevailing Eastern Time),** or at such earlier date as counsel and interested parties may be heard.

3624133-7

9.      Objections, if any, to the relief requested in the Motion must:  (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, West Palm Beach Division, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, West Palm Beach, FL 33401 (or filed electronically via CM/ECF), on or before **4:00 p.m. (prevailing Eastern Time)** on the third business day before a hearing on the Bid Procedures (the "Bid Procedures Objection Deadline; and (d) be served upon (i) counsel to the Debtor, Berger Singerman, P.A., 350 East Las Olas Blvd., Suite 1000, Ft. Lauderdale, Florida 33301, Attn:  Brian K. Gart, Esq. and Debi Evans Galler, Esq., (ii) counsel to the Committee, if any, (iii) counsel to the Proposed Purchaser, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, Attn: Sharon L. Levine, Esq. and Peter H. Ehrenberg, Esq.; and (iv) the Office of the United States Trustee, 51 SW 1st Ave # 1204, Miami, FL 33130-1614, Attn: Heidi Feinman, Esq., in each case, so as to be actually received no later than 4:00 p.m. (prevailing Eastern Time) on the same day.

10.      Objections, if any, to the Sale contemplated by the Asset Purchase Agreement must:  (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, West Palm Beach Division, Flagler Waterview Building, 151 North Flagler Drive, 8th Floor, West Palm Beach, Florida 33401 (or filed electronically via CM/ECF), on or before 4:00 p.m. (prevailing Eastern Time) on the earlier of (i) seven (7) business days prior to the date of the Auction or (ii) **July 11, 2011** (the "Sale Objection Deadline"); and (d) be served upon (i) counsel to the Debtor, (ii) counsel to the DIP Lender, (iii) counsel to the Committee, (iv) counsel to the Proposed Purchaser, and (v) the Office of the United States Trustee, in each case, so as to be actually received no later than 4:00 p.m. (prevailing Eastern Time) on the same day.

6

11.     The notice, substantially in the form attached hereto as <u>Exhibit 2</u> (the "<u>Sale Notice</u>"), is hereby approved.

12.     On or before three (3) business days after entry of this Bidding Procedures Order, the Debtor will cause the Sale Notice to be sent by first-class mail postage prepaid, to the following: (a) all creditors or their counsel known to the Debtor to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Purchased Assets; (b) the Office of the United States Trustee; (c) the Securities and Exchange Commission; (d) all applicable federal, state and local taxing and regulatory authorities of the Debtor or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtor's ownership of the Purchased Assets or have any known interest in the relief requested by the Motion; (e) the state and local environmental agencies in the jurisdictions where the Debtor owns or leases real property; (f) counsel to the DIP Lender; (g) the United States Attorney's office for the Southern District of Florida; (h) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of entry of this Bidding Procedures Order; (i) counsel to the Committee, if any; (j) all parties to any litigation involving the Debtor; (k) all counterparties to any executory contract or unexpired lease of the Debtor; (l) all other known creditors and interest holders of the Debtor; and (m) all potential bidders, including the Proposed Purchaser, previously identified or otherwise known to the Debtor

13.     **Copies of exhibits to the Bid Procedures Motion (including the Asset Purchase Agreement) may be obtained by request in writing, by telephone, or via email from counsel to the Debtor: Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn: Debi Evans Galler, Esq.; Tel. (305) 755-9500; email at**

**dgaller@bergersingerman.com.  In addition, copies of the aforementioned (i) will be available for review on the website of the Debtor's appointed claims, noticing and balloting agent, Trustee Services, Inc. ("TSI"), at www.hearUSA-bkc.com, (ii) may be requested by telephone at 1-888-369-8915, and (iii) may be found on the Pacer website, http://ecf.flsb.uscourts.gov.**

14.     In addition to the foregoing, as soon as practicable, but in any event no later than five (5) business days after the entry of this Bidding Procedures Order, the Debtor shall publish the Sale Notice (modified for publication, as necessary) in *The Wall Street Journal*, national edition.

15.     The notice of potential assumption and assignment of the Scheduled Contracts (as defined in the Cure Notice), substantially in the form attached hereto as Exhibit 3 (the "Cure Notice"), is hereby approved.

16.     On or before three (3) business days after the entry of this Bidding Procedures Order, the Debtor shall serve by first class mail or hand delivery the Cure Notice on all non-Debtor parties to the Scheduled Contracts.  The Cure Notice shall identify the Scheduled Contracts and provide the cure amounts that the Debtor believes must be paid to cure all prepetition defaults under the Scheduled Contracts (collectively, the "Cure Amounts" and individually, a "Cure Amount").

17.     Unless the non-Debtor party to a Scheduled Contract files an objection (the "Cure Amount Objection") to its scheduled Cure Amount, the assumption and assignment to the Proposed Purchaser of the Scheduled Contracts or the ability of the Proposed Purchaser to provide adequate assurance of future performance by the Sale Objection Deadline and serves a copy of the Cure Amount Objection so as to be received no later than the Sale Objection

8

Deadline on the same day to:  (a) the Debtor, HearUSA, Inc., 1250 Northpoint Parkway, West Palm Beach, FL  33407, Attn:  Gino Chouinard, Interim CEO, President and COO; (b) counsel for the Debtor, Berger Singerman, P.A., 350 East Las Olas Blvd, Suite 1000, Ft. Lauderdale, Florida 33301, Attn: Brian K. Gart, Esq. and Debi Evans Galler, Esq.; (c) counsel to the Committee, if any; (d) counsel to the Proposed Purchaser, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, Attn: Sharon L. Levine, Esq. and Peter H. Ehrenberg, Esq.; and (e) the Office of the United States Trustee, 51 SW 1st Ave # 1204, Miami, FL 33130-1614, Attn: Heidi Feinman, Esq.; such non-Debtor party shall be deemed to consent to the Cure Amount proposed by the Debtor and shall be forever enjoined and barred from seeking an additional amount on account of the Debtor's cure obligations under section 365 of the Bankruptcy Code or otherwise from the Debtor, its estate or the Proposed Purchaser (or other Prevailing Bidder) on account of the assumption and assignment of the Scheduled Contracts and shall be deemed to have consented to the proposed assumption and assignment.  In addition, if no timely Cure Amount Objection is filed, the Proposed Purchaser (or other Prevailing Bidder) shall enjoy all the rights and benefits under all Scheduled Contracts without the necessity of obtaining any party's written consent to the Debtor's assumption and assignment of such rights and benefits, and each such party shall be deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment or to object or contest that the Proposed Purchaser (or other Prevailing Bidder) has not provided adequate assurance of future performance.

18.    If the Proposed Purchaser is not the Prevailing Bidder, the non-Debtor parties to the Scheduled Contracts shall have until the Sale Hearing (the "Adequate Assurance Objection Deadline") to object to the assumption and assignment of such Scheduled Contract solely on the

issue of whether the Prevailing Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code (an "Adequate Assurance Objection"); provided, however, that if the Proposed Purchaser is the Prevailing Bidder, all Adequate Assurance Objections must be filed by the Sale Objection Deadline; provided, further, however, that any objections to the assumption and assignment of Scheduled Contracts that do not relate to the issue of whether the Prevailing Bidder can provide adequate assurance of future performance must be filed by the Sale Objection Deadline.

19.    In the event of a dispute regarding:  (a) any Cure Amount with respect to any Scheduled Contract; (b) the ability of the Prevailing Bidder (including the Proposed Purchaser) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under such Scheduled Contract; or (c) any other matter pertaining to assumption and assignment, the Cure Amounts shall be paid as soon as reasonably practicable after the Closing and following the entry of a final order resolving the dispute and approving the assumption of such Scheduled Contract; provided, however, that the Debtor, with the consent of the Proposed Purchaser or other Prevailing Bidder, as applicable, is authorized to settle any dispute regarding the amount of any Cure Amount or assignment to the Prevailing Bidder (including the Proposed Purchaser) without any further notice to or action, order or approval of the Court.

20.    Notwithstanding the inclusion of an executory contract or unexpired lease on any list of Scheduled Contracts, the Proposed Purchaser or other Prevailing Bidder, as applicable, shall have authority, in its sole discretion, to remove any contract or lease from the list of Scheduled Contracts either (i) at the Auction, or (ii) within five (5) business days after the Bankruptcy Court sustains, in whole or in part, such non-Debtor party's Cure Amount Objection

or Adequate Assurance Objection; in either such case, the Debtor shall not assume and assign such Scheduled Contract to the Proposed Purchaser or other Prevailing Bidder, as applicable, who removed such contract or lease from any list of Scheduled Contracts.

21.     In the event any party to a Scheduled Contract timely objects to the calculation of the Cure Amount for such Scheduled Contract designated by Debtor and alleges that the Cure Amount for such Scheduled Contract exceeds the amount calculated by Debtor for such Scheduled Contract (the amount of such excess Cure Amount for the Scheduled Contract in question, the "Excess Cure Amount"), then, (i) Debtor shall provide written notice to Proposed Purchaser of such Cure Amount objection and the amount of such Excess Cure Amount for each of the proposed Assumed Contracts, and (ii) Proposed Purchaser shall, within three business days after receipt of such notice from Debtor either (a) notify Debtor that Proposed Purchaser elects not to assume such Scheduled Contract if the Excess Cure Amount is in excess of ten percent of the Cure Amount for such Scheduled Contract and (b) take no action with respect to such notice, in which case, such Scheduled Contract shall continue to be assumed by Proposed Purchaser at the Closing.  At the Closing, Debtor shall retain the aggregate Excess Cure Amounts for all Assumed Contracts in escrow and shall use commercial reasonable efforts to resolve such discrepancy with such Scheduled Contract parties after the Closing.  In the event any such discrepancies are resolved by Debtor, then, Debtor shall refund such Excess Cure Amounts to Proposed Purchaser less any out of pocket expenses incurred by Debtor to resolve such matter(s).  In the event Debtor does not resolve such discrepancy with such Scheduled Contract party in question, then, Debtor shall deliver such Excess Cure Amount to the Scheduled Contract parties in question.

22.     Within two (2) business days after the Closing Date, the Debtor will file a complete list of the Scheduled Contracts that were assumed and assigned as Assumed Executory Contracts, as of the Closing Date, to the Proposed Purchaser or to the Prevailing Bidder, to the extent that the Prevailing Bidder is not the Proposed Purchaser.

23.     The notice of assumption and assignment of the Assumed Executory Contracts, substantially in the form attached hereto as <u>Exhibit 4</u> (the "<u>Assumption Notice</u>"), is hereby approved.

24.     The Sale Hearing may be continued, from time to time, without further notice to creditors, equity holders or other parties in interest other than by announcement of said continuance before the Court on the date scheduled for such hearing or in the hearing agenda for such hearing.

25.     The Asset Purchase Agreement is approved in all respects.

26.     Other than the Proposed Purchaser, no party submitting an offer or Bid for the Purchased Assets or a Qualified Bid shall be entitled to any expense reimbursement, breakup, termination or similar fee or payment.

27.     In the event the Debtor consummates an Alternative Transaction, provided that the Asset Purchase Agreement has not been terminated by Seller in accordance with sections 4.4 (k) or (m), Seller shall pay to the Proposed Purchaser from the closing proceeds, (i) the actual and reasonable, out-of-pocket, third party costs and expenses actually incurred by the Proposed Purchaser in connection with the conduct of due diligence with respect to the Seller, the Business and the Purchased Assets and the Assumed Liabilities, the negotiation of the Asset Purchase Agreement and the preparation of, and participation in the Auction, excluding expenses incurred in connection with the DIP Loan, but including those in excess of $50,000 in connection with

12

pursuing HSR approvals (the "Expense Reimbursement"), and  (ii) a break-up fee of $1,500,000 (the "Break-up Fee").

28.    If an Auction is conducted, the party with the next highest and best Qualified Bid after the Bid made by the Prevailing Bidder or otherwise second best Qualified Bid at the Auction, as determined by the Debtor, in the exercise of its reasonable business judgment, will be designated as the backup bidder (the "Backup Bidder").

29.    In consideration for receiving the Break-up Fee and the Expense Reimbursement, if the Proposed Purchaser is not the Prevailing Bidder, the Proposed Purchaser agrees to act as a Backup Bidder at the Proposed Purchaser's last highest bid announced at the Auction, even if it is not determined to have the best Qualified Bid.

30.    To the extent that the Purchased Assets contain personally identifiable information, the proposed sale, upon consummation, will transfer to the Proposed Purchaser (or other Prevailing Bidder) such information subject to any existing privacy policy or policies of the Debtor in place as of the date hereof governing such information.

31.    Except as otherwise provided in the Asset Purchase Agreement or this Bidding Procedures Order, the Debtor further reserves the right as it may  determine to be in the best interests of its estate, after consultation with the Committee, if any, to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtor and its estate; (e) remove some or all of the Purchased Assets from the Auction; (f) waive terms and conditions set forth herein with respect

13

to all potential bidders; (g) impose additional terms and conditions with respect to all potential bidders; (h) extend the deadlines set forth herein; (i) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (j) modify the Bidding Procedures as they may determine to be in the best interests of its estate or to withdraw the Motion at any time with or without prejudice.  In making such determination, the Debtor may take account of non-price considerations, such as the risk that the purchaser will fail to close. For the avoidance of doubt, the Proposed Purchaser is hereby deemed to be a Qualified Bidder and the Asset Purchase Agreement is hereby deemed to be a Qualified Bid.

32.     To the extent that any chapter 11 plan confirmed in these cases or any order confirming any such plan or any other order in this case (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Bidding Procedures Order, the provisions of this Bidding Procedures Order shall control.  The Debtor's obligations under this Bidding Procedures Order, the provisions of this Bidding Procedures Order and the portions of the Asset Purchase Agreement pertaining to the Bidding Procedures shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtor, and the reorganized or reconstituted debtor, as the case may, after the effective date of a confirmed plan or plans in the Debtor's case (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code).

33.     To the extent there are any inconsistencies between the terms of this Bidding Procedures Order and the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Bidding Procedures Order shall govern.

34.     The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Bidding Procedures Order shall be effective immediately upon its entry.

35.     All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

36.     The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

37.     The Court shall retain jurisdiction over any matters related to or arising from the implementation of this Bidding Procedures Order.

# # #

Submitted by:
Paul Steven Singerman, Esq.
Berger Singerman, P.A.
200 South Biscayne Blvd., Suite 1000
Miami, FL  33131
Tel: 305-755-9500
Fax: 305-714-4340
Email: singerman@bergersingerman.com

15

# **EXHIBIT A**

(Asset Purchase Agreement)

**EXHIBIT 1 to the Bidding Procedures Order**

**(Bidding Procedures)**

2

## BIDDING PROCEDURES[1]

By the Bidding Procedures Motion dated May 16, 2011, HearUSA, Inc., (the "Debtor"),[2] sought approval of, among other things, the procedures through which the Debtor will determine the highest and best bid  for the sale of substantially all of its assets (the "Purchased Assets") described in the Asset Purchase Agreement by and among, an affiliate of William Demant Holdings A/S or its permitted assigns, as purchaser (the "Proposed Purchaser"),  William Demant Holdings A/S, as guarantor, the Debtor and Auxiliary Health Benefits Corporation d/b/a National Ear Care Plan, as seller thereto, dated as of May 16, 2011 (the "Asset Purchase Agreement"), a copy of which is attached to the proposed Sale Order as Exhibit 1, attached as Exhibit A to the Bidding Procedures Motion.

On _____, 2011, the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtor to determine the highest and best price for the Purchased Assets through the process and procedures set forth below (the "Bidding Procedures").

## Marketing Process

### Contact Parties

The Debtor, in consultation with its investment banker, Sonenshine Partners LLC ("Sonenshine"), has developed a list of parties whom the Debtor believes may potentially be interested in and who the Debtor reasonably believes would have the financial resources to consummate a competing transaction to that of the Proposed Purchaser (a "Competing Transaction"), which list includes both potential strategic buyers and potential financial sponsors (each, individually, a "Contact Party", and collectively, the "Contact Parties"). The Debtor and Sonenshine intend to contact the Contact Parties after the Petition Date to explore their interest in pursuing a Competing Transaction.  The Contact Parties may include parties whom the Debtor or its advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction. The Debtor will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

The Debtor may distribute to each Contact Party an "Information Package," comprising:

(a)    A cover letter;

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the motion to approve these Bidding Procedures (the "Bidding Procedures Motion") or the Asset Purchase Agreement, as applicable.

[2]    The address of the Debtor is 1250 Northpoint Parkway, West Palm Beach, FL  33407, Attn:  Gino Chouinard, Interim CEO, President and COO; and the last four digits of the taxpayer identification number of the Debtor are (8248).

(b)     A copy of these Bidding Procedures; and

(c)     A copy of a confidentiality agreement (unless the party has already signed a confidentiality agreement).

### *Access to Diligence Materials*

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtor an executed confidentiality agreement in the form and substance satisfactory to the Debtor and evidence demonstrating the party's financial capability with respect to the Competing Transaction as determined by the Debtor.

A party who qualifies for access to Diligence Materials shall be a "Preliminary Interested Purchaser." All due diligence requests must be directed to Sonenshine.

For any Preliminary Interested Purchaser who is a competitor of the Debtor or is affiliated with any competitor of the Debtor, the Debtor reserves the right to withhold any Diligence Materials that the Debtor, in its sole discretion, determine are business-sensitive or otherwise not appropriate for disclosure to such Preliminary Interested Purchaser.

### **Auction Qualification Process**

To be eligible to participate in the Auction (defined below), each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtor to satisfy each of the following conditions:

(a)     Good Faith Deposit:  Each Bid must be accompanied by a deposit in the amount of $4,000,000 to an interest bearing escrow account to be identified and established by the Debtor (the "Good Faith Deposit").

(b)     Same or Better Terms:  The Bid must be on terms that, in the Debtor's business judgment, are substantially similar, the same or better than the terms of the Asset Purchase Agreement.  A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Competing Transaction (the "Modified Asset Purchase Agreement").  A Bid shall include a copy of the Asset Purchase Agreement marked to show all changes requested by the Bidder (including those related to purchase price); provided, however, that the terms of the Modified Asset Purchase Agreement are substantially similar, the same or better than the terms of the Asset Purchase Agreement. A Bid must propose a Competing Transaction involving all or substantially all of the Debtor's assets or operations.  A Bid must propose a purchase price equal to or greater than the sum of (i) $72,350,000 in cash, plus (ii) the outstanding Obligations under the DIP Loan Documents in cash (clauses ((i) and (ii) are collectively called the "Minimum Cash Amount"), plus an amount equal to the liabilities being assumed under the Asset Purchase Agreement plus the total Cure Amount (as defined in the Asset Purchase Agreement) being paid or reimbursed under the Asset Purchase Agreement. A Bid will not be considered by Sellers as qualified for the Auction if (i) such Bid contains additional representations and warranties, covenants, closing conditions, termination rights other than as may be included in the Asset Purchase Agreement (it being agreed

2

and understood that the Modified Asset Purchase Agreement shall modify the Asset Purchase Agreement as needed to comply in all respects with the Bidding Procedures Order and will remove provisions that apply only to the Proposed Purchaser as the stalking horse bidder), (ii) such Bid is not received by Debtor and Proposed Purchaser in writing on or prior to the Bid Deadline (as defined herein), and (iii) such Bid does not contain evidence that the Person submitting it has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby; and (iv) such bid contains a break-up fee, expense reimbursement, or similar type of payment.  A Bid must obligate the Bidder to pay, to the extent provided in the Asset Purchase Agreement, all Cure Amounts and any cure amounts with respect to the Assumed Executory Contracts for which an Assumption Notice is provided.  The Bid shall also identify any executory contracts and unexpired leases of the Debtor that the Bidder wishes to have assumed and assigned to it pursuant to the Competing Transaction.

(c)    Corporate Authority:  The Bid must include written evidence acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the proposed Competing Transaction; provided, however, that, if the Bidder is an entity specially formed for the purpose of effectuating the Competing Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Competing Transaction by the equity holder(s) of such Bidder.

(d)    Proof of Financial Ability to Perform:  The Bid must include written evidence that the Debtor concludes demonstrates that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Competing Transaction.  Such information must include, inter alia, the following:

(i)    contact names and numbers for verification of financing sources;

(ii)    evidence of the Bidder's internal resources and proof of unconditional debt or equity funding commitments, from a recognized banking institution in the amount of the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtor in the amount of the cash portion of such Bid, in each case, as are needed to close the Competing Transaction;

(iii)    the Bidder's current financial statements (audited if they exist), provided, that if the Bidder is an entity formed solely for the purpose of the Bid, the Bidder shall include current financial statements (audited if they exist) for such Bidder's equity holders; and

(iv)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor demonstrating that such Bidder has the ability to close the Competing Transaction; provided, however, that the Debtor shall determine, in consultation with the Debtor's advisors, whether the written evidence of

3

such financial wherewithal is acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

(e)　Contingencies:　A Bid may not (i) contain representations and warranties, covenants, termination rights, financing, due diligence contingencies other than as may be included in the Asset Purchase Agreement (it being agreed and understood that such Bid shall modify the Asset Purchase Agreement as needed to comply in all respects with the Bidding Procedures Order (including removing any termination rights in conflict with the Bidding Procedures Order) and will remove provisions that apply only to the Proposed Purchaser as the stalking horse bidder) and (ii) be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(f)　Irrevocable:　A Bid must be irrevocable through the time of the Auction (as defined herein), provided, however, that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of these Bidding Procedures.

(g)　Bid Deadline:　Regardless of when a party qualifies as a Preliminarily Interested Purchaser, the following parties must actually receive a Bid in writing, on or before **July 11, 2011 at 4:00 p.m. (prevailing Eastern Time)** or such earlier date as may be agreed to by the Debtor (the "Bid Deadline"): (i) the Debtor, HearUSA, Inc., 1250 Northpoint Parkway, West Palm Beach, FL 33407, Attn: Gino Chouinard, Interim CEO, President and COO; (ii) counsel for the Debtor, Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Ft. Lauderdale, Florida 33301, Attn: Brian K. Gart, Esq. and Debi Evans Galler, Esq.; (iii) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases, if any (the "Committee"); (iv) counsel to the Proposed Purchaser, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, Attn: Sharon L. Levine, Esq. and Peter H. Ehrenberg, Esq. and; (v) Sonenshine Partners, LLC, 400 Park Avenue, 17th Floor, New York, New York 10022, Attn: Jennifer Doré Russo.　If the Debtor receives one or more Qualified Bids (as defined below), as soon as practicable after the Bid Deadline, the Debtor shall file a notice disclosing the identity and aggregate consideration offered by such Qualified Bid(s).　If the Debtor does not receive any other Qualified Bid(s) on or before the Bid Deadline, the Debtor shall file a notice cancelling the Auction (as defined below) and shall proceed to seek approval of the Qualified Bid evidenced by the Asset Purchase Agreement.

A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "Qualified Bid," and such Bidder shall constitute a "Qualified Bidder."　For purposes of the Auction, the Asset Purchase Agreement submitted by the Proposed Purchaser is a Qualified Bid and the Proposed Purchaser is a Qualified Bidder for all purposes and requirements pursuant to these Bidding Procedures, notwithstanding the requirements that bidders must satisfy to be a Qualified Bidder.　The Proposed Purchaser shall not be required to take any further action in order to participate in the Auction, or if the Asset Purchase Agreement

4

submitted by the Proposed Purchaser is the Successful Bid (as defined herein) or the Backup Bid (as defined herein), to be named the Prevailing Bidder (as defined below) or the Backup Bidder (as defined below), as applicable.  In accordance with these Bidding Procedures, counsel to the Proposed Purchaser will receive a copy of any Bids at the time such Bid is submitted to the Debtor.  The Debtor shall inform counsel to the Proposed Purchaser whether the Debtor will consider such Bids to be Qualified Bids within three (3) calendar days after the Bid Deadline.

### Auction

If one or more Qualified Bids (other than the Asset Purchase Agreement submitted by the Proposed Purchaser) are received by the Bid Deadline, the Debtor will conduct an auction (the "Auction") to determine the highest and best Qualified Bid.  This determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estates, including, among other things, the following:  (a) the amount and nature of the consideration; (b) the number, type and nature of any changes to the Asset Purchase Agreement requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale of the Purchased Assets and the cost to Sellers of such modifications or delay; (d) the total consideration to be received by Sellers; (e) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (f) the net benefit to the estate; and (g) the impact of the transaction on any actual or potential litigation (collectively, the "Bid Assessment Criteria"). The highest and best Bid must include cash in an amount no less than the Minimum Cash Amount.  If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, the Debtor shall not conduct the Auction.  Unless otherwise agreed to by the Proposed Purchaser in its sole discretion, only Qualified Bidders may participate in the Auction.

The Auction shall take place on **July 18, 2011 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301, or such other place and time as the Debtor shall notify all Qualified Bidders, including the Proposed Purchaser, the Committee, if any, counsel for the Proposed Purchaser and other invitees. The Auction shall be conducted according to the following procedures:

(a)    The Debtor Shall Conduct the Auction, and

(b)    The Auction may be transcribed by a certified court reporter and it may be videotaped should the Debtor elect to do so.

The Debtor and its professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtor shall describe the terms of the highest and best Qualified Bid received prior to the Bid Deadline (such Qualified Bid, the "Auction Baseline Bid").  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or sale of the Purchased Assets and at the Debtor's request, each Qualified Bidder must disclose the direct and indirect legal and beneficial owners of the Qualified Bidder.

Unless otherwise agreed by the Debtor, only the Debtor, its counsel and other professionals, representatives of the DIP Lender and its counsel, members of the Committee, if any, and its counsel, the Proposed Purchaser and its counsel and any other Qualified Bidder, in

each case, along with their representatives, shall attend the Auction in person, and only the Proposed Purchaser and such other Qualified Bidders will be entitled to make any Bids at the Auction.

        (c)     Terms of Overbids.

An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Auction Baseline Bid.  To submit an Overbid for purposes of the Auction, a Bidder must comply with the following conditions:

        (i)     The Initial Overbid must be a purchase price equal to or greater than the sum of (i) $72,350,000 plus (ii) the outstanding obligations under the DIP Loan Documents in cash, plus an amount equal to the liabilities being assumed under the Asset Purchase Agreement plus the total Cure Amount (as defined in the Asset Purchase Agreement) being paid or reimbursed under the Asset Purchase Agreement.

Any Incremental Bid after the Initial Overbid shall be made in increments valued at not less than $250,000.  Additional consideration in excess of the amount set forth in the minimum overbid may include cash and/or noncash consideration.

        (ii)     Remaining Terms Are the Same as for Qualified Bids.

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the Bidder until and unless the Debtor accepts a higher Overbid.

To the extent not previously provided (which shall be determined by the Debtor), a Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor) demonstrating such Bidder's ability to close the Alternative Transaction proposed by such Overbid and performance obligations under any assumed contracts.

        (iii)     Announcing Overbids.

The Debtor shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid and the resulting benefit to the Debtor's estates based on, *inter alia*, the Bid Assessment Criteria.

        (iv)     Consideration of Overbids.

The Debtor reserves the right, in its reasonable business judgment, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtor and individual Bidders; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor in its reasonable business judgment may require, that the Bidder has sufficient internal

resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternative Transaction at the prevailing Overbid amount.

(d)     Backup Bidder.

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest Qualified Bid after the Bid made by the Prevailing Bidder (as defined herein) or otherwise next best Qualified Bid at the Auction, as determined by the Debtor, in the exercise of its reasonable business judgment, will be designated as a backup bidder (the "Backup Bidder").  The Backup Bidder shall be required to keep its initial Bid, if any, (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is sixty (60) days after the date of the Sale Hearing (the "Outside Backup Date"); provided, however, that notwithstanding the foregoing, in no event shall the Outside Backup Date be later than one hundred and twenty (120) days following the Petition Date or (ii) the date of closing of a transaction with the Prevailing Bidder or with the Backup Bidder (such transaction, an "Alternative Transaction").   Following the Sale Hearing, if the Prevailing Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Prevailing Bidder, the Debtor may designate the Backup Bidder to be the new Prevailing Bidder, and the Debtor will be authorized, but not required, to consummate the transaction, with the Backup Bidder without further order of the Bankruptcy Court.  In such case, the defaulting Prevailing Bidder's deposit, if any, shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all available damages from the defaulting Prevailing Bidder.  The deposit of the Backup Bidder, if any, shall be held by the Debtor until the earlier of 24 hours after (i) the closing of the transaction with the Prevailing Bidder and (ii) the Outside Backup Date.

If an Auction is conducted, the Proposed Purchaser shall be entitled to credit bid using the outstanding balance of the DIP Loan (as defined in the DIP Loan Documents), the Expense Reimbursement and the Breakup Fee as a portion of the Proposed Purchaser's bid. If the Proposed Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Prevailing Bidder"), regardless of whether the Proposed Purchaser is the next highest bidder at the Auction, the Proposed Purchaser shall keep its bid open to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the Outside Backup Date; provided, however, that notwithstanding the foregoing, in no event shall the Outside Backup Date be later than one hundred and twenty (120) days following the Petition Date or (ii) the date of closing of an Alternative Transaction.  For the avoidance of doubt, the Proposed Purchaser shall be required to maintain its bid to consummate the transactions contemplated by this Agreement even if the Proposed Purchaser is not the Prevailing Bidder or the initial Backup Bidder.  If the Proposed Purchaser is the Prevailing Bidder or otherwise closes on the transactions contemplated by this Agreement, then, at the Closing, the DIP Loan shall be deemed satisfied without reducing the Cash Balance or Deposit of the Purchase Price.

(f)     Additional Procedures.

The Debtor may announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time to make subsequent Overbids) for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures or the Asset Purchase Agreement.

(g)     Consent to Jurisdiction as Condition to Bidding.

The Proposed Purchaser and all Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the Asset Purchase Agreement, the Auction or the construction and enforcement of any documents delivered in connection with a Bid.

(h)     Sale Is As Is/Where Is.

The Purchased Assets shall be conveyed at Closing free and clear of all liens, claims, interests and encumbrances, and in their then present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED,**" except for the explicit representations and warranties set forth in the Asset Purchase Agreement.

(i)     Closing the Auction.

The Auction shall continue until there is only one Qualified Bid that the Debtor determines in its reasonable business judgment, after consultation with its financial and legal advisors, is the highest and best Qualified Bid at the Auction (the "Successful Bid" and the Bidder submitting such Successful Bid, the "Prevailing Bidder"). In making this decision, the Debtor, in consultation with their financial and legal advisors, shall consider the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid.

The Debtor shall not consider any Bids submitted after the conclusion of the Auction.

## Sale Hearing

The Court will conduct a hearing (the "Sale Hearing") on **July 19, 2011 at _____ __.m. (prevailing Eastern Time)**, at which the Debtor will seek approval of the transactions contemplated by the Asset Purchase Agreement with the Prevailing Bidder. Objections, if any, to the sale of the Purchased Assets to the Prevailing Bidder and the transactions contemplated therewith must be in writing and filed with the Court on or before the earlier of **(i) seven (7) days prior to the date of the Auction; or (ii) on July 11, 2011** and be served such that they are actually received by (a) counsel to the Debtor, Berger Singerman, P.A., Attn: Brian K. Gart, Esq., 350 East Las Olas Boulevard, Suite 1000, Ft. Lauderdale, Florida 33301, and Debi Evans Galler, Esq., 200 South Biscayne Blvd., Suite 1000, Miami, FL 33131; (b) counsel to the Committee, if any; (c) counsel to the Proposed Purchaser, Lowenstein Sandler PC, 65 Livingston

8

Avenue, Roseland, NJ 07068, Attn: Peter H. Ehrenberg, Esq. and (d) the Office of the United States Trustee, 51 SW 1st Ave # 1204, Miami, FL 33130-1614, Attn: Heidi Feinman, Esq.

### Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders, if any, shall be held in one or more interest-bearing escrow accounts by the Debtor, but shall not become property of the Debtor's estate absent further order of the Court. The Good Faith Deposit of any Qualified Bidder that is neither the Prevailing Bidder nor the Backup Bidder, if any, shall be returned to such Qualified Bidder not later than three (3) business days after the Sale Hearing. The Good Faith Deposit, if any, of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of 24 hours after (a) the closing of the transaction with the Prevailing Bidder and (b) the Outside Backup Date. Upon the return of the Good Faith Deposits, if any, their respective owners shall receive any and all interest that will have accrued thereon. If the Prevailing Bidder timely closes the winning transaction, its Good Faith Deposit, if any, shall be credited towards its purchase price.

### Reservation of Rights

Except as otherwise provided in the Asset Purchase Agreement or the Sale Order, the Debtor further reserves the right as they may reasonably determine to be in the best interests of its estate, after consultation with the Committee, if any, to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of these Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtor and its estate; (e) remove some or all of the Purchased Assets from the Auction; (f) waive terms and conditions set forth herein with respect to all potential bidders; (g) impose additional terms and conditions with respect to all potential bidders; (h) extend the deadlines set forth herein; (i) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (j) modify these Bidding Procedures as they may determine to be in the best interests of its estate or to withdraw the Motion at any time with or without prejudice. Notwithstanding the foregoing sentence, in the event that the Debtor made material modifications to the Bidding Procedures that are not consented to by the Proposed Purchaser, such material modifications shall permit the Proposed Purchaser to terminate the Asset Purchase Agreement and withdraw its bid without any liability to the Debtor, its estate or otherwise; provided, however, the Debtor may seek a determination from the Court that any such modifications are not material and should not permit the Proposed Purchaser to terminate the Asset Purchase Agreement in accordance with this paragraph.

**EXHIBIT 2 to the Bidding Procedures Order**

**(Sale Notice)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                                    Chapter 11 Case

HEARUSA, INC[1]                                           Case No. _____

      Debtor.

_____/

## NOTICE OF AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

      1.    On May 16, 2011, HearUSA, Inc., (the "Debtor"), filed its Motion[2] for entry of an order (the "Bidding Procedures Order"), among other things, (a) approving Bidding Procedures for the sale of substantially all of the assets owned by the Debtor (the "Purchased Assets") as described in the Asset Purchase Agreement by and between William Demant Holdings A/S or its permitted assigns (the "Proposed Purchaser"), William Demant Holdings A/S, guarantor and the Debtor and Auxiliary Health Benefits Corporation d/b/a National Ear Care Plan (a subsidiary of the Debtor) dated as of May 16, 2011 (the "Asset Purchase Agreement"); (b) approving the Asset Purchase Agreement; (c) approving the form and manner of notice of the auction on the Purchased Assets and the Sale Hearing; (d) approving procedures relating to the assumption and assignment of contracts and leases; and (e) scheduling a sale hearing (the "Sale Hearing") to consider the sale of the Purchased Assets and setting objection and bidding deadlines with respect to the sale of the Purchased Assets.  The Motion additionally requests entry of an order (the "Sale Order") approving (i) the sale of the Purchased Assets free and clear of liens, claims, encumbrances and interests contemplated by the Asset Purchase Agreement; (ii) assumption and assignment of certain executory contracts and unexpired leases; and (iii) certain related relief.

      2.    On _____, 2011, the United States Bankruptcy Court for the Southern District of Florida entered the Bidding Procedures Order [D.E. _____].  Pursuant to the Bidding Procedures Order, the auction for the Purchased Assets shall take place on **July 18, 2011 at _____ __.m. (prevailing Eastern Time)** at the offices of Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301.  Only parties that have submitted a Qualified Bid in accordance with the Bidding Procedures, attached to the Bidding

---

[1] The address of the Debtor is 1250 Northpoint Parkway, West Palm Beach, FL  33407, Attn:  Gino Chouinard, Interim CEO, President and COO; and the last four digits of the taxpayer identification number of the Debtor are (8248).

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion and/or the Bidding Procedures, as applicable.

Procedures Order as Exhibit 1, by no later than **July 11 2011 at 4:00 p.m. (Eastern Time)** (the "Bid Deadline") may participate at the Auction.  Any party that wishes to take part in this process and submit a bid for the Purchased Assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.  Parties interested in receiving information regarding the sale of the Purchased Assets should contact the Debtor's investment bankers, Sonenshine Partners, LLC, 400 Park Avenue, 17th Floor, New York, New York 10022, Attn:  Jennifer Doré Russo, at (212) 944-3334.

3.     To the extent that the Purchased Assets contain personally identifiable information, the proposed sale, upon consummation, will transfer to the Proposed Purchaser (or other Prevailing Bidder) such information subject to any existing privacy policy or policies of the Debtor in place as of the date hereof governing such information.

4.     The Sale Hearing to consider approval of the Sale of the Purchased Assets to the Proposed Purchaser or Prevailing Bidder free and clear of all liens, claims and encumbrances will be held before the Honorable_____, United States Bankruptcy Judge, 1515 North Flagler Dr., Courtroom ___, West Palm Beach, FL  33401 on **July 19, 2011 at _____ __.m. (prevailing Eastern Time)**, or at such earlier date as counsel may be heard. The Sale Hearing may be continued from time to time without further notice to creditors or parties in interest other than by announcement of the continuance in open court on the date scheduled for the Sale Hearing (or in agenda).

5.     Objections, if any, to the sale of the Purchased Assets contemplated by the Asset Purchase Agreement, or the relief requested in the Motion (including with respect to cure amounts and adequate assurance) must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, West Palm Beach Division, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, West Palm Beach, FL 33401, (or filed electronically via CM/ECF), on or before the earlier of **(i) seven (7) days prior to the date of the Auction; or (ii)  July 11, 2011**, or such earlier date and time as the Debtor may agree and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon:  (i) counsel to the Debtor, Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Ft. Lauderdale, Florida 33301, Attn: Brian K. Gart, Esq., and Debi Evans Galler, Esq.; (ii) counsel to the Committee, if any; (iii) counsel to the Proposed Purchaser, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, Attn: Peter H. Ehrenberg, Esq.; and (iv) the Office of the United States Trustee, 51 SW 1st Ave # 1204, Miami, FL 33130-1614, Attn: Heidi Feinman, Esq.

6.     In the event that the Proposed Purchaser is not the Prevailing Bidder at the Auction, the non-Debtor party to any Scheduled Contract(s) will have until the Sale Hearing to object to the Prevailing Bidder's ability to perform under such Scheduled Contract(s).

7.     This Notice and the Sale Hearing are subject to the fuller terms and conditions of the Motion, the Bidding Procedures Order and the Bidding Procedures, which shall control in the event of any conflict and the Debtor encourages parties in interest to review such documents in their entirety.  **Copies of the Bid Procedures Motion, the Asset Purchase Agreement (including exhibits thereto), the Bidding Procedures, and/or the Bidding Procedures Order may be obtained by request in writing, by telephone, or via email from**

2

**counsel to the Debtor: Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn: Debi Evans Galler, Esq.; Tel. (305) 755-9500; email at <u>dgaller@bergersingerman.com</u>. In addition, copies of the aforementioned pleadings (i) will be available for review on the website of the Debtor's appointed claims, noticing and balloting agent, Trustee Services, Inc. ("TSI"), at <span style="color:blue">www.hearUSA-bkc.com,</span> (ii) may be requested by telephone at 1-888-369-8915, and (iii) may be found on the Pacer website, <u>http://ecf.flsb.uscourts.gov</u>.**

Dated: _____ __, 2011

Respectfully submitted,

BERGER SINGERMAN, P.A.
*Counsel for the Debtor*
350 East Las Olas Boulevard, Suite 1000
Ft. Lauderdale, FL  33301
Telephone:  (954) 525-9900
Facsimile:   (954) 523-2872

By:  /s/  *Paul Steven Singerman*
    Paul Steven Singerman
    Florida Bar No. 378860
    singerman@bergersingerman.com
    Brian K. Gart
    Florida Bar No. 381152
    bgart@bergersingerman.com

3

**EXHIBIT 3 to the Bidding Procedures Order**

**(Cure Notice)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                                          Chapter 11 Case

HEARUSA, INC.,[1]                                              Case No.

         Debtor.

_____/

## NOTICE TO COUNTERPARTIES TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES[2]

**PLEASE TAKE NOTICE** that on May 16, 2011, the above-captioned debtor and debtor-in-possession (the "Debtor") filed a motion [D.E. ___] (the "Sale Motion") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") which seeks approval of key dates, times and procedures related to the sale of substantially all of the Debtor's assets (the "Purchased Assets") to William Demant Holdings A/S, a corporation or its permitted assigns (the "Proposed Purchaser") contemplated by the Asset Purchase Agreement. On _____, 2011, the Bankruptcy Court approved the Bidding Procedures.  On July 19, 2011, the Debtor intends to seek approval of, among other things, the sale of the Purchased Assets, including the assumption and assignment of certain executory contracts and unexpired leases. To the extent that there are any inconsistencies between the Bidding Procedures and the summary description of the terms and conditions contained in this Notice, the terms of the Bidding Procedures shall control.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH THE DEBTOR AS SET FORTH ON EXHIBIT A ATTACHED HERETO.[3]**

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures, the Debtor **may** assume and assign to the Proposed Purchaser the executory contract(s) or unexpired lease(s) listed on Exhibit A attached hereto (each, an "Scheduled Contract") to which you are a counterparty.  The Debtor has conducted a review of its books and records and has determined that the cure amount for unpaid monetary obligations under such Scheduled Contract is as set

---

[1] The address of the Debtor is 1250 Northpoint Parkway, West Palm Beach, FL  33407, Attn:  Gino Chouinard, Interim  CEO, President and COO; and the last four digits of the taxpayer identification number of the Debtor are (8248).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures or the Bidding Procedures Order, as applicable.

[3] This Notice is being sent to counterparties to Executory Contracts and Unexpired Leases.  This Notice is not an admission by the Debtor that such contract or lease is executory or unexpired.

forth on <u>Exhibit A</u> attached hereto (the "<u>Cure Amount</u>").  **If you disagree with the proposed Cure Amount, object to the proposed assignment to the Proposed Purchaser of the Scheduled Contract(s) or object to the Proposed Purchaser' ability to provide adequate assurance of future performance with respect to any Scheduled Contracts, you must file an objection with the Bankruptcy Court no later than 4:00 p.m. (prevailing Eastern Time) on July 11, 2011, (the "Objection Deadline") and serve such objection on (a) the Debtor, HearUSA, Inc., 1250 Northpoint Parkway, West Palm Beach, FL  33407, Attn:  Gino Chouinard, Interim CEO, President and COO; (b) counsel for the Debtor, Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301, Attn:  Brian K. Gart, Esq. and Debi Evans Galler, Esq.; (c) counsel to any official committee of unsecured creditors appointed in these chapter 11 cases (the "Committee"); (d) counsel to the Proposed Purchaser, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, Attn: Peter H. Ehrenberg, Esq.; and (e) The Office of the United States Trustee, 51 SW 1st Ave # 1204, Miami, FL 33130-1614, Attn: Heidi Feinman, Esq. so that it is actually received no later than 4:00 p.m. (prevailing Eastern Time) on July 11, 2011.**

PLEASE TAKE FURTHER NOTICE that the Debtor proposes that if no objection to (a) the Cure Amount(s); (b) the proposed assignment of the Scheduled Contract(s) to the Proposed Purchaser or (c) adequate assurance of the Proposed Purchaser' ability to perform is filed by Objection Deadline, (i) you will be deemed to have stipulated that the Cure Amount(s) as determined by the Debtor is correct, (ii) you shall be forever barred, estopped and enjoined from asserting any additional cure amount under the Scheduled Contract(s) and (iii) you will be forever barred from objecting to the assignment of the Assumed Executory Contract(s) to the Proposed Purchaser.

PLEASE TAKE FURTHER NOTICE that in the event the Proposed Purchaser is not the Prevailing Bidder at the Auction, any counterparty to a Scheduled Contract shall have the right to object to the Prevailing Bidder's ability to perform on or before the Sale Hearing scheduled for **July 19, 2011 at _____ __.m. (prevailing Eastern Time)**.  To the extent such counterparty does not object in accordance herewith, the Bankruptcy Court may enter an order forever barring such counterparty to a Scheduled Contract from objecting to the adequate assurance of the Prevailing Bidder's ability to perform.

PLEASE TAKE FURTHER NOTICE that with respect to any Scheduled Contract assumed and assigned to the Prevailing Bidder (including the Proposed Purchaser), all Cure Amounts shall be satisfied by payment of the Cure Amounts as soon as reasonably practicable after Bankruptcy Court approval of the sale of the Purchased Assets to the Prevailing Bidder (including the Proposed Purchaser) or on such other terms as the parties to each such Scheduled Contract may otherwise agree without any further notice to or action, order or approval of the Bankruptcy Court.  In addition, the assumption of each such Scheduled Contract may be conditioned upon the disposition of all issues with respect to such Scheduled Contract.

PLEASE TAKE FURTHER NOTICE that pursuant to the Bidding Procedures, with respect to any Scheduled Contract, in the event of a dispute regarding: (a) the amount of any Cure Amount; (b) the ability of the Prevailing Bidder (including the Proposed Purchaser) to provide "adequate assurance of future performance" (within the meaning of section 365 of the

2

Bankruptcy Code), if applicable, under such Scheduled Contract; or (c) any other matter pertaining to assumption, the Cure Amounts shall be paid as soon as reasonably practicable following the entry of a final order resolving the dispute and approving the assumption of such Scheduled Contract; provided, however, that the Debtor, with the consent of the Proposed Purchaser or other Prevailing Bidder, as applicable, may settle any dispute regarding the amount of any Cure Amount or assignment to the Prevailing Bidder (including the Proposed Purchaser) without any further notice to or action, order or approval of the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE THAT notwithstanding anything herein, this Notice shall not be deemed to be an assumption, adoption, rejection or termination of the Scheduled Contracts.  Moreover, the Debtor explicitly reserves its rights, in their sole discretion, to reject or assume each Scheduled Contract pursuant to section 365(a) of the Bankruptcy Code and nothing herein (a) alters in any way the prepetition nature of the Scheduled Contracts or the validity, priority or amount of any claims of a counterparty to an Scheduled Contract against the Debtor that may arise under such Scheduled Contract; (b) creates a postpetition contract or agreement or (c) elevates to administrative expense priority any claims of an counterparty to an Scheduled Contract against the Debtor that may arise under such Scheduled Contract.

PLEASE TAKE FURTHER NOTICE THAT this Notice is subject to the fuller terms and conditions of the Motion, the Bidding Procedures Order, the Asset Purchase Agreement and the Bidding Procedures, which shall control in the event of any conflict and the Debtor encourages parties in interest to review such documents in their entirety.  Copies of the Motion, the Asset Purchase Agreement, the Bidding Procedures, and/or the Bidding Procedures Order may be obtained by request in writing, by telephone, or via email from counsel to the Debtor: Berger Singerman, P.A., 200 South Biscayne Blvd., Suite 1000, Miami, Florida 33131, Attn: Debi Evans Galler, Esq.; Tel. (305) 755-9500; email dgaller@bergersingerman.com.  In addition, copies of the aforementioned pleadings (i) will be available for review on the website of the Debtor's appointed claims, noticing and balloting agent, Trustee Services, Inc. ("TSI"), at www.hearUSA-bkc.com, (ii) may be requested by telephone at 1-888-369-8915, and (iii) may be found on the Pacer website, http://ecf.flsb.uscourts.gov.

Dated: _____ __, 2011

Respectfully submitted,

BERGER SINGERMAN, P.A.
*Counsel for the Debtor*
350 East Las Olas Boulevard, Suite 1000
Ft. Lauderdale, FL  33301
Telephone:  (954) 525-9900
Facsimile:   (954) 523-2872

By:  _/s/  Paul Steven Singerman_____
        Paul Steven Singerman
        Florida Bar No. 378860
        singerman@bergersingerman.com
        Brian K. Gart
        Florida Bar No. 381152
        bgart@bergersingerman.com

3

3624133-7

## EXHIBIT A

[Counterparty Name]                [Contract/Lease]                        Cure Amount

**DRAFT**  034784-0119

**EXHIBIT 4 to the Bidding Procedures Order**

**(Assumption Notice)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                                    Chapter 11 Case

HEARUSA, INC., [1]                                        Case No.

     Debtor.

_____/

**NOTICE OF ASSUMPTION AND ASSIGNMENT**
**OF EXECUTORY CONTRACT OR UNEXPIRED LEASE**

     **PLEASE TAKE NOTICE THAT**:

     1.     A hearing (the "Sale Hearing")[2] was held at _____ __.m. on July 19, 2011 before the Honorable _____, United States Bankruptcy Judge, in the Bankruptcy Court, Flagler Waterview Building, 1515 North Flagler Drive, Courtroom ___, West Palm Beach, Florida 33401.  At the Sale Hearing, the Bankruptcy Court entered an order (the "Sale Order") (a) approving the sale of the Purchased Assets to _____ (the "Purchaser") in accordance with the Asset Purchase Agreement, and (b) authorizing, among other things, the Debtor, pursuant to the terms of the Asset Purchase Agreement, to assume and assign certain executory contracts and unexpired leases to the Purchaser.

     2.     The Purchaser has elected to take assignment of the executory contracts and unexpired leases as set forth on Exhibit A hereto.

---

[1] The address the Debtor is 1250 Northpoint Parkway, West Palm Beach, FL  33407, Attn:  Gino Chouinard, Interim CEO, President and COO; and the last four digits of the taxpayer identification number of the Debtor are (8248).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures or the Bidding Procedures Order, as applicable.

3624133-7

## EXHIBIT A

[Counterparty Name/Address]          [Contract/Lease]                    Cure Amount

**EXHIBIT C**

22

# HearUSA

## Disclaimer

Enclosed is the financial projection ("Projection") for HearUSA (the "Company") for the period beginning May 16, 2011 through August 12, 2011, inclusive.  This Projection has been prepared with information provided by management of the Company ("Management"). Development Specialists, Inc. ("DSI") did not audit or review the historical information provided by management. DSI does not provide any opinion or assurance that the historical information presented is accurate.

The Projection was not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants or any other US or international governing body regarding projections or forecasts for Generally Accepted Accounting Principles ("GAAP") or local laws or regulations.. There can be no assurance that the Projection will be realized and actual results may be materially different. The Projection should not be regarded as a representation of DSI or Management that the projected results will be achieved. DSI and Management assume no responsibility for the accuracy of such information.

The Projection is intended solely for the use by the Company and William Demant Holdings A/S and should not be used by any person without knowledge of the Company's business or any other user except for William Demant Holdings A/S.

The Projection reflects the Company's anticipated financial results and are forward-looking statements subject to risks and uncertainties such as the breadth of the global economic downturn, the ability to successfully rationalize inventory, retail demand and other competitive pressures. Forward-looking statements included herein are made as of the date hereof, and the Company and DSI undertake no obligation to update such statements to reflect subsequent events or circumstances. Actual results could differ materially from anticipated results.

**HearUSA**
**Debtor-in-Possession Budget**
Summary Statement of Cash Sources and Uses

$000s

| | Total | 5/16/2011 | 5/23/2011 | 5/30/2011 | 6/6/2011 | 6/13/2011 | 6/20/2011 | Week of 6/27/2011 | 7/4/2011 | 7/11/2011 | 7/18/2011 | 7/25/2011 | 8/1/2011 | 8/8/2011 | Wind Down & Reserve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOURCES OF CASH** | | | | | | | | | | | | | | | |
| Patient Revenue and A/R | $14,774.0 | $1,136.5 | $1,463.5 | $932.0 | $1,136.5 | $1,136.5 | $1,136.5 | $1,340.9 | $972.9 | $972.9 | $1,136.5 | $1,463.5 | $972.9 | $972.9 | $0.0 |
| Cap Payments | 1,170.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 0.0 |
| HeaRx Payment | 440.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 220.0 | 0.0 | 0.0 | 0.0 | 220.0 | 0.0 | 0.0 | 0.0 |
| Credit Card Fees | (57.5) | (4.4) | (6.2) | (3.3) | (4.4) | (4.4) | (4.4) | (5.5) | (3.5) | (3.5) | (4.4) | (6.2) | (3.5) | (3.5) | 0.0 |
| **Total Cash Inflows** | $16,326.5 | $1,222.0 | $1,547.3 | $1,018.7 | $1,222.0 | $1,222.0 | $1,222.0 | $1,645.3 | $1,059.4 | $1,059.4 | $1,222.0 | $1,767.3 | $1,059.4 | $1,059.4 | $0.0 |
| **USES OF CASH** | | | | | | | | | | | | | | | |
| **Cost of Sales** | | | | | | | | | | | | | | | |
| Cost of Sales | $5,403.0 | $41.9 | $1,678.1 | $31.4 | $41.9 | $41.9 | $41.9 | $1,671.8 | $33.5 | $33.5 | $41.9 | $1,678.1 | $33.5 | $33.5 | $0.0 |
| Bonuses/Commissions | 693.0 | 0.0 | 0.0 | 231.0 | 0.0 | 0.0 | 0.0 | 0.0 | 231.0 | 0.0 | 0.0 | 0.0 | 231.0 | 0.0 | 0.0 |
| **Net Cost of Sales** | $6,096.0 | $41.9 | $1,678.1 | $262.4 | $41.9 | $41.9 | $41.9 | $1,671.8 | $264.5 | $33.5 | $41.9 | $1,678.1 | $264.5 | $33.5 | $0.0 |
| **Gross Profit (Cash Basis)** | $10,230.5 | $1,180.1 | ($130.8) | $756.3 | $1,180.1 | $1,180.1 | $1,180.1 | ($26.4) | $794.9 | $1,025.9 | $1,180.1 | $89.2 | $794.9 | $1,025.9 | $0.0 |
| **Operating Expenses** | | | | | | | | | | | | | | | |
| Salaries and Benefits | $7,311.5 | $1,056.1 | $8.1 | $854.7 | $251.6 | $856.1 | $8.1 | $854.7 | $251.6 | $856.1 | $8.1 | $854.7 | $51.6 | $1,059.8 | $340.2 |
| Advertising and Marketing | 1,222.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 0.0 |
| Occupancy | 2,594.7 | 36.2 | 362.2 | 35.2 | 559.2 | 36.2 | 109.6 | 35.2 | 559.2 | 36.2 | 109.6 | 35.2 | 559.2 | 28.2 | 93.0 |
| Supplies and Postage | 176.0 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 0.0 |
| Insurance | 486.0 | 0.0 | 23.0 | 0.0 | 39.0 | 0.0 | 23.0 | 0.0 | 39.0 | 0.0 | 23.0 | 0.0 | 39.0 | 300.0 | 0.0 |
| Travel & Entertainment | 99.0 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 0.0 |
| Prof. Fees (Lgl/Tax/Other) | 1,297.5 | 63.1 | 98.1 | 123.1 | 73.1 | 123.1 | 73.1 | 63.1 | 63.1 | 63.1 | 83.1 | 83.1 | 83.1 | 73.1 | 232.5 |
| Shareholder Expense | 120.0 | 0.0 | 0.0 | 0.0 | 40.0 | 0.0 | 0.0 | 0.0 | 40.0 | 0.0 | 0.0 | 0.0 | 40.0 | 0.0 | 0.0 |
| Bank Fees/Late Fees | 36.0 | 0.0 | 0.0 | 0.0 | 12.0 | 0.0 | 0.0 | 0.0 | 12.0 | 0.0 | 0.0 | 0.0 | 12.0 | 0.0 | 0.0 |
| Miscellaneous Expenses | 321.4 | 17.9 | 17.9 | 20.9 | 17.9 | 17.9 | 17.9 | 20.9 | 17.9 | 17.9 | 17.9 | 17.9 | 20.9 | 17.9 | 80.0 |
| **Ttl Center/Region Exp.** | $13,664.1 | $1,288.4 | $624.4 | $1,149.0 | $1,107.9 | $1,148.4 | $346.8 | $1,089.0 | $1,097.9 | $1,088.4 | $356.8 | $1,109.0 | $917.9 | $1,594.1 | $745.7 |
| **Other Expenses** | | | | | | | | | | | | | | | |
| AARP Expenses | $450.0 | $0.0 | $150.0 | $0.0 | $0.0 | $0.0 | $150.0 | $0.0 | $0.0 | $0.0 | $150.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Network Payments | 2,577.0 | 425.0 | 227.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 0.0 |
| Regulatory Matters | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 50.0 | 150.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Interest (DIP) | 91.4 | 0.0 | 0.0 | 0.0 | 18.6 | 0.0 | 0.0 | 0.0 | 30.1 | 0.0 | 0.0 | 0.0 | 42.6 | 0.0 | 0.0 |
| **Total Other Expenses** | $3,318.4 | $425.0 | $377.0 | $175.0 | $193.6 | $225.0 | $475.0 | $175.0 | $205.1 | $175.0 | $325.0 | $175.0 | $217.6 | $175.0 | $0.0 |
| Total Operating Expenses | $16,982.4 | $1,713.4 | $1,001.4 | $1,324.0 | $1,301.6 | $1,373.4 | $821.8 | $1,264.0 | $1,303.1 | $1,263.4 | $681.8 | $1,284.0 | $1,135.6 | $1,769.1 | $745.7 |
| **Net Operating Cash Flow** | ($6,751.9) | ($533.3) | ($1,132.2) | ($567.7) | ($121.5) | ($193.3) | $358.4 | ($1,290.5) | ($508.2) | ($237.6) | $498.4 | ($1,194.8) | ($340.7) | ($743.2) | ($745.7) |
| **Bankruptcy Expenses** | | | | | | | | | | | | | | | |
| Utility Deposits | $94.7 | $0.0 | $0.0 | $0.0 | $94.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Claims/Noticing Agent | 291.0 | 17.0 | 7.0 | 38.0 | 7.0 | 7.5 | 7.5 | 9.5 | 66.5 | 9.5 | 42.0 | 9.5 | 9.5 | 10.5 | 50.0 |
| Critical Vendors | 336.2 | 0.0 | 336.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Bankruptcy Professionals | 1,772.5 | 0.0 | 130.0 | 125.0 | 140.0 | 125.0 | 86.7 | 86.7 | 126.7 | 83.0 | 98.0 | 97.5 | 97.0 | 117.0 | 460.0 |
| Investment Banker Fees[1] | 1,750.0 | 0.0 | 0.0 | 0.0 | 90.0 | 0.0 | 0.0 | 0.0 | 80.0 | 0.0 | 0.0 | 0.0 | 0.0 | 80.0 | 1,500.0 |
| Other Wind Down Exp. | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 200.0 |
| DIP Closing Fee | 200.0 | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| US Trustee Fees | 63.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 13.0 | 0.0 | 0.0 | 0.0 | 0.0 | 50.0 |
| **Total Bankruptcy Exp.** | $4,707.4 | $217.0 | $473.2 | $163.0 | $331.7 | $132.5 | $94.2 | $96.2 | $273.2 | $105.5 | $140.0 | $107.0 | $106.5 | $207.5 | $2,260.0 |
| **Net Cash Flow** | ($11,459.3) | ($750.3) | ($1,605.4) | ($730.7) | ($453.1) | ($325.8) | $264.2 | ($1,386.7) | ($781.4) | ($343.1) | $358.4 | ($1,301.8) | ($447.2) | ($950.7) | ($3,005.7) |
| Beginning Cash Balance | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $264.2 | $0.0 | $0.0 | $0.0 | $358.4 | $0.0 | $0.0 | $0.0 |
| +Cash Generated from Ops | (11,459.3) | (750.3) | (1,605.4) | (730.7) | (453.1) | (325.8) | 264.2 | (1,386.7) | (781.4) | (343.1) | 358.4 | (1,301.8) | (447.2) | (950.7) | (3,005.7) |
| +Loan Needed | 11,459.3 | 750.3 | 1,605.4 | 730.7 | 453.1 | 325.8 | 0.0 | 1,122.5 | 781.4 | 343.1 | 0.0 | 943.4 | 447.2 | 950.7 | 3,005.7 |
| **Ending Cash Balance** | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $264.2 | $0.0 | $0.0 | $0.0 | $358.4 | $0.0 | $0.0 | $0.0 | $0.0 |

[1] HUSA reserves the right to change the amount owed for the transaction fee owed to the investment banker dependent on final purchase price in accordance with the terms of the investment banker engagement letter.