UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 11 Case

HearUSA, Inc.,[1]                                   Case No. 11-_____

                    Debtor.

_____/

## DEBTOR'S EMERGENCY MOTION FOR AUTHORIZATION
## TO HONOR LICENSE AND SERVICES AGREEMENTS
## <u>WITH AARP IN THE ORDINARY COURSE OF BUSINESS</u>
### <u>Emergency Hearing Requested</u>

### <u>Basis for Requested Emergency Hearing</u>

HearUSA is the recognized leader in hearing care for the nation's top managed care organizations through its network of approximately 1,800 hearing care provider locations, including 134 company-owned centers. In the operation of its business, HearUSA is the administrator of the AARP Hearing Care Program, designed to help millions of Americans aged 50+ who have hearing loss. The Hearing Care Program is subject to certain licensing and services agreements with AARP. It is imperative to the Debtor's business operations that this Court enter an order authorizing the Debtor to honor its obligations under these agreements so that the operation and management of the Hearing Care Program continues uninterrupted during this bankruptcy proceeding. The Debtor respectfully requests that the Court conduct a hearing on this Motion as soon as the Court's calendar will permit. The Debtor further requests that the Court waive the provisions of Local Rule 9075-1 (B), which requires an affirmative statement that a bona fide effort was made in order to resolve the issues raised in this Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

HearUSA, Inc. ("HearUSA" or the "Debtor"), by and through undersigned counsel, and pursuant to 11 U.S.C. §§ 105(a), files *Debtor's Emergency Motion for Authorization to Honor License and Services Agreements With AARP in the Ordinary Course of Business* (the "Motion"). In support of this Motion, the Debtor relies upon the *Declaration of Joseph J.*

---

[1] The address of the Debtor is 1250 Northpoint Parkway, West Palm Beach, Florida 33407; and the last four digits of the taxpayer identification number of the Debtor are (8248).

*Luzinski in Support of Chapter 11 Petition and Request for First Day Relief* (the "First Day Declaration") filed on the Petition Date (as defined below), and respectfully represents as follows:

## I.     Jurisdiction

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue of this case and this Motion in this district is proper pursuant to 28 U.S.C. § 1408.

## II.     Background

2.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

3.      The Debtor is operating its business and managing its affairs as debtor-in-possession.  11 U.S.C. §§ 1107(a) and 1108.

4.      For a detailed description of the Debtor and its operations, the Debtor respectfully refers the Court and parties in interest to the First Day Declaration.

5.      The Debtor is the recognized leader in hearing care for the nation's top managed care organizations through its network of approximately 1,800 hearing care provider locations, including 134 company-owned centers.

6.      Since 1991, HearUSA has entered into arrangements with institutional buyers relating to the provision of hearing care products and services.  These institutional buyers include managed care companies, employer groups, health insurers, benefit sponsors, senior citizen groups and unions.

7.      HearUSA also is the administrator of the AARP Hearing Care Program (the "Hearing Care Program"), designed to help millions of Americans aged 50+ who have hearing

loss. HearUSA is the only hearing care program endorsed by the American Association of Retired Persons ("AARP"). Under this program, the Debtor has agreed to provide to the members of AARP discounts on hearing aids and related services through the Debtor's company-owned centers and independent network of participating hearing care providers. Hearing aids sold under the Hearing Care Program include a three year limited warranty and a three year supply of batteries included in the price of the hearing aid.

### III.    Description of the Hearing Care Program and Related License and Services Agreements with AARP

8.     AARP has licensed HearUSA to provide hearing aids and related services available to AARP members.  Co-branded advertising and AARP member communications promote the benefits of purchasing hearing aids through the Hearing Care Program, and members are provided a consistent program with uniform discounted pricing, along with extended guarantees and warranties.

9.     The Hearing Care Program was piloted in 2009 and 2010, and became available in 45 states in the third quarter of 2010.[2]  The Debtor considers the Hearing Care Program to be of significant consumer appeal and a major part of its national branding strategy.  The following is a brief summary of the applicable contractual relationships between HearUSA and AARP in connection with the Hearing Care Program.

**AARP License Agreement**

10.     Under the AARP License Agreement dated August 8, 2008, as amended (a copy of which is attached hereto as composite **Exhibit "A"**) (the "AARP License Agreement"), AARP granted HearUSA a license to use the AARP Intellectual Property (as defined in the AARP License Agreement).  Amendment No. 2 to the AARP License Agreement (included as

---

[2] The Hearing Care Program currently is not available in the states of California, Oklahoma, Rhode Island, Texas, and Minnesota.

part of composite Exhibit "A") establishes royalty payments due from HearUSA to AARP for hearing aids sold through the Hearing Care Program at $55/unit in 2011 and $60/unit in 2012. Such royalties are payable in arrears and quarterly.[3] The balance owing on fourth quarter 2010 and first quarter 2011 fixed fee royalties are due May 6 ($100K) and May 13 ($100,039).

11.    To secure the performance of HearUSA's obligations under the AARP License Agreement, the Debtor has provided two irrevocable standby letters of credit (the "Letters of Credit") to AARP.   One of the Letters of Credit (in the amount of $1 million) expires on January 1, 2012; the second Letter of Credit (also in the amount of $1 million) expires in August 2012.

**AARP Services Agreement**

12.    Under the Hearing Care Program Services Agreement dated August 8, 2008, as amended (a copy of which is attached hereto as composite **Exhibit "B"**) (the "AARP Services Agreement"), AARP and AARP Services ("ASI") contracts with HearUSA to provide services relating to the design, development and management of AARP branded products and services. This agreement includes the Economic Assistance Program which requires HearUSA to donate 1000 hearing aids to disadvantaged individuals.[4]   HearUSA has also agreed to donate funds to AARP's Education and Awareness Fund.  By letter agreement dated April 6, 2011, the Debtor is obligated in 2011 to make quarterly payments equaling a total annual contribution of $250,000 to this fund.  Amendment No. 1 to the AARP Services Agreement requires HearUSA to commit

---

[3] In three states, there is a fixed fee schedule amount, which approximates the variable unit amount in the states where HearUSA is currently operating.

[4] The Economic Assistance Program is in pilot mode in the state of Florida.  Thus far, no hearing aids have been donated to this program, but it is anticipated that a small number will be donated this year (<100).

$4.4 million to the annual marketing budget of the Hearing Care Program, with 9.25% of such amount to go to the AARP General Program administered by ASI.[5]

## IV.    Relief Requested

13.    By this Motion, the Debtor seeks authority to continue to (i) perform under the AARP License Agreement and the AARP Services Agreement (collectively, the "Agreements"); (ii) make certain payments due under the Agreements, and (iii) continue postpetition, in the ordinary course of business, to honor the Agreements and any obligations thereunder.

14.    The Debtor has made significant investments into the Hearing Care Program. Its license to use the AARP Intellectual Property is a marketing advantage. There have been over 12,000 hearing aids sold under this program since inception, and over 50,000 calls and inquiries by AARP members. It is important that the Debtor be permitted to continue operating the Hearing Care Program so that it may gain rewards from the resources invested.

15.    In order to do so, HearUSA needs to continue meeting its royalty obligations as outlined above, its donation to the Education and Awareness Fund, and the annual marketing spend (which is under evaluation, but considered to be less than half of the $4.4 million stated in the Amendment No. 1 to the AARP Services Agreement). Failure to meet these obligations could result in allegations of the Debtor's breach of its obligations under the Hearing Care Program and the loss of $2 million held in Letters of Credit. Further, if the Hearing Care Program is terminated, HearUSA's brand will suffer in the market, and the Debtor will lose future sales that otherwise would have resulted from the current marketing investments.

---

[5] Although the AARP Services Agreement, as amended, requires HearUSA to commit $4.4 million to the annual marketing budget of the Hearing Care Program, budgets submitted to AARP for less than that amount historically have been approved. The Debtor's 2011 budget for this marketing item is currently pending approval and is anticipated to total approximately $2 million.

HearUSA will also lose the confidence of AARP purchasers, as well as its provider network, which receives business from HearUSA and AARP co-branded member communications.

16.     Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). The relief sought herein is necessary and appropriate to ensure that the management and conduct of the Hearing Care Program will not be affected by the Debtor's bankruptcy filing and may continue to operate as it did prior to the Petition Date, and in order to maintain the Debtor's critical relationships with Hearing Care Program participants and AARP.

17.     There will be no prejudice to unsecured creditors resulting from the relief sought herein. Rather, disruption in the operation and maintenance of the Hearing Care Program will result in irreparable harm to the Debtor's business.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an Order, in the form attached hereto as **Exhibit "C"**, granting the relief requested herein and granting such other and further relief as is just and proper.

Dated:   May 16, 2011

Respectfully submitted,

BERGER SINGERMAN, P.A.
*Proposed Counsel for Debtor-in-Possession*
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
Telephone: (954) 525-9900
Facsimile:  (954) 523-2782

and

200 S. Biscayne Boulevard, Suite 1000
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile:   (305) 714-4340

By:    */s/  Paul Steven Singerman*
            Paul Steven Singerman
            Florida Bar No. 378860
            singerman@bergersingerman.com
            Brian K. Gart
            Florida Bar No. 381152
            bgart@bergersingerman.com

# EXHIBIT "A"

## (AARP LICENSE AGREEMENT)

EXECUTION COPY

# AARP LICENSE AGREEMENT

This AARP LICENSE AGREEMENT (the "**Agreement**") is entered into as of this 8th day of August 2008 (the "**Effective Date**"), between AARP, Inc., a District of Columbia nonprofit corporation ("**AARP**"), and HearUSA, Inc. ("**HUSA**"), a Delaware corporation. (AARP and HUSA, each a "**Party**" and collectively, the "**Parties**").

## WITNESSETH

WHEREAS, AARP is a non-profit, non-partisan membership corporation for persons age 50 and over whose goals include the advancement of the education, well-being and social welfare of its members and older persons generally;

WHEREAS, AARP represents that is the sole and exclusive owner of all proprietary and other property rights and interests in the Licensed Intellectual Property (as defined in this Agreement);

WHEREAS, AARP makes available to AARP members many benefits and desires to make available to AARP members certain products and services through the use of the Licensed Intellectual Property;

WHEREAS, AARP agrees to grant to HUSA a license to the Licensed Intellectual Property pursuant to the terms of this Agreement;

WHEREAS, AARP has contracted with AARP Services, Inc. ("**ASI**"), a wholly-owned subsidiary of AARP, to undertake the obligation to maintain Quality Control Standards (as defined in this Agreement);

NOW, THEREFORE, in consideration of the representations, warranties, conditions, covenants, and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

1.  Definitions.

    "**AARP Marks**" means all U.S. registered and unregistered common law trademarks, trade dress, service marks, logos, symbols, acronyms, trade names, corporate names and all registrations and applications to register the same for the marks "AARP", and the "AARP" logo, and any specific Program name (so long as such Program name does not incorporate all or any part of HUSA's name or trade mark or service mark of HUSA), as may be modified or supplemented from time to time by AARP.

    "**Affiliate**" as applied to any Person, means any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. The term "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person,

1
*CONFIDENTIAL*

EXECUTION COPY

means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through ownership interest, by contract or otherwise.

"**Applicable Law**" means all applicable federal, state, and local laws, statutes, regulations, rulings, ordinances, and other legal requirements.

"**Claims**" means damages (including, without limitation, consequential and punitive damages), judgments, fines, awards, settlements, costs and expenses, including reasonable fees and expenses of counsel and experts.

"**Licensed Copyrights**" means the original works of authorship, if any, marked with AARP's copyright notice, provided by AARP and/or ASI as provider of Quality Control Services on behalf of AARP to HUSA for its use in connection with the Program.

"**AARP Intellectual Property**" consists of the Licensed Marks, AARP's name, Member Data, and the Licensed Copyrights, and the goodwill associated therewith.

"**Licensed Marks**" means the AARP Marks as set forth in Exhibit A, as such Exhibit may be modified or supplemented from time to time by AARP upon giving written notice to HUSA; provided that HUSA shall not be required to remove, replace, reprint or cease use of any existing advertising or promotional materials, paper goods, and any other materials and supplies that contain one or more of the Licensed Marks as previously set forth on Exhibit A for a period of three (3) months following the date of written notice to HUSA, except as would be necessary in the ordinary course of business, following which time HUSA shall promptly remove, replace, reprint or cease use of any such materials.

"**Member**" means an individual who is then (i.e., at the time in question) a current member of AARP, as evidenced by a valid membership number.

"**Member Data**" means the names, addresses, telephone numbers, AARP membership numbers, and e-mail addresses that AARP or ASI provide to HUSA or permit HUSA to access in connection with this Agreement or the License Agreement, including Member mailing lists.

"**Person**" means any corporation, partnership, limited liability company, joint venture, organization, entity, governmental entity, or natural person.

"**Program**" means the hearing care program provided to Members by or through HUSA, as more fully described in the Services Agreement.

"**Program Products**" means the products and services offered to Members under the Program.

2
*CONFIDENTIAL*

EXECUTION COPY

> **"Program Year"** means December 1 of a calendar year through and including November 30 of the next calendar year. (For example, Program Year 1 under this Agreement is December 1, 2008 through and including November 30, 2009.)

> **"Quality Control Standards"** means those standards and obligations imposed upon HUSA to ensure that activities of HUSA with respect to the Program comply with the terms of this Agreement, do not depreciate the value of the Licensed Intellectual Property being licensed to HUSA under this Agreement, and uphold the goodwill and reputation of AARP, all as set forth in the Services Agreement.

> **"Services"** means the services to be performed by HUSA pursuant to and in accordance with the Services Agreement.

> **"Services Agreement"** means the Hearing Care Program Services Agreement between ASI, AARP and HUSA, entered into on August 8, 2008.

> **"Third Party"** means any Person other than a Party to this Agreement and other than ASI.

2.     Right to Use AARP Intellectual Property.

> 2.1     License. During the Term of the Services Agreement and in consideration of the compensation paid under this Agreement, AARP grants to HUSA the right and license to use the AARP Intellectual Property solely in connection with the operation and administration of all or any part of the Program (including without limitation advertising and promoting all or any part of the Program) and in connection with HUSA's performance of its obligations under the Services Agreement, all in accordance with the terms and conditions set forth in the Services Agreement (the "**License**"). The License shall be subject to HUSA's compliance at all times with any and all Quality Control Standards as set forth in the Services Agreement.

> 2.2     Prohibited Uses. In no event may HUSA use any of the Licensed Intellectual Property for any of the following activities, other than as expressly authorized in this Agreement, as authorized in writing in advance by AARP, or as authorized under the Services Agreement:

> 2.2.1     In connection with public policy statements made by HUSA (whether formally or informally);

> 2.2.2     In connection with communications with federal or state government officials;

> 2.2.3     On business cards, business stationary or letterhead, and/or signage;

> 2.2.4     In any manner that is likely to confuse or mislead as to the ownership of any AARP Intellectual Property, or that may infringe, dilute or denigrate any of the AARP Intellectual Property; or

3
*CONFIDENTIAL*

EXECUTION COPY

2.2.5   To use the Licensed Intellectual Property in any manner other than in accordance with this Agreement, the Services Agreement, or as otherwise expressly authorized in advance in writing by ASI as provider of Quality Control Services on behalf of AARP.

2.3   Ownership; Use.  Except for purposes of providing the Program, as described under Section 2.1, HUSA shall acquire no right, title or interest in the AARP Intellectual Property and all AARP Intellectual Property is and shall remain the sole property of AARP.  In addition, except as otherwise expressly provided in this Agreement, or the Services Agreement, or with AARP's prior written consent, HUSA agrees as follows:

2.3.1   HUSA shall not use, sell, transfer, barter, lease, rent, license or otherwise provide or disclose all or any portion of the AARP Intellectual Property to any Third Party.

2.3.2   Any Confidential Information (as such term is defined in the Services Agreement) of AARP and/or ASI acquired by HUSA pursuant to this Agreement, and all use and/or disclosure of such Confidential Information by HUSA, shall be subject to the Services Agreement, including Section VIII of the Services Agreement.

2.3.3   HUSA agrees that all AARP Intellectual Property is and shall remain the property of AARP and HUSA shall acquire no title or interest in such property, other than the limited license granted to HUSA under Section 2.1 above.

2.3.4   HUSA shall promptly notify ASI as provider of Quality Control Services on behalf of AARP upon HUSA becoming aware of any actual, alleged or threatened unauthorized use of any AARP Intellectual Property, and HUSA shall reasonably assist ASI as provider of Quality Control Services on behalf of AARP and AARP in investigating or prosecuting any action relating to any such unauthorized use at AARP's sole cost and expense.

2.3.5   At the request of ASI, as provider of Quality Control Services on behalf of AARP, HUSA shall apply written notations to the Licensed Marks (e.g., the "SM" or "TM" symbols).  ASI as provider of Quality Control Services on behalf of AARP will provide HUSA with written notice of changes to the notation requirements for the Licensed Marks and HUSA will implement such changes as soon as reasonably practicable.

2.3.6   Improvements, enhancements or derivative works (**"Modifications"**) to the AARP Intellectual Property made as a result of the implementation or administration of the Program or of this Agreement shall belong to AARP, unless the parties agree otherwise in writing in advance of making the Modifications.  If HUSA creates any Modifications to the AARP Intellectual Property, HUSA agrees to the extent necessary or requested by

4
*CONFIDENTIAL*

EXECUTION COPY

ASI as provider of Quality Control Services on behalf of AARP to irrevocably assign any right, title and interest HUSA may have in and to the Modifications to AARP, and agrees to take or cause to be taken reasonable actions, and to execute, deliver and file or cause to be executed, delivered and filed such further instruments, documents and agreements as may be reasonably requested in order to fully effectuate the assignment described herein. HUSA will promptly disclose and deliver to AARP any and all material Modifications.

2.4     Quality Control; Designation of New Quality Control Representative. The license of AARP Intellectual Property hereunder shall be subject to HUSA's compliance at all times with any and all Quality Control Standards as set forth in the Services Agreement. AARP has engaged ASI as its representative to perform Quality Control Services on AARP's behalf, subject to a separate agreement between AARP and ASI. AARP, by written notice to HUSA at any time, may designate a different provider of Quality Control Services on AARP's behalf, with respect to some or all of such Quality Control Services; HUSA will be afforded an opportunity to consent, such consent not to be unreasonably withheld. In the event of such designation, references to ASI in this Agreement and in the Services Agreement, with respect to those components of Quality Control Services covered by such designation, shall be deemed to refer to the new provider of Quality Control Services.

2.5     Goodwill. HUSA recognizes that there is great value to AARP in all components of the AARP Intellectual Property, including the associated goodwill. Therefore, HUSA agrees that all uses by HUSA of the AARP Intellectual Property shall inure solely to the benefit of AARP. HUSA shall not, during the period of this Agreement or thereafter, directly or indirectly acquire or assert any interest or property right in the AARP Intellectual Property , nor alter, modify, -dilute or misuse or bring into dispute or challenge the validity or enforceability of any component of the AARP Intellectual Property.

2.6     Registration. HUSA shall not during the term of this Agreement or at any time thereafter adopt, use, register or attempt to register, as the case may be, as a trademark, service mark, trade name, domain name or corporate name, or as part thereof, any of the AARP Intellectual Property, or any word, symbol or picture or combination thereof which is confusingly similar to any component of the AARP Intellectual Property, anywhere in the world, other than as expressly permitted by this Agreement, the Services Agreement, or as expressly authorized in writing by AARP. HUSA shall not challenge, in a court of law or otherwise, the ownership of any other rights of AARP in and to any component of the AARP Intellectual Property.

2.7     Compliance with Law. As a condition of the License granted in this Agreement, HUSA will perform, conduct, and manage the Program at all times in accordance with Applicable Law.

EXECUTION COPY

2.8   No Marketing Services.  It is agreed that AARP shall provide no marketing, administrative, or management services in connection with the Program, and that any such services shall be provided by or on behalf of HUSA.

2.9   Compliance with Services Agreement.  HUSA acknowledges that AARP's decision to enter into this Agreement is conditioned upon HUSA's execution of the Services Agreement, whereby HUSA has agreed to permit ASI to maintain Quality Control Standards of the Program.

3.   Exclusivity.

During the term of the Services Agreement and in consideration of the compensation paid under this Agreement, and for purposes of the Program only, AARP grants HUSA the exclusive right to be the provider of the Products and Services under the Program. Notwithstanding the foregoing, AARP may brand, and ASI as provider of Quality Control Services on behalf of AARP may contract with, programs, plans and/or service providers of bundled healthcare services that include hearing care benefits as long as AARP does not specifically brand the hearing care benefit and ASI as provider of Quality Control Services on behalf of AARP does not contract directly with the hearing care service provider.

4.   Royalty.

4.1   AARP shall be paid a royalty by HUSA for the license of the AARP Intellectual Property as follows:  A fixed amount per Program Year during the Term as shown below, payable in equal quarterly installments by the tenth (10th) day of the first month in each quarter of the Program Year.  (For example, the first payment in Program Year 2 is to be paid by December 10, 2009.)  Notwithstanding the foregoing, the first payment for Program Year 1 shall be paid on January 10, 2009.

| Program Year | Annual Royalty |
|:---:|:---|
| 1 | $  7,600,000.00 |
| 2 | $  7,600,000.00 |
| 3 | $  7,600,000.00 |

4.2   As set forth in Section 10.2 of the Services Agreement, HUSA has the option to continue the Services Agreement for two more years – Program Years 4 and 5 (December 1, 2011 – November 30, 2012 and December 1, 2012 through November 30, 2013.)  If HUSA exercises that option, pursuant to Section 10.2 of the Services Agreement, AARP shall be paid a royalty by HUSA for the license of the AARP Intellectual Property in the fixed amount per Program Year during Program Years 4 and 5 as shown below, payable in equal quarterly installments by the tenth (10th) day of the first month in each quarter of the Program Year.

EXECUTION COPY

| Program Year | Annual Royalty |
|:---:|:---|
| 4 | $ 11,000,000.00 |
| 5 | $ 12,000,000.00 |

    4.3     Payment instructions are set forth in Exhibit B.

5.    Relationship of the Parties.

Neither AARP nor HUSA are now, nor shall they become or be considered, by virtue of this Agreement, as principal, agent or partner of the other. Neither AARP nor HUSA will be considered to have an ownership interest in the other, and neither Party shall be liable or responsible to the other in any such capacity or capacities. Neither Party shall at any time and in any medium or manner state or imply that the other Party has any such ownership interest in such Party.

6.    Term and Termination of Agreement.

    6.1     Term. The term of this Agreement shall begin on the Effective Date and shall expire at 12:00 midnight, Eastern Time on November 30, 2011, unless (i) HUSA exercises the Option to Continue pursuant to Section 10.2 of the Services Agreement or (ii) the Agreement is terminated earlier than November 30, 2011 in accordance with the terms of this Agreement ("**Term**").

    6.2     Termination. AARP shall have the right to terminate this Agreement upon written notice to HUSA if HUSA has breached any of its material obligations under this Agreement, which breach has not been cured within sixty (60) days after written notice to HUSA of the breach; provided, that in the event AARP reasonably determines that HUSA is using its reasonable best efforts to cure the breach, then HUSA shall be entitled to an additional sixty (60) days within which to effectuate that cure. If any material breach of this Agreement by HUSA has not been cured within the cure period determined in accordance with this Section 6.2, this Agreement shall terminate, effective at the conclusion of the last day of the cure period or the day on which HUSA receives written notice of termination from AARP, whichever is later. Notwithstanding the foregoing, if a material breach is incapable of cure and constitutes a willful breach or is not compensable by monetary damages or equitable relief (other than termination), AARP may immediately terminate this Agreement upon written notice to HUSA. This Agreement shall automatically terminate upon termination or expiration of the Services Agreement.

    6.3     Effect of Termination. Subject to Applicable Law, and subject to HUSA's obligations with respect to Member Data and AARP Confidential Information that might include and/or incorporate AARP Intellectual Property upon termination of the Services Agreement, upon termination or expiration of this Agreement,

*CONFIDENTIAL*

EXECUTION COPY

HUSA shall (i) immediately cease using the AARP Intellectual Property and all materials incorporating, having or using any AARP Intellectual Property; (ii) within a commercially reasonable time, remove or cause to be removed all components of the AARP Intellectual Property from all systems, applications or physical components that cause such components of the AARP Intellectual Property to be printed or displayed in any medium; (iii) if feasible delete or otherwise destroy all AARP Intellectual Property from any and all materials incorporating, having or using any AARP Intellectual Property. Notwithstanding the foregoing, to the extent it is not feasible for HUSA to remove or destroy any part of the AARP Intellectual Property pursuant to clauses (ii) and (iii), HUSA will notify AARP of the conditions that make return or destruction impossible and will ensure that there is no continued use and no disclosure of such AARP Intellectual Property after the effective date of termination.

7. Indemnification.

7.1 Indemnification by HUSA. HUSA shall, at its own cost and expense, defend, hold harmless and indemnify AARP and its parent, subsidiaries, Affiliates, and each of their respective officers, directors, trustees, employees, agents and representatives (each an "**AARP Indemnified Party**") from and against any and all Claims sustained or incurred by that AARP Indemnified Party, caused by, resulting from, or attributable to (i) the use by HUSA, its parents, subsidiaries, subcontractors, and Affiliates, and each of their respective officers, directors, employees, agents and representatives (each a "**HUSA Indemnifying Party**") of the AARP Intellectual Property, including but not limited to any use of Licensed Marks or Member Data, and relating to any marketing and advertising materials concerning the Program, (other than any such Claims for which an HUSA Indemnified Party, as defined below, is indemnified by AARP pursuant to Section 7.2 below), or (ii) the breach, gross negligence or willful misconduct by a HUSA Indemnifying Party with respect to its obligations under this Agreement; except to the extent the Claim arises out of the gross negligence or willful misconduct of an AARP Indemnified Party.

7.2 Indemnification by AARP. AARP shall at its own cost and expense, defend, hold harmless and indemnify HUSA each of its respective parents, subsidiaries, and Affiliates, and each of their respective officers, directors, trustees, employees, agents and representatives (each a "**HUSA Indemnified Party**") from and against any and all Claims sustained or incurred by that HUSA Indemnified Party, caused by, resulting from, or attributable to (i) any claim that any AARP Intellectual Property used in performance of this License Agreement or the Services Agreement, as authorized by AARP or ASI as provider of Quality Control Services on behalf of AARP, infringes, misappropriates or violates any intellectual property or other right of any Third Party, is libelous or slanderous, or violates any right of privacy or right of publicity, or (ii) the breach, gross negligence or willful misconduct by AARP with respect to its obligations under this Agreement; except to the extent the Claim arises out of the gross negligence or willful misconduct of an HUSA Indemnified Party.

8
*CONFIDENTIAL*

EXECUTION COPY

7.3    <u>Notice; Defense of Claim</u>.  A HUSA Indemnified Party, or an AARP Indemnified Party, as applicable (an "**Indemnified Party**") shall promptly notify the AARP Indemnifying Party, or the HUSA Indemnifying Party, as applicable (an "**Indemnifying Party**"), in writing, immediately following the time the Indemnified Party shall receive notice of any claims occurring for which indemnification is sought.  The Indemnifying Party shall assume, on behalf of the Indemnified Party, and conduct with due diligence and in good faith, the defense thereof with counsel reasonably satisfactory to the Indemnified Party; *provided,* that the Indemnified Party shall have the right to be represented therein by counsel of its own selection and at its own expense; and, *provided, further*, that if the defendants in any such action include both the Indemnifying Party and the Indemnified Party, and the Indemnified Party shall have reasonably concluded that there may be legal defenses available to it which are different from or additional to, or inconsistent with, those available to the Indemnifying Party, the Indemnified Party shall have the right to select separate counsel to participate in the defense of such action on its own behalf and at the Indemnifying Party's expense.  The Indemnifying Party shall not agree to settle any matter without the prior written consent of the Indemnified Party.

7.4    <u>Failure to Defend Action</u>.  If any Claim arises as to which the indemnity provided for in <u>Section 7.1</u> or <u>Section 7.2</u> may apply, and the Indemnifying Party fails to assume the defense of that Claim within thirty (30) days of the Indemnified Party's notice of the Claim, then the Indemnified Party may at the Indemnifying Party's expense contest the Claim; <u>provided</u>, that no contest need be made and settlement in full payment of the Claim may be made without the Indemnifying Party's consent (with the Indemnifying Party remaining obligated to indemnify the Indemnified Party) if, in the written opinion of the Indemnified Party's outside counsel, the Claim is meritorious.

7.5    <u>Settlement</u>.  In no event shall the Indemnifying Party agree to settle any matter that does not include as an unconditional term a release of all Claims that the claimant has or may have against the Indemnified Party, without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld.  In the event any party agrees to settle a Claim subject to this <u>Article VII</u>, no Party shall publicize the settlement without first obtaining the written permission of the other Party, which permission shall not be unreasonably withheld or delayed.

7.6    <u>Insurance</u>.  At all times during the Term of this Agreement, HUSA shall maintain a general comprehensive and professional liability insurance policy, or provide suitable self-funded coverage, having a single occurrence limit of not less than One Million Dollars ($1,000,000) and an aggregate limit of not less than Two Million Dollars ($2,000,000).  HUSA shall carry excess liability insurance in the amount of at least Fifteen Million Dollars ($15,000,000).  HUSA shall provide ASI as provider of Quality Control Services on behalf of AARP with summaries of the insurance policies (and, if ASI requests, copies of any specific insurance policies) carried in accordance with this provision, as may be amended,

9

*CONFIDENTIAL*

EXECUTION COPY

supplemented or replaced from time-to-time. Each insurance policy required to be carried hereunder may not be voluntarily canceled or reduced by HUSA without at least thirty (30) days' prior written notice to ASI.

8.   Representations and Warranties.

8.1   AARP Warranties. AARP represents and warrants to HUSA:

8.1.1   AARP has full power and authority to execute, deliver and perform its obligations set forth in this Agreement and the transactions contemplated in this Agreement.

8.1.2   This Agreement has been duly authorized by AARP, and when executed and delivered by AARP, constitutes a legal, valid and binding obligation of AARP, enforceable against it in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization or other laws relating to or affecting creditors' rights generally.

8.1.3   No consent, approval, authorization, order, registration or qualification of or with any court or government agency or body having jurisdiction over AARP, is required for the execution, delivery or performance of the Agreement by AARP.

8.1.4   The execution, delivery and performance of the Agreement by AARP has been approved by all necessary action, corporate or otherwise, and neither the execution, delivery nor performance of this Agreement will conflict with or result in a material breach of or default under any of the terms or provisions of its certificate of incorporation, bylaws, any statute, any order, rule or regulation of any court or government agency or body having jurisdiction over it or any indenture, mortgage, deed of trust, loan agreement or other material agreement or instrument of which AARP is a party.

8.1.5   AARP owns all right, title and interest in, to and under the Licensed Marks for the products and services for which use of the Licensed Marks is contemplated by this Agreement and the Services Agreement (the "Licensed Products and Services") in the United States and Canada, and the use and/or employment of any of the Licensed Marks in the advertising, marketing, distribution, offer for sale, sale and promotion of any Licensed Products and Services in the United States or Canada will not violate and/or infringe any intellectual property or any other rights of any third party. AARP represents and warrants that the Licensed Marks are valid and enforceable for the Licensed Products and Services in the United States and Canada, and, further, that it is not aware of any allegations, claims, disputes, proceedings, opposition proceedings, cancellation proceedings, lawsuits, or the like, relating to the ownership, validity, enforceability, and/or infringement of any of the Licensed Marks

10
*CONFIDENTIAL*

EXECUTION COPY

for the Licensed Products and Services in the United States or Canada. AARP represents and warrants that it has not previously assigned, transferred, conveyed, and/or otherwise encumbered any right, title or interest in or to the Licensed Marks for the Licensed Products and Services in the United States or Canada.

8.1.6    AARP owns all right, title, and interest in, to, and under each of the Licensed Copyrights. To AARP's knowledge, no Licensed Copyright is involved in any meritorious infringement, ownership, accounting, or other adverse proceeding, and, to AARP's knowledge, no such action is threatened with the respect to any of the Licensed Copyrights.

8.2    HUSA Warranties.  HUSA represents and warrants to AARP:

8.2.1    HUSA has full power and authority to execute, deliver and perform this Agreement and the transactions contemplated in this Agreement.

8.2.2    This Agreement has been duly authorized by HUSA, and when executed and delivered, constitutes a legal, valid and binding obligation of HUSA, enforceable against it in accordance with these terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws relating to or affecting creditors' rights generally.

8.2.3    No consent, approval, authorization, order, registration or qualification of or with any court or government agency or body having jurisdiction over HUSA is required for the execution or delivery of the Agreement by HUSA.

8.2.4    The execution, delivery and performance of the Agreement by HUSA has been approved by all necessary action, corporate or otherwise, and neither the execution, delivery nor performance of the Agreement by HUSA will conflict with or result in a material breach of, or default under, any of the terms or provisions of its certificate of incorporation, or bylaws or any present statute, order, rule or regulation of any court or government agency or body having jurisdiction over it or any indenture, mortgage, deed of trust, loan agreement or other material agreement or instrument to which HUSA is a party.

9.    General Provisions.

9.1    Entire Agreement.  This Agreement, including the Exhibits, which are hereby incorporated into and made a part of this Agreement, constitutes the entire agreement among the parties with respect to the subject matter of this Agreement and, except with respect to the Services Agreement (which remains in full force and effect in accordance with its terms) supersedes and replaces any prior agreement between the parties relating to that subject matter.

*CONFIDENTIAL*

EXECUTION COPY

9.2　Amendments. Modifications or amendments to this Agreement shall be effective only if in writing and signed by both Parties.

9.3　Counterparts. This Agreement, including any amendments, may be executed and delivered in counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same agreement. A facsimile or other reproduction of this Agreement shall be deemed an original.

9.4　Further Assurances. The Parties shall cooperate with one another to carry out and implement their respective obligations under this Agreement and shall perform such further acts, execute such further documents, and enter into such further agreements as may be reasonably necessary or appropriate to these ends.

9.5　No Third Party Beneficiaries. The Agreement confers no rights whatsoever upon any Person other than the Parties and shall not create or be interpreted to create any standard of care, duty or liability to any Person not a Party.

9.6　Governing Law. To the extent any issue is governed by state law, this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the District of Columbia, without regard to conflict of laws principles. Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the matters contemplated hereby may only be brought in the state and federal courts of the District of Columbia. Each of the Parties consents to the jurisdiction of such courts (and of the appropriate appellate court there from) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, actions or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

9.7　Dispute Resolution. The dispute resolution provisions as set forth in Sections 11.7, 11.8 and 11.9 of the Services Agreement (the **"Dispute Provisions"**) are hereby incorporated into this Agreement and shall apply to any dispute between the Parties arising under this Agreement. For purposes of this Agreement, all references to a "Party" in the Dispute Provisions shall mean one of the Parties to this Agreement and all references to "this Agreement" in the Dispute Provisions shall mean this AARP License Agreement.

9.8　Confidentiality. The confidentiality provisions as set forth in Section VIII of the Services Agreement (the **"Confidentiality Provisions"**) are hereby incorporated into this Agreement, and shall apply to the Confidential Information of either Party disclosed to the other Party pursuant to this Agreement. For purposes of this Agreement, all references to a "Party" in the Confidentiality Provisions shall mean one of the Parties to this Agreement and all references to "this Agreement" in the Confidentiality Provisions shall mean this AARP License Agreement.

*CONFIDENTIAL*

EXECUTION COPY

9.9    Survival. The provisions of Sections 6.3, 7 and 9 of this Agreement shall survive termination or expiration of this Agreement. 9.10    Notices. All notices, requests and other communications to any Party under this Agreement must be in writing and given as follows:

If to HUSA:

HearUSA, Inc.
1250 Northpoint Parkway
West Palm Beach, Florida 33407
Attention: Stephen Hansbrough, Chief Executive Officer
Facsimile Number: (561) 688-8893

with a copy to:

Bryan Cave LLP
700 13th Street, N.W.
Washington, D.C. 20005
Attention: LaDawn Naegle, Esq.
Facsimile Number:  (202) 508-6200

If to AARP:

AARP
601 E Street, N.W.
Washington, DC  20049
Attention:  Chief Executive Officer
Facsimile Number:  (202) 434-2339

with copy to:

AARP
601 E Street, N.W.
Washington, DC  20049
Attention:  General Counsel
Facsimile Number:  (202) 434-2320

AARP Services Inc.
650 F Street, N.W.
Washington, DC  20049
Attention:  General Counsel
Facsimile Number:  (202) 434-6513

or any other address or facsimile number that the Party may hereafter specify for the purpose by notice to the other Parties. All notices, requests and other communications under this Section shall be deemed to have been given and received and shall be effective: (i) in the case of personal delivery, on the date of

13
*CONFIDENTIAL*

EXECUTION COPY

personal delivery; (ii) in the case of delivery by facsimile, when successfully transmitted (if sent during the recipient's normal business hours, or one Business Day after the date sent if not sent during the recipient's normal business hours on a business day, or one Business Day after the date sent if not sent during the recipient's normal business hours on a Business Day) to the applicable number specified in this Section and an appropriate confirmation of transmission is received; (iii) in the case of overnight delivery by nationally recognized, overnight courier, one Business Day following the date of dispatch; and (iv) in the case of mailing, on the third Business Day following the date of deposit in the mail. For purposes of this Agreement, "**Business Day**" means any calendar day other than Saturday, Sunday or other calendar day on which commercial banks in Washington, D.C. are authorized or required by Applicable Law or executive order to close.

9.11    Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their respective successors and permitted assigns.

9.12    Assignment. Neither Party shall assign or otherwise transfer this Agreement or any of its rights or obligations under this Agreement, except with the prior written consent of the other Party; *provided, however,* that if such assignment or transfer is to an Affiliate of such Party, the other Party's consent shall not be unreasonably withheld. Any purported assignment or transfer without the requisite consent shall be null and void.

9.13    No Waiver. Whenever possible, each provision of this Agreement shall be interpreted in a manner to render it effective and valid under Applicable Law, but if any provision of this Agreement shall be held to be prohibited or invalid under Applicable Law, that provision shall be ineffective only to the extent of the applicable prohibition or invalidity, without invalidating the remainder of that provision or the remaining provisions of this Agreement. No failure on the part of any Party to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver of that right, nor shall any single or partial exercise of any right under this Agreement by any Party preclude any other or further exercise of any other right and no waiver whatever shall be valid unless in a signed writing, and then only to the extent specifically set forth in that writing. No waiver of any right under this Agreement shall operate as a waiver of any other or of the same or similar right on another occasion.

9.14    Injunctive Relief. HUSA acknowledges and agrees that there may be no adequate remedy at law for any breach or threatened breach of HUSA's material obligations under this Agreement, that any material breach or threatened material breach may result in irreparable harm to AARP, and therefore, that, upon any material breach or threat of a material breach, AARP shall be entitled to seek injunctive or other appropriate equitable relief, in addition to whatever remedies it may have at law.

14
*CONFIDENTIAL*

EXECUTION COPY

9.15    Interpretation.  The headings to the Sections and Articles of this Agreement are
        for ease of reference only and shall not affect the meaning or interpretation of this
        Agreement.  References to the singular include the plural, and vice versa.
        References to "this Agreement" mean this AARP License Agreement, together
        with all exhibits, schedules and attachments, as each may be amended, modified,
        supplemented or restated from time to time in accordance with the terms of this
        Agreement.  Unless otherwise indicated, references to Sections or Articles shall
        mean the sections or articles in this Agreement.  The use in this Agreement of the
        term "including" means "including, without limitation."  Any instrument or
        Applicable Law defined or referred to in this Agreement means that instrument or
        law as from time to time amended, modified or supplemented, including by
        succession of comparable successor laws.

*CONFIDENTIAL*

EXECUTION COPY

IN WITNESS WHEREOF, the parties have executed this Agreement this 8th day of August, 2008.

**AARP**

By: _____

Name:

Title:    *C O O*

**HearUSA, Inc.**

By: _____

Name:

Title:

EXECUTION COPY

IN WITNESS WHEREOF, the parties have executed this Agreement this 8th day of August, 2008.

**AARP**

By: _____
Name:
Title:


**HearUSA, Inc.**

By: _____
Name: STEPHEN J. HANSBROUGH
Title: CHAIRMAN, CEO

16
*CONFIDENTIAL*

EXECUTION COPY

## LICENSE AGREEMENT

## EXHIBIT A

### Licensed Marks



17
*CONFIDENTIAL*

EXECUTION COPY

## LICENSE AGREEMENT

### EXHIBIT B:

#### Payment Instructions

IF BY CHECK—

Send documentation and total payment due to:

AARP
Attn:  Treasury Services
601 E Street, N.W.
Washington, DC 20049


IF ELECTRONICALLY—

Or send documentation to the address above and total payment due electronically to:

Bank of America
Washington, D.C.
ABA: 026009593
Acct.:  001933253059
Beneficiary:  AARP

*CONFIDENTIAL*

EX-10.1 2 exh10-1.htm AMEND. NO. 1 TO LICENSE AGREEMENT

**Exhibit 10.1**

### AMENDMENT NO. 1 TO THE AARP LICENSE AGREEMENT

This Amendment is entered into by and between AARP, Inc. (**"AARP"**) and HearUSA, Inc. (**"HUSA"**) as of the 22 day of December 2008. (AARP and HUSA are referred to herein as each a **"Party"** and collectively, the **"Parties."**)

WHEREAS, the Parties along with AARP Services, Inc. (**"ASI"**) entered into the Hearing Care Program Services Agreement, effective August 8, 2008, pursuant to which HUSA is to provide or arrange to provide through HUSA's network of hearing care providers an AARP-branded discount hearing program for the benefit of AARP Members (the **"Services Agreement"**); and

WHEREAS, the Parties entered into the AARP License Agreement, effective August 8, 2008 (the **"License Agreement"**); and

WHEREAS, on November 18, 2008, HUSA requested that AARP restructure the royalty compensation structure of the License Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements of the Parties herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to amend the License Agreement as follows:

1. Section 4 of the License Agreement shall be deleted.

2. The Parties will negotiate in good faith a revised royalty compensation structure that is mutually agreeable to the Parties, which structure must be determined and agreed to by the Parties on or before January 16, 2009.

3. If the Parties are unable to reach agreement on the revised royal compensation structure on or before January 16, 2009, AARP may, in its sole and absolute discretion, extend the deadline.

4. If the Parties are unable to reach a mutually acceptable revised royalty compensation structure on or before January 16, 2009 (or such later date as is set by AARP at its sole and absolute discretion), AARP reserves the right to terminate the License Agreement and engage another entity to provide the Program.

Except for the above modifications, all other terms and conditions of the License Agreement shall remain in full effect.

[signatures appear on the following page]

IN WITNESS WHEREOF, AARP and HUSA have caused this Amendment to be executed by their duly authorized representatives as Amendment No. 1 to the License Agreement.

**AARP**

By:  /s/ Thomas Nelson
Name:   Thomas C. Nelson
Title:    Chief Operating Officer

**HearUSA, Inc.**

By:  /s/ Stephen J. Hansbrough
Name:   Stephen J. Hansbrough
Title:    Chief Executive Officer

2

**AMENDMENT NO. 2**
**TO THE AARP LICENSE AGREEMENT**

This Amendment No. 2 to the AARP License Agreement ("Amendment No. 2")
is entered into by and between AARP, Inc. (**"AARP"**) and HearUSA, Inc. (**"HUSA"**) as
of the ____ day of August, 2009. (AARP and HUSA are referred to herein as each a
**"Party"** and collectively, the **"Parties."**)

WHEREAS, the Parties along with AARP Services, Inc. (**"ASI"**) entered into the
Hearing Care Program Services Agreement, effective August 8, 2008, pursuant to which
HUSA is to provide or arrange to provide through HUSA's network of hearing care
providers an AARP-branded discount hearing program (the "Program") for the benefit of
AARP Members (the **"Services Agreement"**); and

WHEREAS, in connection with the Services Agreement, the Parties and ASI
entered into the AARP License Agreement, effective August 8, 2008 (the **"License
Agreement"**), pursuant to which AARP granted to HUSA a license to use certain of
AARP's intellectual property in connection with the Program and HUSA agreed to make
certain payments to AARP in consideration of that license; and

WHEREAS, on December 22, 2008, the Parties amended the License Agreement,
pursuant to Amendment No. 1 to the AARP License Agreement (**"Amendment No. 1"**),
in order to delete Section 4 (**"Royalty"**) of the License Agreement and undertook to
negotiate a revised royalty compensation structure mutually agreeable to the Parties; and

WHEREAS, the Parties now desire to further amend the License Agreement in
order to reflect the mutually agreeable changes to the royalty compensation structure of
the License Agreement (as amended pursuant to Amendment No. 1 and this Amendment
No. 2, the **"Amended License Agreement"**); and

WHEREAS, contemporaneously with the execution of this Amendment No. 2, the
Parties and ASI are executing Amendment No. 1 to the Services Agreement to effectuate
certain other changes to the Parties' relationship and the Program (the **"Amended
Services Agreement"**).

NOW THEREFORE, in consideration of the mutual covenants and agreements of
the Parties herein contained and for other good and valuable consideration, the receipt
and sufficiency of which is hereby acknowledged, the Parties hereby agree to further
amend the License Agreement as follows:

1. A new Section 4 is added to the License Agreement as follows:

4. Royalty.

    4.1    Except as otherwise provided in this Section 4, HUSA shall pay to AARP
for the license to HUSA of the AARP Intellectual Property hereunder, a
royalty on each hearing aid sold by or through HUSA to a Member
pursuant to the Program (each such hearing aid being referred to herein as
a **"Program Unit"**) as follows:

Sales during calendar 2009: $50 per Unit

Sales during calendar 2010: $50 per Unit

Sales during calendar year 2011: $55 per Unit; and

Sales during calendar year 2012 until termination of the License
Agreement: $60.00

4.2    Notwithstanding Section 4.1, if, at the end of any calendar year, HUSA
has failed to meet the Program Roll Out requirements set forth in Section
3.3 of the Amended Services Agreement for that year, HUSA shall pay to
AARP a royalty on each Program Unit sold during each subsequent
calendar quarter that HUSA has not met the requirement for the preceding
Roll Out year(s) as follows:

Sales during calendar 2010: $55 per Unit

Sales during calendar year 2011: $60 per Unit; and

Sales during calendar year 2012 until termination of the License
Agreement: $65.00

4.3    The Parties acknowledge that certain states laws and regulations
applicable to the Program may require the Parties to modify the royalty
structure of their relationship and the details of the Program in such states
to ensure compliance with those laws. Accordingly, the Parties agree that,
to the extent that a unit-based royalty arrangement for the Program is
inconsistent with applicable law in any given state, the Parties will
establish a fixed fee for the license of the Intellectual Property from AARP
to HUSA under this Amended License Agreement for HUSA's Program
activities in that state. In the event the Parties are unable to reach
agreement on whether a unit-based royalty or a fixed fee payment is
required in a particular state, AARP shall have the right, in its sole
discretion, to elect payment in a fixed fee prior to the Program being made
available in the state in question by HUSA. With respect to any fixed fee
royalty arrangement for a particular state, such fixed fee shall be payable
on a quarterly basis commencing six months from the date HUSA begins
offering the Program in such state.

4.4    Further to the considerations set forth in Section 4.3, above, the Parties
hereby agree to a fixed fee royalty relating to the Program in the state of
Florida of $29,948 per month through June 30, 2010. For periods after
June 30, 2010, the Parties shall mutually agree in writing to the amount of
such fixed fee.

4.5    Royalty payments, whether unit-based royalties or fixed fee royalties,
shall be made on a quarterly basis within ten (10) calendar days of the end
of each quarter for such quarter or pro-rata portion thereof. With respect

2

to unit-based royalties, the Parties agree that within 30 days of the end of each calendar year, they will true-up actual Unit sales as against unit-based royalties paid. Payment instructions for all royalties are set forth in Exhibit B.

4.6    Additional royalty may be payable per Section 6.2 and that additional royalty shall not be offset by royalty fees paid under this Section 4.

2.    Section 6.1 (**"Term"**) is deleted and replaced with the following:

6.1 <u>Term</u>.    The term of this License Agreement shall begin on the **Effective Date** and shall expire at 12:00 midnight, Eastern Time on August 31, 2012, unless this Agreement is terminated earlier in accordance with its terms (the **"Term"**). This Agreement shall automatically terminate upon termination or expiration of the Amended Services Agreement.

3.    Section 6.2 (**"Termination"**) is deleted and replaced with the following:

6.2 Termination.

(a) <u>Material Breach</u>.  AARP shall have the right to terminate this Agreement upon written notice to HUSA if HUSA has breached any of its material obligations (including those identified specifically in subparagraph (b) below) under this Agreement or the Amended Services Agreement, which breach has not been cured within sixty (60) days after written notice to HUSA of the breach; provided that in the event AARP reasonably determines that HUSA is using its reasonable best efforts to cure the breach, then HUSA shall be entitled to an additional sixty (60) days within which to effectuate that cure.  If any material breach of this Agreement or the Amended Services Agreement by HUSA has not been cured within the applicable cure period (or extension, as the case may be), this Agreement shall terminate, effective at the conclusion of the last day of the cure period or the day on which HUSA receives written notice of termination from AARP, whichever is later.

(b) <u>Identified Material Obligations.</u>  HUSA's material obligations include, but are not limited to

(i) making the Program available as described in Section 3.3 of the Amended Services Agreement,

(ii) making the annual marketing budget expenditures as required under Section 3.12 of the Amended Services Agreement, including allocation of 9.25% of those marketing expenses to the AARP General Program as required under Section 3.14 of the Amended Services Agreement, and

(iii) making royalty payments as required under this Agreement.

3

(c) <u>Additional Royalty in Event of Uncured Breach of Identified Material Obligations or Early Termination by HUSA</u>. In the event AARP terminates this Agreement by reason of an uncured breach of HUSA's material obligations specified in subparagraph (b)(i)-(iii) of this Section 6.2, or in the event HUSA terminates this Agreement or the Amended Services Agreement prior to the expiration of the Term, HUSA shall pay to AARP an additional royalty fee for use of the licensed Intellectual Property during the time period leading up to the termination as follows: $3 million if termination occurs before August 31, 2010; $2 million if termination occurs between September 1, 2010 and August 31, 2011; and $1 million if termination occurs between September 1, 2011 and August 31, 2012.

(d) <u>Letter of Credit</u>. HUSA shall provide AARP an irrevocable standby letter of credit from Wells Fargo naming AARP as the beneficiary in order to ensure payment of the additional royalty provided for in Section 6.2(c) within ten (10) business days of the execution of this Amended License Agreement. The terms and conditions of the letter of credit shall be subject to AARP's review and approval. Failure to provide such a letter of credit in accordance with this Section 6.2(d) will be grounds for immediate termination of this Amended License Agreement and the Amended Services Agreement.

3. Except for the above modifications, all other terms and conditions of the License Agreement shall remain in full force and effect.

[signatures appear on the following page]

4

IN WITNESS WHEREOF, AARP and HUSA have caused this Amendment to be executed by their duly authorized representatives as Amendment No. 2 to the License Agreement.

**AARP**

By: _____

Name: Tim Nelson

Title: COO


**HearUSA, Inc.**


By: _____

Name:

Title:

5

IN WITNESS WHEREOF, AARP and HUSA have caused this Amendment to be executed by their duly authorized representatives as Amendment No. 2 to the License Agreement.

**AARP**

By: _____
Name:
Title:


**HearUSA, Inc.**

By: _~~signature~~_
Name:  STEPHEN J. HANSBROUGH
Title:  CHAIRMAN + CEO

5

## EXHIBIT "B"

## (AARP SERVICES AGREEMENT)

EXECUTION COPY

## HEARING CARE PROGRAM SERVICES AGREEMENT

This Hearing Care Program Services Agreement (**"Agreement"**) is entered into as of August 8, 2008 (the **"Effective Date"**), by and among HearUSA, Inc. (**"HUSA"**), a Delaware corporation with its principal place of business located at 1250 Northpoint Parkway, West Palm Beach, Florida 33407, AARP, Inc. (**"AARP"**), a District of Columbia non-profit corporation with its principal place of business at 601 E Street, NW, Washington, DC 20049 and AARP Services, Inc. (**"ASI"**), a Delaware corporation with its principal place of business located at 650 F Street, NW, Washington, DC 20004 (collectively, **"the Parties"** and each, individually, a **"Party"**). AARP and ASI are sometimes collectively referred to herein as the **"AARP Parties"** and individually as an **"AARP Party"**.

### WITNESSETH

WHEREAS, AARP is a non-profit, non-partisan membership corporation for persons age 50 and over whose goals include the advancement of the education, well-being and social welfare of its members and older persons generally;

WHEREAS, AARP has selected HUSA to provide or arrange to provide through HUSA's network of hearing care providers an AARP-branded discount hearing care program for the benefit of AARP Members as more fully described in this Agreement (the **"Program"**); and

WHEREAS, ASI, a wholly-owned subsidiary of AARP, contracts with AARP to provide to AARP services relating to the design, development and management of AARP-branded products and services made available to AARP Members;

NOW, THEREFORE, in consideration of the representations, warranties, conditions, covenants, and agreements herein contained and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### SECTION I
### DEFINITIONS

As used in this Agreement, the terms set forth in this Section I shall have the meanings defined below. Capitalized terms not defined in this Section I, but defined elsewhere in this Agreement, including the preamble and recitals above, shall have the meanings specified in those other places in this Agreement and in the context in which they are used.

1.1   AARP Intellectual Property consists of the Licensed Marks (as defined in the License Agreement), Member Data, AARP's name, and any Licensed Copyrights (as defined in the License Agreement), and the goodwill associated therewith.

1.2   AARP Marks has the meaning set forth in the License Agreement.

1.3   Aural Rehabilitation means (i) instructional programs that are delivered to the individual in a structured and approved format to supplement the initial counseling/orientation material; (ii) care and maintenance of hearing products, troubleshooting hearing aids, assistive technologies, listening strategies, auditory and communication training; and (iii) approved materials made available in various formats, including books, interactive online programs, group support programs and DVDs.

**EXECUTION COPY**

1.4     HUSA Centers means HUSA company-owned retail hearing care centers.

1.5     HUSA Network means the network of independent audiologists and hearing care specialists that contract with HUSA to participate in certain hearing benefit programs contracted by HUSA with employer groups, health insurers and other benefit sponsors.

1.6     HUSA Network Providers means those independent Providers that are members of the HUSA Network and not employees of HUSA.

1.7     Intellectual Property means all intellectual property and proprietary rights worldwide (whether or not registered or registrable, patented or patentable), including, without limitation, rights in inventions, patent rights, copyrights, trademark rights, trade secret rights, rights in ideas, inventions and innovations, rights in Confidential Information, moral rights, semiconductor chip rights, database rights, industrial design rights, and all other similar rights, along with all applications, registrations, divisionals, continuations, continuations-in-part, reexams, extensions, reissues and foreign counterparts for the foregoing.

1.8     License Agreement means that certain AARP License Agreement entered into on August 8, 2008 between HUSA and AARP.

1.9     Member means an individual who, at the time in question, is a current member of AARP, as evidenced by a valid membership number.

1.10    Member Communications means all electronic, print, visual, oral, or scripted communications regarding the Program directed at Members or the general public, including inserts in kits for new or renewing Members, promotional materials, advertisements, press releases, web site design and copy, in-store signage and any other communications that bear the AARP Marks or that address the Program.

1.11    Member Data means the names, addresses, telephone numbers, AARP membership numbers, and e-mail addresses that AARP or ASI provide to HUSA or permit HUSA to access in connection with this Agreement or the License Agreement, including Member mailing lists.

1.12    Products and Services means the hearing care products and services and related discounts offered to Members pursuant to the Program as set forth on Exhibit E hereto, as the same may be amended from time to time in accordance with the terms of this Agreement.

1.13    Program Year has the meaning set forth in the License Agreement.

1.14    Provider(s) means an audiologist or hearing care specialist delivering Products and Services to Members pursuant to the Program, whether through a HUSA Center or the HUSA Network.

1.15    Third Party means any person other than a Party to this Agreement.

EXECUTION COPY

## SECTION II

### ROLE OF ASI OR ITS SUCCESSOR(S)

2.1 <u>General</u>. On behalf of AARP and subject to Applicable Law, ASI shall perform Quality Control Services and monitor HUSA's compliance with the Quality Control Standards as set forth in this Agreement and in the License Agreement. ASI's role under this Agreement shall be that of provider of Quality Control Services, solely on behalf of AARP and compensated for its services by AARP, subject to a separate agreement between AARP and ASI governing ASI's services. AARP, by written notice to HUSA at any time, may designate a different provider of some or all of such Quality Control Services on AARP's behalf; HUSA will be afforded an opportunity to consent, such consent not to be unreasonably withheld. In the event of such designation, references to ASI in this Agreement and in the License Agreement, with respect to those components of Quality Control Services covered by such designation, shall be deemed to refer to the new provider of Quality Control Services.

2.2 <u>Consulting Services</u>. HUSA may, in its discretion, separately engage ASI to perform consulting and marketing services in connection with the Program on behalf of HUSA, as may be set forth in any consulting services agreement entered into by ASI and HUSA. HUSA shall separately compensate ASI for any such consulting and marketing services. ASI performs no consulting or marketing services for HUSA under this Agreement.

## SECTION III

### HUSA OBLIGATIONS

3.1 <u>Products and Services</u>. Subject to the terms and conditions of this Agreement, during the Term HUSA shall provide the Products and Services to Members through the HUSA Centers and the HUSA Network.

3.2 <u>Medicare or Medicaid</u>. It is expressly understood and agreed by the Parties that the Program shall not apply to any products or services that are reimbursable by any federal or state health care program. To the extent that any Product or Service provided to a Member under the Program is covered by any federal or state health care program, such Product or Service shall be deemed not to have been provided under the Program pursuant to this Agreement and no discount or other benefit hereunder shall be afforded a Member for such Product or Service. HUSA acknowledges and agrees to provide Products and Services under the Program only to the extent that such Products and Services are not reimbursable by any federal or state health care program, including the Medicare program. Notwithstanding anything else in this Section 3.2 to the contrary, Products and Services may be provided to Members that use a benefit under a Medicare Advantage Plan (Medicare Part C) to pay a portion of the cost of such Products and Services. In the event that a Product or Service provided by a Provider as part of the Program indicates a need for follow-up treatment that may be covered by any federal or state health care program, the Provider shall advise the Member to consult the Member's primary care physician or health insurer for a referral to a qualified health care practitioner for the provision of such treatment.

3.3 <u>Program Roll Out</u>. HUSA shall make the Program available to Members as follows:

**EXECUTION COPY**

(a)     Within one (1) year after the Effective Date, the Program shall be available to Members through all the HUSA Centers in existence on the Effective Date and those audiologists that are members of the HUSA Network on the Effective Date.

(b)     Within two (2) years after the Effective Date, the Program shall be available to Members through a combination of HUSA Centers and HUSA Network Providers in all fifty (50) U.S. States, the District of Columbia, and five U.S. Territories (American Somoa, Guam, Marianas Islands, Puerto Rico, and the U.S. Virgin Islands).

(c)     HUSA will use commercially reasonable efforts to achieve the level of availability set forth in Sections 3.3(a) and (b) above in less time.

(d)     The Parties will cooperate with one another and will confer with one another on a quarterly basis to determine ways in which the roll out can be accelerated.

3.4     <u>HUSA Network Providers</u>.  On or before the Effective Date, HUSA shall provide ASI with the names, professional practice names, and practice locations of the audiologists and hearing care specialists that will become Providers, whether HUSA Network Providers or HUSA employees.  HUSA shall deliver an updated list of Providers to ASI, or a Third Party designated by ASI, monthly on the last business day of each month during the Term.

3.5     <u>Hearing Care Specialists</u>.  Prior to the Effective Date, membership in the HUSA Network has been limited to audiologists.  On or before December 1, 2008, HUSA shall develop and provide to ASI for ASI's approval, such approval not to be unreasonably withheld or delayed, a detailed plan to increase the number of HUSA Network Providers that are hearing care specialists to twenty-five percent (25%) of all HUSA Network Providers within one (1) year of approval of the plan.

3.6     <u>Access to Providers</u>.

(a)     Upon full roll out of the Program as provided in Section 3.3(b), HUSA will use its commercially reasonable efforts to expand access to Members to Providers who meet of the Creditialing and Quality Standards set forth in Section 3.16 in all areas where sufficient numbers of Providers exist as follows:

(i)     <u>Urban</u>:  At least one (1) Provider within ten (10) miles of the Member's home address;

(ii)    <u>Suburban</u>:  At least one (1) Provider within thirty (30) miles of the Member's home address; and

(iii)   <u>Rural</u>:  At least one (1) Provider within sixty (60) miles of the Member's home address.

(b)     Using available data, HUSA and ASI shall review Members' access to Providers quarterly to determine the sufficiency thereof to support Members' needs and to determine the practicality and/or need for adjustments.

**EXECUTION COPY**

      (c)     HUSA shall use commercially reasonable efforts to ensure access to a Member's preference for an audiologist or hearing care specialist.

3.7     <u>Quality Standards and Measures</u>. HUSA and ASI shall work together in developing enhancements to the HUSA quality standards and measures for the Program using industry recognized and best practices criteria and processes.

3.8     <u>Implementation of the Program.</u> In addition, HUSA shall work to develop and implement, in cooperation with ASI and other providers of health products and services that carry the AARP name, as necessary, educational, administrative and promotional programs, materials, products, services, processes and procedures for the purpose of implementing, improving and promoting the Program, as more fully described in HUSA's annual Operating and Marketing Plan described below in Section 3.15.

3.9     <u>Cooperation of the Parties.</u> HUSA and ASI shall work together to develop and implement a quarterly management plan that will serve to monitor sales, Member satisfaction and overall Program operations. HUSA and ASI will meet to review the business operations and marketing efforts no less than once per calendar quarter to assure that HUSA is managing the Program successfully under the quality control oversight of ASI.

3.10     <u>Economic Assistance Program</u>. Starting with calendar year 2009 and continuing annually during the term of this Agreement, HUSA shall donate hearing aids to be distributed to economically disadvantaged individuals in a quantity to be mutually agreed upon by the Parties. In calendar year 2009, HUSA shall donate at least one thousand (1,000) hearing aids. In each subsequent calendar year of the Program, HUSA will donate a quantity of hearing aids mutually agreed upon by the Parties. Donated hearing aids shall be distributed pursuant to procedures established by the Parties and may include Third Parties in determining qualifications of recipients.

      (a)     HUSA will cooperate with ASI to establish mutually agreeable terms regarding discounted services (provider fee) based upon the recipient's economic situation; including price, types of service and qualification of recipients.

      (b)     HUSA will provide recipients of the donated hearing aids with the warranty, free batteries and trial period more fully described in Exhibit E attached hereto detailing the Products and Services offered under the Program.

3.11     <u>Education/Awareness</u>. If both the License Agreement and this Agreement are in effect on November 30 of each year of the Term (beginning November 30, 2009) or on November 30 of 2012 and 2013 if the Option to Continue is exercised pursuant to Section 10.2, HUSA will contribute $500,000 to AARP for campaigns to educate and promote hearing loss awareness and prevention to Members and the public. The funds shall be used to develop collaborative programs to educate about hearing awareness and prevention. The Parties shall work together and, as appropriate, with hearing industry associations or organizations to develop program concepts and activities (e.g., public service announcements, preventive screenings, educational forums) to fulfill this requirement. HUSA shall remit the $500,000 payment annually for each year during the Term within thirty (30) days after November 30 of that year, beginning November 30, 2009.

**EXECUTION COPY**

3.12 <u>HUSA's Annual Marketing Budget</u>. Starting in calendar year 2009 and continuing annually for each calendar year during the Term, HUSA shall commit a minimum of $ 4.4 million per calendar year as the marketing budget for the Program.

3.13 <u>Marketing Materials</u>.

    (a)    The materials used by HUSA to market the Program and other Member Communications by HUSA with Members will be designed to assist Members in making an informed decision regarding the purchase of Products and Services. HUSA will strive to present information concerning the Program and the characteristics of particular Products and Services to Members in an objective and educational manner.

    (b)    As a part of its Quality Control (as defined below) function, ASI shall review and approve all Member Communications. HUSA shall submit all marketing and promotional materials for the Program and other Member Communications to ASI for written approval prior to dissemination of the materials. ASI's approval shall not be unreasonably withheld. ASI shall use reasonable efforts to approve or disapprove of such materials within fourteen (14) Business Days of receipt (or such longer time period specified by HUSA). If ASI fails to approve or disapprove any such materials within the fourteen (14) Business Days (or such longer time period specified by HUSA), HUSA shall notify ASI's Senior Leaders in writing of such failure. Once any such materials are approved by ASI, no further approval with respect to such materials is required for the twelve (12) month period immediately following the date of approval, provided the materials are not materially altered or modified during this period. Notwithstanding the foregoing, ASI has the right to notify HUSA to stop the use of any previously approved materials.

    (c)    HUSA acknowledges and agrees that the AARP Intellectual Property shall remain the exclusive property of AARP. Except as otherwise provided in this Agreement, HUSA shall not use any marketing or promotional materials that incorporate any AARP Intellectual Property without ASI's prior written consent.

    (d)    ASI recognizes and acknowledges that all of HUSA's Intellectual Property, and all goodwill associated therewith, shall remain the exclusive property of HUSA, and agrees that nothing herein shall be construed to establish ownership by the AARP Parties in any of HUSA's Intellectual Property. Notwithstanding the foregoing, HUSA acknowledges and agrees that the AARP Parties may reference HUSA and the Program in communications with Members about the products, services and other benefits made available to them as Members; including references in the benefits guide distributed to Members and in the identification of benefits on the AARP website, subject to HUSA's prior written approval of any such communications or references, such approval not to be unreasonably withheld or delayed.

    (e)    HUSA acknowledges and agrees that any materials related to the Products and Services and designed for Members using AARP Intellectual Property shall be used exclusively for the Program.

**EXECUTION COPY**

3.14    HUSA Contribution to AARP Health Care Options.  HUSA shall commit not less than $4.4 million annually towards marketing the Program as provided in Section 3.12.  HUSA agrees that 9.25% of this annual marketing budget for the Program shall be contributed to the AARP Health Care Options General Program (the **"General Program"**). The General Program is a communications cooperative for all health products and services that carry the AARP name.  HUSA shall pay the annual contribution to the General Program in monthly installments as invoiced by ASI.

3.15    Operating and Marketing Plan.  HUSA shall develop an annual operating and marketing plan for the Program and submit it to ASI for its prior review and written approval, from a quality control perspective, which approval shall not be unreasonably withheld or delayed.  Said plan shall be delivered to ASI no later than January 31, 2009 for the 2009 operating year and no later than November 1 of each subsequent year. Said plan shall include at a minimum:

   (a)    Service and quality objectives that meet ASI criteria;

   (b)    Staffing goals including enhancement of the HUSA Network consistent with Section 3.6;

   (c)    Projection of anticipated participation of Members in the Program;

   (d)    Financial projections for the Program;

   (e)    Marketing goals, objectives and tactics for the Program and the specific budgets allocated to the marketing and promotional efforts;

   (f)    New discounts or services to be offered in response to regulatory and governmental developments and other external matters that may materially affect the Program;

   (g)    Description of how the Program is addressing the social impact goals of AARP: economic security, health supportive services, livable communities, and quality of life for the 50+ population;

   (h)    Marketing strategies and tactics that will help promote the Program directly to Members including efforts designated for in-store promotions and direct mail including (i) an annual calendar of all marketing tactics, budget, expected sales and/or results and (ii) detail of all plans, tactics planned, and target audiences;

   (i)    Marketing strategies and efforts that cross-promote other health products and services that carry the AARP name, including those efforts that promote the Program by other providers of products and services that carry the AARP name; and

   (j)    Issues or concerns regarding the financial sustainability of the Program.

The Operating and Marketing Plan's results shall be accessed and tracked via the reports referred to in Section 3.22 and Exhibit G attached hereto.

**EXECUTION COPY**

3.16   Provider Credentialing and Quality Assurance. HUSA shall verify the credentials of all Providers and shall perform on-going quality assurance activities in accordance with the HUSA Professional Peer Review and Quality Assurance Program (**"QA Manual"**) attached as Exhibit A hereto, as the same may be modified from time to time. HUSA shall provide to ASI copies of any modifications to the QA Manual within thirty (30) days after the effective date of the modifications. HUSA shall require all Providers to conform to all applicable standards and requirements set forth in the QA Manual. The Parties hereto agree that a Provider shall not begin to provide Products or Services pursuant to the Program until HUSA has received from the Provider a complete, executed credentialing application, and evidence of the Provider's professional license and, with respect to HUSA Network Providers, a provider contract and proof of current professional liability insurance which meets HUSA's required insurance coverage limits.

3.17   AARP Hearing Care Program Training.  HUSA shall train all Providers supporting the Program in the operation of the Program and areas of special concern when dealing with senior sensitivity and mature customers (**"AARP Program Training"**). ASI shall have the right to approve, such approval not to be unreasonably withheld or delayed, prior to first use any written materials and the curriculum developed for the AARP Program Training.

3.18   Continuing Education. HUSA will make continuing education information and programs on hearing care available to all Providers on an ongoing basis and communicate the availability to all new HUSA Center employees and HUSA Network Providers who join the HUSA Network during the Term of this Agreement. HUSA shall provide ASI with samples of materials used in continuing education efforts, subject to the provisions of Section VII of this Agreement. In addition, HUSA will seek opportunities to provide continuing education for Providers at medical conferences and other similar gatherings.

3.19   Customer Service and Complaint Resolution. HUSA shall provide, at no cost to Members or the AARP Parties, customer service and complaint resolution services in accordance with HUSA's and ASI's complaint procedures and the Performance Standards and Measurements referred to in Section 3.20 and Exhibit F attached hereto and any applicable federal or state laws, rules or regulations. HUSA also shall establish and maintain a toll-free customer service telephone line dedicated to servicing Members, which shall be staffed by customer service representatives who have undergone training in the operation of the Program. The customer service telephone line shall be staffed, at a minimum, weekdays (other than National Holidays) from 9:00 a.m. until 9:00 p.m. Eastern Time and on Saturdays from 9:00 a.m. until 5:00 p.m. Eastern Time, subject to periods for scheduled maintenance. At least one telephone representative shall be bilingual in Spanish and English. HUSA shall make available to Members, twenty-four (24) hours per day, three hundred sixty-five (365) days per year and at no charge to Members or the AARP Parties, an interactive voice response or other telephonic system to provide information regarding Provider locations, subject to periods for scheduled maintenance.- HUSA shall report to ASI, quarterly and annually, in a format and medium to be agreed upon by the Parties, the performance of HUSA's customer service and complaint resolution services as measured by the standards set forth in the "Customer Service" and "Complaint Resolution" sections of Exhibit F. HUSA shall cooperate with the AARP Member Relations Group in order to best serve Members and address any specific Member-related issues that arise from HUSA's performance under this Agreement.

EXECUTION COPY

3.20    Performance Standards and Measurements. HUSA shall meet or exceed the
        Performance Standards and Measurements set forth in Exhibit F to this Agreement as
        applicable in performing obligations under this Agreement and providing Services to
        Members.

3.21    Member Research. All research related to Members must be approved in advance and
        in writing by ASI, except to the extent the same may be required by any federal or state
        law, rule or regulation. Results of all Member research shall be provided to ASI, except
        to the extent prohibited by any federal or state law, rule or regulation. At ASI's
        discretion, HUSA shall participate in surveys conducted by ASI, including monthly
        Member satisfaction and Member Services Quality Survey ("**MSQS**").

3.22    Reporting. HUSA shall provide ASI with the reports describing the performance by
        HUSA of its obligations arising under this Agreement and the License Agreement as set
        forth in Exhibit G attached hereto, in a format and with such frequency as is reasonably
        acceptable to ASI.

3.23    Changes in Ownership, Organizational Structure or Network. HUSA will notify ASI in
        writing within five (5) days of the effective date of any change in HUSA's ownership, and
        will notify ASI in writing immediately of any changes in HUSA's organizational structure,
        the HUSA Centers or the HUSA Network, in each case that could reasonably be
        expected to have a material adverse effect on HUSA's performance of its obligations
        under this Agreement.

3.24    Disaster Recovery Plan. HUSA shall maintain a disaster recovery and business
        resumption plan, in form and substance reasonably satisfactory to ASI, to maintain
        HUSA's systems and operations in the event of a disaster sufficient to permit
        performance of HUSA's obligations under this Agreement. Such plan shall require, at a
        minimum, annual testing of disaster recovery protocols and the submission of the results
        of such tests to ASI within thirty (30) days of their completion. Such plan shall also
        provide, at a minimum, for the resumption of services necessary to HUSA's performance
        of its obligations under this Agreement within forty-eight (48) hours of any interruption of
        such services.

3.25    Licensure. HUSA shall, at all times during the term of this Agreement, require Providers
        to maintain all licenses, certifications, permits and other authorizations required by law to
        deliver the Products and Services pursuant to the Program. Upon reasonable request
        by ASI, HUSA will submit to ASI evidence that HUSA and all Providers are in good
        standing with all appropriate regulatory bodies. HUSA shall promptly notify ASI of any
        formal disciplinary action taken against HUSA or any Provider of which HUSA is aware
        that seeks to suspend, revoke, or restrict any authorization necessary to HUSA's
        performance of its obligations under this Agreement or that relates to HUSA's
        performance under this Agreement, if an adverse outcome in such action could
        reasonably be expected to have a material adverse effect on HUSA's performance of its
        obgliations under this Agreement.

3.26    Compliance with Applicable Law and AARP Policy. HUSA and the Providers shall
        comply with all applicable federal, state and local laws, regulations, orders, and
        administrative rulings, plus any applicable written AARP policies that are provided to
        HUSA and that do not unreasonably restrict HUSA's performance of its obligations under

**EXECUTION COPY**

this Agreement, in connection with HUSA's performance under this Agreement and the offering of the Products and Services to Members pursuant to the Program. HUSA shall notify ASI promptly in writing in the event that HUSA becomes aware that implementation of the Program as set forth in this Agreement or contemplated by the Parties does not or would not comply with applicable federal, state or local laws, regulations, orders or administrative rulings.

3.27 No Pending Actions. HUSA represents and warrants that it is not aware of any action, suit, investigation or proceeding pending or threatened against HUSA or a Provider by or before any court, arbitrator or administrative or governmental body that could reasonably be expected to have a material adverse effect on HUSA's ability to perform its obligations under this Agreement. HUSA will notify ASI in writing within five (5) days of HUSA becoming aware of the commencement or threat of any such action, suit, investigation or proceeding.

3.28 No Conflict or Violation. HUSA represents and warrants that the execution, delivery and performance of this Agreement by HUSA will not:

(a) Violate any provision of HUSA's articles of incorporation, bylaws or other charter or organizational document;

(b) Violate, conflict with, or result in the breach, acceleration or modification of any material contract or other material agreement to which HUSA is a party;

(c) Violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body binding upon HUSA's assets, operations or business;

(d) Result in the creation of any lien, charge or encumbrance on any HUSA asset or property necessary to the performance of HUSA's obligations under this Agreement; or

(e) Result in the breach of the terms and conditions of, or cause impairment of, any license or other authorization necessary to the performance of HUSA's obligations under this Agreement.

3.29 Financial Condition. HUSA represents and warrants that it is not insolvent, has not filed or had filed against it a petition in bankruptcy, has not made an assignment for the benefit of creditors or otherwise had a receiver or trustee appointed with respect to its properties or affairs.

3.30 Audits, and Inspections; Access to Information. Subject to reasonable restrictions to protect HUSA's Confidential Information, HUSA will, and will require Providers to, afford ASI or its authorized representatives, including without limitation an independent actuary or accountant, upon reasonable request by ASI, access during normal business hours to the books and records of HUSA or Providers that relate to the Program, including any royalty and compensation payments, service and performance standards, and records and data relating to the Operating and Marketing Plan. In addition, subject to applicable law governing the confidentiality, privacy and disclosure of individual patient information and personal identification information, HUSA will, and will require Providers to, afford

EXECUTION COPY

ASI or its authorized representatives reasonable access to records and data relating to the Products and Services provided to Members. Annual or bi-annual audits or inspections are deemed reasonable for purposes of this Section 3.30, provided, that any specific problems detected by ASI may be audited or inspected on a more frequent but reasonable basis until corrected. ASI shall not have access to a Member's claim files or medical information unless the express written consent of the Member has been secured, or such access is necessary either to respond fully to any written inquiry received from a Member by AARP or ASI, or otherwise to fulfill the responsibilities of AARP or ASI to a Member and such access is permitted under applicable federal and state laws, regulations, orders, and administrative rulings.

3.31   No Mediation or Arbitration.   HUSA shall not use mediation or arbitration to settle any dispute arising out of or relating to the Program between HUSA and any Member, user, recipient or purchaser of any Products and Services. HUSA also shall require that the Providers similarly not use mediation or arbitration.

3.32   AARP Privacy Policy. HUSA shall comply with the AARP Privacy Policy attached hereto as Exhibit B.

3.33   AARP Brand Guidelines and Standards.   HUSA shall comply at all times with the brand guidelines that are provided to HUSA by AARP and/or ASI regarding use of the AARP Marks.

3.34   MDW.   HUSA shall participate in ASI's Marketing Data Warehouse ("MDW"). Such participation shall include: (1) the development of business specifications and functional requirements, (2) working closely with ASI and its contracted marketing vendor, (3) coordination with other AARP providers as required and directed by ASI, and (4) sending record level marketing data, including Member participation data and record level data of outbound contact, inbound inquiry and Member participation, to the MDW.

3.35   Call Center.   HUSA shall use an ASI-designated call center, in addition to its own call center, for the Program. The current ASI-designated call center is operated by a division of Hartford Fire Insurance Company known as the Hartford Customer Service Group ("HCSG"), with whom ASI has entered into a Program Administrative Services Agreement (the "HCSG Services Agreement"). Within seven (7) Business Days after reviewing the HCSG Services Agreement, HUSA shall execute a formal Acknowledgment of the agreement. Under the Acknowledgment, HUSA shall acknowledge and accept the relevant terms of the HCSG Services Agreement. Any services that the HUSA call center performs under this Agreement shall be performed at least at the levels required of HCSG under the HCSG Services Agreement.

3.36   AARP Application Interface.   HUSA will use AARP's Application Interface ("AAI") to verify, initiate and renew AARP membership. HUSA will use AAI for integration into AARP's Member database. It is expected that HUSA will have the software and/or hardware necessary to link with AAI. If any modifications to HUSA's software or hardware are necessary to make the link successful, HUSA shall bear the reasonable expenses of such modifications.

3.37   Commencement of Program.   On December 1, 2008, HUSA shall make the Products and Services pursuant to the Program available to Members in Florida and New Jersey.

EXECUTION COPY

## SECTION IV

### AARP SERVICES' OBLIGATIONS

4.1    Quality Control Services. As set forth herein and in the License Agreement, AARP has contracted with ASI to ensure that HUSA's use of the Intellectual Property licensed to HUSA under the License Agreement does not depreciate the value of that licensed Intellectual Property and that it upholds the goodwill and reputation of AARP (**"Quality Control"**), including monitoring HUSA's compliance with its obligations as set forth in this Agreement (**"Quality Control Standards"**), and HUSA acknowledges that, as a condition to the AARP Parties' execution of this Agreement and AARP's execution of the License Agreement, HUSA agrees to permit ASI to perform Quality Control as set forth in this Agreement. The Quality Control is performed at ASI's or AARP's expense.

4.2    Member Data. ASI shall provide to HUSA access, on terms acceptable to ASI, to Member Data, including Member names and addresses, in order to deliver Member Communications effectively and provide the Products and Services. Such access will be in a format that is reasonably acceptable to HUSA. This information shall be made available to HUSA through the MDW. Subject to the provisions of Section VII, all Member Data, including the names and addresses and email addresses of Members, is and at all times shall remain the exclusive property of AARP and at any time, upon request by ASI, will be returned to ASI as part of ASI's Quality Control. Subject to the requirements of applicable federal, state and local laws, rules and regulations and except as expressly provided by this Agreement, the use of all such Member Data will be restricted exclusively to the development and offering of the Program and any use of such Member Data outside of the Program shall be subject to ASI's prior written approval, such approval not to be unreasonably withheld or delayed.

4.3    Ombudsmen Services. ASI shall maintain ombudsmen services to help resolve AARP Member disputes and other problems with the Program. ASI shall provide HUSA with written accounts of Member disputes and resolutions related to the Program.

## SECTION V

### TRANSFORMATIONAL IDEAS

5.1    Diversity. HUSA (in consultation with ASI, as part of ASI's Quality Control) shall develop and maintain a diversity plan to address the product needs of diverse ethnic markets and serve the social welfare of Members and the 50 plus population generally (**"Diversity Plan"**).

(a)    Adoption of Plan. No later than September 30 of each calendar year of the Term with respect to the then subsequent calendar year of the Term, HUSA (in consultation with ASI, as part of ASI's Quality Control) shall develop and adopt a Diversity Plan.

(b)    Content of Plan. The Diversity Plan shall, among other things, address the following:

EXECUTION COPY

(i)     Development of products and services to meet the unique needs of diverse communities;

(ii)    Programs and initiatives to address racial/ethnic disparities in hearing care health and promote equity in hearing care health;

(iii)   Development by HUSA of cultural proficiency training related to health care for its staff and Providers who are involved in Program; and

(iv)    Expansion of multi-lingual capabilities related to the Program.

(c)     2009 Diversity Plan. The Diversity Plan for calendar year 2009 shall be delivered on or before December 31, 2008.

(d)     Implementation Reports. No later than March 31 of each calendar year during the Term of this Agreement (commencing March 31, 2010), HUSA shall produce and deliver to ASI a written report (or presentation) setting forth in reasonable detail the diversity activities undertaken by HUSA during the preceding year and HUSA's compliance with the Diversity Plan.

5.2     Corporate Social Responsibility. HUSA (in consultation with ASI, as part of ASI's Quality Control) shall develop and maintain an annual corporate social responsibility plan applicable to the Program ("**CSR Plan**").

(a)     Adoption of Plan. No later than September 30 of each calendar year of the Term with respect to the then-subsequent calendar year of the Term, HUSA (in consultation with ASI, as part of ASI's Quality Control) shall develop and adopt a CSR Plan.

(b)     Content of Plan. The CSR Plan shall, among other things, address the following:

(i)     Promotion of environmental initiatives, with specific attention to the Program, including (A) waste management and recycling, (B) sourcing of paper products in an environmentally sound manner (including targets for post-consumer waste recycled content and development of e-business driven elements), (C) energy efficiency of operations, (D) reduced greenhouse gas emissions, and (E) greater use of green building design; and

(ii)    Identification of any other initiatives undertaken by HUSA that promote the social welfare.

(c)     2009 CSR Plan. The CSR Plan for calendar year 2009 shall be delivered on or before December 31, 2008.

(d)     Implementation Reports. No later than March 31 of each calendar year during the Term (commencing March 31, 2010), HUSA shall produce and deliver to ASI a written report (or presentation) setting forth in reasonable detail the corporate

EXECUTION COPY

social responsibility activities undertaken by HUSA during the preceding year and HUSA's compliance with the CSR Plan.

5.3    Plain Language.  The Parties acknowledge and agree that they are committed to delivering all information provided to participants in the Program (prospective or current) in a clear, concise and understandable manner.

(a)    Plain Language Standards.  In furtherance of the foregoing, and in the interest of protecting the AARP brand, HUSA and ASI shall, from time to time, jointly develop, adopt and maintain plain language standards applicable to the Program (**"Plain Language Standards"**).  Subject to compliance with applicable federal and state laws, rules and regulations, Plain Language Standards shall, among others, include the following:

(i)    Establishment of methodology to produce plain language communications using principles of information design, including- (A) an assessment of the literacy levels of the participants in the Program, (B) their informational needs, and (C) a statistically valid method for testing the effectiveness and usability of communications with the participants in the Program;

(ii)    All information shall be presented in clear, concise sections, paragraphs, and sentences, consistent with the established methodology, which means using whenever possible:

(A)    Short, explanatory sentences or bullet lists;

(B)    Layouts and graphic design elements that increase the effectiveness of communications, such as choosing appropriate font sizes, pictures, graphs, tables, drawings, and interactive tools;

(C)    Descriptive headings and subheadings;

(D)    Avoiding the use of legal and highly technical business or medical terminology; and

(E)    Avoiding frequent reliance on glossaries or defined terms as the primary means of explaining information in the communication; *provided, however,* that a glossary may be used if it is shown to improve the effectiveness of a communication.

(iii)    Exploration of a methodology for assessing the costs and benefits of implementing plain language standards and the impact of using such standards on gaining behavioral changes that promote health improvements for the participants in the Program.

(b)    Implementation Reports.  No later than March 31 of each calendar year during the Term (commencing March 31, 2010), HUSA shall produce and deliver to ASI a written report (or presentation) setting forth in reasonable detail the plain language activities undertaken by HUSA during the preceding year and HUSA's compliance with the Plain Language Standards.

Page 14 of 73

EXECUTION COPY

5.4    Limitations. Notwithstanding anything else in this Section IV to the contrary, the Parties acknowledge and agree that the Diversity Plan, CSR Plan and Plain Language Standards established hereunder are desirable undertakings, but non-compliance therewith by HUSA shall not be deemed a breach of this Agreement nor shall HUSA be required by ASI to make any material expenditures in complying therewith.

**SECTION VI**

**INSURANCE AND INDEMNIFICATION**

6.1    Insurance.

    (a)    HUSA shall maintain at its expense throughout the term of this Agreement such policy or policies of general liability and professional liability as shall be necessary to insure AARP, ASI and their respective employees, officers, directors, trustees, agents, subsidiaries and affiliates against any claim or claims for damages arising by reason of injury, death or property damage occasioned directly or indirectly by the performance or non-performance of any service by HUSA or its employees. Such insurance shall be in amounts of at least One Million Dollars ($1,000,000) per claim and at least Two Million Dollars ($ 2,000,000) in the aggregate, with an umbrella policy providing excess coverage of at least Fifteen Million Dollars ($15,000,000).

    (b)    HUSA shall additionally require each HUSA Network Provider to maintain malpractice or professional liability insurance covering professional activities conducted by the HUSA Network Provider and his/her employees with limits of at least One Million Dollars ($1,000,000) for each occurrence and at least Three Million Dollars ($ 3,000,000) in the aggregate except for providers licensed and practicing where the state provides a cap on professional liability claims and the provider participates in the state professional liability coverage program.

Upon request by ASI, HUSA shall provide ASI with certificate(s) of insurance which evidence compliance with the foregoing insurance requirements. HUSA shall use its reasonable best efforts to provide ASI with at least ten (10) days advance notice of the cancellation of any insurance policies.

6.2    Indemnification.

    (a)    HUSA shall, at its own expense, defend, indemnify and hold harmless ASI, AARP, and their respective subsidiaries and affiliates, their officers, directors, trustees, employees and agents (**"AARP Indemnified Parties"**) against and from any claims, judgments, loss, costs, damage, expenses, liability, personal injury or property damage, including reasonable attorney's fees and costs, of whatever nature and kind (**"Losses"**), (i) arising out of or related to, or resulting directly or indirectly, intentionally or unintentionally from any action, omission, or course of conduct in connection with the Program or by the Providers, including Third Party claims and/or (ii) incurred by any of the AARP Indemnified Parties by reason of HUSA's gross negligence or intentional misconduct or bad faith in performing its obligations under this Agreement or as a result of the breach by

EXECUTION COPY

HUSA of any of its representations, warranties, covenants or agreements contained in this Agreement.

(b) ASI and AARP shall, at their own expense, jointly and severally defend, indemnify and hold harmless HUSA and its respective subsidiaries and affiliates, its officers, directors, trustees, employees and agents (**"HUSA Indemnified Parties"**) against and from any liabilities, damages, claims, costs and expenses (including reasonable attorney's fees and costs) incurred by any of the HUSA Indemnified Parties by reason of ASI's or AARP's gross negligence or intentional misconduct or bad faith in performing their respective obligations under this Agreement or as a result of the breach by ASI or AARP of any of their representations, warranties, covenants or agreements contained in this Agreement.

(c) Notwithstanding anything to the contrary in Sections 5.2(a) or (b), no AARP Indemnified Party or HUSA Indemnified Party shall be indemnified hereunder for any Losses arising out of or resulting from its gross negligence, intentional misconduct or bad faith.

(d) If any claim by a Third Party is made against any Party to this Agreement, which if sustained, would give rise to a liability for indemnification under this Section 5.2, the Party against whom the claim is made shall promptly give notice of the claim to the Party that would be liable for indemnification under this Section 5.2 if such claims were sustained (the **"Indemnifying Party"**) and shall afford the Indemnifying Party and its counsel, at the Indemnifying Party's expense, the opportunity to defend or settle the claim. If such notice and opportunity are not given to the Indemnifying Party, or if any claim is compromised or settled without the Indemnifying Party's consent, the Indemnifying Party shall not be liable for indemnification hereunder with respect to such claim.

6.3 <u>Survival of Insurance and Indemnification Clauses</u>. The provisions of this Section V shall survive termination or expiration of this Agreement.

## SECTION VII

## NONCOMPETITION AND EXCLUSIVITY

7.1 During the Term of this Agreement, and for a period of three (3) years after its early termination or until the expiration date (whichever is earlier) in the event that this Agreement is breached by HUSA or terminated by ASI for cause pursuant to Section IX below, a program substantially equivalent to the Program cannot be packaged by HUSA and offered in the United States to any association whose membership is comprised primarily of individuals who are age 50 or over (other than AARP and its affiliates).

7.2 Neither ASI nor AARP is obligated to offer HUSA the opportunity to provide any products or services to Members other than the Products and Services pursuant to the Program.

EXECUTION COPY

**SECTION VIII**

**MEMBER DATA AND CONFIDENTIAL INFORMATION**

8.1   Confidentiality and Use of Member Data.

(a)   HUSA shall, and shall communicate to its employees and the Providers, the need to maintain the confidentiality of Member Data in accordance with the provisions of this Agreement and applicable state and federal laws applicable to patient records and personally identifiable information. HUSA shall not use, and shall prohibit its employees and the Providers from using, Member Data or information regarding the Products and Services provided to Members within HUSA's or the Providers' possession or control for any purpose other than as needed for the diagnosis and treatment of Members, HUSA's and the Providers' quality assurance and quality improvement initiatives, and the performance of HUSA's obligations under this Agreement. Without limiting the generality of the foregoing, HUSA and the Providers shall have the right to use Member Data to communicate to Members information as part of a patient recall program, to provide patient reminders on the need for follow-up services, to communicate with former Program patients in a manner consistent with its normal business operations, and to provide such other communications related to the Program, that HUSA reasonably believes are necessary or appropriate in accordance with this Agreement; provided, however, HUSA shall not infringe upon any trade name or trademark of AARP or ASI. In addition, HUSA and the Providers may use Member Data to the extent required to defend against any claim against any of them arising out of or resulting from the Program or the provision of any Products or Services pursuant thereto.

(b)   All Member Data is and at all times shall remain the exclusive property of ASI. Subject to the requirements of applicable federal, state and local laws, rules and regulations, HUSA agrees that the use of Member Data will be restricted exclusively to the development and offering of the Products and Services in the Program and will be subject at all times to the prior written approval of ASI. Except to the extent required for the performance of HUSA's obligations pursuant to this Agreement, HUSA shall not sort, annotate or mark Member Data. Except as expressly provided under this Agreement or the License Agreement, under no circumstances shall Member Data be used, sold, rented, licensed, disclosed, or released to any person or entity, in any form, without prior written consent of ASI.

(c)   Following the termination or expiration of this Agreement, subject to any obligations of HUSA under Section 10.8 below, HUSA shall not maintain or retain any information, lists, records, or files in any media whatsoever identifying, directly or indirectly, the AARP membership numbers of particular individuals or that particular individuals are or were Members or were visitors to the AARP web site, or AARP-related web sites (the **"AARP Membership Identifying Information"**). HUSA shall: (i) turn over to ASI any and all AARP Membership Identifying Information (and any and all copies, tapes and duplications thereof), then in its possession or control or in the possession or control of Providers or HUSA's vendors, affiliates or business partners; and (ii) delete all AARP Membership Identifying Information (and any and all copies, tapes and

**EXECUTION COPY**

duplications thereof), from any remaining customer records in the possession or control of HUSA, the Providers and any HUSA's vendors, affiliates or business partners. ASI shall maintain inspection and audit rights to verify compliance with this Section.

(d)     Further, following termination or expiration of this Agreement, Member Data shall not be used, directly or indirectly, to address, solicit or market an individual as a Member, or directly or indirectly imply that an offer is an AARP-branded offer.

(e)     HUSA will execute the AARP Security and Confidentiality Agreement attached as Exhibit C hereto on or before the Effective Date of this Agreement.   HUSA shall review its compliance with the security processes and procedures periodically with vulnerability testing.

(f)     HUSA shall not disclose any Member Data to HUSA Network Providers, or HUSA vendors, affiliates or business partners, or to any Third Party without the execution by such parties to whom disclosure is to be made of an AARP-approved agreement imposing upon the parties to whom disclosure is to be made the same security and confidentiality obligations imposed upon HUSA under the AARP Security and Confidentiality Agreement. In addition, HUSA is to complete and maintain the AARP Third-Party Security Risk Management Program Third-Party Contractor Certification, attached hereto as Exhibit D.

(g)     The Parties agree to take all action necessary or appropriate to maintain the confidentiality of Member Data in accordance with this Section VIII. Each Party shall be responsible for the compliance by its officers, directors, partners, employees, consultants, agents and any other individuals in privity with such Party with each and every provision of this Section 8.1 applicable to such Party.

(h)     HUSA shall notify ASI as soon as reasonably practicable, but not later than forty-eight (48) hours, of HUSA's discovery of any unauthorized use, disclosure, theft or other loss or compromise of Member Data and HUSA shall cooperate with the AARP Parties as the AARP Parties may reasonably request.

(i)     Member Data that becomes protected health information covered under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) in the custody of HUSA or any Provider shall be maintained and transmitted by HUSA and the Providers in accordance with HIPAA and the privacy and security rules promulgated thereunder and any other applicable federal, state or local laws, rules or regulations, notwithstanding anything in this Agreement, the License Agreement or any other agreement or instrument referred to herein or executed in connection herewith to the contrary.

8.2     Confidential Information.  The term **"Confidential Information"** shall mean information relating to the business or affairs of any Party hereto; including: (i) commercial, technical, contractual and financial information, subject to the provisions set forth herein; (ii) descriptions, know-how and marketing plans with respect to the Program or HUSA; (iii) software, firmware, computer programs and elements of design relating thereto; (iv) information regarding trade secrets; (v) patents, service marks and trademarks; (vi) procedures, manuals and guides; (vii) information regarding the present or future

EXECUTION COPY

business or products of the Parties; (viii) names, addresses, reimbursement or other information of HUSA Network Providers; and (ix) all notes, analyses, compilations, studies, plans or other documents prepared solely by a Party which contain or otherwise reflect Confidential Information. The Parties acknowledge and agree that Confidential Information shall also include Confidential Information pertaining to the business or affairs of a Party's affiliates or subsidiaries, which is disclosed to a Party hereto pursuant to this Agreement.

Notwithstanding the above definition, information received from a Party shall not be deemed to be Confidential Information to the extent to which it is (i) already known from sources other than a Party hereto, provided that such source is not known by the recipient to be bound by a confidentiality agreement or otherwise prohibited from disclosing such information to the recipient by a legal, contractual or fiduciary obligation; (ii) publicly known through no wrongful act of the recipient; (iii) received from a Third Party without restriction or breach of this Agreement; (iv) independently developed by the recipient; (v) approved for release to a Third Party by the written authorization of the disclosing Party; or (vi) disclosed pursuant to the lawful requirement of a court of competent jurisdiction or government or regulatory agency or authority.

8.3    Covenants Regarding Confidential Information.

(a)    Each Party hereto acknowledges and agrees, that from time to time, in connection with this Agreement and with the development and implementation of the Program, each Party and, potentially, Providers will be given or have access to certain Confidential Information of the Parties. Except as otherwise specified in writing by the Party who owns the rights, title, and interest in the Confidential Information, all Confidential Information is and shall remain the exclusive property of the disclosing Party, and the disclosing Party shall retain all rights, title and interest therein.

(b)    Each Party agrees to take all action necessary or appropriate to maintain the confidentiality of Confidential Information. Each Party shall be responsible for the compliance by its officers, directors, partners, employees, consultants, agents and any other individuals in privity with such Party with each and every provision of this Section 8.3 applicable to such Party.

(c)    Except as otherwise provided in this Agreement or the License Agreement, HUSA shall not disclose or reference, and shall provide written notice to Providers regarding not disclosing or referencing ASI or AARP, in any manner, without the prior written consent of ASI. The AARP Parties agree that they shall not disclose or reference HUSA, or any product or service of HUSA, in any manner without the prior written consent of HUSA.

(d)    Each Party acknowledges and agrees that no license under any patents, licenses, service marks or trademarks of any Party is granted by this Agreement or by any disclosure of Confidential Information hereunder except as explicitly stated in this Agreement, in the License Agreement, or in writing by the owner of such patent, license, service mark or trademark.

EXECUTION COPY

(e)     Each Party shall not disclose or permit access to Confidential Information of another Party to anyone; *provided, however*, that (i) a Party may disclose Confidential Information of another Party upon that other Party's prior written consent; (ii) a Party may disclose Confidential Information of another Party to its employees, officers, directors, agents and contractors who are bound by a duty of confidentiality no less restrictive than the terms of this Section 8.3 and, then, only to the extent necessary to perform such Party's obligations and exercise its rights under the Agreement; and (iii) as provided in Section 8.4.

(f)     Notwithstanding Section 8.3(e) above, with respect to any contractor or agent (other than outside counsel), HUSA shall not disclose ASI's or AARP's Confidential Information unless it first obtains (and delivers a  copy to ASI of) the AARP Third-Party Security Risk Management Program Third-Party Contractor Certification, attached hereto as Exhibit D, executed by the contractor or agent.

(g)     A Party shall notify the disclosing Party as soon as reasonably practicable, but not later than forty-eight (48) hours, of the Party's discovery of any unauthorized use, disclosure, theft or other loss or comprise of the disclosing Party's Confidential Information and cooperate with the disclosing Party as the disclosing Party may reasonably request.

8.4     Disclosure Required by Law. Each Party agrees that in the event that a Party is lawfully required by a court of competent jurisdiction, or government or regulatory agency or authority, to disclose Member Data or Confidential Information, such Party shall notify the Party from whom the Member Data or Confidential Information was originally obtained as soon as practicable and in any event prior to any actual disclosure so that the disclosing Party may seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, the Party required to make the disclosure may only furnish that portion of the Member Data or Confidential Information which, in the opinion of the Party's legal counsel, the Party is legally compelled to disclose.

8.5     Return of Confidential Information. Following termination or expiration of this Agreement, the receiving Party shall deliver promptly to the disclosing Party at the disclosing Party's request all Confidential Information of the disclosing Party (including all copies thereof, regardless of the medium or where such information may be found).

8.6     Survival. The provisions of this Section VIII shall survive termination or expiration of the Agreement.

## SECTION IX

### COMPENSATION

9.      Royalty.  In consideration for licensing the AARP Intellectual Property, AARP shall be entitled to receive the Royalty as set forth in the License Agreement.  The Parties acknowledge that AARP, as beneficiary of the Quality Control and related contract performance oversight services provided by ASI under this Agreement, shall be wholly responsible for payment to ASI of compensation for its provision of all services under this Agreement.

EXECUTION COPY

## SECTION IX

## **TERM AND TERMINATION**

10.1   Term.  The term of this Agreement shall commence on the Effective Date and shall expire at 12:00 midnight, Eastern Time on November 30, 2011, unless (i) HUSA exercises the Option to Continue pursuant to Section 10.2 or (ii) the Agreement is terminated earlier than November 30, 2011 as provided in this Section X (the **"Term"**).

10.2   Option to Continue.  HUSA has the option to continue this Agreement for Program Years 4 and 5 (December 1, 2011 through November 30, 2012 and December 1, 2012 through November 30, 2013) (the **"Option to Continue"**).  To exercise the Option to Continue, HUSA must (i) give written notice to ASI on or before one hundred and twenty (120) days prior to November 30, 2011 and (ii) not be in material breach of the Agreement at the time of the exercise of the Option to Continue.

10.3   Termination for Breach.  Except for any termination provided for in Sections 10.5, 10.6 or 10.7, any Party may terminate this Agreement upon ninety (90) days prior written notice in the event of a material breach by another Party provided that such breach has not been cured to the non-breaching Party's reasonable satisfaction within that ninety (90) day period; provided, that neither AARP Party may terminate this Agreement pursuant to this Section 10.3 because of a breach by the other AARP Party.  Notwithstanding the foregoing, if the material breach is incapable of cure, a Party may terminate this Agreement immediately upon written notice to the other Party.

10.4   Automatic Termination.  This Agreement shall terminate automatically in the event that, and on the date that, the License Agreement expires or is terminated for any reason in accordance with its terms.

10.5   Misuse of Confidential Information or Intellectual Property.  Any Party may terminate this Agreement upon written notice to the other Party if the other Party has infringed, misappropriated or misused any of the Confidential Information or Intellectual Property of the Party and if that breach continues for more than forty-five (45) days following the other Party's receipt of a written request for cure from the Party.  Notwithstanding the foregoing, if the infringement, misappropriation or misuse is incapable of cure, the Party may terminate this Agreement immediately.

10.6   Termination by ASI.  ASI may terminate this Agreement by providing thirty (30) days prior written notice to HUSA upon the occurrence of the following events:

(a)   A change in HUSA's ownership, or in HUSA's organizational structure or the HUSA Network that could reasonably be expected to have a material adverse effect on HUSA's performance of its obligations under this Agreement, consistent with the standards set forth in this Agreement.

(b)   ASI reasonably determines that the HUSA Centers and HUSA Network are insufficient to support the Members, and therefore, inconsistent with the standards set forth in this Agreement, provided that HUSA fails to cure the inadequacy to ASI's reasonable satisfaction within that thirty (30) day period.

EXECUTION COPY

    (c)    AARP or ASI reasonably determines that:

        (i)    HUSA's offer and/or services have changed such that it no longer represents value to Members;

        (ii)    HUSA's financial condition is such that the offer and/or services no longer represents value to Members;

        (iii)    HUSA is in danger of becoming insolvent or declaring bankruptcy;

        (iv)    Any action or inaction by HUSA creates a material adverse effect on the goodwill or reputation of AARP, ASI, the AARP brand, the AARP Marks, or any of AARP's or ASI's respective products or services;

        (v)    An adverse legal judgment is rendered against HUSA that materially impairs HUSA's ability to carry out its obligations under the Agreement; or

        (vi)    HUSA fails to maintain the insurance coverage required by Section 6.1 above.

    (d)    In the event that HUSA violates any state or federal law or regulation applicable to HUSA that brings HUSA into public disrepute, scandal or ridicule, shocks or offends the community, or derogates from the public image or reputation of, or reflects unfavorably upon, AARP, ASI, AARP's brands or marks, or any of AARP's or ASI's respective products or services, and in each case or cumulatively could reasonably be expected to cause a material adverse effect on AARP, ASI or the Program.

    (e)    HUSA becomes the subject of investigation, inquiry or proceeding that could reasonably be expected to cause a material adverse effect on the Program.

10.7    Grounds for Immediate Termination.

    (a)    ASI or AARP may terminate this Agreement immediately upon providing written notice to HUSA if HUSA:

        (i)    Declares bankruptcy or is adjudicated bankrupt;

        (ii)    Becomes subject of any proceedings related to liquidation, insolvency or the appointment of a receiver or similar officer for all or a substantial part of HUSA's assets; or

        (iii)    Makes a general assignment for the benefit of its creditors.

    (b)    HUSA may terminate this Agreement immediately upon providing written notice to ASI if either AARP Party:

        (i)    Declares bankruptcy or is adjudicated bankrupt;

EXECUTION COPY

      (ii)     Becomes subject of any proceedings related to liquidation, insolvency or the appointment of a receiver or similar officer for all or a substantial part of such AARP Party's assets; or

      (iii)    Makes a general assignment for the benefit of its creditors.

10.8    <u>Obligations Regarding Successor Vendor</u>.  The Parties shall have the following obligations after termination or expiration of this Agreement:

    (a)    <u>Program Databases</u>. Upon ASI's written request, HUSA shall transfer to ASI or to a successor vendor, at no charge, a copy of the Program reporting databases and related Member Data as provided to HUSA through the MDW, including Member names, addresses, and membership numbers then in databases in HUSA's possession or control, or Third Party vendor's control.

    (b)    <u>Obligations of HUSA Prior to Termination</u>.  HUSA shall use its commercially reasonable efforts to assist in the transfer of responsibilities to a successor vendor and shall not take any action inconsistent with HUSA's obligations under this Section 10.8(b) that could reasonably be expected to materially hinder or delay the transfer. In furtherance and not in limitation of the foregoing, after notice of termination has been received and prior to the effective date of the termination, HUSA and ASI shall develop a transition plan which identifies the timeframe for and the personnel who will be responsible for the transfer set forth in this Section 10.8.

    (c)    <u>Cooperation</u>. The Parties agree that for the period in which the transition plan set forth in Section 10.8(b) is in effect, the Parties shall cooperate fully to affect an orderly transfer to a successor vendor including the transfer of any Member Data databases in HUSA's possession or control related to the Program.

    (d)    <u>Medical Records</u>.  HUSA shall ensure that uon request of a Member or recipient of a Product or Service pursuant to the Program medical records relating to the Products or Services provided to such Member or recipient will be available to such Member or recipient and/or a successor provider of such individuals choice, at no cost, subject to all applicable federal, state and local laws, regulations, orders, and administrative rulings.

10.9    <u>No Use of AARP Name and Mark Following Termination</u>. Following termination or expiration of this Agreement, HUSA shall not use the AARP name or AARP Marks for any purpose.

## SECTION XI

### MISCELLANEOUS

11.1    <u>Amendment</u>.  This Agreement may be amended only by the written agreement of the Parties.

11.2    <u>Severability</u>.   In the event any provision of this Agreement shall be determined to be invalid, illegal or unenforceable under any federal or state law or regulation, or declared

**EXECUTION COPY**

null and void by any court of competent jurisdiction, then such provision shall be reformed, if possible, to conform with the law and, in any event, the remaining provisions of this Agreement shall be fully effective and operative so far as reasonably possible to carry out the contractual purposes and terms set forth herein.

11.3    <u>Public Announcements</u>.  No Party hereto shall make any public announcement or disclosure of the Program or the terms or conditions of this Agreement without the prior written consent of the other Parties; provided, that no Party shall be prohibited from making any legally required public announcement or other disclosure of the terms or conditions of this Agreement. In addition, the Parties will report the successes of the Program to the public pursuant to mutually agreeable procedures.

11.4    <u>Notices</u>.  All notices, requests and other communications to any Party under this Agreement must be in writing and given as follows:

> If to HUSA:
>
> HearUSA, Inc.
> 1250 Northpoint Parkway
> West Palm Beach, Florida 33407
> Attention:  Stephen Hansbrough, Chief Executive Officer
> Facsimile Number: (561) 688-8893
>
> with a copy to:
>
> Bryan Cave LLP
> 700 13th Street, N.W.
> Washington, D.C. 20005
> Attention: LaDawn Naegle, Esq.
> Facsimile Number:  (202) 508-6200
>
> If to AARP:
>
> AARP
> 601 E Street, N.W.
> Washington, D.C.  20049
> Attention:  Chief Executive Officer
> Facsimile Number:  (202) 434-2339
>
> with a copy to:
>
> AARP
> 601 E Street, N.W.
> Washington, D.C.  20004
> Attention:  General Counsel
> Facsimile Number:  (202) 434-2320

**EXECUTION COPY**

If to ASI:

AARP Services, Inc.
650 F Street, N.W.
Washington, DC 20049
Attention: Executive Vice President
Facsimile Number: (202) 434-6428

with copy to:

AARP Services Inc.
650 F Street, N.W.
Washington, DC 20049
Attention: General Counsel
Facsimile Number: (202) 434-6513

or any other address or facsimile number that the Party may hereafter specify for the purpose by notice to the other Parties. All notices, requests and other communications under this Section 11.4 shall be deemed to have been given and received and shall be effective: (i) in the case of personal delivery, on the date of personal delivery; (ii) in the case of delivery by facsimile, when successfully transmitted (if sent during the recipient's normal business hours, or one Business Day after the date sent if not sent during the recipient's normal business hours on a business day, or one Business Day after the date sent if not sent during the recipient's normal business hours on a Business Day) to the applicable number specified in this Section 11.4 and an appropriate confirmation of transmission is received; (iii) in the case of overnight delivery by nationally recognized, overnight courier, one Business Day following the date of dispatch; and (iv) in the case of mailing, on the third Business Day following the date of deposit in the mail. For purposes of this Agreement, "**Business Day**" means any calendar day other than Saturday, Sunday or other calendar day on which commercial banks in Washington, D.C. are authorized or required by applicable law or executive order to close.

11.5    <u>Vendor Agreement</u>. This Agreement is an agreement to provide products and/or services only and nothing contained herein shall be construed to create the relationship of principal and agent between the Parties to this Agreement.

11.6    <u>Senior Leaders</u>.

(a)    <u>General</u>. During the Term, (i) HUSA shall designate at least one but not more than two senior executive officers of HUSA, subject to the approval of ASI (not to be unreasonably withheld or delayed) and (ii) ASI shall designate at least one but not more than two senior executive officers of ASI, subject to the approval of HUSA (not to be unreasonably withheld or delayed) (collectively, the "**Senior Leaders**"), who collectively shall be responsible for coordinating the performance of the Parties' respective obligations with respect to the Program, and overseeing the HUSA/ASI relationship, as provided in this Agreement.