EXECUTION COPY

    (b)    <u>Change in Senior Leaders</u>. If, at any time during the Term of this Agreement, a Senior Leader resigns his/her position as Senior Leader, is no longer employed by the Party that designated him/her, or moves into another capacity within that Party, the designating Party shall notify the other Party promptly, in writing, of the same, and shall replace that individual with a senior executive officer of similar position who is acceptable to the other Party (such acceptance not to be unreasonably withheld or delayed) as promptly as practicable.

    (c)    <u>Decision Making</u>. Notwithstanding anything to the contrary in this Agreement, to be effective, any action or decision of the Senior Leaders under this Agreement requires mutual consent of at least one HUSA Senior Leader and one ASI Senior Leader.

    (d)    <u>Compensation</u>. Notwithstanding anything to the contrary in this Agreement, each Party shall be responsible for paying any and all employment-related compensation and expenses of any Senior Leader designated by it, and these costs shall not be included in expenses charged back to the Program or to any other Party.

11.7    <u>Decision-Making Process</u>. ASI and HUSA acknowledge that the success of the Program requires an efficient decision-making process. The Parties shall use reasonable best efforts to resolve specific requests or disputes posed by either Party. If requests or disputes are not resolved in a satisfactory manner within five (5) Business Days after submission of the request or dispute to the other Party in writing (or within twenty-four (24) hours after submission, if the request or dispute is designated as "High Priority"), the request or dispute may be submitted in writing by the requesting Party to the Senior Leaders for resolution. If the Senior Leaders are unable to resolve a request or dispute submitted to them within five (5) Business Days after its submission (or within twenty-four (24) hours after its submission, if the matter is designated as "High Priority"), the request or dispute may be submitted by either Party for resolution in accordance with the Dispute Resolution provisions set forth in Section 11.8.

11.8    <u>Dispute Resolution</u>. If a dispute has not been resolved in accordance with Section 11.7, either Party may initiate arbitration of the dispute. The arbitration shall be binding arbitration conducted in Washington, D.C., by a single arbitrator pursuant to the rules of the American Arbitration Association (**"AAA"**) then in effect or such other rules as mutually agreed upon by the Parties. The arbitrator shall be disinterested in the subject matter of the dispute; shall not have been employed at any time within the past five years by AARP, ASI or HUSA; shall have appropriate qualifications and experience with respect to arbitration of business disputes and shall possess relevant industry expertise. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Notwithstanding the foregoing, nothing herein shall preclude equitable or other judicial relief to enforce the provisions of Section VII hereof or to preserve the status quo pending the resolution of any dispute hereunder.

11.9    <u>Confidentiality of Dispute Resolution</u>. Notwithstanding anything to the contrary in this Agreement, all negotiations pursuant to Sections 11.7 and 11.8 shall be deemed Confidential Information for purposes of Section 7 of this Agreement and treated as compromise and settlement negotiations under any applicable state or federal

**EXECUTION COPY**

evidentiary law. The Parties shall maintain the confidentiality of all negotiations, settlements and arbitration awards in accordance with the AAA Rules, unless otherwise required by applicable laws; *provided, however,* that arbitration proceedings may be disclosed when and to the extent necessary if a Party requests a judgment confirming, challenging or enforcing an arbitration award. Notwithstanding the preceding sentence, the Parties acknowledge and agree that the Parties may make disclosures as otherwise permitted by Section 8 of this Agreement.

11.10 <u>Governing Law.</u> This Agreement shall be interpreted in accordance with and governed by the laws of the District of Columbia.

11.11 <u>Assigns, Subsidiaries and Controlled Affiliates.</u> None of the Parties hereto shall have the right to assign its interest in this Agreement without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, conditioned or delayed. Nothing herein shall prevent any Party from using a subsidiary or controlled affiliate in meeting any of its obligations hereunder, provided that said Party shall remain primarily obligated to perform its obligations hereunder.

11.12 <u>Subcontracts.</u> HUSA will not subcontract the provision of the whole of the Products or Services or any portion thereof without the express written consent of ASI, which consent shall not be unreasonably withheld, conditioned or delayed. HUSA shall not be relieved of any obligation or responsibility under this Agreement and shall remain liable therefore. HUSA shall be responsible for the work and activities of each of its subcontractors, including compliance with the terms of this Agreement. ASI consents to HCSG as a subcontracted entity performing customer service obligations on behalf of HUSA as described in Section 3.35. The AARP Parties acknowledge and agree that HUSA will use HUSA Network Providers to deliver the Products and Services hereunder and consent thereto is hereby given as long as the HUSA Network Providers satisfy the requirements set forth in this Agreement including the applicable exhibits attached hereto.

11.13 <u>Survival.</u> The following provisions of this Agreement shall survive its termination or expiration: Section VI (Insurance and Indemnification); Section VII (Exclusivity); and Section VIII (Confidential Information).

11.14 <u>Entire Agreement.</u> This Agreement and the License Agreement constitute the entire understanding among the Parties regarding the subject matter contained herein and supersede all prior discussions and agreements among the Parties regarding the subject matter contained herein.

11.15 <u>No Third-Party Beneficiaries.</u> Nothing in this Agreement shall be construed as giving any person or entity, other than the Parties hereto and their successors and permitted assigns, any right, remedy or claim under or in respect of this Agreement or any provision hereof, except as expressly provided herein.

11.16 <u>Independent Contractors.</u> The status of the Parties under this Agreement shall be that of independent contractors. No Party shall be authorized to waive any right, or assume or create any contract or obligation of any kind in the name of, or on behalf of, the other Party or to make any statement that it has the authority to do so. Nothing in this

**EXECUTION COPY**

Agreement shall be construed as establishing a partnership, joint venture, agency, employment or other similar relationship between the Parties hereto.

11.17 <u>Remedies Cumulative</u>. The rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by applicable law.

11.18 <u>Force Majeure</u>. If the performance of this Agreement or of any obligation hereunder is prevented, restricted or interfered with by reason of any cause beyond the reasonable control of the affected Party, such Party, upon prompt written notice to the other Party, shall be excused from such performance to the extent of the aforementioned prevention, restriction or interference, provided that the Party so affected shall use its commercially reasonable efforts to avoid or remove such causes of nonperformance and shall continue performance hereunder with the utmost dispatch whenever such causes are removed.

11.19 <u>Rules of Construction</u>. All section titles or captions in this Agreement shall be for convenience only, shall not be deemed part of this Agreement and shall in no way define, limit, extend or describe the scope or intent of any provisions of this Agreement. Except as specifically provided otherwise, alphanumerical references to "Sections," "Exhibits" and "Schedules" are to the respective sections of, and exhibits and schedules to, this Agreement. Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The schedules and exhibits attached hereto are hereby incorporated herein and made a part of this Agreement. Any reference in this Agreement to schedules and exhibits shall be deemed to be a reference to such schedules and exhibits as amended and in effect from time to time. Whenever the word "including" is used herein, it shall be construed to mean "including without limitation."

11.20 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed to be an original.

**EXECUTION COPY**

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the Effective Date.

**AARP SERVICES, INC.**

By: _____
John Wider
Executive Vice President

**HearUSA, Inc.**

By: _____
_____
_____

**AARP, Inc.**

By: _____
COO
_____

**EXECUTION COPY**

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the Effective Date.

**AARP SERVICES, INC.**                    **HearUSA, Inc.**


By: _____                    By: _____
John Wider                                 STEPHEN J. HANSBROUGH
Executive Vice President                   CHAIRMAN, CEO


**AARP, Inc.**


By: _____
_____
_____

**EXECUTION COPY**

## EXHIBIT A

### HUSA Professional Peer Review and Quality Assurance Program

**Title:**     **QUALITY IMPROVEMENT**

**Policy:**     HearUSA seeks to continuously improve organizational performance and member outcomes through a systematic approach to evaluating and managing quality indicators.

**Purpose:**     To instill best practices and positive patient outcomes through a disciplined process that ultimately improves the service delivery system.

**Scope:**     Patient transactions as monitored through the company owned and network delivery systems.

**Procedure:**

1.0     GENERAL

1.1     The Quality Management Department engages in various activities that are designed to promote the quality of patient care and employee performance. These activities are developed and approved at the corporate level, and implemented by regional Quality Managers (QM) and corporate Quality Management specialists.

1.2     The Quality Manager or QM Specialist is responsible for all aspects of the review and reporting process and for providing the intervention and training required to support the standards.

1.3     The QM is responsible for obtaining compliance with the standards. The QM will notify the Director of QM (DQM) or Sr. Vice President of Professional Services (SVPPS) of providers with sub-standard performance, as designated for the particular performance indicator, within designated time frames, and communicate action plans. *(Explanation of standards is described under separate cover, PROF105 Details for QM Training).*

1.4     The MEC is responsible for oversight of performance improvement activities. The DQM/ SVPPS submit quality measurement data to the Executive Committee quarterly.

EXECUTION COPY

1.5   Monitoring activities may include hearing aid utilization, medical reporting system, peer records review, complaint tracking, risk management program, outcome and exit surveys, and clinic assessments.

1.6   The Quality Improvement Plan is created annually and data from the assessments is reported quarterly. (*See Quality Improvement Reports under separate cover.*)

2.0   PROVIDER PERFORMANCE MONITORS – may include the following:

2.1   Peer Record Review

2.1.1   The purpose of the peer record review is to evaluate the competency levels of provider staff relative to standardized methods of patient care and to maintain compliance with medical record requirements.

2.1.2   A regional QM or QM Specialist performs the PRR. Hearing care providers are reviewed at recredentialing   or as indicated at the sole discretion of the QM.

2.1.3   Areas reviewed include invoicing, clinical notation, medical reporting, and dispensing practices. Standards are referenced in practice guideline manuals.

2.1.4   Results are shared with individual practitioner and regional manager (if HearUSA employee).

**EXHIBIT 105-8:  PEER RECORD REVIEW**
**EXHIBIT 105-8a:  LICENSED PROVIDER PEER ASSESSMENT**
**EXHIBIT 105-8b:  NETWORK PROVIDER AUDIT**

2.3   Site Survey

2.3.1   The purpose of the site Survey is to monitor the effectiveness of facility management in fulfilling the requirements of a well-organized and efficient place of business.

2.3.2   The Site survey is performed at the discretion of the QM department. The report is forwarded to the Quality Management Department for inclusion in a central database and reporting

EXECUTION COPY

purposes at the end of the quarter. The database will monitor performance and compliance levels on a center, regional, and company wide basis.

**EXHIBIT 105-9:  COMPREHENSIVE CENTER ASSESSMENT**

2.4    Incident Reporting and Risk Management

2.4.1  The purpose of the risk management program is to manage, monitor and minimize the occurrence of employee and patient related incidents that may result in undesirable outcomes. Through the centralized Incident reporting procedure, all information is reported on a quarterly basis.

# EXHIBIT 105-10:  INCIDENT REPORT

2.4.2  Company owned clinics: The office or center manager is responsible for ensuring that an Incident Report is created and submitted to Human Resources on the same day that any incident occurs. Human Resources will log the incident onto a central report log and forward the report to the responsible department.

2.4.3  Network- HearUSA responds appropriately to notification of incidents and follows customer service and incident reporting procedures accordingly.

2.4.4  The QM is responsible for ensuring that patient care incidents are reviewed and that appropriate follow up is initiated.

2.4.4.1    The QM department administrator will forward a copy of the incident report to the Regional QM.

2.4.4.2    The Regional QM will follow-up with the report and provider within 5 days. The intervention is documented, either on the incident report form and faxed, or in email, back to the QM Department administrator.

2.4.4.3    Appropriate follow up includes patient contact when indicated (to determine status, coordinate follow-up, offer apology, assess risk associated with incident) and address with provider regarding training and/or compliance. A Root Cause Analysis form is completed for serious incidents requiring extensive medical treatment.

EXECUTION COPY

    2.4.5  The Customer Service investigator notifies the insurance carrier, when applicable.  Company owned: A copy of the Incident is forwarded to HR for inclusion in the central Incident Reporting log.

    2.4.6  Risk management data is collated for occurrence screening and performance improvement measures.

# EXHIBIT 105-11: SUMMARY OF INCIDENT REPORTS
## Exhibit 105-12: ROOT CAUSE ANALYSIS

3.0    PATIENT/MEMBER SURVEYS

    3.1    Patient and member opinion and outcome studies are utilized continuously and reported on a quarterly basis.

        3.1.1  Exit Survey are distributed to patients at the office visit or mailed to the member residence. This questionnaire addresses patient opinion regarding appointments, facility, staff, and quality of care. Completed surveys are returned to the corporate office, where they are entered into a central database.

EXHIBIT 105-13: EXIT SURVEY

### EXHIBIT 105-14:  EXIT SURVEY SUMMARY

        3.1.2  Company owned: SAC/SOAC is distributed to center patients at the HAE to document pre-amplification subjective difficulty and at the subsequent Hearing Aid Check- New Wearer or at the final class of the aural rehabilitation program (HELP).  Patients evaluate their improved ability to communicate in varying listening conditions. The surveys are forwarded to the corporate office attn: QM for entry into the central database.

        EXHIBIT 105-15:  Self Assessment of Communications (SAC) and Significant Other Assessment of Communication (SOAC)

### EXHIBIT 105-16:  SAC/SOAC SUMMARY

        3.1.3  Other surveys, as determined by the SVPPS and approved by the MEC, may be used from time to time.

EXECUTION COPY

    3.2    Patient survey information is used to monitor employee performance and to design performance improvement strategies. When applicable, the appropriate provider is notified about patient outcomes that require follow up or action.

    3.3    Patient information is confidential and used for internal purposes only.

## 4.0   QUARTERLY REPORTING

    4.1    Various monitoring tools are used to gain knowledge about patient and employee performance.  In order to make good use of the data that is produced through this process, analysis of the data is used to create benchmarks and regional quarterly reports are developed.

    4.2    Reports are analyzed for individual, regional and company trends.

    4.3    Strategies for improving outcomes are developed and implemented.

    4.4    Quarterly performance reports/data are presented to the MEC for evaluation, discussion and approval.

    4.5    Policies are reviewed annually.

*(See the Quality Improvement Plan and Reports under separate cover.)*

## 5.0   QUALITY IMPROVEMENT PROJECTS

    5.1    At any given time, at least two quality improvement projects (QIP) will be maintained, in accordance with URAC Core 2.0 37 standard.

        5.1.1  At least one QIP will focus on  consumers, relate to key indicators of quality, and involve a senior clinical staff person in judgments about the clinical aspects of performance.

            5.1.1.1     Consumer is defined as:  an individual person who is the direct or indirect recipient of the services of the organization..   These individuals may be identified   by different   names,   such   as   "member,"   "enrollee," "beneficiary," or "patient".

        5.1.2  At least one QIP will focus on error reduction.

            5.1.2.1     Error is defined as: the failure of a planned action to be completed as intended (i.e., error of execution) of the use of a wrong plan to achieve an aim (i.e., error of planning).

**EXECUTION COPY**

| Revision  Date | Item | Committee Approval Date |
|---|---|---|
| 2/24/97 | N/A | |
| 2/20/01 Changes: | Revised Access instructions. Revised exhibits. | |
| | Annual Review | 1/10/02 |
| 11/08/04 | Revised CCA Updated Forms Revised goals for CCA and PRR | |
| 12/14/06 | Annual Review | |
| 12/13/07 | Annual Review Revised Minimal Standard for PRR and goal for CS complaints | |
| 2/28/2008 | Added 5.0 QIP Added alternative QM performance evaluations Updated exhibits | |
| 5/19/08 | Annual Review | |

EXECUTION COPY

## EXHIBIT 105-8 – Peer Record Review

**Hear**USA
*It's clear we care*

**Quality and Appropriateness of Care**
**Peer Review Training Summary Report**

1 = Does not meet requirements
2 = Meets
3 = Exceeds
0 = N/A

*REGION:  1 N-FL*      Scale: 93-100 = 5  84-92 = 4  76-84 = 3  <75 = 1
**1st Quarter 2008**

| 1st Quarter | Professional: | Cringle, Kristi | Number of Reports | 1 |
| --- | --- | --- | --- | --- |

| Reporting Date: | 2/27/2008 | | Overall Percentage (Sum / Count): | 93% |
| --- | --- | --- | --- | --- |

| Documentation: | Sum/Count 100% | | |
| --- | --- | --- | --- |
| Entry Signed, Dated and Legible: | 100% | 3 | 3 |
| Privacy Notice/Med Record Release: | 100% | 3 | 3 |
| Appropriate Documentation: | 100% | 3 | 3 |
| Forms Cer. Consent, Auth Ex: | N/A | 0 | 0 |
| Medical Clearance: | N/A | 0 | 0 |
| Patient Education/Instructions: | 100% | 3 | 3 |

| Audio and Immittance Reporting: | 100% | | |
| --- | --- | --- | --- |
| *HHP Present and Complete: | 100% | 3 | 3 |
| Accuracy and Interpretation: | N/A | 0 | 0 |
| Appropriate Testing/Recommended: | N/A | 0 | 0 |

| Electrophysiologic Testing: | N/A | | |
| --- | --- | --- | --- |
| Patient History: | N/A | 0 | 0 |
| Accuracy/Appropriate Testing: | N/A | 0 | 0 |

| Pediatric Testing: | N/A | | |
| --- | --- | --- | --- |
| HHP: | N/A | 0 | 0 |
| Accuracy/Appropriate Testing: | N/A | 0 | 0 |

| Verification: | 50% | | |
| --- | --- | --- | --- |
| Real Ear Performed: | N/A | 0 | 0 |
| *Real Ear Verification Appropriate: | N/A | 0 | 0 |
| Sound Field Performed: | 0% | 0 | 3 |
| *Sound Field Verification Appropriate: | N/A | 0 | 0 |
| *Patient Validation: | 100% | 3 | 3 |

| Dispensing Practices: | Sum/Count 100% | | |
| --- | --- | --- | --- |
| Appropriate Aid /Options Selected/Ordered: | 100% | 3 | 3 |
| *Implements Technology Appropriate: | 100% | 3 | 3 |
| *Hearing Aid Fitting Sheet Complete: | 100% | 3 | 3 |
| *Hearing Aid Check Form Complete: | N/A | 0 | 0 |
| *Appropriate Troubleshooting Documented: | N/A | 0 | 0 |

| Invoicing Practices: | 100% | | |
| --- | --- | --- | --- |
| Appropriate Testing / HA Selected/Invoiced: | 100% | 3 | 3 |
| Professional Signature/Lic # on Del: | 100% | 3 | 3 |
| Customer Signature on Ord/Del: | 100% | 3 | 3 |
| Return Invoice Accurate: | N/A | 0 | 0 |
| Re-invoice Testing: | N/A | 0 | 0 |

| Third Party Billing Compliance: | 100% | | |
| --- | --- | --- | --- |
| Meets Plan Specific Eligibility: | 100% | 3 | 3 |
| ICD-9 Supported By Medical Record: | 100% | 3 | 3 |
| Physician Referral/Script: | N/A | 0 | 0 |
| Meets Hearing Aid Fitting Criteria: | N/A | 0 | 0 |

| Training and Support Programs: | YES OR NO |
| --- | --- |
| Participates in Training Programs: | No |
| Manages Customer Service Needs: | No |
| Help Class Attendance: | No |

COMMENTS:

Evaluator Signature: _____    Employee Signature: _____    Date: _____

I am aware of the company compliance and quality assurance program and have been given the opportunity to ask questions about legal mandates and the consequences of non-compliance.

**EXECUTION COPY**

## EXHIBIT 105-8a

### Licensed Professional Provider Peer Assessment

Date:                                              Reviewer:

Name:                                              Address:

| Documentation | Yes | Sometimes | No | Comments |
|---|---|---|---|---|
| Are all entries dated, legible, and initialed by provider? | | | | |
| Is the purpose of each visit noted? | | | | |
| Are actions taken and recommendations noted? | | | | |
| Are unresolved problems addressed? HAC form complete? | | | | |
| Is documentation present and complete? (medical clearance form, cerumen consent form, copies of test results, auth for exception form) | | | | |
| Is the patient chart well organized? | | | | |
| Is patient registration form present and complete? | | | | |
| Did patient provide consent and acknowledge financial responsibility? | | | | |

| Patient Care and Service | Yes | Sometimes | No | Comments |
|---|---|---|---|---|
| Is there evidence that comprehensive individual history and needs assessment was made? HHP present and complete? SAC/SOAC completed and utilized? | | | | |
| Is there evidence that appropriate assessment was performed and that audiologic principles were applied? (complete and accurate testing including air, bone, speech, MCL, UDL and masking, when appropriate) | | | | |
| Are diagnostic and special tests performed and documented appropriately? | | | | |
| Are age specific guidelines and protocols applied? (ex. Pediatric, geriatric) | | | | |
| Does physician communication/medical intervention take place as indicated by the results of the assessment? Clearance and consult protocol in place? | | | | |
| Is there evidence that hearing aid selection process was collaborative and matched to patient needs? (SAC/SOAC? HAC/follow up visits, 48 hr call?) | | | | |
| Did patient receive appropriate counseling and education on hearing aid care and use? | | | | |

**EXECUTION COPY**

| | | | | |
|---|---|---|---|---|
| Is there evidence that the acoustical output of the hearing aid was objectively verified? Does it follow acceptable protocol? HAF sheet complete? | | | | |
| Is there evidence that patient's subjective evaluation of the hearing aid performance was considered? (Patient validation) | | | | |

| Billing and Compliance | Yes | Sometimes | No | Comments |
|---|---|---|---|---|
| Are elements required by insurance plans supported? (scripts, auth #, referral) | | | | |
| Is coding supported by documentation? (ICD) | | | | |
| Does billing match documentation in chart? (provider, procedures consistent,) | | | | |
| Are appropriate signatures on invoice? | | | | |

| Training and Support | Yes | Sometimes | No | Comments |
|---|---|---|---|---|
| Participates in training programs? | | | | |
| Follows customer service guidelines? | | | | |

Reviewer Overall Impression and Notes:
Signature of Reviewer:
Date:

EXECUTION COPY

## Exhibit 105- 8b

Network Audit Tool

| Audio Present | Meet Fittng Criteria | Testing Complete/Accurate | Does the name of provider match the name on the test | Testing and ICD Match | Hearing Aid compatible with Test | Comments |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**EXECUTION COPY**

## EXHIBIT 105-9    Comprehensive Clinic Assessment (Form)

**Hear**USA
it's clear we care.

# COMPREHENSIVE CLINIC ASSESSMENT

1 = Does not meet 2 = Meets 3 = Exceeds 0 = N/A

Office Manager: Jane Doe

DATE: 2/27/2008  Center: 19207

OVERALL SUMMARY: 99%

| GENERAL EXTERIOR: | 100% |
|---|---|
| Lanscape/sidewalk clean | 3 |
| Windows clean | 3 |
| Proper signage | 3 |
| Handicap accessible | 3 |

| SAFETY: | 100% |
|---|---|
| Fire safety plan/extinguisher | 3 |
| Proper HazMat storage | 3 |
| Electrical cords-good | 3 |
| Walkways clear | 3 |

| OFFICE/RECEPTION AREAS: | 95% |
|---|---|
| Clean/organized (inc. HELP) | 3 |
| Brochures/Magazines | 3 |
| Licenses Posted | 3 |
| Help Class schedule | 3 |
| Files organized/Forms in place: | 2 |
| Condidentiality/privacy notice | 3 |
| Records Disposal | 3 |

| PATIENT CARE AREA: | 100% |
|---|---|
| Organized/Neat: | 3 |
| Proper Infection Control | 3 |
| Equipment/Tools-Storage | 3 |
| File Management | 3 |

| RESTROOMS: | 100% |
|---|---|
| Clean and Organized | 3 |
| Appropriate Supplies | 3 |
| Hand-washing poster | 3 |

| GENERAL INTERIOR: | 100% |
|---|---|
| Windows blinds-good | 3 |
| Floor/carpet/baseboards | 3 |
| Furniture clean | 3 |
| Ceiling tiles clean | 3 |
| Paint/Walls clean | 3 |
| Trash Mangement | 3 |
| Pest Control | 3 |
| Interior Odor | 3 |
| Broken furniture/cabinets | 3 |
| Product/company posters | 3 |
| Proper Lighting: | 3 |

| LABORATORY: | 100% |
|---|---|
| Proper Infection Control | 3 |
| Posters | 3 |
| (All In One; FMLA; Emergency prep; Exit Maps; State Specific) Clean/Organized: | 3 |
| Equipment Clean/Functional | 3 |
| Supply mgmt/organized | 3 |
| Sufficent loaner aid supply | 3 |

| COMMENTS: |
|---|
| Excellent first clinic assessment. The clinic is well decorated, clean, and functional. A couple of charts were missing required signed financial policies, otherwise all forms were in place. Recommend annual assessment. |

**CONFIDENTIAL**

**EXECUTION COPY**

## EXHIBIT 105-10   Incident Report

---

HearUSA
It's clear we care.

Exhibit CO-IR

Urgent:  Fax Immediately to Human Resources / Regional Director / Regional QM Supervisor

# INCIDENT REPORT

Regarding: _____ ☐ Patient      ☐ Employee      ☐ Facilities/Premises

Location _____ Center: _____ Date _____

Employee (s) involved _____

Name of Involved Party _____ Age _____ Sex _____

Phone Number: _____ Insurance Company: _____

Address _____ State: _____ Zip: _____ _____

Description of Incident:

_____
_____
_____
_____
_____

☐ Police Called          *If yes,* ☐ Police report attached
                                    ☐ Police report to follow

Witness Name _____ Phone Number: _____

Address _____ State: _____ Zip: _____ _____

Reported By: _____ Date: _____

File in Center Incident Reports (Do not file in Patient Record)

**This Section For Corporate Use Only:**

Date Received          ☐ Professional Services/QA      ☐ Human Resources      ☐ Administration

*Date Received:* _____  *Reviewed By:* _____

*Comments:*

_____
_____

| Summary: | ☐ Safety | ☐ Cerumen Management | ☐ Canal Abrasion Other |
| | ☐ Security | ☐ Impression Blow-By | ☐ Procedure/Protocol |
| | ☐ Police Report Received (if appropriate) | ☐ Impression Embedded | ☐ Illness |
| | ☐ Interpretation | ☐ Impression Abrasion | ☐ Customer Service |
| | ☐ Other_____ | ☐ Impression Trauma | |
| Action: | ☐ Forward to Insurance carrier | ☐ Reimburse for medical expenses | |
| | ☐ Discount the purchase $____ | ☐ No action at this time | |
| | ☐ Other_____ | | |

41

*CONFIDENTIAL*

EXECUTION COPY

## EXHIBIT 105-11   Summary of Incident Reports

**HearUSA**
It's clear we care.

# INCIDENT ANALYSIS REPORT

### April 2007 – June 2007

| | INTERPRE-TATION | IMPRESS.BLOW-BY | IMPRESS. EMBEDDED | IMPRESS. ABRASION | IMPRESS. TRAUMA | CANAL ABRASION | PROCEDURAL | CERUMEN MANAGEMENT | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| *REGION: 70 CA* | | | | | | | | | |
| CENTER:   Hillcrest | | | | | | | | | |
| 5/22/2007  Case #:   38581 | | | | | | | | | |
| CENTER TOTAL  *TOTAL INCIDENTS*  *1* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CENTER:   Vista | | | | | | | | | |
| 4/30/2007  Case #:   37972 | | | | X | | | | | |
| CENTER TOTAL  *TOTAL INCIDENTS*  *1* | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| CENTER:   Huntington Beach | | | | | | | | | |
| 6/8/2007  Case #:   38579 | | | | | X | | | X | |
| CENTER TOTAL  *TOTAL INCIDENTS*  *1* | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| CENTER:   Hillcrest | | | | | | | | | |
| 5/24/2007  Case #:   38587 | | | | X | | | | | |
| CENTER TOTAL  *TOTAL INCIDENTS*  *1* | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |

Run Date: 7/10/2007

*CONFIDENTIAL*

EXECUTION COPY

**EXHIBIT 105-12**

# Procedural Complication Root Cause Analysis Form

**Regarding Patient Incident Report Case #** _____
**Completed by:** _____
**Date:** _____

**Description of Patient's Physical Assessment:**

_____
_____
_____
___

**Description of Patient Observation Procedures:**

_____
_____
_____
___

**Description of current Quality Practice Guideline/Care Planning Process:**

_____
_____
_____
___

**Appropriate Staffing Levels for caseload:**   YES        NO

**Description of Professional Staff Orientation and Training:**

_____
_____
_____
___

**Description of Competency Assessment/Credentialing:**

_____
_____
_____
___

**Description of Staff Supervision:**

_____
_____
_____
___

**Description of Staff Communication:**

_____
_____
_____
___

*CONFIDENTIAL*

EXECUTION COPY

**Description of Availability of Information:**

_____
_____
_____
____

**Is Technological Support Adequate?**     YES        NO
**Comments:**

_____
_____
____

**Description of Equipment Maintenance/Management process:**

_____
_____
__

**Is Physical Environment appropriate for Patient Care?**     YES        NO
**Comments:**

_____
_____
_____
____

**What human/other factors are most directly associated with this event?**

_____
_____
_____
____

***This section for Corporate Use Only:***
Date Received: _____     □Professional Services   □Human Resources     □ Administration

**Recommendations for redesign or development of new systems/processes:**

_____
_____
_____
_____
_____
_____

EXECUTION COPY

**EXHIBIT 105-13   Exit Survey**

# HearUSA
It's clear we care.

Please help us provide a better service by providing your comments. Which center did you visit? _____

1. From the time you called , how long did it take for you to get an appointment?    1-4 days ☐    5-8 days    ☐

    9-13 days ☐    14 or more days ☐

2. How long did you wait at the center before seeing your professional?    15 min/less ☐   20-30 min.☐   30 min/more ☐

3. Was the receptionist courteous and helpful?

| | Yes | No | Undecided |
|---|---|---|---|
| | ☐ | ☐ | ☐ |

4. Was the licensed professional:

| | Yes | No | Undecided |
|---|---|---|---|
| Courteous | ☐ | ☐ | ☐ |
| Helpful | ☐ | ☐ | ☐ |

5. Were you advised by your HEARx professional to use hearing aids?

| | Yes | No |
|---|---|---|
| | ☐ | ☐ |

6. If you were advised to use hearing aids, will you obtain them from HEARx?

| | Yes | No | Undecided |
|---|---|---|---|
| | ☐ | ☐ | ☐ |

7. Are our office hours convenient for you?

| | Yes | No | Undecided |
|---|---|---|---|
| | ☐ | ☐ | ☐ |

8. Is our office conveniently located?

| | Yes | No | Undecided |
|---|---|---|---|
| | ☐ | ☐ | ☐ |

9. Are you a member of an HMO?    Yes ☐ No ☐

    Please indicate which plan:

| | |
|---|---|
| ☐ Kaiser (CA) | ☐ BCBS Blue Complements (FL) |
| ☐ Wellcare (FL) | ☐ BCBS Horizon (NJ) |

45
*CONFIDENTIAL*

**EXECUTION COPY**

## EXHIBIT 105-14:  Exit Survey Report

### HearUSA — EXIT SURVEY REPORT

**REGION 1 N-FL**

| CENTER / Num of Surveys Received | 1-4 days | 5-8 days | 9-13 days | 14 or more days | 15 min. or less | 20-30 min. | More Than 30 min. | Front Staff Courteous and Helpful | UNDECIDED | Prof. COURTEOUS | Prof. HELPFUL | UNDECIDED | Advised To Use Hearing Aids | Would obtain them from HEARx/HearUSA | UNDECIDED | Office Hours | UNDECIDED | Office Location | UNDECIDED | Member of an HMO | PHYSICIAN | NEWSPAPER | FRIEND | WEBSITE | YELLOW PAGES | OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **19001 Hollywood** — 69 (4th Quarter) | 46 / 67% | 12 / 17% | 5 / 7% | 1 / 1% | 57 / 83% | 5 / 7% | 1 / 1% | 68 / 99% | 0 / 0% | 67 / 97% | 55 / 80% | 0 / 0% | 42 / 61% | 50 / 72% | 5 / 7% | 65 / 96% | 2 / 3% | 61 / 88% | 0 / 0% | 46 / 67% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% |
| **19003 West Palm Beach** — 8 (4th Quarter) | 5 / 63% | 2 / 25% | 0 / 0% | 0 / 0% | 8 / 100% | 0 / 0% | 0 / 0% | 8 / 100% | 0 / 0% | 8 / 100% | 8 / 100% | 0 / 0% | 8 / 100% | 8 / 100% | 0 / 0% | 8 / 100% | 0 / 0% | 8 / 100% | 0 / 0% | 5 / 63% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% |
| **19005 Pembroke** — 119 (4th Quarter) | 116 / 97% | 1 / 1% | 1 / 1% | 0 / 0% | 114 / 96% | 1 / 1% | 0 / 0% | 117 / 98% | 0 / 0% | 117 / 98% | 115 / 97% | 0 / 0% | 91 / 76% | 86 / 72% | 5 / 4% | 84 / 71% | 11 / 9% | 83 / 70% | 12 / 10% | 34 / 29% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% |
| **19007 Ft. Lauderdale** — 34 (4th Quarter) | 33 / 97% | 0 / 0% | 0 / 0% | 0 / 0% | 32 / 94% | 1 / 3% | 0 / 0% | 34 / 100% | 0 / 0% | 34 / 100% | 32 / 94% | 0 / 0% | 29 / 85% | 30 / 88% | 1 / 3% | 33 / 97% | 0 / 0% | 33 / 97% | 0 / 0% | 17 / 50% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% |
| **19008 Boynton Beach** — 20 (4th Quarter) | 16 / 80% | 2 / 10% | 1 / 5% | 0 / 0% | 13 / 65% | 5 / 25% | 1 / 5% | 19 / 96% | 0 / 0% | 19 / 96% | 17 / 86% | 1 / 6% | 19 / 95% | 18 / 90% | 1 / 6% | 19 / 96% | 0 / 0% | 18 / 90% | 0 / 0% | 8 / 40% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% |
| **19010 Lauderhill** — 2 (4th Quarter) | 2 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | 1 / 60% | 1 / 50% | 0 / 0% | 2 / 100% | 0 / 0% | 2 / 100% | 2 / 100% | 0 / 0% | 1 / 60% | 2 / 100% | 0 / 0% | 2 / 100% | 0 / 0% | 2 / 100% | 0 / 0% | 2 / 100% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% | 0 / 0% |

Column groups:
- **Length of Time To Get Appointment:** 1-4 days, 5-8 days, 9-13 days, 14 or more days
- **Waiting Time at Center:** 15 min. or less, 20-30 min., More Than 30 min.
- **Front Staff:** Courteous and Helpful, UNDECIDED
- **Professional:** COURTEOUS, HELPFUL, UNDECIDED
- **Advised to Use Aids?:** Advised To Use Hearing Aids, Would obtain them from HEARx/HearUSA, UNDECIDED
- **Office Convenience:** Office Hours, UNDECIDED, Office Location, UNDECIDED
- **HMO Member:** Member of an HMO
- **HearUSA Only Referral Source:** PHYSICIAN, NEWSPAPER, FRIEND, WEBSITE, YELLOW PAGES, OTHER

CONFIDENTIAL

EXECUTION COPY

## EXHIBIT 105-15 – Self Assessment of Communications (SAC) and Significant Other Assessment of Communication (SOAC)

---

### PATIENT SELF-ASSESSMENT OF COMMUNICATION (SAC)                     HearUSA

Name: _____          Date: _____

Instructions: The purpose of this form is to identify the problems your hearing loss may be causing you. If you wear hearing aids, answer the questions according to how you communicate *when the hearing aids are in use.*

One of the five descriptions on the right should be assigned to each of the statements below.

Select a number from 1 to 5 next to each statement (please <u>do not</u> answer with yes or no and pick only one answer for each question.)

(1) Almost never (or never)

(2) Occasionally (about ¼ of the time)

(3) About ½ of the time

(4) Frequently (about ¾ of the time)

(5) Practically Always (or always)

| Question | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| (1) Do you experience communication difficulties in situations when speaking with one other person? (at home, at work, in a social situation, with a waitress, a store clerk, with a spouse, boss, etc.) | 1 | 2 | 3 | 4 | 5 |
| (2) Do you experience communication difficulties while watching TV and in various types of entertainment? (movies, radio, plays, night clubs, musical entertainment, etc.) | 1 | 2 | 3 | 4 | 5 |
| (3) Do you experience communication difficulties in situations when conversing with a small group of several persons? (with friends or families, co-workers, in meetings or casual conversations, over dinner or while playing cards, etc.) | 1 | 2 | 3 | 4 | 5 |
| (4) Do you experience communication difficulties when you are in an unfavorable listening environment? (at a noisy party, where there is background music, when riding in an auto or bus, when someone whispers or talks from across the room, etc.) | 1 | 2 | 3 | 4 | 5 |
| (5) How often do you experience communication difficulties in the situation where you most want to hear better? | 1 | 2 | 3 | 4 | 5 |
| (6) Do you experience difficulty hearing environmental sounds? (telephone or doorbell ring, alarm, horns) | 1 | 2 | 3 | 4 | 5 |
| (7) Do you feel that difficulty with your hearing negatively affects or hampers your personal or social life? | 1 | 2 | 3 | 4 | 5 |
| (8) Does any problem or difficulty with your hearing worry, annoy or upset you? | 1 | 2 | 3 | 4 | 5 |
| (9) How often do others seem to be concerned or annoyed or suggest that you have a hearing problem? | 1 | 2 | 3 | 4 | 5 |
| (10) How often does your hearing negatively affect your enjoyment of life? | 1 | 2 | 3 | 4 | 5 |

(11) If you are using a hearing aid: On an average day, how many hours did you use your hearing aids?

hours _____ /16=_____ %

Please rate your overall satisfaction with your hearing aids.
1 ☐ not at all satisfied (0%)   2 ☐ slightly satisfied (25%)   3 ☐ moderately satisfied (50%)     _____ %
4 ☐ mostly satisfied (75%)   5 ☐ very satisfied (100%)

FOR OFFICE USE ONLY

---

47
*CONFIDENTIAL*

**EXECUTION COPY**

## SIGNIFICANT OTHER ASSESSMENT OF COMMUNICATION (SOAC)    Hear USA

Name: _____    Date: _____

Name of Person Completing Assessment: _____ Relationship: _____

Instructions: The purpose of this form is to identify the problems a hearing loss may be causing your significant other. If the patient has a hearing aid, please fill out the form according to how he/she communicates *when the hearing aid is in use.*

(1) Almost never (or never)
(2) Occasionally (about ¼ of the time)
(3) About ½ of the time
(4) Frequently (about ¾ of the time)
(5) Practically Always (or always)

One of the five descriptions on the right should be assigned to each of the statements below.

Select a number from 1 to 5 next to each statement (please <u>do not</u> answer with yes or no and pick only one answer for each question.)

| Statement | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| (1) Does he/she experience communication difficulties in situations when speaking with one other person? (at home, at work, in a social situation, with a waitress, a store clerk, with a spouse, boss, etc.) | 1 | 2 | 3 | 4 | 5 |
| (2) Does he/she experience communication difficulties while watching TV and in various types of entertainment? (movies, radio, plays, night clubs, musical entertainment, etc.) | 1 | 2 | 3 | 4 | 5 |
| (3) Does he/she experience communication difficulties in situations when conversing with a small group of several persons? (with friends or families, co-workers, in meetings or casual conversations, over dinner or while playing cards, etc.) | 1 | 2 | 3 | 4 | 5 |
| (4) Does he/she experience communication difficulties when you are in an unfavorable listening environment? (at a noisy party, where there is background music, when riding in an auto or bus, when someone whispers or talks from across the room, etc.) | 1 | 2 | 3 | 4 | 5 |
| (5) How often does he/she experience communication difficulties in the situation where he/she most wants to hear better? | 1 | 2 | 3 | 4 | 5 |
| (6) Does he/she experience difficulty in hearing environmental sounds? (telephone ring, doorbell ring, horns, alarms) | 1 | 2 | 3 | 4 | 5 |
| (7) Do you feel that any difficulty with hearing negatively affects or hampers his/her personal or social life? | 1 | 2 | 3 | 4 | 5 |
| (8) Do you feel that any problem or difficulty with hearing worries, annoys or upsets him/her? | 1 | 2 | 3 | 4 | 5 |
| (9) Do you or others seem to be concerned or annoyed that he/she has a hearing problem? | 1 | 2 | 3 | 4 | 5 |
| (10) How often does hearing loss negatively affect his/her enjoyment of life? | 1 | 2 | 3 | 4 | 5 |

*FOR OFFICE USE ONLY*

☐ Pre- Assessment     ☐ Not currently using Hearing Aids
☐ Post- Assessment    ☐ Current Hearing Aid User

Score : (Q1-10)_____ (/10)_____ -1 ____ x 25 = _____%
SOAC - 81185 (50/pd)

EXECUTION COPY

## EXHIBIT 105-16 – Self Assessment of Communications (SAC) and Significant Other Assessment of Communication (SOAC)  - Pre/Post Report

### Self Assessment of Communication Summary Report

**HearUSA** — it's clear we care

(1) Almost never (or never)
(2) Occasionally (about 1/4 of the time)
(3) About 1/2 of the time
(4) Frequently (about 3/4 of the time)
(5) Practically Always (or always)

| | Q1 One on One | Q2 TV/Radio | Q3 Small Groups | Q4 Environment | Q5 Communication Diff. | Q6 Loud Environ. | Q7 Social Life | Q8 Hearing Loss problems | Q9 Outside Perception | Q10 Enjoyment of Life | S U M M A R Y | Q11 OVERALL SATISFACTION OF HEARING AIDS (1) Not at all satisfied (2) Slightly satisfied (3) Moderately satisfied (4) Mostly satisfied (5) Very satisfied |

**REGION:** _____ 1 _____ SUMMARY

*OVERALL SATISFACTION (POST) Reporting Moderate to High Satisfaction*

| Total Surveys: 236 | | Q1 | Q2 | Q3 | Q4 | Q5 | Q6 | Q7 | Q8 | Q9 | Q10 | AVG (Pre-Post) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre Score | 3.19 | 3.4 | 3.5 | 4.0 | 3.8 | 2.9 | 3.2 | 3.2 | 3.3 | 3.2 | 3.36  59% |
| | Post Score | 1.51 | 1.7 | 1.8 | 2.1 | 1.7 | 1.4 | 1.6 | 1.7 | 1.6 | 1.5 | 1.66  17%  Avg 1-10 |
| | Difference | 1.7 | 1.7 | 1.7 | 1.8 | 2.0 | 1.5 | 1.6 | 1.5 | 1.8 | 1.7 | |

**REGION:** _____ 2 _____ SUMMARY

*OVERALL SATISFACTION (POST) Reporting Moderate to High Satisfaction*

| Total Surveys: 16 | | Q1 | Q2 | Q3 | Q4 | Q5 | Q6 | Q7 | Q8 | Q9 | Q10 | AVG (Pre-Post) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre Score | 3.25 | 3.6 | 3.7 | 3.9 | 4.3 | 3.6 | 3.8 | 3.8 | 4.0 | 3.6 | 3.74  69% |
| | Post Score | 1.81 | 2.1 | 2.2 | 2.8 | 2.1 | 1.7 | 2.0 | 2.1 | 2.1 | 2.1 | 2.05  27%  Avg 1-10 |
| | Difference | 1.4 | 1.6 | 1.5 | 1.2 | 2.3 | 1.9 | 1.8 | 1.6 | 1.9 | 1.5 | |

*Reporting at least moderate levels of satisfaction

EXECUTION COPY

## EXHIBIT B

### AARP's Privacy Policy

Last Updated: October 4, 2007

## AARP Understands How Important Privacy Is to Our Members

We are committed to protecting your privacy and want to make sure that you understand how your membership information is used. We also want you to be aware that you have choices about how we use this information.

## What Information We Collect

When you apply for membership, we ask for basic information such as your name, contact information, and date of birth. We keep track of your participation in AARP activities and member services so we can understand our members' interests and evaluate the effectiveness of our offerings. We also collect demographic information from other sources to help us learn more about member characteristics and needs. As explained in the Questions and Answers below, we may ask for additional information in your visits to AARP.org. All of this information helps us better serve our members and improve our programs.

## Information Sharing

We share your personal information only with companies we have selected to provide official AARP member services or support AARP operations. Some of the providers of AARP member services, including many of those listed on our Products and Services area, pay a fee for access to our membership list. Our contracts with these companies require them to keep the member information strictly confidential, and allow them to use the information only to offer the contracted services to AARP and AARP members. We oversee the companies' compliance through our wholly owned subsidiary, AARP Services, Inc.

Other AARP affiliates, such as the AARP Foundation, may also have access to member information. Finally, we may release personal member information on the rare occasions when we are required to do so by law, or when necessary or appropriate to comply with legal process or to protect or defend AARP and its members. We do not sell or rent member information to telemarketers, mailing list brokers, or any other companies that are not offering AARP-endorsed services or benefits.

### Your Choices

We respect your choices. If you do not want us to share your information with providers of AARP member services, you can contact us as specified below. You should then stop receiving AARP service provider mailings in about 14 weeks. (Note: If you request services or information from an AARP service provider directly, we may still need to confirm to the provider that you are an eligible AARP member). You may also elect not to receive information about AARP activities, such as legislative events and educational programs, or about the activities of other AARP affiliates like the AARP Foundation.

**CONFIDENTIAL**

EXECUTION COPY

**For More Information**
For more detailed information about our privacy practices, and about privacy on AARP.org, please review the frequently asked questions below. To exercise your choices, or ask questions about your membership information, please contact us online, by e-mail, by phone at 1-888-OUR-AARP (1-888-687-2277), or by mail:

AARP Membership Center
3200 E. Carson Street
Lakewood, CA 90712

**Privacy and AARP.org - Questions and Answers**
The following Questions and Answers address AARP and AARP.org privacy issues in more detail. We want to make sure that you understand the types of information that are collected at AARP.org, the ways in which that information is used and protected, and the choices that you have about this collection and use. Specifically, this privacy policy answers the frequently asked questions listed below.

In this policy, the terms "AARP," "we," "our," and "us" refer to AARP and its subsidiary,

AARP Services, Inc. The terms "you" and "your" refer to AARP.org visitors like yourself.

**1. Do I have to submit any personal information in order to use AARP.org?**
You do not need to give us any information about yourself in order to access most of AARP.org. You can visit our pages, read our publications, and learn about our member services on a completely anonymous basis.

If you want to take advantage of some of the optional services available on AARP.org, however, we will sometimes request information that allows us to identify you ("personal information"). If you use the online form to join AARP or renew your membership, for example, we will ask for certain information to process your application (name, birth date, phone number, mailing address, e-mail address, e-mail permissions, and credit card number). If you register to receive e-mail newsletters, we will ask for your name, address, e-mail address, and birth date (or member number) so that we can send you the newsletters. We may also ask for personal information when you participate in other activities or services on AARP.org, such as surveys and discussion groups.

We also have relationships with certain providers and vendors that we have selected and approved to offer services and benefits on linked sites. On some of these sites, you may be asked to enter personal information in order to take advantage of their services or programs. If you decide to purchase services on the Web site of one of our member benefits service providers, the contracted member benefit provider offering the services may ask for your name, member number, address, and e-mail in order to contact you about the services. Examples of sites operated in conjunction with AARP Service Providers include: AARP Health Care Options and AARP Pharmacy Services. These sites may also have their own unique privacy policies that you should review.

Again, regardless of whether you are visiting AARP.org or an affiliated site, you do not have to disclose any personal information if you do not want to. You can always decide not to use the optional services that require the submission of such information. The choice is yours. We are only interested in offering you convenient online services that match your interests and needs.

**CONFIDENTIAL**

EXECUTION COPY

**2. Does AARP.org collect non-personal information, using "cookies" or otherwise?**
We also collect other types of information that do not allow us to identify your name, e-mail address, or other personal characteristics. This "non-personal information" includes the number assigned to your computer whenever you access the Internet ("IP address"), and the type of browser you use. None of this non-personal information allows us to identify or contact you. We use this information to help us evaluate how AARP.org is being used. By gathering this information, we can learn, among other things, how many people visit AARP.org, which AARP.org pages are the most and least popular, and which other Web sites are the most frequent referral sources for AARP.org.

We may also assign a "cookie" to your computer in some situations. Like an IP address, a "cookie" is a kind of online identification tag that allows us to recognize your computer each time you visit AARP.org. For example, the AARP Online Community, that is, thoseregistered users of AARP.org who submit personal profiles, or participate in message boards, journals, chat rooms, and user groups, uses cookies to recognize returning registered users of the site.

Unless you have already provided us with personal information on AARP.org or an affiliated site, cookies do not allow us to identify you by name, e-mail address, or other personal characteristics. We use cookies primarily to identify return visitors and make your AARP.org experience more convenient.

We use vendors for various purposes. For example, AARP uses a vendor to place AARP-approved banner advertisements on AARP.org. The cookies allow AARP to manage the delivery of these ads – for example, by counting the number of times a visitor has viewed different banners. If a visitor has viewed the same banner a number of times, AARP can use the vendor's system to automatically display different banners in the next visit. AARP has complete control over the banners that are placed on AARP.org through this system.

We also use a vendor to collect aggregate information about AARP.org usage – such as the most visited pages and features. This vendor also uses cookies and transparent image tags to collect this information. Like cookies, image tags do not allow us or the vendor to identify you by name or other personal characteristics. These vendors do not collect any personal information from members on AARP.org, and they do not share the non-personal information collected on AARP.org with anyone else for any other purpose.

If you are uncomfortable allowing cookies to be placed on your computer, read this article on AARP.org that explains how to set your browser so that it will not accept these cookies, or so that it will notify you whenever a web site is trying to use cookies. If you choose not to accept cookies, however, you may not be able to use certain features of AARP.org or linked sites. You will still be able to visit the general AARP.org pages on an anonymous basis, just as you have in the past.

**3. How is this information used, and can I control the uses?**
Our primary purpose in collecting this information is to provide you with the services you request, and to evaluate and improve other services that we offer. As explained above, for example, we ask for information so that we can process your membership application, send you the e-mail newsletters to which you have subscribed, and provide you with special offers for AARP members. We store your membership information in our computer files, and use this information to service your membership account, send you publications like "AARP The Magazine" and the "AARP Bulletin," and answer any questions you may have about membership.

*CONFIDENTIAL*

EXECUTION COPY

We may also use this information for other purposes. For example, we may review demographic information, survey results, and statistical analyses of AARP.org usage in order to help us evaluate, modify, and develop services that are likely to be of interest to our members.

On occasion, we will also use your membership information to send you notices in the mail or by e-mail about special member benefits, discounts, and offers. If you do not want to receive these mailings, you can:
1. e-mail us at member@aarp.org,
2. call us at 1-888-OUR-AARP (1-888-687-2277),
3. write to us at AARP Membership Center, 3200 E. Carson Street, Lakewood, CA 90712, or
4. visit E-mail Updates on the Web.

If you have subscribed to any of the AARP.org e-mail newsletters, and would like to stop receiving them, follow the instructions at the bottom of each of the newsletters that you receive. Some affiliated sites may also send you promotional e-mails if you asked to receive them when you registered for their respective services. In addition, each issue of these e-mail newsletters or notices will always include instructions for unsubscribing. Again, these notices are designed to describe the benefits of AARP membership, but we do not want to send them to you if you are not interested in receiving them.

## 4. Is any information shared with other companies or organizations, and can I "opt out"?

AARP takes very seriously its responsibility to keep your personal information confidential and private. We do not sell or rent any of our members' personal information to telemarketers, mailing list brokers, or any other companies that are not offering AARP-endorsed services or benefits. As explained above, we share member information with the limited number of companies that we have selected to provide AARP member services. These "AARP Service Providers" include the insurance companies offering plans through AARP Health Care Options, and the financial institutions offering products through AARP Credit Card Services. Most of these AARP Service Providers are listed in our Products and Services page. Like most organizations, we also hire companies to provide certain administrative services that require access to member information, such as processing address labels, managing databases, and sending mailings ("approved vendors").

We require all of these AARP Service Providers and approved vendors to hold member information in strict confidence. These providers and vendors are contractually required to maintain the security and confidentiality of all member information, and are prohibited from using that information for any purpose other than providing the services specified in their contracts with AARP. We audit and monitor these companies to ensure that the member information is protected.

If you do not want us to share your personal information with AARP Service Providers, you can:
1. e-mail us at member@aarp.org,
2. call us at 1-888-OUR-AARP (1-888-687-2277),
3. write to us at AARP Membership Center, 3200 E. Carson Street, Lakewood, CA 90712, or
4. visit E-mail Updates on the Web.

If you ask us not to share your personal information, you should then stop receiving AARP Service Provider mailings in about 14 weeks. (Note: If you request services or information from an AARP Service Provider directly, we may still need to confirm to the provider that you are an eligible AARP member).

**CONFIDENTIAL**

EXECUTION COPY

We may also disclose personal information when required to do so by law or when such action is necessary or appropriate to comply with legal process served on AARP, to protect and defend the rights or property of AARP, or to protect the personal safety of users of AARP.org. We reserve the right to contact the appropriate authorities in our discretion when visitors' activities appear to be illegal or inconsistent with our policies.

Finally, we may sometimes share aggregate statistics and non-personal information with the media, government agencies, advertisers, and other third-parties. For example, we may publish statistics on the number of members in various states, or the number of visitors to AARP.org. These aggregate statistics will not allow anyone to identify member names or other personal information.

**5. What privacy policy rules apply when I "click" over to other web sites?**
AARP.org includes links to other Web sites, some of which are operated by AARP Service Providers or approved vendors, and some of which are not. Sites operated by AARP Service Providers and approved vendors may also collect personal information, and may have their own privacy policies that differ from, and are not covered by, this privacy policy. It is important that you review any privacy policies on these sites carefully before you use any services or programs offered.
When you click to unaffiliated third-party sites, AARP is not responsible for, and has no control over, the information collection or privacy practices of that site. It is important that you review and understand the privacy policies posted on any linked sites you visit before volunteering any of your personal information. These sites may also collect cookies, or allow third-party advertisers on their sites to collect cookies. You can often find information regarding a site and its privacy policy on the site's home page. If you cannot find or do not like a site's privacy policy, you may prefer not to do business with, or offer information to, that site.

**6. Do privacy protections exist in AARP's Online Community?**
It is important to understand that the information you submit in personal profiles, message boards, journals, chat rooms, and user groups is publicly displayed. Your messages will be seen by people and organizations not related to AARP, and may be used by these third parties to contact you. As a result, you should be very careful about the information that you publish online. Because these unrelated parties will also see your "User Name" on any postings that you make in online discussions, you may not want to use your full name. You can use your first name only, or use an assumed name, if you like. Read the Terms of Service to learn more about using the AARP Online Community.

**7. How does AARP.org protect security and confidentiality?**
In order to protect your personal information, we use technologies and processes such as encryption, access control procedures, network firewalls, physical security, and other measures. These measures increase the security and privacy of information traveling to, from, and within AARP.org. Only our authorized employees or agents carrying out permitted business functions are allowed to access personal information. Employees who violate our privacy access policies may be subject to disciplinary actions, including termination when appropriate.

In order to interact with AARP.org, we require you to use a password to protect your account from unauthorized access by others. If you do allow others, including family or household members, to access AARP members-only services through your personal password or to use your membership account number, please understand that you are responsible for the actions of those individuals.

**CONFIDENTIAL**

**EXECUTION COPY**

This privacy policy describes the types of information we currently collect, and the ways we use and protect that information. If you are uncomfortable with our policies and practices, please do not provide any personal information to us through AARP.org.

From time to time, we may collect different types of information and use that information in different ways – for example, when we add features or services to AARP.org. In these cases, we may edit this policy to explain the new practices. Because protecting members' privacy is very important to us, we do not expect major changes in policy. However, if we do make significant changes in our practices, we will include announcements on the AARP.org home page so that you will know to review the revised policy.

**8. Whom can I contact with privacy questions?**
If you have any questions or comments about your member information or this privacy policy, please send an e-mail by visiting AARP Membership, or writing to member@aarp.org, call us at 1-888-OUR-AARP (1-888-687-2277), or write us at the address listed above. We will do our best to investigate any complaint you may have and respond promptly to your concerns.

*CONFIDENTIAL*

**EXECUTION COPY**

## EXHIBIT C

### AARP Security and Confidentiality Agreement

1.  **Confidential Information Defined.** All information, whether written, verbal or electronic, concerning the affairs and operations of AARP, its subsidiaries and affiliates, including AARP Services, Inc. ("ASI"), and their respective contractors and agents, including, without limitation, operational plans, financial data, employee data, contractual information, and information relating to AARP members (including but not limited to member names, addresses, phone numbers, e-mail addresses) ("Member Information"), shall be considered Confidential Information under this Agreement. HearUSA, Inc. ("HUSA") shall presume that all other information provided, or made available to HUSA by AARP or ASI is Confidential Information unless HUSA is informed by AARP to the contrary. Confidential Information shall not include information that HUSA can demonstrate: (a) was already known to HUSA at the time of disclosure; (b) information in the public domain or available to the public; (c) was made available to HUSA by third parties (other than AARP members) without any non-disclosure obligation to AARP; or (d) was independently developed by HUSA.

2.  **Use of Confidential Information; Non-Disclosure.** HUSA agrees that it shall use Confidential Information solely for the purpose of providing Products and Services pursuant to the Program and solely as expressly permitted under this Agreement, the Services Agreement and the License Agreement. Except as permitted under this Agreement, the Services Agreement or the License Agreement, HUSA may not disclose, transfer, sell, rent, copy, or allow third-party access to Confidential Information, or use Confidential Information for HUSA's own benefit or the benefit of third parties. AARP agrees that HUSA will be permitted to disclose relevant aspects of the Confidential Information to its employees to the extent necessary to provide the Products and Services pursuant to the Program and to the extent such employees are bound to maintain the security and confidentiality of the Confidential Information. Notwithstanding the foregoing, HUSA may disclose Confidential Information to the extent compelled by any court, regulatory order or other service of legal process, in which case HUSA will provide AARP prompt prior notice of any such order or process sufficient to allow AARP to contest such order, and HUSA shall cooperate with AARP in responding to such order. In the event that a protective order or other such remedy is sought, but not obtained, by AARP, HUSA may only furnish that portion of the Confidential Information which, in the opinion of HUSA's legal counsel, HUSA is legally compelled to disclose.

3.  **Security Controls.** HUSA shall protect and maintain the security and confidentiality of the Confidential Information using at least the same level of care (but no less than reasonable care) that HUSA uses to protect and maintain the security and confidentiality of its own confidential information. Without limiting HUSA's obligations with respect to Confidential Information, AARP shall have the right to have its designated representative or representatives at HUSA's premises, to observe and monitor the handling of Confidential Information pursuant to the Program, and ensure that adequate security controls are in place. AARP agrees that any access to HUSA's premises will be in a manner that minimizes interference with HUSA's business operations. To the extent that HUSA has access to Member Information or other Confidential Information that AARP

**EXECUTION COPY**

deems to be particularly sensitive, HUSA shall maintain, at a minimum, the following controls: (a) updated anti-virus software installed on all appropriate computing equipment, (b) updated security software patches installed on all appropriate computing equipment, (c) firewall software installed on computing environments connected to the Internet, (d) use of encryption software when electronically transmitting AARP/ASI data to external organizations (including AARP/ASI), (e) appropriate access controls to restrict access to authorized individuals of AARP/ASI data, materials, or computing systems or locations processing or storing AARP/ASI data, and (f) such other security controls, systems, and measures as the parties may require during the term of the Agreement.

4.     **Third-Party Contractors.** HUSA shall not disclose any Confidential Information to any subcontractors, vendors, advisors, or agents ("Third-Party Contractors") without (a) the prior written consent of AARP except as permitted under this Agreement, the Services Agreement or the License Agreement,, and (b) the execution by such Third-Party Contractor of an AARP-approved agreement imposing upon the Third-Party Contractor the same security and confidentiality obligations imposed upon HUSA under this Agreement. HUSA shall be responsible for ensuring that all Third-Party Contractors comply with such obligations, and shall remain responsible for any unauthorized use or disclosure of Confidential Information by any such Third-Party Contractors. Further, HUSA shall be responsible for monitoring Third-Party Contractors' compliance with these obligations, including retaining records or reports related to this monitoring activity that identify monitoring procedures performed and associated conclusions or findings. These records or reports shall be provided to AARP when requested.

5.     **Notice of Incidents.** HUSA shall notify AARP as soon as practicable, but no later than forty-eight (48) hours, of any discovery of any unauthorized use, disclosure, theft, or other loss or compromise of Confidential Information. HUSA agrees to make available sufficient resources and data for AARP to determine the full impact and root cause of the incident.

6.     **Audits.** HUSA will maintain accurate and detailed records of its performance of its obligations under this Agreement. AARP reserves the right to perform, either itself or through an authorized representative, financial and performance audits relating to the Products and Services and obligations under this Agreement. Audits may include examination of HUSA's internal controls (such as business, security, and information technology practices) relevant to this Agreement. HUSA will make all directly pertinent records available for inspection or audit by AARP or its authorized agent at HUSA's business office during normal business hours for up to two (2) years after the termination of this Agreement.

7.     **Return of Confidential Information.** Except as provided under the Services Agreement or the License Agreement, upon termination of this Agreement, or at any other time during the term of the Agreement if requested by AARP, HUSA shall return to AARP, within ten (10) days, any and all Confidential Information, including Member Information (and any and all copies, tapes and duplications thereof), then in its or its Third-Party Contractors' possession, and shall maintain no such information in its or its subcontractors' possession. AARP shall maintain inspection and audit rights to verify the compliance with this Section.

EXECUTION COPY

8.  **Regulatory Requirements.** To the extent that HUSA has access to any Confidential Information subject to the terms of any privacy laws or regulations, including but not limited to the Gramm-Leach-Bliley Act and the Health Insurance Portability and Accountability Act, HUSA agrees to amend this Agreement or execute additional agreements (either with AARP, its subsidiaries or affiliates, including ASI, or AARP member benefit providers) as directed by AARP.

9.  **Remedies for Confidentiality Breach.** HUSA agrees that its breach of the terms in this Exhibit will cause irreparable damage to AARP, and its subsidiaries and affiliates, including ASI. In the event of any breach or imminent breach of this Article, HUSA agrees that, in addition to other remedies (which in the case of disclosure of Member Information may include, but not be limited to, lost value), AARP shall be authorized and entitled to obtain preliminary or permanent injunctive relief from any court of competent jurisdiction (without being required to post bond or other security) to prevent, restrain, compel an act, or limit the effects of, as applicable or appropriate, such breach or imminent breach.

**AGREED TO BY:**

HearUSA, Inc.:

_____
Signature

*STEPHEN  J. HANSBROUGH*
Name

*CHAKMAN, CEO*
Title

*8/7/08*
Date

AARP

_____
Signature

Joseph Lee
Director, Information Security

_____
Date

EXECUTION COPY

8. **Regulatory Requirements.** To the extent that HUSA has access to any Confidential Information subject to the terms of any privacy laws or regulations, including but not limited to the Gramm-Leach-Bliley Act and the Health Insurance Portability and Accountability Act, HUSA agrees to amend this Agreement or execute additional agreements (either with AARP, its subsidiaries or affiliates, including ASI, or AARP member benefit providers) as directed by AARP.

9. **Remedies for Confidentiality Breach.** HUSA agrees that its breach of the terms in this Exhibit will cause irreparable damage to AARP, and its subsidiaries and affiliates, including ASI. In the event of any breach or imminent breach of this Article, HUSA agrees that, in addition to other remedies (which in the case of disclosure of Member Information may include, but not be limited to, lost value), AARP shall be authorized and entitled to obtain preliminary or permanent injunctive relief from any court of competent jurisdiction (without being required to post bond or other security) to prevent, restrain, compel an act, or limit the effects of, as applicable or appropriate, such breach or imminent breach.

**AGREED TO BY:**

HearUSA, Inc.:

_____
Signature

_____
Name

_____
Title

_____
Date

AARP

_____
Signature

Joseph Lee
Director, Information Security

_____
8/8/08
Date

58
**CONFIDENTIAL**

**EXECUTION COPY**

### EXHIBIT D



### THIRD-PARTY SECURITY RISK-MANAGEMENT PROGRAM
### THIRD-PARTY CONTRACTOR CERTIFICATION

This certification confirms that HearUSA, Inc. ("HUSA") has executed agreements covering information security and confidentiality with all Providers (as defined in the Services Agreement), subcontractors, vendors, advisors, agents and other third-parties providing support in the delivery of Products and Services pursuant to the Program (as defined in the Services Agreement). Unless exceptions are noted below, these agreements include all provisions noted in the AARP Security and Confidentiality Agreement as agreed to by HUSA.

**Please note any exceptions or additional comments below:**

**AGREED TO BY:**

HearUSA, Inc.:

_____
Signature

_____
Name

_____
Title

_____
Date

Company Name: _____

Address: _____

Address: _____

City, State Zip: _____

AARP

_____
Signature

Joseph Lee
Director, Information Security

_____8/8/08_____
Date

59

EXECUTION COPY

### Program Products and Services

The Program is to include the following products and services:

1.   The evaluation/consultation fee is to be ninety dollars ($90.00) and shall include the following tests: (i) otoscopy, (ii) air conduction, (iii) bone conduction, (iv) speech audiometry, (v) comfortable listening level, and (vi) uncomfortable listening level.

2.   The hearing aid discount is to include hearing aid, fitting and service:

   (a)   Hearing aids (directional microphones included in all products)

      (i)    Basic:  $1,280.00

      (ii)   Economy:  $1,600.00

      (iii)  Mid-Level:  $1,760.00

      (iv)   Premium:  $2,240.00

   (b)   Fitting protocol

      (i)    REM/Sound Field

      (ii)   Post-Fitting Assessment

   (c)   Pricing for existing products shall be reviewed and adjusted annually to ensure the competitiveness of the Program.

   (d)   Any new products and the pricing thereof shall be added to the Program quarterly.

3.   The Program shall offer products from a variety of manufacturers and a variety of brands within manufacturers' lines.

4.   HUSA shall ensure that Providers and suppliers of hearing aids provide recipients of hearing aids with a limited warranty of three (3) years from date of order of the product. The warranty shall cover defects in materials and workmanship for thirty-six (36) months from date of order and shall include loss and damage replacement; provided, however, that the warranty only includes one loss or damage replacement per hearing aid in the three-year period. HUSA shall ensure that the termination or expiration of this Agreement will not affect the warranties for hearing aids ordered prior to the date of termination or expiration of this Agreement.

5.   HUSA will provide recipients of hearing aids with free batteries for three (3) years after date of order of the hearing aids. HUSA shall ensure that the termination or expiration of this Agreement will not affect a recipient's right to free batteries for three years after date of order of the hearing aid if the aid is ordered prior to the date of termination or expiration of the Agreement.

60
*CONFIDENTIAL*

**EXECUTION COPY**

6.      Subject to any differing requirements under applicable law, rules or regulations, HUSA shall insure that Providers provide recipients of hearing aids with a trial period to use the product. The trial period will be ninety (90) days from date of order of the hearing aid. During the trial period, the recipient may return the product(s) at no charge. During the trial period, the recipient may make unlimited visits to the dispensing office or, if recipient is out of the area of the dispensing office, to another HUSA center or network provider as arranged by HUSA. During the trial period, HUSA will ensure that each hearing aid recipient has access to Aural Rehabilitation services in an approved format (book, DVD, Internet). HUSA shall ensure that the termination or expiration of this Agreement will not affect a recipient's trial period if the recipient ordered the hearing aid prior to the date of termination or expiration of the Agreement.

7.      HUSA shall offer, through its online store (ehearingshop.com), a variety of hearing aid accessories and assistive listening devices; including: (i) hearing aid batteries, (ii) carrying cases, and (iii) amplified telephones. Members will receive a 15% discount off the price of these accessories and devices sold through ehearingshop.com.

8.      Examination Reports. All Members requesting and receiving a hearing examination under the Program may receive a hearing care examination report from the Provider. HUSA shall specify to the Providers the information to be included in such examination reports. A sample of the format of such examination reports is attached hereto as Attachment 1.

9.      Medical Evaluation by Physician. The Program shall include in the test and evaluation protocol specific practice guidelines for determining the need to refer or recommend the Member for medical evaluation by a physician (otolarngologist/Ear Nose & Throat specialist or primary car physician) as appropriate.

10.     HUSA shall ensure that the assessment and rehabilitative protocols among the Provider locations, including HUSA Centers and the HUSA Network, are standardized.

11.     HUSA shall not offer mail order hearing aids.

12.     HUSA and ASI shall cooperate in developing enhancements to the HUSA quality standards and measures for the Program using industry-recognized and best practices criteria and processes.

13.     Provider Contract. HUSA shall submit to ASI's for its written approval the form of contract to be used with HUSA Network Providers. If, during the Term of this Agreement, HUSA wants to modify the form provider contract, HUSA shall submit the modified form to ASI for its written approval before the modified form is used. Any such approval by ASI shall not be unreasonably withheld or delayed.

**EXECUTION COPY**

## ATTACHMENT 1 TO EXHIBIT E

**Sample Audiologic Report**

*CONFIDENTIAL*

# YOUR CLINIC LOGO

## AUDIOLOGIC REPORT

**My Clinic**
555 Main St.
New York, NY 55555
Phone: 555-555-5555
Fax: 555-555-5555

**Patient Name:** Jane Smith
**Birthdate:** 02/11/1970
**Visit Date:** 2/25/2007

**Audiologist:** John Smith, Au.D.
**Title:** Doctor of Audiology



| | |
| AC Unmasked (L) | X |
| BC Unmasked (L) | > |
| AC Masked (L) | □ |
| BC Masked (L) | ] |
| AC Unmasked (R) | O |
| BC Unmasked (R) | < |
| AC Masked (R) | Δ |
| BC Masked (R) | [ |
| BC Binaural | ∧ |
| MCL | M |
| UCL | U |
| Soundfield Unaided | S |
| Soundfield Aided | A |

| CONFIGURATION | |
| --- | --- |
| Audiometer | GSI-61 |
| Calibration | 7/7/2006 |
| Reliability | Good |
| Test Method | Conventional |
| Transducer | |
| Notes | |

| TYMPANOMETRY [226 Hz] | | |
| --- | --- | --- |
| | Right | Left |
| Type | A | A |
| Pressure (daPa) | -25 | -25 |
| Compliance (ml) | 0.8 | 0.7 |
| ECV (ml) | 1.8 | 2.0 |
| Gradient (daPa) | 50 | 50 |
| Width (daPa) | 75 | 110 |

### SPEECH AUDIOMETRY

| | SAT | SRT | Masking | MCL | UCL |
| --- | --- | --- | --- | --- | --- |
| Right | | 30 | | 65 | 105 |
| Left | | 30 | | 65 | 105 |
| Soundfield | | | | | |
| Soundfield Aided | | | | | |

### ACOUSTIC REFLEX

| Stim. Ear | Contra Right | Contra Left | Ipsi Right | Ipsi Left |
| --- | --- | --- | --- | --- |
| 500 | 100 | 100 | 100 | 100 |
| 1000 | 100 | 100 | 100 | 100 |
| 2000 | 105 | 105 | 100 | 105 |
| 4000 | 110 | 110 | 105 | 105 |

### ACOUSTIC REFLEX DECAY

| | | | | |
| --- | --- | --- | --- | --- |
| 500 | Neg | Neg | Neg | Neg |
| 1000 | Neg | Neg | Neg | Neg |

Neg = No significant reflex decay    Pos = Significant reflex decay

| Word List: NU-6 | | | | Presentation: MLV | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| WORD RECOGNITION | | | | | | Unaided SF | | Aided SF | | | |
| | dBHL | % | Mask | dBHL | % | Mask | dBHL | % | dBHL | % | |
| Right | 50 | 88 | | 60 | 100 | 40 | | | | | |
| Left | 50 | 88 | | 60 | 100 | 40 | | | | | |

| PTA | | |
| --- | --- | --- |
| Freqs. | Right | Left |
| 2 | 42.5 | 32.5 |
| 3 | 41.67 | 31.67 |
| 4 | 41.25 | 31.25 |

**HISTORY:** Primary concern: Gradual decrease in hearing sensitivity, bilaterally.  Primary concern: Tinnitus (right ear - intermittent).  Denied any history of noise exposure.  Denied any family history of hearing loss.  Denied any history of ear surgery.  Denied any vertigo.  Denied any history of noise exposure.  Denied any otalgia.

**RESULTS:** Otoscopy: Clear ear canals, bilaterally.  Tympanometry: Normal TM mobility, middle ear pressure, and ear canal volume, bilaterally.   Pure testing testing: Mild to moderate flat sensorineural hearing loss across frequencies, bilaterally.  Significant asymmetry noted from 500 - 8000 Hz with the right ear being worse.  Acoustic

reflex testing (Ipsilateral/Contralateral): Bilateral - Normal.  Acoustic reflex decay testing: Bilateral - Negative (normal). Word Discrimination: Excellent bilaterally.

## RECOMMENDATIONS

1. Follow-up with the referring physician to review today's results.
2. ENT consultation to further determine the etiology of the asymmetric hearing loss.
3. Consider binaural amplification following medical clearance.
4. Wear hearing protection whenever in noisy situations.

Audiologist: _____    Date: _____

EXECUTION COPY

## ATTACHMENT 2 TO EXHIBIT E

HUSA Form Provider Contract

*CONFIDENTIAL*

EXECUTION COPY

# EXHIBIT F

## Performance Standards and Measurements

### Standards and Measurements

1. The Program represents the best overall value that HUSA can offer to AARP members for the bundle of products and services in the Program.

2. Service Level Agreements regarding the Call Center:

    2.1 Inquiry and Appeals Response Time -- HUSA will respond to 90% of all inquiries and appeals within ten (10) calendar days and 99% within thirty (30) calendar days.

    2.2 Escalated Customer Service Response Time -- HUSA will respond to ASI's non-routine and highly visible issues according to its required turnaround time for such issues.

3. Additional Service Level Agreements are contained in the table that follows in this exhibit.


### Measurement Date for the Performance Standards and Measurements

On or before the 31st of March of each year during the Term or at such later date as might be required based upon the availability of the results of the performance standards and measurements (the **"Measurement Date"**), with respect to the preceding calendar year (the first such Measurement Date being March 1, 2010 for the 2009 calendar year), the Parties shall evaluate whether or not HUSA's performance met the standards and measurements for that calendar year.


### Failure to Attain the Performance Standards and Measurements

If, upon evaluation of the Parties as set forth above, HUSA's performance did not meet any of the Performance Standards and Measurements established for a particular calendar year, the Parties agree to collaborate on remedial measures designed to facilitate HUSA's future attainment of those standards and measurements.

CONFIDENTIAL

**EXECUTION COPY**

**HUSA SERVICE LEVELS TABLE**

| Service Category | Performance Indicator | Measurement Definition | Measurement Tool | Reporting and Measurement Period | Service Level | |
|---|---|---|---|---|---|---|
| Answer Time | Call Blockage Rate | Call Blockage Rate measures the number of calls that cannot be connected immediately because (a) no circuit is available when the call arrives or (b) the ACD or network is programmed to block calls from entering the queue when the queue reaches a defined threshold. Call Blockage Rate shall be calculated by dividing the number of calls blocked by the total number of calls offered to the Contact Center (both blocked and connected). | **TBD** | Monthly/Quarterly | <= 1% | |
| Answer Time | Telephone Service Factor or TSF | Telephone Service Factor or TSF measures the amount of time it takes for an inbound call to be answered by a Customer Service Representative ("CSR"). TSF | TBD | Monthly/Quarterly | At least 85% of IVR Calls and Direct Calls are either answered within 30 seconds or are abandoned by the caller | |

*CONFIDENTIAL*

**EXECUTION COPY**

| Service Category | Performance Indicator | Measurement Definition | Measurement Tool | Reporting and Measurement Period | Service Level | |
|---|---|---|---|---|---|---|
| | | shall be calculated as the amount of time, as measured in seconds, that: <br>(i) for calls directed to an Interactive Voice Response ("IVR") unit following the AARP disclaimer announcement ("IVR Calls"), begins when the caller makes the selection on the IVR to speak to a CSR and ends when the CSR answers the call; and <br>(ii) for calls directed to a CSR (i.e. not an IVR) following the AARP disclaimer announcement ("Direct Calls"), begins at the completion of the AARP disclaimer announcement and ends | | | prior to the end of the AARP disclaimer announcement | |

**CONFIDENTIAL**

**EXECUTION COPY**

| Service Category | Performance Indicator | Measurement Definition | Measurement Tool | Reporting and Measurement Period | Service Level | |
|---|---|---|---|---|---|---|
| | | when the CSR answers the call. For avoidance of doubt, TSF will not include: (A) IVR Calls for which the caller does not select an option to speak to a CSR; or (B) abandoned calls measured under the Call Abandon Rate below. | | | | |
| Answer Time | Call Abandon Rate | Call Abandon Rate measures calls that are terminated by the caller prior to reaching a CSR. Call Abandon Rate shall be calculated by dividing: (i) the sum of (A) total number of IVR Calls terminated by the caller after making the selection on the IVR to speak to a CSR and prior to the CSR answering the call, plus (B) the total number of | TBD | Monthly/Quarterly | <= 3% | |

67
*CONFIDENTIAL*

**EXECUTION COPY**

| Service Category | Performance Indicator | Measurement Definition | Measurement Tool | Reporting and Measurement Period | Service Level |
|---|---|---|---|---|---|
| | | Direct Calls terminated by the caller after the AARP disclaimer announcemen t and prior to the CSR answering the call; by (ii) the total number of IVR Calls and Direct Calls. | | | |
| Answer Time | Email Response Time | Email Response Time measures the time it takes for CSR's to respond to emails from consumers. Email Response Time shall be calculated as the time elapsed from (i) the time an email is received by the Contact Center (currently through KANA) and (ii) the time the CSR sends a reply email that is responsive to the question or issue raised by the consumer. In addition, the email system will be designed to automatically generate a reply acknowledgement to the sender. | TBD | Monthly/Quarterly | At least 97% of emails responded to within 3 Business Days |

**CONFIDENTIAL**

EXECUTION COPY

| Service Category | Performance Indicator | Measurement Definition | Measurement Tool | Reporting and Measurement Period | Service Level |
|---|---|---|---|---|---|
| Answer Time | White Mail Response Time | White Mail Response Time measures the time it takes to respond to letters and other paper correspondence from consumers as part of the business reply card (BRC) Services. White Mail Response Time shall be calculated as the time elapsed from (i) the time paper correspondence is received at the Contact Center and (ii) the time that a response, properly addressed to the consumer, is delivered to the U.S. post office (or other ASI or Vendor approved courier) with proper postage for shipment to the customer. | TBD | Monthly/Quarterly | At least 90% of white mail responded to within 5 Business Days and At least 98% of white mail responded to within 7 Business Days |
| Call Handling | First Call Resolution | First Call Resolution measures the percentage of service calls that are resolved by CSR's on the initial call or within one (1) Business Day | TBD | Monthly/Quarterly | At least 95% resolved on the initial call and At least 98% resolved within 1 Business Day |

**CONFIDENTIAL**

EXECUTION COPY

| Service Category | Performance Indicator | Measurement Definition | Measurement Tool | Reporting and Measurement Period | Service Level |
|---|---|---|---|---|---|
| | | after the initial call. Sales calls are not included in this performance measure. First Call Resolution shall be the percentage calculated by dividing: (i) the number of service calls that are resolved by a CSR to the caller's reasonable satisfaction upon the initial call with the CSR or within one (1) Business Day after the initial call with the CSR, by (ii) the total number of service calls received by CSR's during the month. Calls that are warm transferred to Vendor personnel for resolution pursuant to procedures set forth in the Procedures Manual will not be counted; however, HCSG will report on the number of warm | | | after the initial call |

**CONFIDENTIAL**

**EXECUTION COPY**

| Service Category | Performance Indicator | Measurement Definition | Measurement Tool | Reporting and Measurement Period | Service Level |
|---|---|---|---|---|---|
| | | transfers for purposes of trending analysis. | | | |
| | | | | | |
| | | | | | |

71

*CONFIDENTIAL*

EXECUTION COPY

**EXHIBIT G**

**HUSA Reporting Requirements**

(a)     Royalty payment.

(b)     Customer service report –

    (i)     AARP Member utilization of the Program and the imputed savings attributable thereto; and

    (ii)     Aggregate hearing products purchased and the imputed savings attributed thereto.

(c)     Marketing report — HUSA shall report response data associated with direct response activities. Data shall include campaign cost, number of AARP Members participating in the campaign, and, where available, number of Members that were directly contacted. The response data associated with direct response activities shall be provided to the MDW through the established MDW process.

(d)     Member access and satisfaction report as defined by ASI – HUSA shall also provide an electronic report in a format acceptable to ASI, which will identify the Providers and the

    (i)     Utilization of the Program by Members; and

    (ii)     Customer service issues and resolutions, including escalated customer service issues regarding the Program.

(e)     MSQS – HUSA shall provide a representative sample list of Program participants for the annual MSQS as requested by ASI.  ASI will manage the MSQS.

(f)     Network utilization.

(g)     Geographic utilization.

(h)     Buyer profile report, with product trends and demographics.

(i)     Performance Standards and Measurements – HUSA shall provide a report as to whether it has satisfied the performance standards and measurements set forth in Exhibit F.

(j)     Compliance with reporting schedule and review.

Reports will be provided by the 25th business day following the end of the month or quarter, as appropriate.  HUSA shall provide ASI with a monthly report containing the information described in sections (b) through (d) and (f) through (j). HUSA shall provide ASI with a quarterly report containing the information described in section (a).  HUSA

*CONFIDENTIAL*

**EXECUTION COPY**

and ASI will determine the appropriate frequency of the reporting of the information described in section (e).

**CONFIDENTIAL**

**AMENDMENT NO. 1**
**TO THE AARP HEARING CARE PROGRAM SERVICE AGREEMENT**

This Amendment No. 1 to the AARP Hearing Care Program Service Agreement ("**Amendment No. 1**") is entered into by and between AARP, Inc. ("**AARP**"), HearUSA, Inc. ("**HUSA**") and AARP Services, Inc. ("**ASI**") as of the _____ day of August, 2009. (AARP, HUSA and ASI are referred to herein as each a "**Party**" and collectively, the "**Parties.**")

WHEREAS, the Parties entered into the Hearing Care Program Services Agreement, effective August 8, 2008, pursuant to which HUSA is to provide or arrange to provide through HUSA's network of hearing care providers an AARP-branded discount hearing program (the "**Program**") for the benefit of AARP Members (the "**Services Agreement**"); and

WHEREAS, in connection with the Services Agreement, HUSA and AARP entered into the AARP License Agreement, effective August 8, 2008 (the "**License Agreement**"), pursuant to which AARP granted to HUSA a license to use certain of AARP's intellectual property in connection with the Program and HUSA agreed to make certain payments to AARP in consideration of that license; and

WHEREAS, on December 22, 2008, AARP and HUSA amended the License Agreement pursuant to Amendment No. 1 to the AARP License Agreement in order to delete the royalty provision therein and to undertake to negotiate a revised royalty compensation structure mutually agreeable to the parties; and

WHEREAS, contemporaneously with the execution of this Amendment No 1, AARP and HUSA are executing Amendment No. 2 to the AARP License Agreement to set forth the parties mutually agreeable changes to the License Agreement (as amended pursuant to such Amendment and Amendment No. 1 to the License Agreement, the "**Amended License Agreement**"); and

WHEREAS, in connection with the further amendment of the License Agreement, the Parties desire to amend certain terms of the Services Agreement in order to reflect changes in the Program (as amended hereby, the "**Amended Services Agreement**").

NOW THEREFORE, in consideration of the mutual covenants and agreements of the Parties herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to amend the Services Agreement as follows:

1. Section 3.3 shall be deleted and replaced with the following:

3.3 <u>Program Roll Out</u>. Subject to subparagraph (f) below, HUSA shall make the Program available to Members as follows:

   (a)    By the end of 2009, the Program shall be available to Members through all the HUSA Centers and those participating audiologists that are members of the HUSA Network in Florida and New Jersey.

(b)    By the end of 2010, the Program shall be available to Members through those participating audiologists that are members of the HUSA Network in Illinois, Michigan, Pennsylvania, Indiana, Massachusetts, Arizona, Wisconsin, Washington, California, Georgia, Maryland, North Carolina, Virginia, Missouri, New York, Texas and Ohio.

(c)    By the end of 2011, the Program shall be available to Members through a combination of HUSA Centers and participating HUSA Network Providers in all fifty (50) U.S. States, the District of Columbia, and the five U.S. Territories.

(d)    HUSA will use commercially reasonable efforts to achieve the level of availability set forth in Sections 3.3(a), 3.3(b) and 3.3(c) above in less time but will not be deemed in breach of this Section 3.3 so long as the availability set forth in Sections 3.3(a) through (c) is achieved by the dates set forth in Sections 3.3(a), 3.3(b) and 3.3(c).

(e)    The Parties will cooperate with one another and will confer with one another on a quarterly basis to determine ways in which the roll out can be accelerated.

(f)    Notwithstanding the foregoing, the Parties acknowledge that certain state laws and regulations may preclude HUSA from making the Program available in such state in compliance with such laws and regulations. The Parties agree that in the event such laws preclude the Program, HUSA will be relieved from its obligation to make the Program available to Members in that state unless and until provision of the Program in such state is permitted under then applicable law.

2.    Section 3.6 shall be amended as follows:

The reference in Section 3.6(a) to Section 3.3(b) shall be replaced with "Section 3.3".

The following shall be added to Section 3.6:

(d) HUSA shall use commercially reasonable efforts to expand the number of HUSA Network Providers to 5,000 over the term of this Agreement. Once the Program provides Members access to HUSA Network Providers as contemplated in Section 3.3, HUSA shall use commercially reasonable efforts to sustain that number of HUSA Network Providers.

3.    Section 3.10 is amended by deleting references to "calendar year 2009" and substituting "calendar year 2010."

4.    Section 3.11 shall be deleted and in its place shall appear: "Intentionally deleted.".

5.    Section 3.12 shall be deleted and replaced with the following:

2

3.12    <u>HUSA's Annual Marketing Budget</u>. Starting in calendar year 2010 and continuing annually for each calendar year during the Term, HUSA shall commit a minimum of $4.4 million per calendar year as the marketing budget for the Program. For calendar year 2009, HUSA's minimum marketing budget shall be as set forth in a marketing plan for 2009 as shall be reasonably approved by ASI in performing its quality control function.

6.  Section 3.37 shall be deleted and replaced with the following:

HUSA shall maintain a database of all products and manufacturer warranty terms. Upon early termination of this Agreement, HUSA shall provide ASI with a copy of such database in a format mutually agreed to by the Parties.

7.  Section 10.1 shall be deleted and replaced with the following:

10.1    <u>Term</u>. The term of this Amended Services Agreement shall commence on the Effective Date and shall expire at 12:00 midnight, Eastern Time on August 31, 2012, unless this Agreement is terminated earlier in accordance with its terms (the **"Term"**). This Agreement shall automatically terminate upon termination or expiration of the Amended License Agreement.

7.  Section 10.2 shall be deleted and in its place shall appear: "Intentionally deleted.".

8.  Section 10.3 shall be amended as follows:

All references to "ninety (90) days" shall be deleted and "sixty (60) days" shall be substituted therefor.

The following language shall be added to Section 10.3:

A material breach by HUSA shall include, but not be limited to, (i) failure to make the Program available as described in Section 3.3 of this Agreement, (ii) failure to make the marketing budget expenditures as required under Section 3.12 of this Agreement, including allocation of 9.25% of those marketing expenses to the AARP General Program, and (iii) failure to pay the royalties required under Section 4 of the Amended License Agreement.

9.  Exhibit E is amended as set forth in the attached **Exhibit E.**

10. Exhibit G is amended as set forth in the attached **Exhibit G.**

10. Except for the above modifications, all other terms and conditions of the Hearing Care Program Services Agreement shall remain in full force and effect.

[signatures appear on the following page]

3

IN WITNESS WHEREOF, AARP, HUSA and ASI have caused this Amendment to be executed by their duly authorized representatives as Amendment No. 1 to the Services Agreement.

**AARP**

By: _____

Name: Tom Nelson

Title: COO


**HearUSA, Inc.**

By: _____

Name:

Title:


**AARP Services, Inc.**

By: _____

Name:

Title:


4

IN WITNESS WHEREOF, AARP, HUSA and ASI have caused this Amendment to be executed by their duly authorized representatives as Amendment No. 1 to the Services Agreement.

**AARP**

By: _____
Name:
Title:

**HearUSA, Inc.**

By: _____
Name:  STEPHEN J. HANSBROUGH
Title:  CHAIRMAN + CEO

**AARP Services, Inc.**

By: _____
Name:
Title:

4

**EXHIBIT E**

**Program Products and Services**

The Program is to include the following products and services:

1.     The evaluation/consultation fee is to be ninety dollars ($90.00) and shall include the following tests: (i) otoscopy, (ii) air conduction, (iii) bone conduction, (iv) speech audiometry, (v) comfortable listening level, and (vi) uncomfortable listening level.

2.     The hearing aid discount is to include hearing aid, fitting and service:

   (a)     Hearing aids (directional microphones included in all products)

          (i)     Basic:  $1,280.00

          (ii)    Economy:  $1,600.00

          (iii)   Mid-Level:  $1,760.00

          (iv)    Premium:  $2,240.00

          (v)     Ultimate: $2,600

   (b)     Fitting protocol

          (i)     REM/Sound Field

          (ii)    Post-Fitting Assessment

   (c)     Pricing for existing products shall be reviewed and adjusted annually to ensure the competitiveness of the Program.

   (d)     Any new products and the pricing thereof shall be added to the Program quarterly.

3.     The Program shall offer products from a variety of manufacturers and a variety of brands within manufacturers' lines.

4.     HUSA shall ensure that Providers and suppliers of hearing aids provide recipients of hearing aids with a limited warranty of three (3) years from date of order of the product.  The warranty shall cover defects in materials and workmanship for thirty-six (36) months from date of order and shall include loss and damage replacement; provided, however, that the warranty only includes one loss or damage replacement per hearing aid in the three-year period.  HUSA shall ensure that the termination or expiration of this Agreement will not affect the

5

warranties for hearing aids ordered prior to the date of termination or expiration of this Agreement.

5. HUSA will provide recipients of hearing aids with free batteries for three (3) years after date of order of the hearing aids. HUSA shall ensure that the termination or expiration of this Agreement will not affect a recipient's right to free batteries for three years after date of order of the hearing aid if the aid is ordered prior to the date of termination or expiration of the Agreement.

6. Subject to any differing requirements under applicable law, rules or regulations, HUSA shall insure that Providers provide recipients of hearing aids with a ninety (90) day return period. The return period will be ninety (90) days from date of order of the hearing aid. During that period, the recipient may return the product(s) at no charge. During the return period, the recipient may make unlimited visits to the dispensing office or, if recipient is out of the area of the dispensing office, to another HUSA center or network provider as arranged by HUSA. During the return period, HUSA will ensure that each hearing aid recipient has access to Aural Rehabilitation services in an approved format (book, DVD, Internet). HUSA shall ensure that the termination or expiration of this Agreement will not affect a recipient's return period if the recipient ordered the hearing aid prior to the date of termination or expiration of the Agreement.

7. HUSA shall offer, through its online store (ehearingshop.com), a variety of hearing aid accessories and assistive listening devices; including: (i) hearing aid batteries, (ii) carrying cases, and (iii) amplified telephones. Members will receive a 15% discount off the price of these accessories and devices sold through ehearingshop.com.

8. Examination Reports. All Members requesting and receiving a hearing examination under the Program may receive a hearing care examination report from the Provider. HUSA shall specify to the Providers the information to be included in such examination reports. A sample of the format of such examination reports is attached hereto as Attachment 1.

9. Medical Evaluation by Physician. The Program shall include in the test and evaluation protocol specific practice guidelines for determining the need to refer or recommend the Member for medical evaluation by a physician (otolarngologist/Ear Nose & Throat specialist or primary car physician) as appropriate.

10. HUSA shall ensure that the assessment and rehabilitative protocols among the Provider locations, including HUSA Centers and the HUSA Network, are standardized.

11. HUSA shall not offer mail order hearing aids.

12. HUSA and ASI shall cooperate in developing enhancements to the HUSA quality standards and measures for the Program using industry-recognized and best practices criteria and processes.

6

13.    Provider Contract.  HUSA shall submit to ASI's for its written approval the form of
       contract to be used with HUSA Network Providers.  If, during the Term of this
       Agreement, HUSA wants to modify the form provider contract, HUSA shall
       submit the modified form to ASI for its written approval before the modified form
       is used.  Any such approval by ASI shall not be unreasonably withheld or
       delayed.

7

**EXHIBIT G**

**HUSA Reporting Requirements**

(a)     Royalty payment.

(b)     Customer service report –

      (i)     AARP Member utilization of the Program and the imputed savings attributable thereto; and

      (ii)    Aggregate hearing products purchased and the imputed savings attributed thereto.

(c)     Marketing report — HUSA shall report response data associated with direct response activities. Data shall include campaign cost, number of AARP Members participating in the campaign, and, where available, number of Members that were directly contacted. The response data associated with direct response activities shall be provided to the MDW through the established MDW process.

(d)     Member access and satisfaction report as defined by ASI – HUSA shall also provide an electronic report in a format acceptable to ASI, which will identify the Providers and the

      (i)     Utilization of the Program by Members; and

      (ii)    Customer service issues and resolutions, including escalated customer service issues regarding the Program.

(e)     MSQS – HUSA shall provide a representative sample list of Program participants for the annual MSQS as requested by ASI.  ASI will manage the MSQS.

(f)     Network utilization.

(g)     Geographic utilization.

(h)     Buyer profile report, with product trends and demographics.

(i)     Performance Standards and Measurements – HUSA shall provide a report as to whether it has satisfied the performance standards and measurements set forth in Exhibit F.

(j)     Compliance with reporting schedule and review.

(k)     Financial Reports

Reports will be provided by the 25th business day following the end of the month or quarter, as appropriate.  HUSA shall provide ASI with a monthly report containing the information described in sections (b) through (d) and (f) through (k).  HUSA shall provide ASI with a quarterly report containing the information

8

described in section (a). HUSA and ASI will determine the appropriate frequency
of the reporting of the information described in section (e).

**EXHIBIT "C"**

**(Proposed Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 11 Case

HearUSA, Inc., [1]                                  Case No. 11-_____

       Debtor.

_____/

**ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR
AUTHORIZATION TO HONOR LICENSE AND SERVICES AGREEMENTS
<u>WITH AARP IN THE ORDINARY COURSE OF BUSINESS</u>**

     **THIS MATTER** came before the Court on the _____ day of May, 2011 at _____

a.m./p.m. in West Palm Beach, Florida, upon the *Debtor's Emergency Motion for Authorization*

*to Honor License and Services Agreements with AARP in the Ordinary Course of Business* [D.E.

_____] (the "Motion").  The Motion seeks authority to continue to perform under the AARP

License Agreement and the AARP Services Agreement (collectively, the "Agreements"), make

certain payments due under the Agreements, and continue postpetition, in the ordinary course of

---

[1] The address of the Debtor is 1250 Northpoint Parkway, West Palm Beach, Florida 33407; and the last four digits
of the taxpayer identification number of the Debtor are (8248).
3649857-1

business, to honor the Agreements and any obligations thereunder. The Court has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The relief requested in the Motion is in the best interests of the Debtor, its estate, and its creditors. Proper and adequate notice of the Motion and the hearing thereon has been given and that no other or further notice is necessary. Upon review of the record before the Court, good and sufficient cause exists to grant the relief requested. Accordingly, it is

     **ORDERED** as follows:

1.     The Motion is **GRANTED**.

2.     The Debtor is authorized, but not directed, to continue to perform under the AARP License Agreement[2] and the AARP Services Agreement, and continue postpetition, in the ordinary course of business, to perform under those Agreements.

3.     Notwithstanding anything to the contrary herein, any payment to be made hereunder shall be subject to the requirements imposed on the Debtor under any approved debtor-in-possession financing facility, any budget prepared in connection therewith and any order regarding the use of cash collateral.

4.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

# # #

---

[2] Capitalized terms used herein shall have the meanings ascribed to them in the Motion.

2

Submitted by:
Paul Steven Singerman, Esq.
Berger Singerman, P.A.
200 S. Biscayne Boulevard, Suite 1000
Miami, FL 33131
Telephone (305) 755-9500
Facsimile (305) 714-4340
singerman@bergersingerman.com

Copy furnished to:
Paul Steven Singerman, Esq.
*(Attorney Singerman is directed to serve a conformed copy of this Order upon all interested parties, and to file a Certificate of Service with the Court).*