

**ORDERED in the Southern District of Florida on May 19, 2011.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

In re:

HearUSA, Inc.,[1]

              Debtor.

_____/

Chapter 11

Case No. 11-23341-BKC-EPK

**INTERIM ORDER (1) AUTHORIZING POST PETITION FINANCING**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3);**
**(2) AUTHORIZING THE USE OF CASH COLLATERAL; (3) GRANTING**
**SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (4) PROVIDING**
**ADEQUATE PROTECTION; AND (5) GRANTING RELATED RELIEF**

The *Debtor's Motion For Interim And Final Orders Under 11 U.S.C. §§ 361, 362, 363, and*
*364, Fed. R. Bankr. P. 4001(b) and (c), And Local Bankruptcy Rules 4001-2 and 4001-3,*
*(A) Authorizing Debtor To Incur Post Petition Indebtedness, (B) Granting Security Interests and*
*Superpriority Expense Claims, (C) Authorizing Use Of Cash Collateral, and (D) Granting Other*
*Relief* [D.E. # 18] (the "Motion") filed by HearUSA, Inc., debtor and debtor in possession (the
"Debtor") came on for preliminary hearing on May 18, 2011 at 1:00 p.m. (the "Hearing").

---

[1] The address of the Debtor is 1250 Northpoint Parkway, West Palm Beach, Florida 33407; and the last four digits of the
taxpayer identification number of the Debtor are (8248).

3666406-1
3668927-2

Appearances were made as are noted in the record.  Any objections to the relief sought in the Motion were either withdrawn or are hereby overruled.  The Motion seeks the immediate entry of an interim order (the "Interim Order") and asks the Court to schedule a final hearing the ("Final Hearing") to consider granting the relief requested in the Motion on a final basis.

Based on the record before this Court,

**IT IS HEREBY FOUND:**

A.      On May 16, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Court"), thereby commencing this chapter 11 case.  Since the Petition Date, the Debtor has retained possession of its assets and has continued to operate its business as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  It is anticipated that the United States Trustee will shortly appoint an official committee of unsecured creditors (the "Committee").

B.      By the Motion, the Debtor is seeking authorization to incur post-petition indebtedness (the "DIP Financing"), pursuant to the debtor-in-possession credit facility (the "DIP Facility") under that certain "Credit and Security Agreement" dated May 16, 2011 by and among the Debtor, as the Borrower, and William Demant Holding A/S, as lender (the "DIP Lender"), attached hereto as Exhibit A (as it may be modified, supplemented or amended from time to time, the "DIP Credit Agreement", and together with the other Loan Documents, as defined in the DIP Credit Agreement, the "DIP Loan Documents"),[2] and to grant liens, security interests and superpriority claims to the DIP Lender under the terms set forth in this Interim Order.  The Debtor has also requested authorization to use prepetition collateral under its prepetition debt facilities, including cash collateral, and provide adequate protection in respect of the interests of the lenders asserting interests in such collateral.

C.      The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(b) and 1334.  This Interim Order is entered in a "core" proceeding as

---

[2]  Otherwise undefined capitalized terms in this Order have the meanings ascribed to them in the DIP Credit Agreement.

defined in 28 U.S.C. §§ 157(b)(2)(D) and (M).

D.      The Debtor is the obligor under that certain Second Amended and Restated Credit Agreement, dated as of December 30, 2006, among the Debtor, as borrower, and Siemens Hearing Instruments, Inc., as lender (the "Pre-Petition Lender"), as the same heretofore has been amended, amended and restated or otherwise modified ("Pre-Petition Credit Agreement"), as well as the "Loan Documents" as defined in the Pre-Petition Credit Agreement (as each of such agreements and other instruments shall have heretofore been amended, amended and restated or otherwise modified), which include all of the agreements granting security interests and liens in property and assets of the Debtor to the Pre-Petition Lender (collectively, the "Pre-Petition Loan Documents").  The Pre-Petition Credit Agreement and Pre-Petition Loan Documents are collectively referred to herein as "Existing Agreements."  For the avoidance of doubt, the Siemens Supply Agreement (as defined in the APA, which is defined in the DIP Loan Documents) is not included in the term "Existing Agreements."

E.      The Pre-Petition Lender claims that the Existing Agreements provide that (i) the Debtor is obligated under the Pre-Petition Credit Agreement and Pre-Petition Loan Documents for principal, accrued and unpaid interest (including default interest), fees, costs, expenses, indemnities, and other amounts arising under the Pre-Petition Credit Agreement (the "Pre-Petition Obligations"); and (ii) all of the Pre-Petition Obligations are secured by a first priority security interest in all collateral identified in the Pre-Petition Credit Agreement and all other security for the Pre-Petition Obligations as provided in the Existing Agreements immediately prior to the Petition Date ("Pre-Petition Collateral"), which collateral includes cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

F.      As of the Petition Date, the outstanding Pre-Petition Obligations asserted under or in connection with the Pre-Petition Credit Agreement totaled approximately $31.3 million.

G.      The Pre-Petition Lender is entitled, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, to adequate protection of its interests in the Pre-Petition Collateral, including the Cash Collateral.  The Debtor asserts that the Pre-Petition Lender is adequately protected pursuant to

the terms and conditions set forth in this Interim Order.

H.    The Debtor has an immediate need to obtain the DIP Financing in order to permit, among other things, the orderly continuation of the operation of their business, and to maintain business relationships with vendors and suppliers, and to satisfy other working capital needs.  The ability of the Debtor to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtor and its successful reorganization.

I.    The DIP Lender is willing to allow the Debtor to obtain financing under the DIP Loan Facility only upon the following terms and conditions: (a) pending the entry of an order (the "Final Order") authorizing the DIP Financing on a final basis, on the terms set forth in this Interim Order, and (b) subsequent to that, on the terms set forth in a Final Order acceptable to the DIP Lender and consistent with the DIP Facility.

J.    The Debtor is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.    The Debtor is also unable to obtain secured credit allowable under section 364(c)(2) or 364(c)(3) of the Bankruptcy Code, except under the terms and conditions set forth in this Interim Order.

K.    The terms of the DIP Financing (a) have been negotiated in good faith and at arm's length and without collusion between the Debtor and the DIP Lender, and (b) are fair and reasonable under the circumstances and enforceable against the Debtor and reflect the Debtor's exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility, including, without limitation, the DIP Credit Agreement, has been negotiated in good faith and at arm's length among the Debtor and the DIP Lenders, and (iii) any credit extended, loans made and other financial accommodations extended or made to the Debtor by the DIP Lender has been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

L.    The relief requested in the Motion with respect to the DIP Financing is necessary,

essential and appropriate for the continued operations of the Debtor's business and the management and preservation of its property.  It is in the best interest of the Debtor's estates to be allowed to enter into, and perform under, the DIP Credit Agreement.

**Notice**

M.    It appears that the Debtor has served the Motion and notice of the Hearing, in accordance with Federal Rule of Bankruptcy Procedure 4001 (a) - (d) and the applicable local rules of the Court, on the United States Trustee, the Pre-Petition Lenders, the DIP Lender, the twenty (20) largest unsecured creditors in the Debtor's case, other parties with liens or security interests of record, and any party having requested special notice in this Chapter 11 case.

**BASED ON THE FOREGOING, IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1.    The Motion is hereby GRANTED on an interim basis, subject to the terms and conditions set forth in this Interim Order.  Any objections that have not previously been withdrawn are hereby overruled on the merits.

**DIP Financing**

2.    The Debtors are hereby authorized, pending approval of the Motion on a final basis, to immediately borrow, pursuant to the DIP Credit Agreement, an aggregate amount not to exceed the sum of $10,000,000 (the "DIP Loan Amount"), provided that disbursements of such amounts shall not exceed the amounts permitted under the DIP Budget attached to the Motion as <u>Exhibit B</u>, for the period to and including the date set by the Court for the hearing on the entry of the Final Order (the "Interim Period").  The DIP Lender consents to the borrowings of the DIP Loan Amount as necessary to fund all of the proposed disbursements under the DIP Budget.

3.    From and after the Petition Date, the Debtor shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Credit Agreement, and in compliance with the Budget, including, without limitation, upon entry of this Interim Order authorizing and directing the Debtor to pay the Closing Fee and on a weekly basis funding the Reserve for fees and expenses of Professional Persons' accrued but not yet allowed by order of this Court. For the avoidance of doubt, no fees or expenses of Professional Persons shall be

paid out of the Reserve absent any order of the Court allowing such fees and expenses and the payment thereof to Estate Professional Persons.  The Debtor shall provide the same financial reports to the Pre-Petition Lender as the Debtor is required to provide to the DIP Lender under the DIP Loan Documents.

4.    Immediately prior to the Auction (as defined in the APA), the DIP Lender shall fund, and the Debtor shall borrow, the sum of  the amount designated in the Budget as the amount needed to fund the wind down of the Debtor's Chapter 11 case (the "Wind Down Amount") and the Reserve.  The Reserve constitutes funds placed in escrow with Debtor's counsel for the exclusive benefit of the payment of Professional Persons with the approval of the Court.    The Wind Down Amount and the Reserve (a) shall be retained by the Debtor (or Debtor's counsel, with respect to the Reserve), (b) shall be free and clear of all liens, claims and encumbrances in favor of any secured creditor, including the Pre-Petition Lender or the DIP Lender, and (c) shall not be sold and transferred to the Purchaser under the APA.

5.    The terms and conditions of the DIP Financing and the DIP Loan Documents, as modified by this Interim Order, are hereby approved in all respects and made fully enforceable against the Debtor and the DIP Lender.

6.    In furtherance of the foregoing, the Debtor is authorized and directed to do and perform all acts, and to make, execute and deliver all instruments and documents that may be reasonably required or necessary for the Debtor's performance under the DIP Credit Agreement, including, without limitation: the execution, delivery and performance of the DIP Loan Documents and any and all schedules attached thereto; the execution and delivery of one or more waivers, amendments, supplements or modification to the DIP Loan Documents, in each case in such form as the Debtor and the DIP Lender may agree (to the extent such waiver, amendment, supplement or modification is permitted under the terms of the Loan Documents and is not material in the good faith judgment of the Debtor and the DIP Lender, the Debtor and the DIP Lender may execute and deliver such instruments without further approval from the Court); the nonrefundable payment to the DIP Lender of all fees referred to in the DIP Credit Agreement; provided however that Debtor shall

not waive any rights with respect to surcharge of the collateral under the DIP Loan Documents. Any amendment to the DIP Loan Agreements will be filed with the Court.

**Priority and Liens.**

7.     Borrower (as debtor and as debtor in possession) hereby grants to DIP Lender a security interest in all presently existing and hereafter acquired or arising Collateral, including any prepetition accounts, in order to secure prompt repayment of the Obligations and in order to secure prompt performance by Borrower of each and all of its covenants and Obligations under the Loan Documents and otherwise, junior to all validly existing prepetition liens and security interests in the Collateral.

8.     Upon the entry of an Interim DIP Order or a Final DIP order, as appropriate, the Obligations: (a) shall at all times constitute a Super-Priority Administrative Expense having priority, pursuant to sections 364(c)(1) of the Bankruptcy Code, and (b) pursuant to sections 364(c)(2) and (3) and 364(d)(1) of the Bankruptcy Code, shall at all times be secured by a perfected lien (the "DIP Liens") in all of the Collateral and  assets (including proceeds of Avoidance Actions), whether now owned or hereafter acquired of Borrower and their estates, pursuant to the terms of the Loan Documents. The DIP Liens shall be junior to all valid, enforceable, nonavoidable, perfected security interests in existence as of the filing date of the Debtor's Chapter 11 case, including those of the Pre-Petition Lender.

9.     The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code, or (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board or court for any liability of the Debtor, other than the Adequate Protection Liens (hereinafter defined).

**Use of Pre-Petition Collateral; Adequate Protection**

10.     The Debtor hereby is authorized to use Pre-Petition Collateral, including Cash Collateral, but solely in accordance with the terms and conditions set forth in this Interim Order.

11.     Subject to the other provisions of this Interim Order, the continued use of the Pre-Petition Collateral pursuant to this Interim Order shall be conditioned upon the Debtor's compliance with the expense line items in the DIP Budget, including any permitted variances.

12.     The Debtor may use Cash Collateral only to pay reasonable and necessary general operating expenses incurred by the Debtor in the ordinary course of operating its business.

13.     The Pre-Petition Lender hereby is granted the following protections (collectively, the "Adequate Protection Obligations") for any and all decrease, diminution, or decline in the value of the Pre-Petition Collateral from and after the Petition Date caused by or resulting from (i) the use of the Cash Collateral, (ii) the use, sale, or lease of the portion of the Pre-Petition Collateral which does not constitute the Pre-Petition Cash Collateral (the "Pre-Petition Non-Cash Collateral"), (iii) the imposition of the automatic stay by section 362 of the Bankruptcy Code, and (iv) the granting of the Super-Priority Administrative Expense Claim:

   a.     Pursuant to sections 361 and 363(e) of the Bankruptcy Code, effective from the Petition Date, the Pre-Petition Lender shall have a continuing, perfected replacement lien and security interest having the same priority, validity and extent as the Pre-Petition Lender's liens and security interests in the Pre-Petition Collateral (the "Adequate Protection Liens") upon (i) all assets of the Debtor's bankruptcy estate acquired after the Petition Date of the same type and description as the Pre-Petition Collateral (the "Post-Petition Like Kind Collateral") and (ii) all other property of the Debtor's bankruptcy estate that is not Pre-Petition Collateral or Post-Petition Like Kind Collateral (other than Avoidance Actions) (the "Additional Collateral" and, collectively with the Post-Petition Like Kind Collateral, the "Adequate Protection Collateral").  The Adequate Protection Liens on the Post-Petition Like Kind Collateral shall have the same priority, validity and extent as the Pre-Petition Lender's liens and security interests in the Pre-Petition Collateral.  The Adequate Protection Liens on the Additional Collateral shall have the same priority, validity and extent as the Pre-Petition Lender's liens and security interests in the Pre-Petition Collateral and shall  be valid only to the extent that the Pre-Petition Lenders' lien and/or security on the Pre-Petition Collateral is

valid and enforceable and not subject to avoidance and shall only be valid to the extent that the Adequate Protection Liens on the Post-Petition Like Kind Collateral are insufficient to provide complete adequate protection to the Pre-Petition Lenders.

b.    Additionally, the Debtor is authorized to use the Pre-Petition Lender's Cash Collateral derived from all prepetition receivables.  As adequate protection with respect thereto, the Pre-Petition Lender is granted a replacement lien having the same priority, validity and extent as the Pre-Petition Lender's liens and security interests in the Pre-Petition Collateral on all post-petition receivables on dollar-for-dollar basis of the prepetition cash utilized until the Pre-Petition Obligations are paid in full.  The Debtor asserts that the Pre-Petition Lender is being provided further adequate protection in that the full amount of its claim will be paid or escrowed at closing until allowed.

c.    All rights and remedies granted hereby to the DIP Lender  shall at all times be subject to and subordinate to the prior satisfaction of the Pre-Petition Lender's Obligations.  .

**Perfection of Liens**

14.    Neither the DIP Lender nor the Pre-Petition Lender shall be required to file or record any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the respective security interests and liens granted to them pursuant to this Interim Order.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens and the Adequate Protection Liens.  If the DIP Lenders or the Pre-Petition Lender chooses, in its sole discretion, to file a copy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction, the applicable filing or recording official is authorized and directed to file or record this Interim Order for such purpose.

**Events of Default**

15.    Unless the DIP Lender shall have provided its prior written consent or written waiver, or all DIP Obligations shall have been indefeasibly paid in full in cash and the commitments under

the DIP Financing shall have been terminated in whole, each of the following, in addition to the applicable provisions in the DIP Loan Documents, shall constitute an "Event of Default":

a.  the Debtor's failure to obtain entry of a Final Order within thirty (30) days of the entry of this Interim Order;

b.  the issuance of an order staying, reversing, modifying or vacating the Interim Order or the Final Order, as applicable;

c.  a plan of reorganization is proposed which does not provide for termination of the commitment under the DIP Facility and payment in full in cash of the Debtor's obligations thereunder on the effective date of the plan;

d.   with respect to a sale of substantially all of the Debtor's assets, (i) the Debtor's failure to obtain entry of the Bid Procedures Order by June 6, 2011 in a manner acceptable to the DIP Lender, or (ii) the Debtor's failure to obtain approval of an asset sale under Bankruptcy Code section 363 or an alternate transaction that pays off, in full, the DIP Financing in a manner acceptable to the DIP Lender;

e.  the entry of an order dismissing the Debtor's Chapter 11 case, converting the case to chapter 7, or appointing a chapter 11 trustee or an examiner with expanded powers in the case, if such order does not provide for the termination of the DIP Facility and payment in full in cash of all obligations thereunder;

f.  any action by the Debtor, including the filing of an application, in support of any of the foregoing Events of Default, or the failure of the Debtor to contest in good faith any such application filed by a person other than the Debtor;

g.  the breach by the Debtor of any term or provision of this Interim Order or the Final Order, subject to written notice to the Debtor, the Committee (or the top 20 unsecured creditors if no Committee has been appointed) and the United States Trustee, and an opportunity to cure, in each case only to the extent such notice and opportunity to cure are provided for herein;

h.  the acquisition by any post-petition lender to the Debtor of a post-petition security interest in or lien upon any property of the Debtor having parity with or priority over the security

interest and liens in such property held by the DIP Lender (other than a statutory lien arising in the ordinary course of business);

      i.  the automatic stay is lifted with respect to any of the Collateral of the DIP Lender having an aggregate book value in excess of $150,000; or

      j.  the entry of an order of any court that terminates the authority of the Debtor to conduct all or any material part of its business.

16.    In the event of a default under any provision of this Interim Order, the DIP Credit Agreement, or the DIP Loan Documents, and upon filing of a notice by the DIP Lender with the Court providing five calendar  days' notice and served on the Debtor, the Debtor's legal counsel, the Pre-Petition Lender, the Committee (or the top 20 unsecured creditors if no Committee has been appointed) and the United States Trustee ("Default Notice"), the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to exercise the DIP Lender's rights and remedies under this Interim Order, the DIP Facility, the DIP Credit Agreement and the Loan Documents, subject to the rights and remedies of the Pre-Petition Lender with respect to the Debtor and the collateral of the Pre-Petition Lender, and, on the expiration of that five calendar days' notice hereby, automatically terminating the  Debtor's authorization to use borrowings under the DIP Financing and the Debtor shall have no right to use borrowings under the DIP Financing other than toward the satisfaction of the DIP Obligations or claims of the Debtor's employees for unpaid wages and commissions accrued in the ordinary course of the Debtor's business prior to the default (to the extent provided in the DIP Budget).  Such termination is without prejudice to the right of the Debtor to seek an order contesting the Event of Default, and the DIP Lender consents to a hearing for such purpose on such expedited notice as the Court orders. For the avoidance of doubt, electronic notice shall constitute service of the notice of default required hereunder.

### **Preservation of Rights Granted Under This Interim Order**

17.    Except as otherwise specifically provided in this Interim Order, no claim having a priority superior to or *pari passu* with that granted by this Interim Order to the DIP Lender shall be granted while any portion of the DIP Financing (or any refinancing thereof) or the commitment

thereunder, remains outstanding.    The security interest and liens granted to the DIP Lender hereunder shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code.

18.    If an order dismissing this Chapter 11 case is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the claims, liens and security interests granted to the DIP Lender pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all obligations in respect thereof shall have been paid and satisfied in full (and that such claims, liens and security interests shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

19.    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any obligation, indebtedness or liability incurred by the Debtor to the DIP Lenders prior to written notice to the DIP Lender of the effective date of such reversal, stay, modification or vacation, or (ii) the validity and enforceability of any lien or security interest, or priority authorized or created hereby with respect to any such obligation, indebtedness or liability.    Notwithstanding any such reversal, stay, modification or vacation, any indebtedness, obligation or liability incurred by the Debtor to the DIP Lender prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in this Interim Order and pursuant to the DIP Loan Documents with respect to all and such indebtedness, obligation or liability.

20.    The obligations of the Debtor under this Interim Order shall not be discharged by the entry of an order confirming a plan of reorganization in this Chapter 11 case, unless the DIP

Obligations are unconditionally and indefeasibly repaid in full in cash as a condition of the effectiveness of any such plan.

**Miscellaneous**

21.      Nothing in this Interim Order shall prejudice, impair or otherwise impact the rights of the DIP Lender to seek any other or supplemental relief consistent with the provisions of this Interim Order.

22.      If any provision of this Interim Order is hereafter modified, vacated or stayed by a subsequent order of this or any other court for any reason, such modification, vacatur or stay shall not affect the validity of (a) any liability incurred pursuant to this Interim Order prior to the effective date of such modification, vacatur or stay, or (b) the validity, priority, extent or enforceability of any lien or security interest granted hereunder.

23.      The Debtor shall, from time to time, execute and deliver to the DIP Lender any statement, assignment, instrument, document, agreement or other paper and take any other action that the DIP Lender may reasonably request to implement the provisions of this Interim Order.

24.      Other than as expressly permitted hereunder, and subject to the terms of the DIP Facility, no claim having a priority superior to or *pari passu* with those granted by this Order to the DIP Lender shall be granted or permitted by any order of this Court heretofore or hereafter entered in this case, while (i) any amounts remain outstanding under either the DIP Facility (or refinancing thereof), or (ii) the DIP Lender has any commitment under the DIP Facility.  Except as expressly permitted by the DIP Facility, the Debtor will not, at any time during this case, grant mortgages, security interests or liens in the Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

25.      The liens granted to the DIP Lender shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtor or any other party and without the necessity of execution

by the Debtor, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including without limitation the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions.  The granting of the liens on the Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Facility and this Order and except in respect of validly existing duly perfected liens as of the Petition Date.  If the DIP Lender requests that the Debtor execute and deliver to the DIP Lender financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Lender, in accordance with the terms of the DIP Facility, to be reasonably necessary or desirable to further evidence the perfection of the liens granted hereunder, the Debtor is hereby authorized and directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Lender is hereby authorized to file or record such documents,  without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

26.     Without in any way limiting the foregoing paragraph 26, a certified copy of the Interim Order or anyfurther or Final DIP Order may, at the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of the Interim Order or further or Final DIP Order for filing and recording.

27.     Any provision of any lease or other license, contract or other agreement that requires (1) the consent or approval of one or more landlords or other parties or (2) the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post petition Collateral related

thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the transactions granting post petition liens in such leasehold interest, or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lender.

28.    Notwithstanding anything to the contrary in the Motion,  this Interim Order or any further or Final Order, (a) with respect to the liens and security interests granted under this Order, for any real property lease with the Debtor that contains a provision that expressly prohibits a leasehold mortgage or lien thereon, such lien or security interest shall be limited to and shall attach solely to the proceeds of such real property lease; and (b) the provisions of the preceding paragraph 30 shall not (1) render any real property lease unable to be assumed and/or assigned by any Debtor (or by the DIP Lender, as the Debtor's true and lawful agent and attorney-in-fact pursuant to the DIP Facility), or (2) impair, limit or waive the ability or right of (A) the Debtor (or the DIP Lender, as the Debtor's true and lawful agent and attorney-in-fact pursuant to the DIP Facility), to assume and/or assign any real property lease or (B) any lessor to object to such relief on any other grounds, including but not limited to sections 365(b)(3) or 1123 of the Bankruptcy Code.

29.    Nothing contained herein with regard to the Wind Down Budget or Reserve or otherwise is intended to constitute, nor should be construed as consent to, the allowance of any Professional Person's fees, costs or expenses by any party and shall not affect the right of the Debtor and DIP Lender, any Committee, the U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any amounts incurred or requested.  Further, the DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons' fees, costs or expenses in connection with the Chapter 11 case or any successor case and, except as provided in the Budget and nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender, in any way, to pay compensation to or to reimburse expenses of any of the Professional Persons' fees, costs

or expenses, or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement; provided, however, the foregoing shall not excuse the obligation of the DIP Lender to permit the Debtor to borrow funds allocated to the Reserve in accordance with the terms of the DIP Budget.

30.      Section 6.8 of the DIP Credit Agreement shall be modified to read as follows: "**DIP Lender Expenses.**  Borrower shall immediately and without demand reimburse DIP Lender for all reasonable DIP Lender Expenses and Borrower hereby authorizes the payment of such DIP Lender Expenses without the need for further approval of the Bankruptcy Court or any other court having jurisdiction over the Chapter 11 Case and/or the Borrower. In the event of a dispute over whether any DIP Lender Expense is reasonable that cannot be resolved by the parties, such unresolved dispute shall be brought before and subject to the jurisdiction of this Court.

31.      Other than as expressly provided herein, nothing herein shall be deemed a waiver by the Debtor, the Committee, the DIP Lender  or the Pre-Petition Lender of any claim, right or remedy it or they and/or the bankruptcy estate may have.

32.      Following entry of the Interim Order, the Debtor shall, on or before May 23, 2011, provide notice of the Interim Order and the Final Hearing by first-class mail to the Committee (or the top 20 unsecured creditors if no Committee has been appointed), the Pre-Petition Lender, the DIP Lender, the United States Trustee, and all parties requesting special notice or having liens or security interests of record in any assets of the Debtor.

33.      The Final Hearing shall be held before this Court on **May 31, 2011 at 9:30 a.m., United States Bankruptcy Court, 1515 North Flagler Drive, Courtroom   B, West Palm Beach, Florida 33401** or as soon as the parties may be heard.

34.      This Interim Order shall take effect and be fully enforceable immediately upon the Court's execution hereof.

**###**

<u>Submitted by:</u>
Paul Steven Singerman, Esq.
Berger Singerman, P.A.
200 S. Biscayne Boulevard, Suite 1000
Miami, FL 33131
Telephone (305) 755-9500
Facsimile (305) 714-4340
singerman@bergersingerman.com


<u>Copy furnished to:</u>
Paul Steven Singerman, Esq.
*(Attorney Singerman is directed to serve a conformed copy of this Order upon all interested parties, and to file a Certificate of Service with the Court).*

EXHIBIT A

DIP LOAN AGREEMENT

**CREDIT AND SECURITY AGREEMENT**

This CREDIT AND SECURITY AGREEMENT is entered into as of May 16, 2011 (the "Execution Date"), by and among, HearUSA, Inc., a Delaware corporation ("HUSA" or "Borrower") and William Demant Holdings A/S ("DIP Lender"):

WHEREAS, HUSA intends to be a debtor and debtor in possession in a bankruptcy case to be pending under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), to be filed within two business days after the Execution Date (the date in which such bankruptcy case shall be commenced, the "Filing Date") in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "Bankruptcy Court")(the "Chapter 11 Case") and Borrower shall retain possession of its assets and shall be authorized under sections 1107 and 1108 of the Bankruptcy Code to continue the management and operation of its business as a debtor in possession;

WHEREAS, Borrower requested that DIP Lender provide, and the DIP Lender agrees to provide, subject to the terms and conditions hereof, a new debtor-in-possession financing facility to Borrower to provide working capital to the Borrower in an aggregate principal amount up to and including $10,000,000.00;

WHEREAS, DIP Lender or its affiliate has also executed an APA (hereinafter defined) with the Borrower to serve as the "stalking horse" purchaser in connection with a section 363 sale of substantially all of the assets of the Borrower in the Chapter 11 Case and DIP Lender is providing the DIP Loan to accommodate and support such sale process and such "stalking horse" bid;

NOW, THEREFORE, in consideration of these premises and the covenants and agreements contained herein, the parties hereto agree to as follows:

1.   DEFINITIONS, CONSTRUCTION AND RATIFICATION

1.1   **Terms**. As used in this DIP Credit Agreement, the following terms have the following meanings:

(a)   "Account" means (i) any and all post petition accounts receivable, trade accounts and other amounts receivable (including overdue accounts receivable) owed to the Borrower relating to, or arising in connection with the operation and conduct of, the Business from and after the Filing Date and any other rights of the Borrower to payment from third parties arising from and after the Filing Date, including, but not limited to, those reflected in the books and records of HUSA, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of services rendered, in each case owing to the Borrower from and after the Filing Date; (ii) all other accounts or notes receivable of the Borrower arising from and after the Filing Date and the full benefit of all security for such accounts or notes receivable arising in the conduct of the Business; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon, in each case existing on the Execution Date or arising in the ordinary course of business after the Execution Date and in each case that have not been satisfied or discharged prior to the close of business on the day

immediately preceding the Filing Date or have not been written off or sent to collection prior to the close of business on the day immediately preceding the Filing Date (it being understood that the receipt of a check prior to the close of business on the day immediately preceding the Filing Date shall constitute satisfaction or discharge of the applicable account or note receivable to the extent of the payment represented thereby). No PrePetition Collateral shall be included in this definition of the term "Account."

(b)    "Advances" means all loans, advances and other financial accommodations by DIP Lender to or on account of Borrower under **Section 2.1** hereof.

(c)    "APA" means the Asset Purchase Agreement entered into contemporaneously or prior to the execution of this DIP Credit Agreement by the DIP Lender or its affiliate, subsidiary or designee established for such purpose, William Demant Holdings A/S, as guarantor, the Borrower and Auxiliary Health Corporation ("Auxiliary Health") for the purchase of substantially all of the Borrower's assets and Auxiliary Health's assets and to serve as the stalking horse bidder under the section 363 sale proposed by the Borrower in the Chapter 11 Case.

(d)    "Authorized Officer" means any officer or other representative of Borrower authorized in a writing delivered to DIP Lender to transact business with DIP Lender.

(e)    "Avoidance Actions" means recoveries from, or settlements of, actions commenced by Borrower's bankruptcy estate under chapter 5 of the Bankruptcy Code.

(f)    "Bankruptcy Code" means chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*

(g)    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division, or such other court having jurisdiction over the Chapter 11 Case.

(h)    "Borrower's Books" means all of Borrower's books and records including all of the following: ledgers; records indicating, summarizing, or evidencing Borrower's assets or liabilities, or the Collateral; all information relating to Borrower's business operations or financial condition; and all computer programs, disk or tape files, printouts, runs, or other computer prepared information, and the facilities containing such information, but specifically excluding Borrower's corporate minute books, stock ledgers and the like.

(i)    "Borrower Professional Expense Reserve" means on any date, an amount (in each case excluding security retainers provided by Borrower to Professionals prior to the date hereof) set forth for Professional Expenses in the Budget, but in no event shall such amount exceed the aggregate amount set forth in the Budget.

(j)    "Business Day" means any day, excluding Saturday, Sunday and any other day on which commercial banks in New York are authorized or required by law to close.

3635404-9

(k)     "Budget" means the budget agreed to by the Borrower and the DIP Lender (and as amended, from time to time, with the consent of Borrower and the DIP Lender), a copy of which is attached as **Schedule 2.1**.

(l)     "Chapter 11 Case" means, collectively, Borrower's cases under chapter 11 of the Bankruptcy Code, to be commenced in the Bankruptcy Court within two business days after the Execution Date.

(m)     "Chattel Paper" shall have the same meaning ascribed to such term in the Code.

(n)     "Code" means the Florida Uniform Commercial Code, as amended or revised from time to time.

(o)     "Collateral" means and shall include, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, a fully perfected security interest in substantially all of the existing and after-acquired real property and personal, tangible and intangible, assets of the Company including, without limitation, all cash, cash equivalents, bank deposit and securities accounts, Accounts, other receivables, Chattel Paper, contract rights, Inventory, instruments, documents, securities (whether or not marketable), Equipment, fixtures, real property interests, franchise rights, general intangibles, Avoidance Actions (to the extent permitted in the Final DIP Order), investment property, supporting obligations, tax refunds, securities, franchise rights, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, patents, tradenames, trademarks, copyrights, intellectual property and all substitutions, accessions and proceeds of such intellectual property, wherever located, including insurance or other proceeds; but expressly excluding Avoidance Actions and any proceeds with respect to such Avoidance Actions (unless expressly permitted in the Final DIP Order). Notwithstanding the foregoing, the Borrower will not be required to grant leasehold mortgages on their leased property, but the Interim DIP Order and Final DIP Order will grant a security interest in any proceeds of leases and other real property.

(p)     "Committee Professional Expense Reserve" means on any date, the applicable amount per week set forth in the Budget (effective as of Monday or first business day of each week), multiplied by the number of Mondays that have elapsed from the date of this Agreement through the date of determination, minus the amount of allowed Professional Expenses paid during such period to Professional Persons retained by the Committee, but in no event shall such amount exceed the aggregate amount provided therefor in the Budget.

(q)     "Deposit Account" shall have the meaning ascribed to such term in the Code.

(r)     "DIP Credit Agreement" means this Credit and Security Agreement, by and among HUSA and the DIP Lender and any extensions, supplements, amendments, addenda or modifications to or in connection with this DIP Credit Agreement.

(s)     "DIP Lender" means William Demant Holdings A/S, its successors and assigns.

-3-

(t)    "DIP Lender Expenses" means all of the following:  costs and expenses (whether taxes, assessments, insurance premiums or otherwise) required to be paid by Borrower under any of the Loan Documents which are paid or advanced by DIP Lender; filing, recording, publication, appraisal and search fees paid or incurred by DIP Lender in connection with DIP Lender's transactions with Borrower; costs and expenses incurred by DIP Lender in the disbursement or collection of funds to or from Borrower; charges resulting from the dishonor of checks; costs and expenses incurred by DIP Lender to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated; and costs and expenses incurred by DIP Lender in enforcing or defending the Loan Documents, including, but not limited to, costs and expenses incurred in connection with any proceeding, suit, enforcement of judgment, or appeal; and DIP Lender's reasonable attorneys' fees and expenses (which will include reasonable outside counsel fees and expenses) incurred in amending, terminating, enforcing, defending, or otherwise representing DIP Lender post petition concerning the Loan Documents or the Obligations; but expressly excluding the "Expense Reimbursement" under the APA and any costs and expenses (including, without limitation, any legal, accounting or other fees and expenses) incurred by the DIP Lender or its affiliate(s) in connection with the negotiation of, due diligence with respect to, and the consummation of, the transaction contemplated by the APA.

(u)    "DIP Loan" means the loan, in the aggregate amount up to $10,000,000.00 including but not limited to borrowings, interest due on the DIP Loan and the DIP Lender Expenses, which is made by the DIP Lender to the Borrower, as evidenced by this DIP Credit Agreement and the other Loan Documents.

(v)    "DIP Order" means any Interim DIP Order or Final DIP Order, as applicable, in form and substance satisfactory to the DIP Lender approving the DIP Credit Agreement and authorizing the Borrower's incurrence of post petition secured and super priority debtor in possession financing, subject to the liens and security interests of the First Lien Lender.

(w)    "Documents" means all of Borrower's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case, whether or not in electronic form.

(x)    "Encumbrance" means any lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

-4-

(y) "Equipment" means all equipment, machinery, vehicles, furniture, fixtures, supplies and other tangible personal property of every kind and description used, or held for use, in connection with the operation of the Borrower's business and owned by Borrower, wherever located, and including all warranties of the vendor applicable thereto, to the extent such warranties are transferable, but excluding software and any other intangibles associated therewith except to the extent embedded in such Equipment and required to operate it.

(z) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

(aa) "ERISA Affiliate" means any entity which is, or at any relevant time was, a member of (A) a controlled group of corporations (as defined in section 414(b) of the Code), (B) a group of trades or businesses under common control (as defined in section 414(c) of the Code), (C) an affiliated service group (as defined under section 414(m) of the Code) or (D) any group specified in regulations under section 414(o) of the Code, any of which includes or included Borrower.

(bb) "Event of Default" means the events specified in **Section 8**, below.

(cc) "Financial Assets" shall have the meaning ascribed to such term in the Code.

(dd) "Final DIP Order" means the order, in a form consented to by the DIP Lender in its sole discretion, authorizing, inter alia, the granting of credit by DIP Lender to Borrower on a permanent basis authorizing the Borrower as post petition secured and super priority debtor in possession financing .

(ee) "Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in Borrower's Chapter 11 Case or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari,* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

(ff) "First Lien Credit Agreement" means that certain Second Amended and Restated Credit Agreement, dated as of December 30, 2006, among HUSA, as borrower, and the First Lien Lender, as lender, as such agreement has been amended, modified and supplemented from time to time.

(gg)    "First Lien Lender" means Siemens Hearing Instruments, Inc. and its successors and assigns.

(hh)    "First Lien Loan Documents" means the "Loan Documents" as defined in the First Lien Credit Agreement, as such Loan Documents are amended, modified, supplemented or restated from time to time.

(ii)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(jj)    "General Intangibles" means in addition to the definition of general intangibles in the Code all of Borrower's present and future general intangibles and other personal property (including choses or things in action, goodwill, patents, trade names; trademarks, service marks, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds (other than "trust funds"), route lists, infringement claims, computer programs, computer discs, computer tapes, Borrower's Books, literature, reports, catalogs, deposit accounts, insurance premium rebates, tax refunds, and tax refund claims) other than goods and Accounts. However, the term "General Intangibles" shall not include Avoidance Actions.

(kk)    "Insolvency Proceeding" means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code, as amended, or under any other state or federal insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with its creditors.

(ll)    "Instruments" shall have the meaning ascribed to such term in the Code.

(mm)    Interim DIP Order" means the order, that is consented to by the DIP Lender in its sole discretion, authorizing, inter alia, the granting of credit by DIP Lender to Borrower on a permanent basis authorizing to the Borrower as post petition secured and super priority debtor in possession financing; but without any use by the Borrower of any cash collateral of the First Lien Lender.

(nn)    "Interim Period" means the period commencing on the date that the Interim DIP Order is entered by the Court and ending on the date that the Final DIP Order is entered by the Court.

(oo)    "Inventory" means in addition to the definition of inventory in the Code all present and future inventory in which Borrower has any interest, including goods held for sale or lease or to be furnished under a contract of service, Borrower's present and future raw materials, work in process, finished goods, tangible property, stock in trade, wares, and materials used in or consumed in Borrower's business, goods which have been returned to, repossessed by, or stopped in transit by Borrower, packing and shipping materials, wherever located, any documents of title representing any of the above, and Borrower's Books relating to any of the foregoing.

(pp)    "Investment Property" shall have the meaning ascribed to such term in the Code.

-6-

(qq)    "IRC" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

(rr)    "Letter of Credit Rights" shall have the meaning ascribed to such term in the Code.

(ss)    "Loan Documents" means, collectively, this DIP Credit Agreement, any Note, Interim DIP Order, Final DIP Order, security agreement, pledge agreement, mortgage, deed of trust or any other encumbrance or agreement which secure the Obligations, and any other agreement entered into between Borrower and DIP Lender or by Borrower for the benefit of DIP Lender relating to or in connection with this DIP Credit Agreement or the Obligations, as each of same may be amended, modified, extended or substituted from time to time.

(tt)    "Multiemployer Plan" means a multiemployer plan as defined in ERISA sections 3(37) or 4001(a)(3) or IRC section 414(f).

(uu)    "Negotiable Collateral" means all of Borrower's present and future letters of credit, notes, drafts, instruments, documents, leases, and Chattel Paper.

(vv)    "Note" means any promissory note made by Borrower to the order of DIP Lender concurrently herewith or at any time hereafter.

(ww)    "Obligations" means all loans, advances, debts, liabilities (including all interest and amounts charged to the Obligations pursuant to any agreement authorizing DIP Lender to charge the Obligations), obligations, lease payments, guaranties, covenants, and duties owing by Borrower to DIP Lender of any kind and description (whether Prepetition Obligations or incurred thereafter and whether pursuant to or evidenced by the Loan Documents or by any other agreement between DIP Lender and Borrower, and irrespective of whether for the payment of money), whether made or incurred prior to, on, or after the Termination Date, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including any debt, liability or obligation owing from Borrower to others which DIP Lender may obtain by assignment or otherwise, all interest thereon and all DIP Lender Expenses.

(xx)    "Plan" means any plan described in ERISA section 3(2) maintained for employees of Borrower or any ERISA Affiliate, other than a Multiemployer Plan.

(yy)    "PrePetition Collateral" means any collateral encumbered by the liens evidenced by the First Lien Loan Documents arising prior to the Filing Date.

(zz)    "Prime Rate" means that rate designated in the "Money Section" of the Wall Street Journal on the business day prior to the date in question or any successor thereof, from time to time as its prime rate, which shall not necessarily constitute its lowest available rate.

(aaa)    "Professional Expenses" means the fees and reimbursable expenses of a Professional Person.

(bbb)    "Professional Expense Reserve" means the collective reference to (i) the Borrower's Professional Expense Reserve, (ii) the Committee's Professional Expense Reserve

and (iii) the other reserves for the payment of Professional Persons, in each case, as set forth in the Budget.

(ccc)   "<u>Professional Person</u>" means a Person who is an attorney, accountant, investment banker, appraiser, auctioneer or other professional person and who is retained, with Court approval, by (i) Borrower pursuant to Section 327 of the Bankruptcy Code or (ii) a Committee pursuant to Section 1103(a) of the Bankruptcy Code.

(ddd)   "<u>Reserve</u>" means an amount, for the exclusive benefit of the Professional Persons and the U.S. Trustee, equal to the sum of (a) the Professional Expense Reserve and (b) an amount equal to all claims for the fees and expenses of the Clerk of the Court and fees of the United States Trustee if not paid within five days of the due date.

(eee)   "<u>Super-Priority Administrative Expense</u>" means a claim against Borrower or its estate in its Case which is an administrative expense claim having priority over (i) any and all allowed administrative expenses and (ii) unsecured claims now existing or hereafter arising, including, without limitation, administrative expenses of the kind specified in section 503(b), 506(c) or 507(b) of the Bankruptcy Code.

(fff)   "<u>Supporting Obligation</u>" shall have the meaning ascribed to such term in the Code.

(ggg)   "<u>Term</u>" means the period from the date of the execution and delivery by DIP Lender of this DIP Credit Agreement through and including the earlier of (a) the closing of the sale contemplated by the APA and (b) the closing of any higher and better bid approved by the Bankruptcy Court and (c) to and including 120 days following the entry of the first Interim DIP Order. Once the DIP Loan is repaid it is terminated and unavailable.

(hhh)   "<u>Wind Down Amount</u>" shall have meaning set forth in **Section 2.1**.

1.2     **Construction.** Unless the context of this DIP Credit Agreement clearly requires otherwise, references to the plural include the singular and to the singular include the plural. The words *hereof, herein, hereby, hereunder,* and similar terms in this DIP Credit Agreement refer to this DIP Credit Agreement as a whole and not to any particular provision of this DIP Credit Agreement, section, subsection, clause and exhibit references are to this DIP Credit Agreement unless otherwise specified. Words importing a particular gender mean and include every other gender.

1.3     **Accounting Terms.** All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles (GAAP) as in effect from time to time. When used herein, the term financial statements shall include the notes and schedules thereto.

1.4     **Exhibits.** All of the exhibits, addenda or riders attached to this DIP Credit Agreement shall be deemed incorporated herein by reference.

1.5     **Code.** Any terms used in this DIP Credit Agreement which are defined in the Code shall be construed and defined as set forth in the Code, unless otherwise defined herein.

2.    ADVANCES AND TERMS OF PAYMENT

    2.1   **Advances.**  Upon the request of Borrower, Advances under the DIP Loan will be used, in accordance with the terms of the Budget attached as **Schedule 2.1**, (i) to pay expenses described in the Budget during the Interim Period and, after the Interim Period, to pay any expenses described in the Final DIP Order; (ii) to pay adequate protection claims, but only to the extent authorized by the Bankruptcy Court and consented to by DIP Lender; (iii) to pay, on a weekly basis, fees required to be paid to the office of the U.S. Trustee; (iv) to pay, on a weekly basis, Professional Expenses of Professional Persons subject to any limitations in the Interim DIP Order, the Final DIP Order, allowance by the Court and Borrower's receipt of an itemized billing and expense statement from such Professional Person; (v) to pay property taxes with respect to any Collateral to the extent nonpayment thereof is secured by a Lien senior to DIP Lender's Liens thereon; (vi) to fund the Reserve, on a weekly basis, as provided in the Interim DIP Order and the Final DIP Order; and (vii) to pay other expenses authorized by the Bankruptcy Court in orders entered in the Chapter 11 Case that are acceptable to DIP Lender; including to pay transaction costs, fees and expenses under the DIP Loan, on the entry of an Interim DIP Order approving this DIP Credit Agreement on an interim basis solely up to the interim amount agreed to by the DIP Lender under the Budget for ordinary operating expenses and other expenses described above during the period authorized under the Interim DIP Order and, further, under a Final DIP Order, the lesser of the amount permitted under the Budget and up to and including Ten Million Dollars ($10,000,000.00). DIP Lender shall fund the Reserve on a weekly basis in accordance with the Budget. Notwithstanding the foregoing, immediately prior to the Auction (as defined in the APA), the DIP Lender shall fund, and the Borrower shall borrow, the sum of (i) the amount designated in the Budget as the amount needed to fund the wind down of the Chapter 11 Case (the "Wind Down Amount") and (ii) for the exclusive benefit of the Professional Persons and the U.S. Trustee to be held by Borrower's counsel in escrow, the Reserve. The Reserve and the Wind Down Amount (a) shall be retained by Borrower (or Borrower's counsel in escrow with respect to the Reserve), (b) shall be free and clear of all liens, claims and encumbrances in favor of the First Lien Lender or the DIP Lender and (c) shall not be sold and transferred to the Purchaser under the APA.

    2.2   **Authorization to Make Advances.**  DIP Lender is hereby authorized, on entry of an Interim DIP Order or Final DIP Order to make the Advances based upon telephonic or other instructions received from anyone purporting to be an Authorized Officer. All requests for Advances shall specify the date on which such Advance is to be made (which day shall be a Business Day) and the amount of such Advance. Requests received after 12:00 p.m. Eastern time on any day shall be deemed to have been made as of the opening of business on the immediately following Business Day. All Advances made under this DIP Credit Agreement shall be conclusively presumed to have been made to, at the request of, and for the benefit of Borrower when deposited to the credit of Borrower or otherwise disbursed in accordance with the instructions of Borrower or in accordance with the terms and conditions of this DIP Credit Agreement. Unless otherwise requested by Borrower, all Advances shall be made by a wire transfer to the deposit account of Borrower designated on **Schedule 2.2** annexed hereto, or such other account as Borrower shall notify DIP Lender in writing. Borrower shall pay to DIP Lender a funds transfer fee of $25.00 for each Advance. Said fees shall be payable on the first day of each month of the Term for all Advances made during the preceding month.

2.3     **Interest**.

(a)     Except where specified to the contrary in the Loan Documents, the aggregate outstanding balances of the Obligations shall accrue interest at the per annum rate of four percentage points (4%) above the Prime Rate. The Obligations shall bear interest from and after written notice by DIP Lender to Borrower of the occurrence of an Event of Default, and without constituting a waiver of any such Event of Default, at the per annum rate of two percentage points (2%) above the highest interest rate before an Event of Default. All interest payable under the DIP Loan shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed. Interest as provided for herein shall continue to accrue until the Obligations are paid in full.

(b)     The interest rate payable by Borrower under the terms of this DIP Credit Agreement shall be adjusted in accordance with any change in the Prime Rate from time to time on the date of any such change. No payments of interest or principal shall be due and payable prior to the expiration of the Term of the DIP Loan and DIP Lender shall add such accrued interest and all DIP Lender Expenses to the Obligations, and such amount shall thereafter accrue interest at the rate then applicable under this DIP Credit Agreement.

(c)     In no event shall interest on the Obligations exceed the highest lawful rate in effect from time to time. It is not the intention of the parties hereto to make an agreement which violates any applicable state or federal usury laws. In no event shall Borrower pay or DIP Lender accept or charge any interest which, together with any other charges upon the principal or any portion thereof, exceeds the maximum lawful rate of interest allowable under any applicable state or federal usury laws. Should any provision of this DIP Credit Agreement or any existing or future Notes or Loan Documents between the parties be construed to require the payment of interest or any other fees or charges which could be construed as interest which, together with any other charges upon the principal or any portion thereof and any other fees or charges which could be construed as interest, exceeds the maximum lawful rate of interest, then any such excess shall be applied to the remaining principal balance of the Obligations, if any, and the remainder refunded to Borrower.

(d)     Notwithstanding the foregoing, for purposes of this DIP Credit Agreement, it is the intention of Borrower and DIP Lender that "interest" shall mean, and be limited to, any payment to DIP Lender which compensates it for extending credit to Borrower, for making available to Borrower a line of credit during the term of this DIP Credit Agreement and for any default or breach by Borrower of a condition upon which credit was extended. Borrower and DIP Lender agree that, for the sole purpose of calculating the "interest" paid by Borrower to DIP Lender, it is the intention of Borrower and DIP Lender that interest shall mean and include, and be expressly limited to, any interest accrued on the aggregate outstanding balance of the Obligations during the term hereof. Borrower and DIP Lender further agree that it is their intention that the following fees shall not constitute "interest": any attorney fees incurred by DIP Lender, any premiums or commissions attributable to insurance guaranteeing repayment, finders' fees, credit report fees, appraisal fees or fees for document preparation or notarization. To the extent, however, that governing law excludes from the calculation of "interest" any fees defined herein as interest, or includes as interest any fees or other sums which are intended not to

-10-

constitute interest governing law shall supersede and prevail and all such interest shall be subject to **Section 2.3(c)** above.

      2.4    **Collection of Accounts.** DIP Lender or a DIP Lender designee may, at any time during the existence of an Event of Default (but subject to the terms of any Interim DIP Order and Final DIP Order), with or without notice to Borrower, notify customers or Account debtors that the Accounts have been assigned to DIP Lender, and that DIP Lender has a security interest in them and collect the Accounts directly, and add the collection costs and expenses to the Obligations. During the existence of an Event of Default, at the request of the DIP Lender, Borrower shall notify all Account debtors to remit payments on Accounts to a lockbox to be designated by DIP Lender. All such payments remitted to the lockbox shall be credited to a deposit account of DIP Lender and into which account remittances from account debtors of other clients of DIP Lender may be credited. If during the existence of an Event of Default, notwithstanding said notice Borrower obtains payment on any Account, Borrower shall receive all payments on Accounts and other proceeds, including cash, of Collateral in trust for DIP Lender and immediately deliver said payments to DIP Lender in their original form as received from the Account debtor, together with any necessary endorsements. Notwithstanding the receipt by DIP Lender or a DIP Lender designee of any proceeds of any Accounts during an Event of Default or otherwise or such lockbox arrangement for the payment of proceeds of the Accounts for the benefit of the DIP Lender during the existence of an Event of Default, in either case, in the event the DIP Lender has not properly terminated the Term of the DIP Loan, then, the DIP Lender shall disburse to Borrower, at the request of Borrower, to fund the working capital needs of the Borrower in accordance with the Budget, any and all proceeds of any Account received by DIP Lender.

      2.5    **Use by Borrower of Receipts.** The receipt of any item of payment by DIP Lender from any Person other than Borrower shall be provided to Borrower for use in the funding of Borrower's working capital expenses as described in the Budget. Any prepayment by Borrower of the DIP Loan shall be applied to the outstanding balance of the DIP Loan without penalty. Notwithstanding anything to the contrary contained herein, payments received by DIP Lender after 12:00 p.m. Eastern time shall be deemed to have been received by DIP Lender as of the opening of business on the immediately following Business Day.

      2.6    **Closing Fee.** In consideration of DIP Lender entering into this DIP Credit Agreement, Borrower shall pay DIP Lender a closing fee of two percent (2%) of the DIP Loan, which shall be paid simultaneous with the first Advance made following the entry of the Interim DIP Order.

      2.7    **Monthly Statements.** DIP Lender shall render monthly statements to Borrower of all Obligations, including statements of all principal, interest and DIP Lender Expenses, and Borrower shall have fully and irrevocably waived all objections to such statements and the contents thereof unless, within thirty (30) days after receipt, Borrower shall deliver to DIP Lender, by email (to the email address provided by DIP Lender to Borrower), registered, certified or overnight mail as set forth in **Section 12** hereof, written objection to such statement specifying the error or errors, if any, contained therein.

2.8 **No Right To Reborrow**. The DIP Loan is not a revolving credit facility. The aggregate amount of all Advances made by the DIP Lender under this DIP Credit Agreement shall not at anytime exceed the lesser of the maximum amount provided for in the Budget from time to time and $10,000,000; provided however that DIP Lender shall provide to Borrower and Borrower shall be entitled to use, 100% of the funds received by DIP Lender (or its designee) or Borrower from any Account or otherwise and the release of such funds by DIP Lender to Borrower (or the use of such funds by Borrower) shall not be included in the calculation of the $10,000,000 DIP Loan amount. Any amounts repaid hereunder may not be reborrowed at any time.

2.9 **Use of Cash Collateral; Adequate Protection Liens and Relative Priorities.** Notwithstanding anything to the contrary set forth in this Agreement, Borrower shall have the right to use 100% of the proceeds of any and all Accounts (regardless of whether such proceeds are received by DIP Lender, its designee or Borrower) to fund the working capital needs of Borrower as described in the Budget, in addition to the amounts funded by DIP Lender to Borrower under the DIP Loan. The DIP Order shall provide that (i) the First Lien Lender shall be granted first priority, perfected replacement lien covering the Accounts to secure the indebtedness owing under the First Lien Loan Documents and (ii) the DIP Lender shall be granted a junior perfected lien on such Accounts to secure the DIP Loan, subject only to the first lien granted to the First Lien Lender described in clause (i) above.

3. TERM

3.1 **Term.** This DIP Credit Agreement shall become effective upon execution by DIP Lender and continue in full force through the Term. This DIP Credit Agreement may be extended by mutual written agreement of the parties on mutually agreeable terms. In addition, DIP Lender shall have the right to terminate the Term of this DIP Credit Agreement immediately at any time upon the occurrence of an Event of Default by sending written notice of termination to Borrower. No such termination shall relieve or discharge Borrower of its duties, Obligations and covenants hereunder until all Obligations have been paid and performed in full, and DIP Lender's continuing security interest in the Collateral shall remain in effect until the Obligations have been fully and irrevocably paid and satisfied in cash or cash equivalent. Following the termination of the Term of this DIP Credit Agreement, the Obligations shall be immediately due and payable in full. In the event DIP Lender or its affiliate closes the acquisition contemplated by the APA, then, following the disbursement by the DIP Lender to Borrower prior to the Auction of the Wind Down Amount and, to Borrower's counsel, the Reserve which disbursement is described in the last sentence of **Section 2.1**, all Obligations under this DIP Credit Agreement shall be automatically paid in full at the closing under such APA and the DIP Lender shall release all liens and security interests granted in connection with the DIP Loan.

3.2 **Interim DIP Order**. Prior to making Advances, the Bankruptcy Court shall have entered an Interim DIP Order or a Final DIP Order, as appropriate, and the applicable order shall be in full force and effect and shall not have been amended, modified, stayed or reversed.

4. CREATION OF CONTINUING SECURITY INTEREST

4.1 **Grant of Security Interest.** Borrower (as debtor and as debtor in possession) hereby grants to DIP Lender a security interest in all presently existing and hereafter acquired or

-12-

arising Collateral, which is subject and junior to any and all validly existing prepetition liens and security interests in the Collateral, including without limitation, the liens and security interests of the First Lien Lender, in order to secure prompt repayment of the Obligations and in order to secure prompt performance by Borrower of each and all of its covenants and Obligations under the Loan Documents and otherwise.

      4.2    **Negotiable Collateral.** In the event that any Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, Borrower shall notify DIP Lender and upon the request of DIP Lender, immediately endorse and assign such Negotiable Collateral to DIP Lender and deliver physical possession of such Negotiable Collateral to DIP Lender.

      4.3    **Delivery of Additional Documentation Required.** Borrower shall execute and deliver to DIP Lender concurrently with Borrower's execution and delivery of this DIP Credit Agreement and at any time thereafter at the request of DIP Lender, all financing statements, continuation financing statements, fixture filings, security agreements, chattel mortgages, pledges, assignments, endorsements of certificates of title, applications for title, affidavits, reports, notices, schedules of accounts, letters of authority, and all other documents that DIP Lender may request, in form satisfactory to DIP Lender, to perfect and maintain perfected DIP Lender's continuing security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents and Borrower hereby authorizes DIP Lender to file and/or record such financing statements and other documents as DIP Lender deems necessary to perfect and maintain DIP Lender's continuing security interest in the Collateral, and agrees any such financing statement may contain an "all asset" or "all property" description of the Collateral, and Borrower hereby ratifies any such financing statement or other document heretofore filed by DIP Lender. The documentation of the DIP Loan and any Interim DIP Order and Final DIP Order shall be reasonably satisfactory to the DIP Lender.

      4.4    **Power of Attorney.** Borrower hereby irrevocably makes, constitutes and appoints DIP Lender (and any person designated by DIP Lender) as Borrower's true and lawful attorney-in-fact with power to sign the name of Borrower on any of the above described documents or on any other similar documents to be executed, recorded or filed in order to perfect or continue perfected DIP Lender's continuing security interest in the Collateral, subject however to the rights of the First Lien Lender in and to the PrePetition Collateral. In addition, subject to the rights of the First Lien Lender in the PrePetition Collateral, Borrower hereby appoints DIP Lender (and any person designated by DIP Lender) as Borrower's attorney-in-fact with power to: (a) sign Borrower's name on verifications of Accounts, on other Collateral and, subject to **Section 2.5** hereof, on notices to Account debtors; (b) send requests for verification of Accounts and other Collateral; (c) endorse Borrower's name on any checks, notes, acceptances, money orders, drafts or other forms of payment or security that may come into DIP Lender's possession; (d) upon the occurrence of an Event of Default notify the post office authorities to change the address for delivery of Borrower's mail to an address designated by DIP Lender, to receive and open all mail addressed to Borrower, and to retain all mail relating to the Collateral and forward all other mail to Borrower; (e) upon the occurrence of an Event of Default make, settle and adjust all claims under Borrower's policies of insurance (other than any director's and officer's insurance of the Borrower), endorse the name of Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and make all determinations and decisions with respect to such policies of insurance. The appointment of DIP Lender as

-13-

Borrower's attorney-in-fact and each and every one of DIP Lender's rights and powers, being coupled with an interest, is irrevocable so long as any Accounts in which DIP Lender has a continuing security interest remain unpaid and until all of the Obligations have been fully repaid and performed.

 4.5 **Right To Inspect.** DIP Lender shall have the right at any time or times hereafter during Borrower's usual business hours, or during the usual business hours of any third party having control over Borrower's Books to inspect Borrower's Books in order to verify the amount or condition of, or any other matter relating to, the Collateral or Borrower's financial condition. DIP Lender also shall have the right at any time or times hereafter during Borrower's usual business hours to inspect and examine the Inventory, the Equipment and the other Collateral and to check and test the same as to quality, quantity, value and condition.

5. REPRESENTATIONS AND WARRANTIES

 Borrower represents and warrants to DIP Lender the following and acknowledges (it being agreed that references to the "knowledge of Borrower" in this DIP Credit Agreement shall be limited to the actual (not constructive) knowledge of Steve Hansbrough, Frank Punal and Gino Chouinard):

 5.1 **Prior Encumbrances; Security Interests**. Borrower has good and marketable title to the Collateral, including without limitation the Collateral, free and clear of liens, claims, security interests or encumbrances, except for the security interests granted to DIP Lender by Borrower and those arising under the First Lien Documents in favor of the First Lien Lender and those disclosed on **Schedule 5.1** annexed hereto. Other than those expressly disclosed, Borrower will not create or permit to be created any security interest, lien, pledge, mortgage or encumbrance on any Collateral or any of its other assets other than purchase money security interests on and capital leases of hereafter acquired items of Equipment.

 5.2 **Location of Inventory and Equipment.** The Inventory and Equipment is not now and shall not at any time or times hereafter be stored with a bailee, warehouseman, processor, or similar party.

 5.3 **Inventory Records.** Borrower now keeps and hereafter at all times shall keep correct and accurate records itemizing and describing the kind, type, quality and quantity of the Inventory and Borrower's cost of said items.

 5.4 **Relocation of Chief Executive Office.** The chief executive office of Borrower is at the address indicated on the first page of this DIP Credit Agreement and Borrower will not, without thirty (30) days' prior written notice to DIP Lender, relocate such office.

 5.5 **Due Incorporation and Qualification.** Borrower is and shall at all times hereafter be a corporation duly organized and existing under the laws of the state of its incorporation as set forth on the first page hereof and is qualified and licensed to do business and is in good standing in any state in which the conduct of its business or its ownership of assets requires that it be so qualified.

5.6     **Fictitious Name.** Borrower is conducting its business under the following trade or fictitious name(s) and no others: **[none]**. Borrower has complied with the fictitious name laws of all jurisdictions in which compliance is required in connection with its use of such name(s).

5.7     **Permits and Licenses.** Borrower holds all licenses, permits, franchises, approvals and consents required for the conduct of its business and the ownership and operation of its assets.

5.8     **Due Authorization.** Borrower has the right and power and is duly authorized to enter into the Loan Documents to which it is a party.

5.9     **Compliance with Articles; Bylaws.** The execution by Borrower of the Loan Documents to which it is a party does not constitute a breach of any provision contained in Borrower's Certificate or Articles of Incorporation or its Bylaws, nor does it constitute an event of default under any material agreement to which Borrower is now or may hereafter become a party.

5.10     **Accuracy of Information and Financial Statements.** All information furnished by Borrower to DIP Lender and all statements made by Borrower to DIP Lender including, without limitation, information set forth in any loan application, is true, accurate and complete in all material respects and, to the knowledge of Borrower, does not contain any misstatement of fact or omit to state any facts necessary to make the statements or information contained therein not misleading. All financial statements relating to Borrower which have been or may hereafter be delivered to DIP Lender (i) have been prepared in accordance with GAAP; (ii) fairly present Borrower's financial condition as of the date thereof and Borrower's results of operations for the period then ended; and (iii) disclose all contingent obligations of Borrower which are required to be disclosed in accordance with GAAP; provided however the Budget was not prepared in accordance with GAAP or any reporting requirements by the Securities and Exchange Commission, the AICPA or any state societies of CPAs.

5.11     **ERISA.** Neither Borrower or any ERISA Affiliate, nor any Plan is or has been in violation of any of the provisions of ERISA, any of the qualification requirements of IRC section 401(a), or any of the published interpretations thereof. No lien upon the assets of Borrower has arisen with respect to any Plan. No *prohibited transaction* within the meaning of ERISA section 406 or IRC section 4975(c) has occurred with respect to any Plan. Neither Borrower nor any ERISA Affiliate has incurred any withdrawal liability with respect to any Multiemployer Plan. Borrower and each ERISA Affiliate have made all contributions required to be made by them to any Plan or Multiemployer Plan when due. There is no accumulated funding deficiency in any Plan, whether or not waived.

5.12     **Environmental Laws and Hazardous Materials.** (A) Subject to **subsection (B)** below: to the knowledge of Borrower, Borrower has complied, and at all times through the Term will comply, with all Environmental Laws. Borrower has not and will not cause or permit any Hazardous Materials to be located, incorporated, generated, stored, manufactured, transported to or from, released, disposed of, or used at, upon, under, or within any premises at which Borrower conducts its business, or in connection with Borrower's business. To the Borrower's knowledge,

-15-

no prior owner or operator of any premises at which Borrower conducts its business has caused or permitted any of the above to occur at, upon, under, or within any of the premises. Borrower will not permit any lien to be filed against the Collateral or any part thereof under any Environmental Law, and will promptly notify DIP Lender of any proceeding, inquiry or claim relating to any alleged violation of any Environmental Law, or any alleged loss, damage or injury resulting from any Hazardous Material. DIP Lender shall have the right to join and participate in, as a party if it so elects, any legal or administrative proceeding initiated with respect to any Hazardous Material or in connection with any Environmental Law. "Hazardous Material" includes without limitation any substance, material, emission, or waste which is or hereafter becomes regulated or classified as a hazardous substance, hazardous material, toxic substance or solid waste under any Environmental Law, asbestos, petroleum products, urea formaldehyde, polychlorinated biphenyls (PCBs), radon, and any other hazardous or toxic substance, material, emission or waste. The term "Environmental Law" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act of 1976, the Hazardous Materials Transportation Act, the Toxic Substances Control Act, the regulations pertaining to such statutes, and any other safety, health or environmental statutes, laws, regulations or ordinances of the United States or of any state, county or municipality in which Borrower conducts its business or the Collateral is located.

(B)     To the knowledge of Borrower, all present business operations of Borrower's businesses including those involving Hazardous Materials are in material compliance with all applicable Environmental Laws.

5.13    **Tax Compliance.** Borrower has filed all tax returns required to be filed by it and has paid all taxes due and payable on said returns and on any assessment made against it or its assets, except for returns which have not been filed but are the subject of appropriate extensions.

5.14    **Use of Proceeds.** All proceeds provided by DIP Lender to Borrower pursuant to any Interim DIP Order or Final DIP Order, this DIP Credit Agreement or otherwise, shall be used by Borrower to make payments in accordance with the Budget prior to the closing of the Section 363 sale, including, without limitation, to fund prior to the Auction, both the Wind Down Amount and the Reserve. Borrower shall pay for administrative expenses from the proceeds of Advances which are (i) directly attributable to the operation of the business of Borrower or (ii) as otherwise authorized by the Bankruptcy Court in any proceeding to which DIP Lender received notice and a reasonable opportunity to object, but in no event may the proceeds of any Advance be used for in excess of the amount permitted under the Budget as approved by the then applicable Interim DIP Order or Final DIP Order.

5.15    **DIP Order.** Any applicable Interim DIP Order or Final DIP Order has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by DIP Lender) and is not subject to any pending appeal or stay.

5.16    **Super-Priority Administrative Expenses.** Upon the entry of an Interim DIP Order of a Final DIP Order, as appropriate, the Obligations: (a) shall at all times constitute a Super-Priority Administrative Expense having priority, pursuant to sections 364(c)(1) of the Bankruptcy Code, over any other claims of any entity, including, without limitation, any claims

-16-

under sections 503, 507, 1113, and 1114 of the Bankruptcy Code, and (b) pursuant to sections 364(c)(2) and (3) and 364(d) of the Bankruptcy Code, shall at all times be secured by a second priority perfected lien in all of the assets (expressly excluding any proceeds of Avoidance Actions until the issuance of the Final DIP Order), whether now owned or hereafter acquired of Borrower and their estates, pursuant to the terms of the Loan Documents, subject to the first priority liens and security interests of the First Lien Lender in the PrePetition Collateral.

5.17 **Reliance by DIP Lender; Cumulative.** Each warranty, representation and agreement contained in this DIP Credit Agreement shall be automatically deemed repeated by Borrower with each request for an Advance and shall be conclusively presumed to have been relied on by DIP Lender regardless of any investigation made or information possessed by DIP Lender; provided however that the information in any schedule with respect to such representation or warranty shall be limited to the time period in which such schedule was delivered to the DIP Lender. The warranties, representations and agreements set forth herein shall be cumulative and in addition to any and all other warranties, representations and agreements which Borrower shall now or hereafter give, or cause to be given, to DIP Lender.

5.18 **Credit Bidding.** Subject to the terms and provisions of the APA, DIP Lender shall have the right to credit bid all of the Obligations in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization or otherwise.

6. AFFIRMATIVE COVENANTS

Borrower covenants and acknowledges that during the Term Borrower shall comply with all of the following:

6.1 **Budget Variance and Other Reports.** On the fifth (5th) Business Day of the week, the Borrower shall issue a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Borrower for the prior week and setting forth all the variances in excess of ten percent, on a line-item basis, from the amount set forth for such week as compared to the Budget on a weekly and cumulative basis; each such Variance Report shall include explanations for all material variances in excess of ten percent per line item and shall be certified by the Chief Financial Officer. Borrower shall deliver to DIP Lender, as DIP Lender may from time to time require, collection reports, sales journals, invoices, original delivery receipts, customers' purchase orders, shipping instructions, bills of lading and other documentation respecting shipment arrangements. Absent such a request by DIP Lender, copies of all such documentation shall be held by Borrower as custodian for DIP Lender. In addition, Borrower shall provide to DIP Lender within three (3) business days of Borrower's filing with the Bankruptcy Court all Monthly Operating Reports required by the Office of the United Sates Trustee and all schedules and statements required by section 521 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007.

6.2 **Financial Statements, Reports, Certificates.** Borrower shall deliver to DIP Lender: (a) as soon as available, but in any event within forty-five (45) days after the end of each month during the Term, a balance sheet and profit and loss statement prepared by Borrower covering Borrower's operations during such period; and (b) as soon as available, but in any event within one hundred fifty (150) days after the end of each of Borrower's fiscal years, financial statements of Borrower for each such fiscal period, reviewed by independent certified public

-17-

accountants acceptable to DIP Lender. Such financial statements shall include a balance sheet and profit and loss statement, and the accountants' management letter, if any, and shall be prepared in accordance with GAAP. Together with the above, Borrower shall also deliver Borrower's Form 10-Qs, 10-Ks or 8-Ks, if any, as soon as the same become available, and any other report reasonably requested by DIP Lender relating to the Collateral and the financial condition of Borrower and a certificate signed by its chief financial officer to the effect that all reports, statements or computer prepared information of any kind or nature delivered or caused to be delivered to DIP Lender under this **Section 6.2** fairly present its financial condition and that there exists on the date of delivery of such certificate to DIP Lender no condition or event which constitutes an Event of Default.

6.3 **Tax Returns, Receipts.** Borrower shall deliver to DIP Lender copies of each of its future federal income tax returns, and any amendments thereto, within thirty (30) days of the filing thereof. Borrower further shall promptly deliver to DIP Lender, upon request, satisfactory evidence of Borrower's payment of all withholding and other taxes required to be paid by it.

6.4 **Title to Equipment.** Upon DIP Lender's request, Borrower shall deliver to DIP Lender, properly endorsed, any and all evidences of ownership of, certificates of title, or applications for title to any items of Equipment.

6.5 **Maintenance of Equipment**. Borrower shall keep and maintain the Equipment in good operating condition and repair (ordinary wear and tear excepted), and shall make all necessary replacements thereto so that its value and operating efficiency shall at all times be maintained and preserved. Borrower shall not permit any item of Equipment to become a fixture to real estate or an accession to other property, and the Equipment is now and shall at all times remain leased by Borrower or be Borrower's personal property.

6.6 **Taxes**. To the extent Borrower has sufficient funds to pay such amounts when they become due, all Federal, state and local assessments and taxes, whether real, personal or otherwise, due or payable by, or imposed, levied or assessed against Borrower or any of its assets or in connection with Borrower's business shall hereafter be paid in full, before they become delinquent or before the expiration of any extension period except for those taxes, assessments and the like being contested by Borrower in good faith and by appropriate proceedings and as to which Borrower has established appropriate reserves, provided that no lien is placed on any assets of Borrower during any such contest as a consequence of the failure to pay such tax, assessment or the like. To the extent Borrower has sufficient funds to pay such amounts when they become due, Borrower shall make due and timely payment or deposit of all federal, state and local taxes, assessments or contributions required of it by law, and will execute and deliver to DIP Lender, on demand, appropriate certificates attesting to the payment or deposit thereof.

6.7 **Insurance.** Borrower, at its expense, shall keep and maintain the Collateral insured against all risk of loss or damage from fire, theft, vandalism, malicious mischief, explosion, sprinklers, and all other hazards and risks of physical damage included within the meaning of the term "extended coverage" in such amounts as are ordinarily insured against by similar businesses. Borrower shall also keep and maintain comprehensive general public liability insurance and property damage insurance, and insurance against loss from business interruption, insuring against all risks relating to or arising from Borrower's ownership and use of the

-18-

Collateral and its other assets and the operation of its business. All such policies shall be in such form, with such companies and in such amounts as are currently maintained by Borrower. Borrower shall deliver to DIP Lender certificates of insurance for such policies and evidence of the payments of all premiums therefor. All such policies (except those of public liability and liability property damage) shall contain a DIP Lender's Loss Payable endorsement in a form satisfactory to DIP Lender, naming DIP Lender as sole loss payee thereof, and containing a waiver of warranties. Subject to the rights of the First Lien Lender in such insurance with respect to any PrePetition Collateral, all proceeds payable under such policies shall be payable to DIP Lender. In the event of partial or total destruction of the collateral by fire or other casualty, then, subject to the rights of the First Lien Lender with respect to any PrePetition Collateral, the insurance proceeds shall, if an Event of Default exists, at the option of DIP Lender, be paid to DIP Lender to reduce the Obligations, or, alternatively, be held in a trust fund with DIP Lender to be disbursed solely for repairs and reconstruction of such collateral or if no Event of Default exists such insurance proceeds shall at the option of Borrower, be applied to reduce the balance owing on the Obligations or be held in a trust fund with DIP Lender to be disbursed solely for repairs and reconstruction of the collateral. Any such trust fund shall be additional security for the Obligations. Borrower shall notify DIP Lender of its exercise of its option as to the use of such insurance proceeds within thirty (30) days of the subject casualty occurrence.

6.8  **DIP Lender Expenses.** Borrower shall immediately and without demand reimburse DIP Lender for all DIP Lender Expenses and Borrower hereby authorizes the payment of such DIP Lender Expenses without the need for further approval of the Bankruptcy Court or any other court having jurisdiction over the Chapter 11 Case and/or the Borrower.

6.9  **Compliance With Law.** Borrower shall comply, in all material respects, with the requirements of all applicable laws, rules, regulations and orders of governmental authorities relating to Borrower and the conduct of its business.

6.10  **Accounting System.** Borrower at all times hereafter shall maintain a standard and modern system of accounting in accordance with GAAP with ledger and account cards or computer tapes, disks, printouts and records pertaining to the Collateral containing such information as may from time to time be requested by DIP Lender.

6.11  **Compliance with Bankruptcy Court**. Borrower shall comply in full with the notice and other requirements of the Bankruptcy Code and all other applicable rules with respect to any relevant DIP Order in a manner acceptable to DIP Lender and its counsel.

7.  NEGATIVE COVENANTS

Borrower covenants and acknowledges that during the Term Borrower shall not undertake any of the following without the prior written consent of DIP Lender:

7.1  **Extraordinary Transactions and Disposal of Assets.** Except as expressly authorized by the Bankruptcy Court under section 363 of the Bankruptcy Code, enter into any transaction not in the ordinary and usual course of its business as conducted on the date hereof, including but not limited to the sale, lease, disposal, movement, relocation or transfer, whether by sale or otherwise, of any its assets other than sales of Inventory in the ordinary and usual course of its business as presently conducted; incur any indebtedness for borrowed money or other

-19-

indebtedness outside the ordinary and usual course of its business as conducted on the date hereof except for renewals or extensions of existing debts permitted by DIP Lender; make any advance or loan to any third party; or grant a lien on any of its assets except (a) in favor of DIP Lender or (b) the continuing security interests, if any, set forth on **Schedule 5.1**.

      7.2    **Change Name.** Change its name, business structure or identity or add any new fictitious name.

      7.3    **Merge, Acquire**. Merge, acquire, or consolidate with or into any other business organization.

      7.4    **Guaranty.** Guaranty or otherwise become in any way liable with respect to the obligations of any third party, except by endorsement of instruments or items of payment for deposit to the account of Borrower for negotiation and delivery to DIP Lender.

      7.5    **Restructure.** Make any change in its financial structure or business operations.

      7.6    **Prepayments.** Prepay any existing indebtedness owing to any third party other than trade payables and provided no Event of Default exists, upon notice to DIP Lender, prepayments of permitted equipment financing indebtedness.

      7.7    **Change of Ownership.** Cause, permit or suffer any change, direct or indirect, in the ownership of the capital stock of Borrower or enter into any agreement with any person or entity that provides for a payment to such person or entity based upon the income of Borrower.

      7.8    **Loans and Advances.** Make any loans, advances or extensions of credit to any officer, director, executive employee or shareholder of Borrower (or any relative of any of the foregoing), or to any entity which is a subsidiary of, related to, affiliated with or has common shareholders, officers or directors with Borrower.

      7.9    **Consignments of Inventory**. Consign any Inventory except to persons or entities as to which Borrower has furnished to DIP Lender prior written notice and provided Borrower has filed such UCC-1 financing statements or taken such other action as required by applicable law to perfect Borrower's interest in such consigned Inventory.

      7.10    **Distributions**. Make any distribution or declare or pay any dividends (in cash or in stock) on, or purchase, acquire, redeem or retire any of its capital stock, of any class, whether now or hereafter outstanding except that provided no Event of Default exists so long as Borrower is a subchapter S corporation under federal or state income tax laws Borrower may pay and declare cash dividends to its stockholders up to the amount of the federal or state income tax payable by said shareholders solely as a consequence of the income of Borrower being attributed to said shareholders based upon the highest income tax rates applicable to any shareholder of Borrower.

      7.11    **Accounting Methods.** Modify or change its method of accounting or enter into, modify or terminate any agreement presently existing or at any time hereafter entered into with any third party for the preparation or storage of Borrower's records of Accounts and financial

condition without said party agreeing to provide DIP Lender with information regarding the Collateral or Borrower's financial condition.

      7.12   **Business Suspension**.  Suspend or go out of business.

      7.13   **Chapter 11 Case.**  Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to any DIP Order, unless (A) DIP Lender has failed to perform its obligations hereunder in any respect material to the business or operations of Borrower and the effect of such modification, stay, vacation or amendment is solely to remedy such failure or to obtain for Borrower substitute performance or (B) DIP Lender has consented to such modification, stay, vacation or amendment in writing, (ii) a priority claim for any administrative expense or unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense of the kind specified in section 503(b), 506(c) or 507(b) of the Bankruptcy Code) equal or superior to the priority claim of DIP Lender in respect of the Obligations, or (iii) any lien on any Collateral, having a priority equal or superior to the liens in favor of DIP Lender in respect of the Obligations (other than the existing prepetition liens and security interests, including,without limitation the liens and security interests of the First Lien Lender).

      7.14   **Prepetition Indebtedness**.  Borrower shall not pay or discharge, or cause to be paid or discharged, any obligations of Borrower incurred before the Filing Date other than those agreed to by the DIP Lender in the Budget and permitted by Final Order.

8.     EVENTS OF DEFAULT

      The occurrence of any one or more of the following events shall constitute an Event of Default by Borrower hereunder:

      8.1   **Failure to Pay.**  Borrower's failure to pay when due and payable, or when declared due and payable, any portion of the Obligations (whether prepetition or post petition, and whether principal, interest, taxes, or otherwise) and such failure continues for a period of three days after written notice from DIP Lender to Borrower;

      8.2   **Failure to Perform**.  Borrower's failure to perform, keep or observe any term, provision, condition, representation, warranty, covenant or agreement contained in this DIP Credit Agreement, in any of the Loan Documents, in any DIP Order, or in any other present or future agreement between Borrower, and/or a DIP Lender and such failure to perform, keep or observe continues for a period of twenty days after written notice by the DIP Lender to Borrower;

      8.3   **Misrepresentation.**  Any material misstatement or material misrepresentation now or hereafter exists in any warranty, representation in this DIP Credit Agreement

      8.4   **Injunction Against Borrower.**  Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business;

      8.5   **Government Lien.**  A notice of lien, levy or assessment is filed of record with respect to any of Borrower's assets by the United States Government, or any department, agency or instrumentality thereof, or by any state, county, municipal or other governmental agency, or

-21-

any taxes or debts owing at any time hereafter to any one or more of such entities becomes a lien, whether choate or otherwise, upon any of Borrower's assets and the same is not paid on the payment date thereof;

8.6     **Subordinated Debt Payments.** Borrower makes any payment on account of indebtedness which has now or hereafter been subordinated to the Obligations, except to the extent such payment is allowed under any subordination agreement entered into with DIP Lender;

8.7     **ERISA Violation.** A *prohibited transaction* within the meaning of ERISA section 406 or IRC section 1975(c) shall occur with respect to a Plan which could have a material adverse effect on the financial condition of Borrower; any lien upon the assets of Borrower in connection with any Plan shall arise; Borrower or any ERISA Affiliate shall completely or partially withdraw from a Multiemployer Plan and such withdrawal could, in the good faith opinion of DIP Lender, have a material adverse effect on the financial condition of Borrower. Borrower or any of its ERISA Affiliates shall fail to make full payment when due of all amounts which Borrower or any of its ERISA Affiliates may be required to pay to any Plan or any Multiemployer Plan as one or more contributions thereto; Borrower or any of its ERISA Affiliates creates or permits the creation of any accumulated funding deficiency, whether or not waived; the voluntary or involuntary termination of any Plan or Borrower shall fail to notify DIP Lender promptly and in any event within ten (10) days of the occurrence of an event which constitutes an Event of Default under this clause or would constitute an Event of Default upon the exercise of DIP Lender's judgment.

8.8     **Bankruptcy Court.** The Bankruptcy Court enters any order (i) amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying any DIP Order or any other order with respect to the Chapter 11 Case affecting in any material respect this DIP Credit Agreement  (ii) appointing a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code in the Chapter 11 Case, (iii) dismissing the Chapter 11 Case or converting the Chapter 11 case to a chapter 7 case or (iv) granting relief from the automatic stay to any creditor holding or asserting a lien or reclamation claim (in excess of $100,000 when aggregated with all other reclamation claims), except if the relief granted to the creditor is limited to an administrative expense or except with respect to the First Lien Lender.

8.9     **Judgments or Execution Action**. There remains undischarged for more than ten (10) days any final post-petition judgment or execution action against Borrower, or relief from the automatic stay of section 362(a) of the Bankruptcy Code shall be granted to any creditor or creditors of Borrower with respect to assets having an aggregate value in excess of $100,000 or where the deprivation of Borrower of such assets would reasonably be expected to have a material adverse effect on Borrower, considered as a whole.

8.10     **Motions.** Borrower files a motion in any of the Chapter 11 Case (i) except as provided in any DIP Order, to use cash collateral of DIP Lender under section 363(c) of the Bankruptcy Code without the DIP Lender's consent, (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section

-22-

506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to DIP Lender or its rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating DIP Lender's interest in any of the Collateral;

8.11    **Actions.**  A suit or action against DIP Lender is commenced by Borrower, any federal, state environmental protection or health and safety agency or any official committee in any Case, which suit or action asserts any claim or legal or equitable remedy contemplating subordination of any claim or lien of DIP Lender, and shall remain undismissed or unstayed for thirty (30) days after its commencement without any preliminary relief of the nature sought having been granted;

8.12    **Reorganization Plan**.  Borrower files a plan of reorganization in any Case which does not provide for payment in full of the Obligations on the effective date thereof or to which DIP Lender does not consent in writing.

9.    DIP LENDER'S RIGHTS AND REMEDIES

9.1    **Rights and Remedies.**  Upon the occurrence of an Event of Default and subject to the rights and remedies of the First Lien Lender with respect to the Borrower and the PrePetition Collateral, DIP Lender may, notwithstanding the provisions of section 362 of the Bankruptcy Code, at its election, without notice of such election and without demand, do any one or more of the following:

(a)    Declare all Obligations, whether evidenced by the Loan Documents or otherwise, immediately due and payable in full:

(b)    Cease advancing money or extending credit to or for the benefit of Borrower under the Loan Documents or under any other agreement between Borrower and DIP Lender;

(c)    Terminate this DIP Credit Agreement as to any future liability or obligation of DIP Lender, but without affecting DIP Lender's rights and security interest in the Collateral and without affecting the Obligations;

(d)    Settle or adjust disputes and claims directly with Account debtors for amounts and upon terms which DIP Lender considers advisable and, in such cases, DIP Lender will credit the Obligations with the net amounts received by DIP Lender in payment of such disputed Accounts, after deducting all DIP Lender Expenses;

(e)    Cause Borrower to hold all returned Inventory in trust for DIP Lender, segregate all returned Inventory from all other property of Borrower or in Borrower's possession and conspicuously label said returned Inventory as the property of DIP Lender;

(f)    Without notice to or demand upon Borrower, make such payments and do such acts as DIP Lender considers necessary or reasonable to protect its security interest in the Collateral.  Borrower shall assemble the Collateral if DIP Lender so requires and deliver or make the Collateral available to DIP Lender at a place designated by DIP Lender.  Borrower authorizes DIP Lender to enter any premises where the Collateral is located, to take and maintain possession

of the Collateral, or any part of it, and to pay, purchase, contest or compromise any encumbrance, charge or lien which in DIP Lender's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith;

(g)     Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, lease, license or other disposition, advertise for sale, lease, license or other disposition, and sell, lease, license or otherwise dispose (in the manner provided for herein or in the Code) the Collateral. DIP Lender is hereby granted a license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any asset of a similar nature, pertaining to the Collateral, in completing the production of, advertising for sale, lease, license or other disposition, and sale, lease license or other disposition of the Collateral. Borrower's rights under all licenses and all franchise agreements shall inure to DIP Lender's benefit;

(h)     Sell, lease, license or otherwise dispose of the Collateral at either a public or private proceeding, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as is commercially reasonable. It is not necessary that the Collateral be present at any such sale;

(i)     DIP Lender shall give notice of the disposition of the Collateral as follows:

(1)     To Borrower and each holder of a security interest in the Collateral who has filed with DIP Lender a written request for notice, a notice in writing of the time and place of public sale or other disposition or, if the sale or other disposition is a private sale or some other disposition other than a public sale is to be made, then the time on or after which the private sale or other disposition is to be made;

(2)     The notice hereunder shall be personally delivered or mailed, postage prepaid, to Borrower as provided in **Section 12** hereof, at least ten (10) calendar days before the date fixed for the sale or other disposition, or at least five (5) calendar days before the date on or after which the private sale or other disposition is to be made, unless the Collateral is perishable or threatens to decline speedily in value. Notice to persons other than Borrower claiming an interest in the Collateral shall be sent to such addresses as they have furnished to DIP Lender;

(j)     DIP Lender may credit bid and purchase at any public sale:

(k)     Any deficiency that exists after disposition of the Collateral as provided herein shall be immediately paid by Borrower. Any excess will be remitted without interest by DIP Lender to the party or parties legally entitled to such excess;

(l)     In addition to the foregoing, DIP Lender shall have all rights and remedies provided by law (including those set forth in the Code) and any rights and remedies contained in any Loan Documents and all such rights and remedies shall be cumulative; and

(m)     In addition to the foregoing, DIP Lender shall, as provided for in the Interim DIP Order and the Final DIP Order, at any time at the request of Borrower (whether or not an Event of Default exists or has occurred) fund, prior to the Auction: (i) into an escrow

-24-

account with Borrower's counsel for the sole and exclusive benefit of the Professional Persons and the U.S. Trustee in an amount equal to the Reserve, and (ii) to the Borrower, the Wind Down Amount; and such funds advanced by the DIP Lender shall be entitled to all of the benefits and security of such Orders.

9.2　**No Waiver.**　No delay on the part of DIP Lender in exercising any right, power or privilege under any Loan Document shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege under such Loan Documents or otherwise, preclude other or further exercise of any such right, power or privilege.

10.　TAXES AND EXPENSES REGARDING THE COLLATERAL

If Borrower fails to pay any monies (whether taxes, assessments, insurance premiums or otherwise) due to third persons or entities, or fails to make any deposits or furnish any required proof of payment or deposit, or fails to perform any of Borrower's other covenants under any of the Loan Documents, then in its discretion and upon prior notice to Borrower, DIP Lender may do any or all of the following: (a) make any payment which Borrower has failed to pay or any part thereof; (b) set up such reserves in Borrower's loan account as DIP Lender deems necessary to protect DIP Lender from the exposure created by such failure; (c) obtain and maintain insurance policies of the type described in **Section 6.10** hereof and take any action with respect to such policies as DIP Lender deems prudent; or (d) take any other action deemed necessary to preserve and protect its interests and rights under the Loan Documents. Any payments made by DIP Lender shall not constitute: (a) an agreement by DIP Lender to make similar payments in the future or (b) a waiver by DIP Lender of any Event of Default. DIP Lender need not inquire as to, or contest the validity of, any such expense, tax, security interest, encumbrance or lien and the receipt of notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

11.　WAIVERS

11.1　**Demand, Protest.**　Except as provided in the Interim DIP Order and the Final DIP Order, Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, and notice of nonpayment at maturity and acknowledges that DIP Lender may compromise, settle or release, without notice to Borrower, any Collateral and/or guaranties at any time held by DIP Lender. Borrower hereby consents to any extensions of time of payment or partial payment at, before or after the Termination Date.

11.2　**No Marshaling.**　Borrower, on its own behalf and on behalf of its successors and assigns hereby expressly waives all rights, if any, to require a marshaling of assets by DIP Lender or to require that DIP Lender first resort to some portion(s) of the Collateral before foreclosing upon, selling or otherwise realizing on any other portion thereof.

11.3　**DIP Lender's Non-Liability for Inventory or Equipment or for Protection of Rights.**　So long as DIP Lender complies with its obligations, if any, under section 9-207 of the Code, DIP Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Inventory or Equipment; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency or other person whomsoever.

All risk of loss, damage or destruction of the Inventory or Equipment shall be borne by Borrower. DIP Lender shall have no obligation to protect any rights of Borrower against any person obligated on any Collateral.

12.    NOTICES

Unless otherwise provided herein, all consents, waivers, notices or demands by any party relating to the Loan Documents shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be telecopied (followed up by a mailing), personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by receipted overnight delivery service to Borrower or to DIP Lender, as the case may be, at their addresses set forth below

If to Borrower, to:

> HearUSA, Inc.
> 1250 Northpoint Parkway
> West Palm Beach, FL 33407
> Attn: Stephen Hansbrough, CEO
> Facsimile No.: (561) 478-9603

With a copy (which shall not constitute effective notice) to:

> Berger Singerman
> 200 South Biscayne Boulevard
> Miami, FL 33131
> Attn: Paul Steven Singerman, Esq.
> and Brian Gart, Esq.
> Facsimile No.: (305) 755-4340

And to:

> Bryan Cave LLP
> 1155 F Street, N.W.
> Washington, D.C. 20004
> Attn: LaDawn Naegle, Esq.
> Facsimile No.: (202) 508-6046

-26-

If to the DIP Lender, to:

> William Demant Holding A/S
> Kongebakken 9
> 2765 Smørum
> Denmark
> Attn: Legal Department

With a copy (which shall not constitute effective notice) to:

> Lowenstein Sandler PC
> 65 Livingston Avenue
> Roseland, New Jersey 07068
> Attn: Peter H. Ehrenberg, Esq.
> Telephone No.: 973-597-2350
> Facsimile No.: 973-597-2351

or to such other Persons or addresses as may be designated in writing by the party to receive such notice. Any party may change the address at it is to receive notices hereunder by notice in writing in the foregoing manner given to the other. All notices or demands sent in accordance with this **Section 12** shall be deemed received on the earlier of the date of actual receipt or five (5) calendar days after the deposit thereof in the mail or on the date telecommunicated if telecopied. The failure to provide a copy of any notice, consent, waiver, demand or other document or communication to Borrower's or DIP Lender's counsel as indicated above shall not affect its validity.

13.    DESTRUCTION OF BORROWER'S DOCUMENTS

All documents, schedules, invoices, agings or other papers delivered to DIP Lender may be destroyed or otherwise disposed of by DIP Lender four (4) months after they are delivered to or received by DIP Lender, unless Borrower requests, in writing, the return of the said documents, schedules. invoices or other papers and makes arrangements, at Borrower's expense, for their return.

14.    GENERAL PROVISIONS

14.1    **Effectiveness.** This DIP Credit Agreement shall be binding and deemed effective when executed by Borrower and executed and delivered by DIP Lender.

14.2    **Successors and Assigns.** This DIP Credit Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; **provided, however,** that Borrower may not assign this DIP Credit Agreement or any rights hereunder and any prohibited assignment shall be absolutely void. No consent to an assignment by DIP Lender shall release Borrower from its Obligations. Without notice to or the consent of Borrower, DIP Lender may assign this DIP Credit Agreement and its rights and duties hereunder and DIP Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in DIP Lender's rights and benefits hereunder. In connection therewith, DIP Lender may disclose

all documents and information which DIP Lender now or hereafter may have relating to Borrower or Borrower's business. Borrower and DIP Lender do not intend any of the benefits of the Loan Documents to inure to any third party, and no third party shall be a third party beneficiary hereof or thereof.

14.3    **Section Headings.** Headings and numbers have been set forth herein for convenience only.

14.4    **Interpretation.** Neither this DIP Credit Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against DIP Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this DIP Credit Agreement has been reviewed by each party and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto.

14.5    **Severability of Provisions.** Each provision of this DIP Credit Agreement shall be severable from every other provision of this DIP Credit Agreement for the purpose of determining the legal enforceability of such provision.

14.6    **Amendments in Writing.** Neither this DIP Credit Agreement nor the APA can be changed or terminated orally. This DIP Credit Agreement is the entire agreement between the parties with respect to the matters contained herein. This DIP Credit Agreement supersedes all prior agreements, understandings and negotiations, if any, all of which are merged into this DIP Credit Agreement.

14.7    **Counterparts.** This DIP Credit Agreement may be executed in any number of counterparts each of which, when executed and delivered, shall be deemed to be an original and all of which, when taken together, shall constitute but one and the same DIP Credit Agreement.

14.8    **Indemnification.** Borrower hereby indemnifies, protects, defends and saves harmless DIP Lender and any member, officer, director, official, agent, employee and attorney of DIP Lender, and their respective heirs, successors and assigns (collectively, the "Indemnified Parties"), from and against any and all losses, damages, expenses or liabilities of any kind or nature and from any suits, claims or demands, including reasonable counsel fees incurred in investigating or defending such claim, suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with the Loan Documents and the transactions contemplated therein or the Collateral (whether prepetition or post-petition) (unless caused by the gross negligence or willful misconduct of the Indemnified Parties) including, without limitation: (a) losses, damages, expenses or liabilities sustained by DIP Lender in connection with any environmental cleanup or other remedy required or mandated by any Environmental Law; (b) any untrue statement of a material fact contained in information submitted to DIP Lender by Borrower or the omission of any material fact necessary to be stated therein in order to make such statement not misleading or incomplete; (c) the failure of Borrower to perform any obligations required to be performed by Borrower under the Loan Documents; and (d) the ownership, construction, occupancy, operations, use and maintenance of any of Borrower's assets. The provisions of this **Section 14.8** shall survive termination of this DIP Credit Agreement and the other Loan Documents.

14.9 **Joint and Several Obligations**. If more than one person or entity is named as a Borrower hereunder, all Obligations, representations, warranties, covenants and indemnities set forth in the Loan Documents to which such person or entity is a party shall be joint and several. The foregoing is a material inducement to the agreement of DIP Lender to enter into this DIP Credit Agreement and to consummate the transactions contemplated hereby. The Borrower represents they are operated as part of one consolidated business entity and are directly dependent upon each other for an in connection with their respective business activities financial resources. Each Borrower will receive a direct economic and financial benefit from the Obligations incurred under this DIP Credit Agreement and the incurrence of such Obligations is in the best interests of Borrower.

15. CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER

THE VALIDITY OF THE LOAN DOCUMENTS, THEIR CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF FLORIDA , WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THE LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT. **BORROWER AND DIP LENDER EACH WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY** IN ANY PROCEEDING UNDER THE LOAN DOCUMENTS OR RELATING TO THE DEALINGS OF BORROWER AND DIP LENDER AND ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF *"FORUM NON CONVENIENS"* OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS **SECTION 15**.

Borrower and DIP Lender have executed this DIP Credit Agreement as of the date first above written.

**DIP LENDER:**

**WILLIAM DEMANT HOLDING A/S**

By:_____
      Name: Niels Jacobsen
      Title:  President & CEO

**BORROWER:**

**HEARUSA, INC.,**
a Delaware corporation

By:_____
      Name:
      Title:

-30-

Borrower and DIP Lender have executed this DIP Credit Agreement as of the date first above written.

DIP LENDER:

WILLIAM DEMANT HOLDING A/S

By:_____
     Name:
     Title:

BORROWER:

HEARUSA, INC.,
a Delaware corporation

By:_____
     Name: Gino Chouinard
     Title: Interim CEO, President & COO

-30-

Schedule 2.1

BUDGET

# HearUSA

## Disclaimer

Enclosed is the financial projection ("Projection") for HearUSA (the "Company") for the period beginning May 16, 2011 through August 12, 2011, inclusive. This Projection has been prepared with information provided by management of the Company ("Management"). Development Specialists, Inc. ("DSI") did not audit or review the historical information provided by management. DSI does not provide any opinion or assurance that the historical information presented is accurate.

The Projection was not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants or any other US or international governing body regarding projections or forecasts for Generally Accepted Accounting Principles ("GAAP") or local laws or regulations... There can be no assurance that the Projection will be realized and actual results may be materially different. The Projection should not be regarded as a representation of DSI or Management that the projected results will be achieved. DSI and Management assume no responsibility for the accuracy of such information.

The Projection is intended solely for the use by the Company and William Demant Holdings A/S and should not be used by any person without knowledge of the Company's business or any other user except for William Demant Holdings A/S.

The Projection reflects the Company's anticipated financial results and are forward-looking statements subject to risks and uncertainties such as the breadth of the global economic downturn, the ability to successfully rationalize inventory, retail demand and other competitive pressures. Forward-looking statements included herein are made as of the date hereof, and the Company and DSI undertake no obligation to update such statements to reflect subsequent events or circumstances. Actual results could differ materially from anticipated results.

**HealUSA**
**Debtor-In-Possession Budget**
Summary Statement of Cash Sources and Uses

Week of

| $000s | Total | 5/16/2011 | 5/23/2011 | 5/30/2011 | 6/6/2011 | 6/13/2011 | 6/20/2011 | 6/27/2011 | 7/4/2011 | 7/11/2011 | 7/18/2011 | 7/25/2011 | 8/1/2011 | 8/8/2011 | Wind Down & Reserve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOURCES OF CASH** | | | | | | | | | | | | | | | |
| Patient Revenue and A/R | 14,774.0 | 1,136.5 | 972.9 | 932.0 | 1,136.5 | 1,136.5 | 1,136.5 | 1,340.9 | 972.9 | 972.9 | 1,136.5 | 1,463.5 | 972.9 | 972.9 | 0.0 |
| Cap Payments | 1,170.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 0.0 |
| HealIX Payments | 440.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 220.0 | 0.0 | 0.0 | 0.0 | 220.0 | 0.0 | 0.0 | 0.0 |
| Credit Card Fees | (57.5) | (4.4) | (3.5) | (3.3) | (4.4) | (4.4) | (4.4) | (5.5) | (3.5) | (3.5) | (4.4) | (6.2) | (3.5) | (3.5) | 0.0 |
| **Total Cash Inflows** | 16,326.5 | 1,222.0 | 1,059.4 | 1,018.7 | 1,222.0 | 1,222.0 | 1,222.0 | 1,645.3 | 1,059.4 | 1,059.4 | 1,222.0 | 1,767.3 | 1,059.4 | 1,059.4 | 0.0 |
| **USES OF CASH** | | | | | | | | | | | | | | | |
| **Cost of Sales** | | | | | | | | | | | | | | | |
| Cost of Sales | 5,403.0 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 0.0 |
| Broker Commissions | 693.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net Cost of Sales | 6,096.0 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 0.0 |
| **Gross Profit (Cash Basis)** | 10,230.5 | 1,180.1 | 1,059.4 | 976.3 | 1,180.1 | 1,180.1 | 1,180.1 | 1,603.4 | 1,017.5 | 1,017.5 | 1,180.1 | 1,676.1 | 1,017.5 | 1,017.5 | 0.0 |
| **Operating Expenses** | | | | | | | | | | | | | | | |
| Salaries and Benefits | 7,311.5 | 1,056.1 | 8.1 | 854.7 | 251.6 | 856.1 | 8.1 | 854.7 | 251.6 | 856.1 | 8.1 | 854.7 | 251.6 | 1,059.8 | 340.2 |
| Advertising and Marketing | 1,222.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 94.0 | 0.0 |
| Occupancy | 2,594.7 | 382.2 | 36.2 | 35.2 | 559.2 | 36.2 | 35.2 | 35.2 | 559.2 | 36.2 | 35.2 | 35.2 | 559.2 | 36.2 | 28.2 |
| Supplies and Postage | 176.0 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 | 13.5 |
| Insurance | 468.0 | 0.0 | 23.0 | 0.0 | 39.0 | 0.0 | 23.0 | 0.0 | 39.0 | 0.0 | 23.0 | 0.0 | 39.0 | 0.0 | 300.0 |
| Travel & Entertainment | 99.0 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 7.6 | 0.0 |
| Prof. Fees (Lgl/Tax/Other) | 1,297.5 | 63.1 | 63.1 | 123.1 | 73.1 | 123.1 | 7.6 | 63.1 | 63.1 | 63.1 | 7.6 | 83.1 | 7.6 | 73.1 | 232.5 |
| Bank/Credit Card Expense | 320.0 | 0.0 | 0.0 | 0.0 | 40.0 | 40.0 | 0.0 | 0.0 | 40.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Bad Debt Expense | 36.0 | 0.0 | 0.0 | 0.0 | 12.0 | 12.0 | 0.0 | 0.0 | 12.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Miscellaneous Expenses | 321.4 | 17.9 | 20.9 | 20.9 | 17.9 | 17.9 | 17.9 | 17.9 | 17.9 | 17.9 | 17.9 | 20.9 | 17.9 | 17.9 | 80.0 |
| Ttl Center/Region Exp. | 13,684.1 | 1,288.4 | 624.4 | 624.4 | 1,149.0 | 1,107.9 | 1,148.4 | 346.8 | 1,089.0 | 1,097.9 | 1,088.4 | 356.8 | 1,105.0 | 917.9 | 1,594.1 |
| **Other Expenses** | | | | | | | | | | | | | | | |
| AARP Expenses | 450.0 | 0.0 | 150.0 | 150.0 | 0.0 | 0.0 | 150.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 | 0.0 | 0.0 | 0.0 |
| Network Payments | 2,577.7 | 425.0 | 227.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 175.0 | 0.0 |
| Royalty Payments | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 50.0 | 150.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Interest (DIP) | 91.4 | 0.0 | 0.0 | 0.0 | 18.6 | 0.0 | 0.0 | 0.0 | 30.1 | 0.0 | 0.0 | 0.0 | 42.6 | 0.0 | 0.0 |
| Total Other Expenses | 3,318.4 | 425.0 | 377.0 | 325.0 | 193.6 | 225.0 | 475.0 | 175.0 | 205.1 | 175.0 | 175.0 | 325.0 | 217.6 | 175.0 | 0.0 |
| **Total Operating Expenses** | 16,982.4 | 1,713.4 | 1,001.4 | 1,132.2 | 1,324.0 | 1,301.6 | 1,148.4 | 1,264.0 | 1,303.1 | 1,283.4 | 681.8 | 1,284.0 | 1,335.6 | 1,769.1 | 745.7 |
| **Net Operating Cash Flow** | (6,751.9) | (533.3) | (533.3) | (567.7) | (121.5) | (193.3) | 568.4 | (1,290.5) | (508.2) | (237.6) | 498.4 | (1,194.8) | (340.7) | (743.2) | (745.7) |
| **Bankruptcy Expenses** | | | | | | | | | | | | | | | |
| Utility Deposits | 94.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Claims/Noticing Agent | 201.0 | 17.0 | 7.0 | 38.0 | 7.0 | 7.5 | 7.5 | 0.0 | 0.0 | 9.5 | 9.5 | 9.5 | 9.5 | 10.5 | 50.0 |
| Critical Vendors | 336.2 | 0.0 | 336.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Bankruptcy Professionals | 1,772.5 | 0.0 | 130.0 | 125.0 | 140.0 | 125.0 | 86.7 | 86.7 | 126.7 | 83.0 | 86.0 | 97.5 | 87.0 | 117.0 | 460.0 |
| Investment Banker Fees [1] | 1,750.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 80.0 | 1,500.0 |
| Other Wind Down Exp. | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 200.0 |
| DIP Closing Fee | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| US Trustee Fees | 63.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 13.0 | 0.0 | 0.0 | 0.0 | 0.0 | 50.0 |
| **Total Bankruptcy Exp.** | 4,707.4 | 17.0 | 473.2 | 163.0 | 331.7 | 132.5 | 94.2 | 96.2 | 273.2 | 105.5 | 140.0 | 107.0 | 106.5 | 207.5 | 2,260.0 |
| **Net Cash Flow** | (11,459.3) | (750.3) | (1,006.4) | (730.7) | (453.1) | (325.8) | 264.2 | (1,386.7) | (781.4) | (343.1) | 358.4 | (1,301.8) | (447.2) | (950.7) | (3,005.7) |
| +Cash Generated from Ops | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| +Loan Needed | 11,459.3 | 750.3 | 1,006.4 | 730.7 | 453.1 | 325.8 | 0.0 | 1,386.7 | 781.4 | 343.1 | 0.0 | 1,301.8 | 447.2 | 950.7 | 3,005.7 |
| Beginning Cash Balance | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Ending Cash Balance | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

[1] HUSA reserves the right to change the amount owed for the transaction fee owed to the investment banker dependent on final purchase price in accordance with the terms of this investment banker engagement letter.

Schedule 2.2

DEPOSIT ACCOUNT OF BORROWER FOR ADVANCES

Schedule 5.1

## EXISTING LIENS WHICH ARE TO CONTINUE

1.    Each of the liens and security interests listed on the UCC financing statements attached hereto.

Date: Apr. 26,2011

## UCC Search Report (CT Database)
### CT Corporation

The following represents a list of the information you requested upon a search of UCC records conducted using the content and search logic available on the website of the relevant state authority, and/or records maintained in the relevant states and licensed from that state or from an independent third party and made available through our offices. Variations of the Name and Address of the search key may appear on this report as a result of the search findings and your individual request for that information. CT Corporation cannot independently verify the accuracy or timeliness of the public information maintained by the responsible government agency or the other sources of this data. CT, therefore, makes no guarantees, representations, or warranties as to the accuracy or completeness of the information contained in this report. For the fees charged, the user understands that CT Corporation cannot and does not accept any liability to the user or third party for errors or omissions CT Corporation's terms and conditions also apply to this report.

The report reflects records effective at the time of the last update of the relevant information source.

Search results performed on the below Search Key:

Information source:  UCC Database for the State of Delaware

Name = HearUSA

| Debtor(s) | Debtor Address | Service | Jurisdiction | Currency Date | Findings | Secured Party of Record | Secured Party Address | File Type | Fleet, Cases, Book/Page | File Date | Original Filer |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CISCO SYSTEMS CAPITAL CORPORATION | | Original | 31453698 | 06/09/2003 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CISCO SYSTEMS CAPITAL CORPORATION | | Original | 60565465 | 02/15/2006 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | SIEMENS HEARING INSTRUMENTS, INC. | 10 CONSTITUTION AVENUE PISCATAWAY NJ 08855 | Original | 22269770 | 09/03/2002 | - |
| HEAR USA INC | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | US BANCORP | 1450 CHANNEL PARKWAY MARSHALL MN 56258 | Original | 30247651 | | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | DVI STRATEGIC PARTNER GROUP, A DIVISION OF DVI FINANCIAL SERVICES INC. | 1751 LAKE COOK ROAD SUITE 650 DEERFIELD IL 60015 | Original | 32247651 | 01/10/2003 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CISCO SYSTEMS CAPITAL CORPORATION | 170 WEST TASMAN DRIVE, MAILSTOP SJ 13-3 SAN JOSE CA 951341706 | Original | 32239437 | 05/28/2003 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CISCO SYSTEMS CAPITAL CORPORATION | 170 WEST TASMAN DRIVE, MAILSTOP SJ 13-3 SAN JOSE CA 951341706 | Original | 2008272369 | 08/08/2008 | - |
| HEARUSA, INC | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | WESTCHESTER PREMIUM ACCEPTANCE CORP | PO BOX 17600 DENVER CO 80217 | Original | 41364795 | 05/17/2004 | - |
| HEARUSA, INC | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | WESTCHESTER PREMIUM ACCEPTANCE CORP | PO BOX 17600 DENVER CO 80217 | Original | 50558998 | 02/17/2005 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CALIFORNIA FIRST LEASING CORPORATION | 18201 VON KARMAN AVENUE, SITE 800 IRVINE CA 92612 | Original | 52549195 | 08/16/2005 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CALIFORNIA FIRST LEASING CORPORATION | 18201 VON KARMAN AVENUE, SITE 800 IRVINE CA 92612 | Original | 53125524 | 10/10/2005 | - |
| HEARUSA, INC | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | SIEMENS HEARING INSTRUMENTS, INC. | 10 CONSTITUTION AVENUE PISCATAWAY NJ 08855 | Original | 60545533 | 02/14/2006 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | SIEMENS HEARING INSTRUMENTS, INC. | 10 CONSTITUTION AVENUE PISCATAWAY NJ 08855 | Original | 60565848 | 02/15/2006 | - |
| HEARUSA, INC. | 1250 NORTH PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CALIFORNIA FIRST LEASING CORPORATION | 18201 VON KARMAN AVENUE, SUITE 800 IRVINE CA 92612 | Original | 62719821 | 08/07/2006 | - |
| HEARUSA, INC. | 1250 NORTH PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name=Lens by Address | DE-Secretary of State | Feb. 01,2011 | | CALIFORNIA FIRST LEASING AVENUE, SUITE 800 IRVINE CA 92612 | 18201 VON KARMAN | Original | 2007034040 | 01/04/2007 | - |

| Debtor(s) | Debtor Address | Service | Jurisdiction | Currency Date | Findings | Secured Party of Record | Secured Party Address | File Type | File#, Cause#, Book/Page | File Date | Original File# |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 63165503 | 08/25/2006 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | GENERAL ELECTRIC CAPITAL CORPORATION | 10 RIVERVIEW DRIVE DANBURY CT 06810 | Original | 63860061 | 10/18/2006 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 64156659 | 11/13/2006 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PKWY WEST PALM BCH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | REPUBLIC BANK OF CHICAGO | 2221 CAMDEN COURT FLOOR 1 OAK BROOK IL | Original | 20071870343 | 05/17/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | CALIFORNIA FIRST LEASING CORPORATION | 18201 VON KARMAN AVENUE, SUITE 800 IRVINE CA 92612 | Original | 20071332553 | 03/27/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | CALIFORNIA FIRST LEASING CORPORATION | 18201 VON KARMAN AVE SUITE 800 IRVINE CA 92612 | Original | 20071474369 | 04/19/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 20072195466 | 03/31/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | REPUBLIC BANK OF CHICAGO | 2221 CAMDEN COURT FLOOR 1 OAK BROOK IL 60523 | Original | 20073852943 | 09/07/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | KINGSBRIDGE HOLDINGS, LLC / REPUBLIC BANK OF CHICAGO | 2221 CAMDEN COURT FLOOR 1 OAK BROOK IL / 150 NORTH FIELD DRIVE, SUITE 193 LAKE FOREST IL 60045 | Original | 2007863440 | 09/10/2007 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | REPUBLIC BANK OF CHICAGO | 2221 CAMDEN COURT FLOOR 1 OAK BROOK IL | Original | 20081360912 | 04/21/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | HEWLETT-PACKARD FINANCIAL SERVICE COMPANY | 420 MOUNTAIN AVE NEW PROVIDENCE NJ 07974 | Original | 20080408452 | 02/01/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | TOSHIBA FINANCIAL SERVICES | 1961 HIRST DR MOBERLY MO 65270 | Original | 20081360912 | 04/21/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | MB FINANCIAL BANK, N.A. | 6111 NORTH RIVER ROAD ROSEMONT IL 60018 | Original | 20082832244 | 09/24/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 20083323563 | 09/27/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 20084101/224 | 12/10/2008 | - |
| HEARUSA, INC. | 1250 NORTHPOINT PKWY WEST PALM BCH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | MB FINANCIAL BANK, N.A. | 6111 NORTH RIVER ROAD ROSEMONT IL 60018 | | 20088521548 | 11/03/2009 | - |

| Debtor(s) | Debtor Address | Service | Jurisdiction | Currency Date | Findings | Secured Party of Record | Secured Party Address | File Type | Filed, Case#, Book/Page | File Date | Original File# |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | 2186935 ONTARIO INC. | | Original | 2009T390258 | 04/27/2009 | -- |
| HEARUSA, INC. | 1250 NORTHPOINT PKWY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 2009262413-9 | 09/12/2009 | -- |
| HEARUSA, INC. | 1250 NORTHPOINT PKWY WEST PALM BCH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | KINGSBRIDGE HOLDINGS, LLC | 150 N. FIELD DR. SUITE 193 LAKE FOREST IL 60045 | Original | 2009582157-9 | 11/03/2009 | -- |
| | | | | | | MB FINANCIAL BANK, N.A. | 6111 NORTH RIVER ROAD ROSEMONT IL 60018 | | | | |
| HEARUSA, INC. | 1250 NORTHPOINT PKWY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | DELL FINANCIAL SERVICES L.L.C. | ONE DELL WAY ROUND ROCK TX 78682 | Original | 2012913501 | 08/19/2010 | -- |
| HEARUSA, INC. | 1250 NORTHPOINT PARKWAY WEST PALM BEACH FL 33407 | CT Database Search - Debtor Name-Liens by Address | DE-Secretary of State | Feb. 01, 2011 | | STEELCASE FINANCIAL SERVICES INC. | 901 44TH STREET S.E. GRAND RAPIDS MI 49508 | Original | 2012938440 | 08/26/2010 | -- |

[End of Report]

# ELECTRONIC JUDGMENT LIEN CERTIFICATE

FOR PURPOSES OF FILING A JUDGMENT LIEN, THE FOLLOWING INFORMATION IS SUBMITTED IN ACCORDANCE WITH s. 55.203, F.S.,

'UDGMENT DEBTOR (DEFENDANT) NAME(S) AS SHOWN ON JUDGMENT LIEN:

HEARUSA, INC
1250 NORTH POINT PARKWAY
WEST PALM BEACH, FL. 33407
FEI#: 22-2748248      DOS DOCUMENT#: P14251

HEARX LTD., INC.
1250 NORTH POINT PARKWAY
WEST PALM BEACH, FL. 33407
FEI#: N/-A      DOS DOCUMENT#: N/A

**J07000176050**
**FILED**

**Jun 07, 2007 08:00 A.M.**
**Secretary of State**
KBEYER

JUDGMENT CREDITOR (PLAINTIFF) NAME AS SHOWN ON JUDGMENT LIEN OR CURRENT OWNER
OF JUDGMENT IF ASSIGNED:

DHL EXPRESS (USA) INC.
515 W GREENS ROAD
HOUSTON, TX
DOS DOCUMENT#: N/A

NAME AND ADDRESS TO WHOM ACKNOWLEDGMENT/CERTIFICATION IS TO BE MAILED:

STEVEN B SPRECHMAN ESQ
ROBERTA.BENDELL@SPRECHMANLAW.COM

AMOUNT DUE ON MONEY JUDGMENT: 62,168.74
APPLICABLE INTEREST RATE: 11.00%
NAME OF COURT: PALM BEACH COUNTY CIRCUIT COUR
CASE NUMBER: CA-5912-MBAF
DATE OF ENTRY: 05/24/07
WAS A WRIT OF EXECUTION DOCKETED ON THIS JUDGMENT LIEN WITH ANY SHERIFF PRIOR TO OCTOBER 1, 2001?
( ) YES  (IF YES, A "CREDITOR AFFIDAVIT CERTIFICATION" FORM MUST BE ATTACHED TO THIS CERTIFICATE.)
(X) NO

UNDER PENALTY OF PERJURY, I hereby certify that: (1) The judgment above described has become final and there is no stay of the judgment or its enforcement in effect; (2) All of the information set forth above is true, correct, current and complete; (3) I have not previously filed a Judgment Lien Certificate regarding the above judgment with the Department of State; and, (4) I have complied with all applicable laws in submitting this Electronic Judgment Lien Certificate for filing.

Electronic Signature of Creditor or Authorized Representative: STEVEN B SPRECHMAN

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

Diligenz, Inc.    1-800-858-5294

B. SEND ACKNOWLEDGEMENT TO:

| | |
|---|---|
| Name | 22399981 |
| Address | Prepared by: |
| Address | Diligenz, Inc. |
| | 6500 Harbour Heights Pkwy, Suite 400 |
| City/State/Zip | Mukilteo, WA 98275 |

FLORIDA SECURED TRANSACTION REGISTRY

# FILED

2006 Oct 25 AM 12:00

****** 200603984442 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

| 1a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
| HEARUSA, INC. |  |  |  |  |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1250 NORTHPOINT PARKWAY | WEST PALM BCH | FL | 33407 | USA |

| 1d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID# |
|---|---|---|---|---|
| | | Inc. | FL | P14251  ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

| 2a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID# |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)– INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
| General Electric Capital Corporation |  |  |  |  |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 10 Riverview Drive | Danbury | CT | 06810 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

QTY (6) HP Smart Buy Proliant DL360 and any and all additions, attachments, accessories and accessions and any and all substitutions, replacements or exchanges therefor, and any all insurance and/or other proceeds thereof, securing Debtor's obligations under that certain Lease Agreement between General Electric Capital Corporation and HEARUSA, INC.

| 5. ALTERNATE DESIGNATION (if applicable) | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR |
|---|---|---|---|
| | AG. LIEN | NON-UCC FILING | SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**

☒ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA** 39h7 - 4451627-001

P≠w_S

STANDARD FORM - FORM UCC-1 (REV.12/2001)          Filing Office Copy          Approved by the Secretary of State, State of Florida

Lease Agreement No. 4451627001
Between
**GENERAL ELECTRIC CAPITAL CORPORATION**, as Lessor
And **HEARUSA, INC.**, as Lessee

| Qty | Description |
|---|---|
| 6 | HP Smart Buy ProLiant DL380 G4 2U Rack Xeon 3.0GHz(X1) / 2MB L2 / 2GB / Open Bay U320 HS / CD-ROM / GigNIC / RPS HP SERVERS |
| 6 | Processor, Xeon 3.0GHz, 800MHz FSB, 2MB L2 Cache, for ProLiant DL380 G4, ML370 G4 HP SERVER ACCESSORIES |
| 12 | 72.8GB 10K U320 Hot-Swap Hard Drive HP SERVER ACCESSORIES |
| 6 | HP Hot Plug AC Redundant Power Supply Module for DL380 (IEC cord) HP SERVER ACCESSORIES |
| 24 | 146GB 10K U320 Pluggable Hard Drive HP SERVER ACCESSORIES |
| 6 | 2GB PC2-3200 400MHz 240-pin Registered ECC DDR2 SDRAM DIMM Kit for Select Dell, HP and IBM Models EDGE TECH CORP |
| 1 | 1TB Snap Server 520 ADAPTEC |
| 6 | Corp. MOB Windows Server 2003 Standard Edition R2 License Only MICROSOFT LICENSING |
| 1 | Corp. MLF-EDI Windows Server 2003 Standard Edition R2 x32/n64 Media MICROSOFT LICENSING |
| 49 | HP Smart Buy dc5100 Microtower P4 630 3.0GHz w / HyperThrdng / 2MB L2 / 800MHz / 512MB / 80GB / CD-RW / GigNIC / XPP HEWLETT PACKARD COMMERCIAL PC'S |
| 49 | Config. Desktop / Notebook Hardware install and / or SW install PC CONNECTION CONFIGURATION SERVICES |
| 1 | Config. Customized Customer Image Load Setup (1X) PC CONNECTION CONFIGURATION SERVICES |

THIS IS SCHEDULE 4451627001

THIS SCHEDULE IS HEREBY VERIFIED AS CORRECT BY THE UNDERSIGNED CUSTOMER, WHO
ACKNOWLEDGES RECEIPT THEREOF.

CUSTOMER: **HEARUSA, INC.**

BY: X

TITLE: X  EVP & CFO

DATE: X  5\25\2006

EXHIBIT B

INTERIM DIP BUDGET

# HearUSA

## Disclaimer

Enclosed is the financial projection ("Projection") for HearUSA (the "Company") for the period beginning May 16, 2011 through August 12, 2011, inclusive. This Projection has been prepared with information provided by management of the Company ("Management"). Development Specialists, Inc. ("DSI") did not audit or review the historical information provided by management. DSI does not provide any opinion or assurance that the historical information presented is accurate.

The Projection was not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants or any other US or international governing body regarding projections or forecasts for Generally Accepted Accounting Principles ("GAAP") or local laws or regulations.. There can be no assurance that the Projection will be realized and actual results may be materially different. The Projection should not be regarded as a representation of DSI or Management that the projected results will be achieved. DSI and Management assume no responsibility for the accuracy of such information.

The Projection is intended solely for the use by the Company and William Demant Holdings A/S and should not be used by any person without knowledge of the Company's business or any other user except for William Demant Holdings A/S.

The Projection reflects the Company's anticipated financial results and are forward-looking statements subject to risks and uncertainties such as the breadth of the global economic downturn, the ability to successfully rationalize inventory, retail demand and other competitive pressures. Forward-looking statements included herein are made as of the date hereof, and the Company and DSI undertake no obligation to update such statements to reflect subsequent events or circumstances. Actual results could differ materially from anticipated results.

# HearUSA
## Debtor-in-Possession Budget
### Summary Statement of Cash Sources and Uses

| $000s | | Week of | | |
|---|---|---|---|---|
| | **Total** | **5/16/2011** | **5/23/2011** | **5/30/2011** |
| **SOURCES OF CASH** | | | | |
| Patient Revenue and A/R | $3,532.0 | $1,136.5 | $1,463.5 | $932.0 |
| Cap Payments | 270.0 | 90.0 | 90.0 | 90.0 |
| HeaRx Payment | 0.0 | 0.0 | 0.0 | 0.0 |
| Credit Card Fees | (13.9) | (4.4) | (6.2) | (3.3) |
| **Total Cash Inflows** | $3,788.1 | $1,222.0 | $1,547.3 | $1,018.7 |
| **USES OF CASH** | | | | |
| *Cost of Sales* | | | | |
| Cost of Sales | $1,751.4 | $41.9 | $1,678.1 | $31.4 |
| Bonuses/Commissions | 231.0 | 0.0 | 0.0 | 231.0 |
| **Net Cost of Sales** | $1,982.4 | $41.9 | $1,678.1 | $262.4 |
| **Gross Profit (Cash Basis)** | $1,805.7 | $1,180.1 | ($130.8) | $756.3 |
| *Operating Expenses* | | | | |
| Salaries and Benefits | $1,918.9 | $1,056.1 | $8.1 | $854.7 |
| Advertising and Marketing | 282.0 | 94.0 | 94.0 | 94.0 |
| Occupancy | 433.7 | 36.2 | 362.2 | 35.2 |
| Supplies and Postage | 40.6 | 13.5 | 13.5 | 13.5 |
| Insurance | 23.0 | 0.0 | 23.0 | 0.0 |
| Travel & Entertainment | 22.8 | 7.6 | 7.6 | 7.6 |
| Prof. Fees (Lgl/Tax/Other) | 284.2 | 63.1 | 98.1 | 123.1 |
| Shareholder Expense | 0.0 | 0.0 | 0.0 | 0.0 |
| Bank Fees/Late Fees | 0.0 | 0.0 | 0.0 | 0.0 |
| Miscellaneous Expenses | 56.6 | 17.9 | 17.9 | 20.9 |
| **Ttl Center/Region Exp.** | $3,061.9 | $1,288.4 | $624.4 | $1,149.0 |
| *Other Expenses* | | | | |
| AARP Expenses | $150.0 | $0.0 | $150.0 | $0.0 |
| Network Payments | 827.0 | 425.0 | 227.0 | 175.0 |
| Regulatory Matters | 0.0 | 0.0 | 0.0 | 0.0 |
| Interest (DIP) | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Other Expenses** | $977.0 | $425.0 | $377.0 | $175.0 |
| **Total Operating Expenses** | $4,038.9 | $1,713.4 | $1,001.4 | $1,324.0 |
| **Net Operating Cash Flow** | ($2,233.2) | ($533.3) | ($1,132.2) | ($567.7) |
| *Bankruptcy Expenses* | | | | |
| Utility Deposits | $0.0 | $0.0 | $0.0 | $0.0 |
| Claims/Noticing Agent | 62.0 | 17.0 | 7.0 | 38.0 |
| Critical Vendors | 336.2 | 0.0 | 336.2 | 0.0 |
| Bankruptcy Professionals | 255.0 | 0.0 | 130.0 | 125.0 |
| Investment Banker Fees[1] | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Wind Down Exp. | 0.0 | 0.0 | 0.0 | 0.0 |
| DIP Closing Fee | 200.0 | 200.0 | 0.0 | 0.0 |
| US Trustee Fees | 13.0 | 0.0 | 13.0 | 0.0 |
| **Total Bankruptcy Exp.** | $866.2 | $217.0 | $486.2 | $163.0 |
| **Net Cash Flow** | ($3,099.4) | ($750.3) | ($1,618.4) | ($730.7) |